**No. 26-7451**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

CITY OF SALEM,

*Plaintiff–Appellant,*

v.

UNITED STATES OF AMERICA, AND
UNITED STATES ARMY CORPS OF ENGINEERS,
AN AGENCY OF THE UNITED STATES GOVERNMENT,

*Defendants–Appellees*

*and*

NORTHWEST ENVIRONMENTAL DEFENSE CENTER AND
NATIVE FISH SOCIETY,

*Defendants-Intervenors-Appellees*,

---

On Appeal from the U.S. District Court, District of Oregon
The Honorable Mustafa T. Kasubhai
Case No. 6:26-cv-01381-MTK

---

**APPELLANT'S EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL**

---

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3**

**RELIEF REQUESTED BY SATURDAY, NOVEMBER 21, 2026 AT 9 AM**

---

Olivier Jamin
Kevin H. Kono,
Verónica Muriel Carrioni
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
olivierjamin@dwt.com
kevinkono@dwt.com
veronicamuriel@dwt.com
Telephone: (503) 241-2300

Daniel L. Quinley,
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111
danquinley@dwt.com
Telephone: (415) 276-6500

*Attorneys for Appellant City of Salem*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Procedural Background .......... 2

B. Salem's System Cannot Treat Turbidity Above 10 NTU .......... 4

III. LEGAL STANDARD .......... 4

IV. ARGUMENT .......... 5

A. Salem Is Likely to Succeed on Its Contention That the District Court Abused Its Discretion in Finding No Likely Irreparable Harm .......... 5

B. Salem Independently Satisfies Each Winter Factor for the Interim Period .......... 13

C. The Requested Injunction Is Prohibitory, and the Alternative Trigger Holds the Corps to Its Own Stated Flexibility .......... 17

V. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) .......... 3

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 5

*Brown v. Wash. Interscholastic Activities Ass'n*,
192 F.4th 1137 (9th Cir. 2026) (order) .......... 4, 5, 17

*Brown v. Wash. Interscholastic Activities Ass'n*,
No. 26A458 (U.S. Oct. 6, 2026) .......... 5

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .......... 14

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .......... 14

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
623 F.3d 633 (9th Cir. 2010) .......... 15

*Feldman v. Ariz. Sec'y*
of *State's Off.*, 843 F.3d 366 (9th Cir. 2016) (en banc) .......... 4, 18

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
689 F.3d 1060 (9th Cir. 2012) .......... 14

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) .......... 18

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
384 F.3d 1163 (9th Cir. 2004) .......... 15

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) (en banc) .......... 14

*United States v. Alisal Water Corp.*,
431 F.3d 643 (9th Cir. 2005) ........ 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ *passim*

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. §706 ........ 2

Clean Water Act, 33 U.S.C. § 1323(a) ........ *passim*

National Environmental Policy Act, 42 U.S.C. § 4332(C)(ii) ........ 3, 14

Thomas R. Carper Water Resources Development Act,
Pub. L. No. 118-272, § 1205(b) ........ 3, 10, 15

**Regulations**

OAR 340-041-0036 ........ 15

**Other Authorities**

*What the Santiam Silt Data Means*, Waterlab Corp. (Nov. 8, 2026), .... 15

# I. INTRODUCTION

At 9:00 a.m. on November 21, the United States Army Corps of Engineers ("Corps") will draw down Detroit Reservoir below its 1,450-foot minimum conservation pool (the "Drawdown"). The Corps concedes the Drawdown will increase turbidity in the North Santiam River, the drinking water source for approximately 220,000 people, yet it never analyzed whether the operation will comply with Oregon's water quality standards, as Section 313 of the Clean Water Act requires, nor did it take a hard look at the turbidity impacts the Drawdown would have on Salem. Salem thus sought a preliminary injunction to enjoin the Drawdown pending resolution of its claims or, alternatively, to impose a turbidity "trigger" requiring the Drawdown to stop if turbidity reached 10 Nephelometric Turbidity Unit (NTU) or more. In denying the motion, the district court agreed that Salem's harm, "should it occur, is undoubtedly irreparable," but denied a preliminary injunction because it found that Salem had not shown the Drawdown would produce "the same or similar turbidity effects seen at Green Peter" Reservoir. Opinion and Order at 16–17, ECF 86 (Nov. 4, 2026) ("Order"). The district court assumed, without deciding, that Salem could satisfy other *Winter* factors. *Id.* at 16.

This was an abuse of discretion because the district court used the wrong benchmark. Salem's slow sand filters fail when turbidity is sustained above 10 Nephelometric Turbidity Units (NTU), not at the 100-to-500-plus NTU seen at Green Peter. ECF 52, Pulley Decl. ¶ 11. Measured against the correct threshold, the record—including the Corps' own predictions—shows that sustained turbidity above 10 NTU is likely, and the Corps' Deep Drawdown Emergency Response Communications Plan ("Emergency Plan") offers no protection until after the damage is done. ECF 77-1 at 2–3. Salem is therefore likely to show that the district court abused its discretion, and it independently satisfies each *Winter* factor for an injunction pending appeal.

The Court should enjoin the Corps from drafting Detroit Reservoir below 1,450 feet pending appeal or, at minimum, require the Corps to pause the Drawdown whenever turbidity below Detroit Dam reaches 10 NTU.

## II. BACKGROUND

### A. Procedural Background

Salem brought six Administrative Procedure Act (APA) claims challenging the Corps' Final Supplemental Environmental Impact Statement ("Final SEIS") and decision to proceed with the Drawdown

under the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Water Resources Development Act of 2024 ("WRDA"). ECF 1.[1] The district court denied Salem's motion for a preliminary injunction, ECF 51, on a single ground: Salem had not shown that irreparable harm was likely. Order at 16, 20. The court found that Salem had not "connect[ed] the dots" between the Green Peter experience and the Drawdown, that there was "no site-specific analysis or data" showing turbidity would reach damaging levels for any particular period, and that the Emergency Plan was an "additional reason" to deny relief. *Id.* at 17–20. Salem appealed on November 5 and, with its co-plaintiffs, moved for an injunction pending appeal. ECF 89. Although Plaintiffs requested a decision from the district court within five days, the district court has been considering the emergency motion for over ten days. Since the Corps is planning on starting the Drawdown at 9 a.m. on November 21, *see* Exhibit A, Plaintiffs could not wait any longer to file this motion. *See A.A.R.P. v. Trump*, 605 U.S. 91 (2025).

---

[1] Salem's case was consolidated with Marion County's parallel action, Case No. 6:26-cv-00956-MTK. Salem's complaint, ECF 1, was filed in Case No. 6:26-cv-01381-MTK.

### B. Salem's System Cannot Treat Turbidity Above 10 NTU

Salem is the only regional water provider in the Mid-Willamette Valley. ECF 52-3, Pulley Decl. Ex. C at 2. Its Geren Island plant draws from the North Santiam below Detroit Dam and treats water through slow sand filtration designed for feedwater below 10 NTU. ECF 52, Pulley Decl. ¶¶ 9–11. When turbidity rises, Salem must close its intake gates and can operate for only about three days. ECF 52-3, Pulley Decl. Ex. C at 4. Its backup supplies—storage, wells, aquifer storage and recovery, and a Keizer intertie—have no redundancy, despite $8 million in resiliency upgrades. *Id.* at 3; ECF 52-2, Pulley Decl. Ex. B at 2.

## III. LEGAL STANDARD

"The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Ariz. Sec'y* of *State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). Salem must show that (1) it is likely to succeed on the merits of its appeal, (2) it is likely to suffer irreparable harm absent relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Brown v. Wash. Interscholastic Activities Ass'n*, 192 F.4th 1137, 1140–41 (9th Cir. 2026) (order) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)), *application*

*filed sub nom. K.M.K. ex rel. Brown v. Wash. Interscholastic Activities Ass'n*, No. 26A458 (U.S. Oct. 6, 2026). The last two factors merge where, as here, the government opposes relief. *Id.* at 1141. Under this Court's sliding scale, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation modified); *Winter*, 555 U.S. at 22.

## IV. ARGUMENT

### A. Salem Is Likely to Succeed on Its Contention That the District Court Abused Its Discretion in Finding No Likely Irreparable Harm

Because this appeal challenges the denial of a preliminary injunction, Salem must show that it is "likely to succeed on [its] contention that the district court erred by denying [its] motion for a preliminary injunction." *Brown*, 192 F.4th 1137 at 1141. A district court abuses its discretion if it "'bases its decision on an erroneous legal standard or on clearly erroneous factual findings.'" *Id.* (quoting *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023)). Here, the district court rested its likelihood of harm ruling on three findings: (1) Salem failed to show

the Drawdown "will produce the same or similar turbidity effects seen at Green Peter"; (2) the record contains "no site-specific analysis or data" showing damaging turbidity for any particular period; and (3) the Emergency Plan provides a mechanism to pause the Drawdown. Order at 17–20. Each is clearly erroneous.

1. The district court measured harm against the wrong benchmark. The district court faulted Salem for failing to show that the Drawdown "will produce the same or similar turbidity effects seen at Green Peter," and relied on its finding that the record "suggests turbidity is likely to occur at some level" that is "likely to be less than" Green Peter's. Order at 17. That framing treats Green Peter-level turbidity as the measure of harm. It is not. Salem is harmed when turbidity is sustained above 10 NTU—a small fraction of the 100-to-500-plus NTU that occurred at Green Peter. Requiring proof of Green Peter-level turbidity was never the standard: the question is whether the injury the movant identifies is likely, not whether a worst-case analogue will repeat. *See Winter*, 555 U.S. at 22. Under the correct threshold, the district court's own finding that turbidity "is likely to occur at some level" *supports* Salem's showing rather than undercutting it. Order at 17

The record establishes that Salem's harm begins at 10 NTU. Salem's plant "is not designed to sustainably treat raw water sources with sustained turbidities above 10 NTU." ECF 52, Pulley Decl. ¶ 11; ECF 52-7, Pulley Decl. Ex. G at 7. Pilot testing with Detroit Reservoir sediment showed adverse effects at turbidity "as low as 10 NTU applied over time," with re-sanding needs extending into the next summer's peak demand. ECF 52-6, Pulley Decl. Ex. F at 14. Filter run times fall from about 90 days to 38 days at 20 NTU and 8 days at 50 NTU, *id.* at 4–6, and at 50 NTU a filter's life cycle shrinks "from four years to less than two months," ECF 52-3, Pulley Decl. Ex. C at 4. The Corps did not rebut this evidence, and its Final SEIS acknowledges that Salem's system can tolerate 50 NTU for only about 13 days. ECF 52-4, Final SEIS at 218.

2. Salem did "connect the dots" and provided "site-specific data" supporting its position. The district court found that Salem had not shown with scientific evidence that the Drawdown would produce "any specific level of turbidity for any specific period of time." Order at 17. But the Corps' own Final SEIS supplies the link: the Drawdown "would increase sediment and turbidity levels downstream of Detroit Reservoir," and "most fine-grained sediment would pass through Big Cliff Reservoir

and be transported downstream."[2] Final SEIS at 127; *see id.* at 30–31. Fine clay "is likely to stay in suspension and pass downstream of Detroit dam"—precisely the particle that defeats slow sand filters. ECF 52-4, Final SEIS at 217–18; ECF 52-7, Pulley Decl. Ex. G at 1-18. And the first year, when accumulated sediment is exposed for the first time, is when the Final SEIS expects the most adverse turbidity. Final SEIS at 129; ECF 72 at 21. Any absence of a *specific level* of expected turbidity results from the Corps' failure to take a hard look at the expected turbidity.

In light of the Corps' failure, Salem showed that comparable Willamette Valley drawdowns in the record exceeded 10 NTU for weeks or months: Green Peter in 2023 (over 100 NTU daily for months), Cougar (50–200 NTU for three months), and Fall Creek (500 to 800 NTU). ECF 52-7, Pulley Decl. Ex. G at 17–18. Even Green Peter in 2025—which incorporated the later start and shorter duration the Corps invokes here—kept the South Santiam above 10 NTU "regularly for approximately two months," *id.*, with sustained readings of roughly 20 to

[2] Big Cliff Reservoir is located downstream of Detroit Reservoir.

80 FNU, ECF 52-3, Pulley Decl. Ex. C at 4.[3] Even if Detroit produces a fraction of Green Peter's turbidity, a fraction of 100 to 500 NTU sustained even for a short period is still well above Salem's 10 NTU tolerance limit. ECF 52-3, Pulley Decl., Ex. C at 4. Salem's own history confirms the consequence of high turbidity in the North Santiam: in 1996, turbidity above 10 NTU for multiple weeks clogged Salem's filters, forced a stage three water alert, and left finished-water turbidity elevated for five months. ECF 52-8, Pulley Decl. Ex. H at 88.

Nor do the differences the district court identified—less exposed sediment, a later start, and prior drafts to 1,425 feet in 2015 and 2019, Order at 17—support a finding that harm is unlikely. At most they suggest turbidity below Green Peter's, which is beside the point under the correct threshold because a fraction of Green Peter's turbidity is still far above Salem's 10 NTU limit. The absence of site-specific modeling cannot be held against Salem: the Corps admits "the exact amount of turbidity in any given year cannot be accurately predicted," ECF 68 at

---

[3] Formazin nephelometric units ("FNU") and NTU are both units for measuring turbidity, but they utilize differing laboratory instruments and light sources. *See* Salem's Reply ISO Mot. for Prelim. Inj., at 22 n.5, ECF No. 72.

31, and it never completed the turbidity report WRDA required, which would have provided additional turbidity data as part of the Final SEIS.

Finally, Salem showed that turbidity impacts will occur well beyond the Drawdown because fine sediment is likely to remain suspended and continue moving downstream, even after drawdown operations are modified or halted. ECF 52-4, Final SEIS at 31. Sediment deposited along the river is resuspended in later storms, elevating turbidity "even when a deep drawdown is not actively occurring," ECF 52-7, Pulley Decl. Ex. H at 290. A four-week operation therefore produces a far longer turbidity event at Salem's intake.

<u>3. The Emergency Plan finding is clearly erroneous.</u> The district court treated the Emergency Plan as an "additional reason" to deny relief because Salem had not shown "why the plan is inadequate." Order at 19–20. The Corps filed the Plan the day before the hearing, leaving little time for Salem to review it before the district court hearing, but its terms answer the question. *First, the Emergency Plan has no turbidity trigger*. It sets no NTU level, duration, or gauge at which any action must occur. ECF 77-1 at 2–3. The Corps rejected Salem's proposed 10 NTU/12-hour

trigger, ECF 52-3, Pulley Decl. Ex. C at 2–3, leaving the decision to initiate the Emergency Plan entirely at the Corps' unfettered discretion.

*Second, the Emergency Plan is triggered only after the harm has occurred*. The State may request a pause when data shows the water system "is at high risk of failing" and only after "[r]easonable options available to provide adequate water quantity or quality have been exhausted." ECF 77-1 at 2–3. But requiring the exhaustion of available options means that the Emergency Plan cannot be activated until a public health emergency is already well ongoing. The Corps' own Operations Project Manager acknowledged that once slow sand systems start failing it is "too late" to stop the draft without damage that takes "a long time to repair and a lot of money." ECF 25, Teed Decl. ¶ 10. A remedy that activates only after irreparable injury occurred does not prevent it.

*Third, the Corps does not commit to act, and Salem cannot invoke the Plan*. The Emergency Plan states that the emergency declaration "will not be made by USACE" and that the Corps "does not intend to take action unless requested by the Oregon Governor's Office or unless a drinking water emergency has been determined." ECF 77-1 at 2–3. Salem itself cannot trigger a halt; it may only contact the Oregon Health

Authority, which "will consider whether to ask for a halt" after "alignment among Oregon agencies and through the Governor's Office." *Id.* at 3. After that, the Corps only commits to "evaluate and determine the response" and "may pause or terminate the drawdown." *Id.*

*Fourth, the Emergency Plan has no timeline, and a halt cannot reverse turbidity already mobilized.* As the district court found, the Emergency Plan "does not provide a timeframe for how long it would take to pause or halt the drawdown." Order at 10. Any pause is accomplished by raising the reservoir "as appropriate and as feasible," which the Emergency Plan concedes depends on inflow exceeding outflow—an uncertain prospect. *Id.*; ECF 89 at 6. And because fine sediment mobilized during the Drawdown will remain suspended and continue moving downstream, even after Drawdown operations are modified or halted, turbidity will continue reaching Salem's intake long after any pause. Final SEIS at 31; ECF 72 at 25.

*Fifth, the Emergency Plan has already failed to prevent harm.* The same communications framework governed the Green Peter drawdowns, during which Lebanon and Sweet Home suffered severe treatment disruptions and Lebanon claimed $26 million in damages. ECF 52-2,

Pulley Decl. Ex. B at 10; ECF 77-1 at 1. The Corps credits the Emergency Plan with suspending the 2024 Green Peter operation early, ECF 52-4, Final SEIS at 217, but an early halt after turbidity had already reached downstream intakes is the outcome Salem's filters cannot survive. A non-binding and discretionary communications protocol is no substitute for the objective turbidity trigger Salem requests in the alternative.

### B. Salem Independently Satisfies Each Winter Factor for an Injunction Pending Appeal

1. Irreparable harm will occur before the appeal can be decided. The harm is not merely possible; it is timed to the Drawdown itself. The Corps will begin drafting on November 21 for two weeks and will hold the target elevation for about two weeks, ECF 69, Tackley Decl. ¶ 6, while this appeal—even expedited—will not be decided before then. Sustained turbidity levels above 10 NTU will occur, forcing Salem either to close its intake gates and rely on backup supplies with no redundancy or to run turbid water through its filters and foul them. ECF 52, Pulley Decl. ¶ 7; ECF 52-3, Pulley Decl. Ex. C at 4. Either way, the injury—loss of drinking water capacity for 220,000 people and months-long, multimillion-dollar filter rehabilitation—cannot be undone. ECF 52-2, Pulley Decl. Ex. B at 2, 7. And because the Corps maintains it is not liable for damages from

its drawdowns, Salem's economic losses are irreparable. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); ECF 89 at 17.

2. Salem raises, at minimum, serious questions on the merits. The district court assumed without deciding that Salem is likely to succeed on the merits, Order at 16, so there is no merits ruling to which this Court must defer. Salem is in fact likely to succeed on the merits and its claims present at least "serious questions" that are "substantial, difficult and doubtful." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc). NEPA required the Corps to take a "hard look" at reasonably foreseeable effects and to consider reasonable alternatives. 42 U.S.C. § 4332(C)(ii); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Although the Final SEIS concedes turbidity will increase, it never modeled turbidity at municipal intakes or assessed what that turbidity means for slow sand systems, offering only "[g]eneral statements about possible effects and some risk." *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012); *see* ECF 51 at 19–20. The Corps also declined to analyze Salem's turbidity trigger, dismissing it as one of several "in-season operating conditions," ECF 68

at 26, although "[t]he existence of reasonable but unexamined alternatives renders an EIS inadequate," *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (internal quotation marks & citation omitted). And the Corps finalized the Drawdown without the turbidity report WRDA required by January 4, 2025. Pub. L. No. 118-272, § 1205(b), 138 Stat. 2992, 3071–72 (2025).

The CWA claim is equally substantial. Section 313 requires federal agencies to comply with state water quality requirements "in the same manner, and to the same extent as any nongovernmental entity[,]" 33 U.S.C. § 1323(a), and "[a]n independent analysis of the Corps's compliance with the requirements of the CWA is required" even where it follows a biological opinion. *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1171 (9th Cir. 2004). Oregon prohibits more than a ten percent cumulative increase over natural background turbidity. OAR 340-041-0036. With baseline North Santiam turbidity below 10 NTU, ECF 52, Pulley Decl. ¶ 9, that criterion leaves room for an increase of roughly 1 NTU.[4] The Corps predicts the drawdown will "mobilize

[4]Defendant-Intervenors argue that increases are measured against a control point immediately upstream, where turbidity tends to be higher.

sediment" and that fine clay will "pass downstream of Detroit dam," ECF 52-4, Pulley Decl. Ex. D, Final SEIS at 217–18, and similar Willamette drawdowns have produced sustained turbidity many times baseline, ECF 52-7, Pulley Decl. Ex. G at 17-18, showing the drawdown will violate the CWA. Yet the Corps never applied the criterion, declining to analyze turbidity as a regulatory parameter, *see* Final SEIS App. C at C-1-14, and it projected that total dissolved gas will exceed Oregon's 110% standard on 86 additional days per year below Detroit Dam—a "substantially adverse" effect it likewise never reconciled with state standards. Final SEIS at 127, 135 tbl. 3-11.

<u>3. The balance of equities tips sharply in Salem's favor, and an injunction serves the public interest.</u> The district court did not reach these factors. Order at 20. On one side is the potential loss of the region's primary drinking water supply and a public health emergency for approximately 220,000 people, along with multimillion-dollar filter

---

Defendant-Intervenors' Opp. at 1 (ECF 93). The Corps has provided no baseline data, and public data show Detroit Lake turbidity at 7.19 NTU as of November 1, 2026, so an increase of roughly 0.7 NTU would violate the criterion. *What the Santiam Silt Data Means*, Waterlab Corp. (Nov. 8, 2026), https://www.waterlabcorp.com/resources/north-santiam-river-water-quality-data-explained (last visited Nov. 16, 2026).

damage. ECF 52, Pulley Decl. ¶ 7; ECF 52-2, Pulley Decl. Ex. B at 7. On the other is a one-season hold at the existing 1,450-foot minimum conservation pool—delaying one part of one of fifty-five measures in the 2024 Biological Opinion's reasonable and prudent alternative, while night passage, spring spillway operations, and other measures continue. ECF 89 at 8, 17. Because the government opposes relief, the equities and public interest merge. *Brown*, 192 F.4th at 1141 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Safe drinking water for downstream populations is a fundamental public interest, *United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005), as is agency compliance with Section 313. The relief requested is no broader than necessary: one season at 1,450 feet or, alternatively, an objective 10 NTU safeguard.

### C. The Requested Injunction Is Prohibitory, and the Alternative Trigger Holds the Corps to Its Own Stated Flexibility

A prohibitory injunction "'preserves the status quo pending a determination of the action on the merits[,]'" while a mandatory injunction "'orders a responsible party to take action.'" *Brown*, 192 F.4th at 1141 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009)). Salem's primary request—

barring any draft below 1,450 feet—is prohibitory. It would keep Detroit Reservoir at the minimum conservation pool the Corps ordinarily maintains each winter. ECF 69, Tackley Decl. ¶¶ 4, 6. Like the injunction in *Feldman*, it "preserves the *status quo*" while this Court considers the appeal. 843 F.3d at 369. The alternative trigger is likewise prohibitory in substance: it requires the Corps to stop the Drawdown if turbidity below Detroit Dam is at or above 10 NTU. Even if viewed as mandatory, it is warranted because "extreme or very serious damage will result" absent relief, *Marlyn*, 571 F.3d at 879, and it requires nothing the Corps has not already promised. The Corps represents that its operation preserves "the ability to pause, modify, delay, or discontinue a drawdown if monitoring or forecast information indicates that doing so is warranted," and that it "may pause or modify operations before turbidity presents an unacceptable risk to downstream drinking-water operations." ECF 69, Tackley Decl. ¶ 10; *id.* at 19 ¶ 24. It told the district court that "a robust monitoring effort will inform whether to modify, pause, or halt the drawdown in real-time," ECF 68 at 8, and that adverse effects "will be further reduced by using real time data to modify, pause, or cease the drawdown based on turbidity levels," *id.* at 35 (quoting Final SEIS App.

W at 149). The Emergency Plan likewise contemplates that the Corps "may pause or terminate the drawdown by raising the reservoir elevation." ECF 77-1 at 3. An objective 10 NTU trigger converts those discretionary assurances into an enforceable limit while letting the operation proceed whenever turbidity permits.

## V. CONCLUSION

Because Salem is likely to show that the district court abused its discretion and independently satisfies each *Winter* factor, Salem respectfully requests that this Court grant an injunction pending appeal prohibiting the Corps from drafting Detroit Reservoir below elevation 1,450 feet during the 2026–27 operating season or, in the alternative, requiring the Corps to immediately cease any drawdown below 1,450 feet if turbidity below Detroit Dam reaches 10 NTU or more for 12 hours and to refrain from resuming the drawdown until turbidity falls below 10 NTU. Given the strong public interest, no bond should be required.

Respectfully submitted,

/s/ Olivier Jamin
Olivier Jamin
Kevin H. Kono,
Verónica Muriel Carrioni
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
olivierjamin@dwt.com
kevinkono@dwt.com
veronicamuriel@dwt.com
Telephone: (503) 241-2300

*Attorneys for Appellant City of Salem*

November 17, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion is 20 pages long, excluding the parts excluded by Federal Rule of Appellate Procedure 27(d)(2), and therefore complies with the 20-page limitation contained in Ninth Circuit Rule 27-1(1)(d).

Dated: November 17, 2026

s/ *Olivier Jamin*
Olivier Jamin

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's Appellate Case Management System (ACMS) on November 17, 2026.

I further certify that all participants in this case are registered ACMS users and that service will be accomplished via ACMS.

Dated: November 17, 2026

*/s/ Olivier Jamin*

## EXHIBITS


| | | Page |
|---|---|---|
| A. | Email from Attorney Brad Leneis, counsel for Appellees, confirming drawdown will begin on 11/21/26 at 9:00am, dated November 17, 2026 | 1-6 |

**From:** Leneis, Brad (ENRD) <Brad.Leneis@usdoj.gov>
**Sent:** Tuesday, November 17, 2026 11:40 AM
**To:** Jamin, Olivier <OlivierJamin@dwt.com>; Steve Elzinga <SElzinga@co.marion.or.us>; ryan@firlawgroup.com; Kono, Kevin <kevinkono@dwt.com>; Quinley, Daniel <DanQuinley@dwt.com>
**Cc:** epotter@advocateswest.org; lrule@advocateswest.org; Sondag, Samantha K. <samantha.sondag@stoel.com>; Jennifer Gates <jgates@pearllegalgroup.com>
**Subject:** RE: Detroit Dam PI appeals (26-7415, 26-7451) - 9th Cir IPA briefing timing

**[EXTERNAL]**

Hi Olivier –

I spoke about the timing for the drawdown a few minutes ago with Mr. Elzinga. The Army Corps has updated me that it will not begin the action about which appellants seek relief before 9:00am on Saturday, November 21, so that seems like the appropriate time to request a decision from the 9th Circuit.

When you email the emergency motions inbox, I think it would also make sense to flag the fact that your appeal arises from the same district court decision as the appeal in No. 26-4715.

Thanks,

**Brad Leneis**
Attorney, Appellate Section
Energy & Natural Resources Division
U.S. Department of Justice
303-844-1363 (desk)
202-532-3252 (cell)
brad.leneis@usdoj.gov



EXHIBIT A
PAGE 1 OF 1