No. 26-7415
(Coordinated with No. 26-7451)

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

MARION COUNTY, OREGON,
*Plaintiff/Appellant*,

and

CITY OF STAYTON
SANTIAM WATER CONTROL DISTRICT
*Intervenor-Plaintiffs/Appellants*

v.

U.S. ARMY CORPS OF ENGINEERS, et al.,
*Defendants/Appellees,*

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER
*Intervenor-Defendant/Appellee.*

---

Appeal from the United States District Court for the District of Oregon
No. 6:26-cv-00956 (Hon. Mustafa T. Kasubhai)
(consolidated with No. 6:26-cv-01381)

---

# APPENDIX OF EXHIBITS TO FEDERAL APPELLEES' CONSOLIDATED OPPOSITION TO APPELLANTS' MOTIONS FOR INJUNCTION PENDING APPEAL

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

BRIAN TOTH
BRAD LENEIS
*Attorneys*

Energy and Natural Resources Division
U.S. Department of Justice
999 18th St., N. Terrace, Suite 600
Denver, CO 80202
(202) 532-3252
brad.leneis@usdoj.gov

## Index for Appendix to Opposition to Motion for an Injunction Pending Appeal

*Marion County, et al. v. U.S. Army Corps of Engineers, et al.*, No. 26-4715
*City of Salem v. U.S. Army Corps of Engineers, et al.*, No. 26-4751


| FED-APP-001 to -411 | | |
|---|---|---|
| **Document Name** | **Dist. Ct. Dkt No.** | **Appendix Page No.** |
| Order on Motion for Injunction Pending Appeal | 104 | 4 |
| Order on Motions for Preliminary Injunction | 86 | 10 |
| Deep Drawdown Emergency Response Communications Plan | 77-1 | 30 |
| Declaration of Kathryn Tackley, Willamette Valley Program Manager | 69 | 34 |
| Declaration of Kirck Schroeder | 67 | 55 |
| Record of Decision (excerpts) | n/a | 87 |
| Final Supplemental Environmental Impact Statement (excerpts) | n/a | 104 |
| Final Supplemental Environmental Impact Statement, Appendix C (excerpts) | n/a | 154 |
| Final Supplemental Environmental Impact Statement, Appendix W (excerpts) | n/a | 200 |
| Draft Supplemental Environmental Impact Statement (excerpts) | n/a | 262 |
| Final Environmental Impact Statement (excerpts) | n/a | 307 |
| Draft Environmental Impact Statement (excerpts) | n/a | 365 |
| Willamette Basin Bi-Annual Status Reports (excerpts) | n/a | 377 |
| Docket Sheet – No. 6:26-cv-00956 (D. Or.) | n/a | 396 |
| Docket Sheet – No. 6:26-cv-01381 (D. Or.) | n/a | 406 |

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARION COUNTY, *a Political Subdivision of the State of Oregon*,

Plaintiff,

And

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

U.S. ARMY CORPS OF ENGINEERS; DANIEL P. DRISCOLL, *in his official capacity as Secretary of the Army*; and WILLIAM H. GRAHAM, JR., *in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

Lead Case No. 6:26-cv-00956-MTK
Trailing Case No. 6:26-cv-01381-MTK

**ORDER**

CITY OF SALEM, *an Oregon Municipal Corporation*,

Plaintiff,

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

UNITED STATES OF AMERICA; UNITED STATES ARMY CORPS OF ENGINEERS,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

---

**KASUBHAI,** United States District Judge:

Before the Court is Plaintiffs' Emergency Motion for an Injunction Pending Appeal (ECF No. 89), in which Plaintiffs ask this Court to enjoin Defendants from drafting Detroit Reservoir to an elevation lower than 1,450 pending the resolution of Plaintiffs' appeal of this Court's Opinion and Order denying their Motions for Preliminary Injunction. Under Federal Rule of Civil Procedure 62(d), "[w]hile an appeal is pending from an interlocutory order or final judgment that . . . refuses . . . an injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the opposing party's rights." The standard for granting such a motion "is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). Thus, "[p]laintiffs seeking a preliminary injunction pending appeal must show that (1) they are likely to

succeed on the merits of their appeal, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest." *Brown as next friend of K.M.K. v. Washington Interscholastic Activities Ass'n*, 192 F.4th 1137, 1140-41 (9th Cir. 2026).

"Rule 62(d) contemplates that there will be situations where district courts can grant injunctions pending appeal even after denying a preliminary injunction." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235 (N.D. Cal. 2025). In particular, "[t]his can occur when the trial court is charting a new and unexplored ground by ruling on an admittedly difficult legal question, and when the equities of the case suggest that the status quo should be maintained." *Id*. at 1236. (citations omitted) (cleaned up). But "the fact that a court previously found that a preliminary injunction was not warranted should carry significant weight, so the circumstances must be of unusual magnitude to justify a district court granting an injunction pending appeal after denying a preliminary injunction." *Id.*

Here, there are no novel or difficult legal questions at play. Instead, the Court's ruling denying Plaintiffs' motions for preliminary injunction was based on a comprehensive review of the voluminous record submitted to the Court. Following that review, the Court concluded that Plaintiffs failed to make a "clear showing" that irreparable harm is "likely" absent injunctive relief. Op. and Order 16, ECF No. 86. That same failure of evidence is fatal to this motion, which likewise requires Plaintiffs to demonstrate that irreparable harm is likely. Indeed, other than several citations to cases not referenced in their original motions and a new exhibit regarding the likelihood of an El Niño event, Plaintiffs largely rehash the same arguments made in their original motions.

On the issue of turbidity, Plaintiffs still fail to demonstrate that irreparable harm is likely to occur as a result of the drawdown. To the extent that Plaintiffs rely on the same arguments, evidence, and case law as their original motions, they fail for the same reasons. To be clear, the issue is not that Plaintiffs fail to show that turbidity will occur at the same levels that occurred during the Green Peter Reservoir drawdowns, but that they provide no data or analysis specific to Detroit Reservoir. The record shows that *some* turbidity is likely to occur as a result of the drawdown, but that fact alone is insufficient to demonstrate irreparable harm. Plaintiffs can and have weathered naturally-caused high turbidity events in the past, *see* Schroeder Decl. ¶¶ 33-34, ECF No. 67, and indeed the pilot testing demonstrates that the water filters at issue can withstand moderate increases in turbidity at reduced runtimes, *see* Pulley Decl. Ex. F at 6, ECF No. 52-6. While the record does show that significantly elevated turbidity for sustained periods can cause irreparable harm, the record does not show that the proposed drawdown will reach such levels for any length of time. Plaintiffs cite a conclusory assertion in an exhibit that "[t]hroughout the drawdown event, turbidity will likely increase well-above 10-15 NTU, with potential spikes above 200 NTU." Pulley Decl. Ex. H at 55, 282, ECF No. 52-8. But that assertion is unsupported by any rationale or analysis other than comparisons to drawdowns of other reservoirs. Moreover, Plaintiffs fail to explain or provide evidence as to why they expect this drawdown will result in more turbidity than experienced the prior two times the Detroit Reservoir was drawn down to the same level. *See* Schroeder Decl. ¶ 32 (turbidity was less than 15 FNU during 2015 drawdown, and less than 10 FNU in 2019 drawdown).[1]

[1] While Plaintiff City of Salem argues in a footnote that these drawdowns occurred for different reasons or for different time periods, it does not explain why those differences are relevant to the expected turbidity levels. *See* Pl. City of Salem Reply 7-8 n.8, ECF No. 95.

Plaintiffs also rely on two newly-cited cases for the proposition that "[v]iolating water quality standards can constitute irreparable injury." Pls.' Mot. 15, ECF No. 89 (citing *Or. State Pub. Int. Rsch. Grp. v. Pac. Coast Seafoods Co.*, 374 F. Supp. 2d 902 (D. Or. 2005); *Ctr. for Env't L. & Pol'y v. United States Fish & Wildlife Serv.*, No. 2:15-CV-0264-SMJ, 2017 WL 1731706 (E.D. Wash. May 3, 2017)). Those two cases do not alter this Court's analysis for two reasons. First, both cases were Clean Water Act enforcement actions in which each court had already found a Clean Water Act violation had occurred and that unlawful discharges were ongoing. That is not the case here. Second, those cases are not precedential and—to the extent they suggest that Clean Water Act violations amount to a per se finding of irreparable harm—they are difficult to square with the Supreme Court's statement in *Weinberger v. Romero-Barcelo* that "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." 456 U.S. 305, 313 (1982). These cases do not relieve Plaintiffs of their burden to show that irreparable harm is likely to occur.

On the issue of inadequate refill of the Detroit Reservoir, Plaintiffs supplement the original preliminary injunction record with an October 8, 2026 "El Nino Advisory" from the National Weather Service noting that "El Niño continues to strengthen, with a strong-to-very strong El Niño likely through January-March 2027 (remaining greater than an 83% chance)." Elzinga Decl. Ex.1, ECF No. 89-1. But as with Plaintiffs' original motions, the likelihood of an El Niño event says nothing specific about the probability that the Detroit Reservoir will fail to refill. Moreover, Defendant and Defendant-Intervenors include the National Weather Service's "Seasonal Precipitation Outlook" during the relevant period, which shows "equal" or "leaning above" average precipitation for January-March 2027. NFS Resp. Ex. 18, ECF No. 93-2. Plaintiffs fail to show that inadequate refill is likely to occur.

Plaintiffs' Emergency Motion for an Injunction Pending Appeal (ECF No. 89) is DENIED because of a failure of proof. Plaintiffs fail to make a clear showing that irreparable harm is likely to occur in the absence of relief.

DATED this 18th day of November 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MARION COUNTY, *a Political Subdivision of the State of Oregon*,

Plaintiff,

And

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

U.S. ARMY CORPS OF ENGINEERS; DANIEL P. DRISCOLL, *in his official capacity as Secretary of the Army*; and WILLIAM H. GRAHAM, JR., *in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

Lead Case No. 6:26-cv-00956-MTK
Trailing Case No. 6:26-cv-1381-MTK

**OPINION AND ORDER**

CITY OF SALEM, *an Oregon Municipal Corporation*,

Plaintiff,

SANTIAM WATER CONTROL DISTRICT and CITY OF STAYTON,

Plaintiff-Intervenors.

v.

UNITED STATES OF AMERICA; UNITED STATES ARMY CORPS OF ENGINEERS, *an agency of the United States government*,

Defendants,

And

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

**KASUBHAI,** United States District Judge:

Plaintiffs Marion County and the City of Salem brought these actions for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, challenging Defendants' decision to conduct an annual deep drawdown of Detroit Reservoir on the North Santiam River. The Court consolidated the cases and granted motions to intervene filed by Plaintiff-Intervenors Santiam Water Control District and City of Stayton and Defendant-Intervenors Northwest Environmental Defense Center and the Native Fish Society. *See* ECF Nos. 28, 42. Before the Court are Plaintiffs' Motions for Preliminary Injunction, ECF Nos. 18, 51, and Plaintiff-Intervenors' Joinders, ECF Nos. 55, 58. For the reasons below, the motions are denied.

## BACKGROUND

Defendant U.S. Army Corps of Engineers ("the Corps") owns, operates, and maintains the Willamette Valley System ("WVS"), a large network of 13 dams and reservoirs, hatcheries, adult fish facilities, and bank protection structures on various tributaries in the Willamette Valley River basin. Pulley Decl. Ex. D ("SEIS"), ECF No. 52-4. At issue in this case is Defendants' decision to conduct annual deep drawdowns of Detroit Reservoir, located in the North Santiam River subbasin of the WVS, in order to allow for volitional passage of Endangered Species Act ("ESA")-listed Upper Willamette River Chinook salmon ("UWR Chinook") past the Detroit Dam. The Court begins with an overview of the relevant legal framework before turning to the factual background.

### I. Legal Framework

#### A. Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). When enacted, the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA charged the National Marine Fisheries Service and the Fish and Wildlife Service (collectively, "the Services") with administering the ESA. Under Section 4 of the ESA, the Services are directed to list endangered and threatened species, and to designate critical habitat for those species. 16 U.S.C. § 1533.

Under Section 7 of the ESA, federal agencies ("action agencies") are required to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the

destruction or adverse modification of [critical habitat].” 16 U.S.C. § 1536(a)(2). The action agency must consult with the relevant Service in making such a determination. If either the action agency or the relevant Service “determines that the proposed action is ‘likely to adversely affect’ a listed species or habitat, formal consultation is required.” *Conservation Cong. v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014) (quoting 50 C.F.R. § 402.14). In formal consultation, the relevant Service prepares a Biological Opinion which includes, among other things, “[t]he Service’s opinion on whether the action is . . . [l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.” 50 C.F.R. § 402.14(h)(1)(iv)(A). If the Service concludes that “take” will not jeopardize the listed species, it will provide an “Incidental Take Statement” that sets forth the terms and conditions of such allowable take. 16 U.S.C. § 1536(b)(4)(c)(i); 50 C.F.R. § 402.14(i). The action agency must reinitiate consultation immediately if it exceeds the permissible amount of incidental take. 50 C.F.R. § 402.14(i)(5), 402.16(a)(1).

Section 9 prohibits the “take” of listed species, which means “to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.” 16 U.S.C. § 1538(a)(1), 1532(19). An Incidental Take Statement operates as a safe harbor from otherwise impermissible take, but the action agency or applicant is no longer insulated from Section 9 liability “where an action agency does not reinitiate consultation with the [Service] despite the failure of promised conservation measures.” *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012). The ESA includes a citizen-suit provision empowering citizens to sue any person who violates the ESA and its implementing regulations. 16 U.S.C. § 1540(g).

### B. National Environmental Policy Act

The purpose of the National Environmental Policy Act ("NEPA") is to require agencies to disclose "relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). It "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). To that end, NEPA requires agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed statement—an Environmental Impact Statement ("EIS")—discussing environmental impacts of the proposed action and a range of alternatives to avoid adverse impacts. 42 U.S.C. § 4332(C).

## II. Factual Background

Defendants intend to conduct annual deep drawdowns of the Detroit Reservoir "to increase survival for juvenile ESA-listed fish as they migrate downstream." SEIS 19. The drawdown decision follows litigation in which the Corps was sued for causing "take" of ESA-listed salmonids in their operation of the WVS. The Court begins with a summary of that litigation and its outcomes before turning to Defendants' decision to proceed with annual drawdowns of the Detroit Reservoir and Plaintiffs' concerns about the impacts of that decision.

### A. Prior Litigation and Outcomes

A 2008 BiOp issued by the National Marine Fisheries Service ("NMFS") assessed the operation and maintenance of dams and related facilities in the WVS and their effect on ESA-listed UWR Chinook and steelhead. *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs* ("*NEDC*"), 479 F.Supp.3d 1003, 1008-09 (D. Or. 2020). The 2008 BiOp found that "the dams harmed the listed salmonids by, among other things, blocking downstream passage of juvenile

salmonids, interfering with upstream migration of salmonids returning to their spawning grounds, and harming water quality and quantity downstream from the dams." *Id.* at 1009. The 2008 BiOp set out certain mitigation measures that the Corps was required to carry out to continue operating the WVS without causing jeopardy to the ESA-listed salmonids. *Id.* at 1009-10. In 2018, the Northwest Environmental Defense Center, the Native Fish Society, and other conservation groups sued the Corps related to its operation of the WVS.

1. *NEDC* Decision

In *NEDC*, the plaintiffs alleged that the Corps failed to implement the mitigation measures required by NMFS' 2008 BiOp to protect ESA-listed UWR chinook and steelhead, caused a "take" of ESA-listed species, and failed to reinitiate formal ESA consultation with NMFS. On summary judgment, the court ruled in favor of the plaintiffs, concluding that the Corps violated Section 7(a)(2) and Section 9 of the ESA. *NEDC*, 479 F.Supp.3d at 1019, 1023; Pulley Decl. Ex. E at 3, ECF No. 52-5. The court ordered the defendants to complete ESA re-consultation and ordered NMFS to issue a new BiOp by December 31, 2024. *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs* ("*NEDC II*"), 558 F.Supp.3d 1056, 1076-77 (D. Or. 2021). The court also issued an interim injunction requiring numerous operational changes in the WVS to afford relief until the completion of the 2024 BiOp. *Id.*

2. Deep Drawdowns

Among the interim operational measures the court ordered in *NEDC II* were "deep drawdowns" of certain reservoirs in the WVS. *Id.* at 1077-78. Judge Hernandez explained the necessity of those measures as follows:

> Juvenile salmonids must pass through the dams to successfully outmigrate to the marine environment. The salmonids typically navigate downstream by following the flow of the river; however, the large, slow-moving reservoirs behind the dams disrupt these natural outmigration cues, making it difficult for the fish to find their way downstream to the dam and lengthening their exposure to predators and

> pathogens in the reservoirs. Increasing flow via drawdowns and spill operations reduces the size of the reservoir and accelerates the salmonids' navigation to the dam, thereby decreasing their exposure to pathogens and predators. But once the juvenile salmonids reach the dams, they can only pass downstream through the hydropower turbines, regulating outlets ("ROs"), or spillways. For likely obvious reasons, significantly higher fish mortality occurs when the juvenile salmonids pass through the turbines instead of the ROs or spillways, making non-turbine fish passage the safest available option. And, concerning drawdowns specifically, juvenile salmonids are surface-oriented fish, meaning they cannot sound very deep and are unlikely to find the ROs unless the reservoir surface elevation is drawn down within 20 to 25 feet of the outlet opening.

*Id.* at 1064-65.

As a result of the interim injunction, the Corps implemented a deep drawdown of the Green Peter Reservoir to allow for fall juvenile fish passage through Green Peter Dam. NFS Resp. Ex. 3, ECF No. 66-3. During the initial drawdown in November 2023, the Corps drew the Green Peter Reservoir down 142 feet in one month. SEIS 19. The drawdown of the Green Peter Dam exposed sediment that substantially increased turbidity in the South Santiam River, resulting in operational disruptions at water treatment plants in the Cities of Lebanon and Sweet Home. Page Decl. ¶ 7, ECF No. 21; Pulley Decl. Ex. B at 7, ECF No. 52-2; FSEIS at 19. In addition, the drawdown caused the death of thousands of kokanee salmon, a non-ESA-listed salmonid. Teed Decl. Ex. 3 at 2, ECF No. 25-3.

Following the issues caused by the 2023 Green Peter Reservoir drawdown, the Corps moved to amend its implementation plan for future fall deep drawdowns of the Green Peter Reservoir, which the court granted over objections from downstream cities concerned that the modifications would not adequately address the turbidity concerns. NFS Resp. Exs. 11, 12, ECF Nos. 66-11, 66-12. The drawdown of Green Peter Reservoir that occurred the following fall, in 2024, resulted in less turbidity both in level and duration. Schroeder Decl. ¶ 35, ECF No. 67. Lower turbidity was attributed to a later drawdown start date and reduced sediment volume following the 2023 drawdown. *Id.* Deep drawdowns of other reservoirs within the WVS have

also taken place due to the interim injunction. For example, the Corps conducted drawdowns of Lookout Point and Dexter Dams in the Middle Fork Willamette River in 2023 and 2024, noting that turbidity levels were significantly lower in 2024 as compared to 2023, "suggest[ing] that the river cut through most of the sediment accumulated in the upper portions of the reservoir during the first year of drawdown." NFS Resp. Ex. 9, ECF No. 66-9.

As a result of the turbidity issues caused by the 2023 Green Peter Reservoir drawdown, Congress enacted legislation that required the Corps to submit a report analyzing instances of high turbidity resulting from drawdown of WVS reservoirs, and identifying lessons learned and opportunities to minimize economic impacts of turbidity on non-Federal entities. 33 USC Section 1205(b) ("WRDA"). Although the report was due to Congress by January 4, 2026, the Corps has not yet submitted it. Def. Opp'n 8-9, ECF No. 68. The Corps has no estimated date for completion of the report, and notes that "its completion is contingent on the availability of funding." Def.'s Notice Re WRDA 5, ECF No. 79.

3. <u>2024 Biological Opinion</u>

In December 2024, NMFS issued its new Biological Opinion for the continued operation of the WVS. NFS Resp. Ex. 2 ("2024 BiOp"), ECF No. 66-2. As relevant to this litigation, the 2024 BiOp instructed the Corps to "test and improve effectiveness of interim juvenile fall drawdown operations through Detroit and Big Cliff Reservoirs and Dams . . . 2025-2028," including "[i]n the fall, draw Detroit reservoir elevation down to no more than 50 feet above upper RO for passage (1395 ft), when possible given hydrology and hydropower activity in the North Santiam and other subbasins." 2024 BiOp 6.4-524. The BiOp explained that the rationale was to increase the "possibility for RO outlets to be accessible by lowering reservoir elevations" to increase survival for juvenile migrants. *Id.*

### B. Detroit Reservoir Drawdown

Following the issuance of the 2024 BiOp, the Corps prepared a Supplemental Environmental Impact Statement ("SEIS") for WVS operation and maintenance. The SEIS included "revisions to the Interim Operations including a late fall/early winter deep drawdown for downstream fish passage at Detroit Dam" based on the 2024 BiOp. SEIS xiv. The Detroit Reservoir drawdown is part of a series of interim operations that would take place until the long-term solution for downstream fish passage and water temperature management is operational. SEIS 19.

Under the SEIS, the Corps plans to use a gradual approach over several years to reach the target elevation of 1395 feet. Tackley Decl. ¶ 6, ECF No. 69; SEIS 19, 80, 137. "[I]n late November or early December" 2026, the Corps intends to lower the reservoir 30 feet to 1425 feet over the course of two weeks, and then hold the reservoir at that elevation for another two weeks. SEIS 19. The Corps noted that the Detroit Reservoir has reached this level twice before, "for low flow augmentation (2015) and spillway gate maintenance (2019)." SEIS 19. The Corps would then use the turbidity information from each year to make informed decisions about how much to "lower the reservoir . . . each year until reaching 1395 feet." SEIS 19; Tackley Decl. ¶ 7.

As required by NEPA, the Corps solicited public comment before finalizing its SEIS. SEIS 14. The public comment period ran from November 14, 2025, to January 13, 2026. SEIS at ES-2. The Corps received input from affected stakeholders including tribes, state and federal agencies, and the public, which it used to shape its evaluation of the impact of the interim operations. SEIS 14-15. The Corps received extensive feedback about the proposed drawdown at Detroit Dam, specifically, the drawdown's "effects on water quality, municipal water supplies, recreation, and kokanee populations." SEIS 15. After the comment period, the Corps updated the Final SEIS based on comments, specifically to shape the interim operation to minimize adverse

effects such as turbidity. SEIS 216-18. The Corps indicated it would use real time turbidity data to modify, pause, or cease the drawdown to avoid unacceptable adverse impacts to drinking water systems and practice strong communication with the State of Oregon, as well as the Cities of Salem, Stayton, and Gates. SEIS 218.

The SEIS acknowledges that drawing down the Detroit Reservoir will increase turbidity because it will leave more of the reservoir bank exposed, increasing the potential for shoreline erosion and sloughing. SEIS 92. However, the SEIS concludes that the downstream turbidity effects are expected to lessen in severity after a few years as the sediment reaches a new equilibrium. SEIS 92. In response to specific comments raised comparing the proposed drawdown to the Green Peter Reservoir drawdown, the Corps explained that it expects the Detroit Reservoir drawdown to "result in much lower levels of turbidity than on the South Santiam during the Green Peter drawdown in 2023 and 2024." SEIS 218.

Defendants have finalized and circulated a "Deep Drawdown Emergency Response Communications Plan" for planned deep drawdowns, including Detroit Reservoir. ECF No. 77-1. The Plan provides for regular meetings with stakeholders "to discuss real-time and forecasted (expected future) dam operations and reservoir level information." *Id.* at 2. It provides that "[i]f drinking water facility concerns arise, the impacted city will contact OHA, who will consider whether to ask for a halt of operations according to . . . criteria." *Id.* at 3. The Corps will not take action to halt the drawdown "unless requested by the Oregon Governor's Office or unless a drinking water emergency has been determined." *Id.* The plan does not provide a timeframe for how long it would take to pause or halt the drawdown in the event of an emergency.

### C. Plaintiffs' Asserted Irreparable Harm

Plaintiffs each present evidence and argument that the Detroit Reservoir deep drawdown will cause them irreparable harm. Because each Plaintiff raises concerns unique to their own interests, the Court summarizes them each separately.

1. <u>City of Salem</u>

The City of Salem operates the Geren Island Water Treatment Plant ("the Facility"). Pulley Decl. ¶ 3, ECF No. 52. The Facility is the primary regional drinking water source in the Mid-Willamette Valley. Pulley Decl. ¶ 4. Salem supplies drinking water to approximately 220,000 individuals, hospitals, schools, businesses, firefighting and emergency services, and is the sole emergency source of drinking water for both the City of Stayton and the City of Keizer. Pulley Decl. Ex. C at 2-3, ECF No. 52-3; Pulley Decl. ¶¶ 5-6.

The Facility uses slow sand filtration and draws water from the North Santiam River downstream of Detroit Dam. Pulley Decl. ¶ 3; Pulley Decl. Ex. C at 3. The plant passes the raw river water through several layers of sand, trapping contaminants in a biologically active surface layer, to produce clean drinking water. Pulley Decl. ¶ 9. The intake water must have low levels of turbidity for the slow sand filtration process to work effectively and prevent damage to the filters. Pulley Decl. Ex. C at 4.

Turbidity in the North Santiam River is naturally low, typically below 10 Nephelometric Turbidity Units ("NTUs"). Pulley Decl. ¶ 9. Salem conducted pilot testing which found that high levels of turbidity in the water affects the ability of the Facility's filters to work correctly, threatening the long-term viability of the water system. Pulley Decl. Ex. F at 13-14, ECF No. 52-6; Pulley Decl. Ex. C at 4-5. The testing demonstrated that filters at the facility ran for 67 days with turbidity at 10 NTU, 14-38 days at 20 NTU, 14-18 days at 30 NTU, 11-12 days at 40 NTU, and 8-13 days at 50 NTU. Pulley Decl. Ex. F at 6. Salem cites empirical data from previous

drawdown actions of the Green Peter Reservoir and asserts that the Detroit Drawdown "will likely increase the concentration of suspended solids and fine particles in the river well above 50 NTU" and therefore imperil drinking water and impact Salem's ability to fight fires. Pulley Decl. ¶¶ 11, 13, 22. In addition, when turbidity exceeds 10 NTUs, Salem "may be required" to shut down the Facility to prevent damage to the filters. Pulley Decl. ¶ 7. If Salem shuts down the Facility, it would be forced to rely on backup sources with no operational redundancy like "groundwater wells, stored reservoir water, and emergency interties with the City of Keizer and Stayton." Pulley Decl. ¶ 7.

2. Marion County

Detroit Dam and Reservoir are located in Marion County, which has a population of over 340,000 residents. Amerman Decl. ¶ 3, ECF No. 20; Elzinga Decl. ¶ 11, ECF No. 27. Plaintiff Marion County notes that the North Santiam River, into which water released from the Detroit Dam flows, is a key source of irrigation and drinking water in the County. Marion County asserts that increased turbidity and inadequate refill of the Detroit Reservoir after the drawdown will cause it irreparable harm.

On the issue of water quantity, Marion County presents evidence that in the event Detroit Reservoir is unable to refill, it or its residents will suffer harm. During a dry winter, the Detroit Reservoir is less likely to rise to the conservation pool level. Elzinga Decl. ¶ 15. If the water does not reach marinas in the reservoir or there were significant fish death, boating, fishing, recreation rentals, campground use, and income from park use, would be adversely impacted. O'Donnell Decl. ¶ 8, ECF No. 22; Lunski Decl. ¶ 7, ECF No. 23; Nicholas Decl. ¶ 5, ECF No. 24. By way of example, Marion County notes that in 2015, when Detroit Reservoir was unable to refill as it would under normal weather patterns, "[t]ourism heavily declined, docks had to move out, and during the annual 'free fishing' weekend in June, there wasn't even enough water to allow for

fishing." Elzinga Decl. ¶ 15. Given that a "very strong" El Niño event is predicted for this fall and winter—which typically result in warmer and drier seasons—Marion County asserts that the likelihood of inadequate refill is particularly high this year. Elzinga Decl. ¶¶ 13-14.

Like Salem, Marion County is also concerned that the drawdown will affect water treatment plants serving Marion County residents and harm downstream water quality. Page Decl. ¶ 15; O'Donnell Decl. ¶ 12. Marion County notes that safe drinking water is necessary not only for its residents but also for the operation of Marion County schools and hospitals. Marion County's Mot. 13, ECF No. 18 (citing SEIS at W-306-07). Also like Salem, Marion County points to the turbidity issues caused by the Green Peter Reservoir drawdown as evidence of the level of turbidity it fears the Detroit Reservoir drawdown will cause. *See* Amerman Decl. ¶¶ 11-13; Page Decl. ¶ 7; Lunski Decl. ¶ 6.

3. City of Stayton

The City of Stayton is a municipal corporation with a population of just over 8,000 people. Hajduk Decl. ¶ 3, ECF No. 60. Stayton provides drinking water to Santiam Hospital and North Santiam School District and provides wastewater treatment and disposal to the City of Sublimity. Mot. Intervene Ex. 3 ¶¶ 8, 11, ECF No. 41-3; Loving Decl. ¶¶ 6-7, ECF No. 62; Hajduk Decl. ¶ 9; Taylor Decl. ¶ 4, ECF No. 61. Stayton's water supply comes exclusively from the North Santiam River downstream of the Detroit Dam and Reservoir. Buchanan Decl. ¶ 7, ECF No. 59. Like Salem's water treatment plant, Stayton's plant uses slow sand filtration to treat the water. Buchanan Decl. ¶ 7. Stayton notes that sustained turbidity within the North Santiam River will lead to frequent cleaning or possible replacement of its water treatment plant's filters, "put[ing] Stayton's drinking water treatment system and the residents and other users who depend on the proper functioning of that system at risk of not only reduced or limited water

availability but also closure of all the public services, hospitals, schools and other functions that depend on the availability of clean water." Buchanan Decl. ¶¶ 11-13.

4. Santiam Water Control District

The Santiam Water Control District ("District") is a municipal corporation. District Intervenors Compl. ¶ 1, ECF No. 46. The District receives water from the North Santiam River and operates an 114-mile irrigation system extending from Stayton to Salem. Stevenson Decl. ¶ 2, ECF No. 39. This system delivers water to over 17,000 acres of agricultural land, and provides water to hydroelectric plants, wetland restoration projects, and municipal governments. Stevenson Decl. ¶¶ 3, 5. Nearly 1,000 acres of farmland depend on stored water from the District for irrigation, and the District is the sole source of irrigation for 580 of those acres. Am. Stevenson Decl. ¶ 3, ECF No. 63. Loss of irrigation to those crops "can quickly reduce yields and, if sustained, kill the plants." Am. Stevenson Decl. ¶ 4.

Santiam is concerned about the impacts of both high turbidity and inadequate reservoir refill. On the issue of turbidity, the District's water conveyance system includes "fish screens and fish barrier structure[s]." Stevenson Decl. ¶ 11. During a high turbidity event, sediment increases and builds up on the fish barriers requiring extra excavation and increasing operations costs. Stevenson Decl. ¶ 11. The District is further concerned that in dry years, the drawdown will cause inadequate reservoir refill, preventing the District from fulfilling its delivery obligations for irrigation water. Am. Stevenson Decl. ¶ 2. During a past El Niño year—as this year is expected to be—"Detroit Reservoir [was left] well below full pool, and thus the District was very worried about stored water supply that year." Am. Stevenson Decl. ¶ 5.

## STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20, 22 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter* did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (quotation marks omitted). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## DISCUSSION

Plaintiffs and Plaintiff-Intervenors contend that they satisfy the *Winter* test and ask the Court to grant preliminary injunctive relief. Plaintiff Marion County seeks injunctive relief that compels the Corps to complete the WRDA report, compels Defendants to withdraw the decision to conduct annual drawdowns of Detroit Reservoir, and prohibits Defendants from conducting any drawdowns until they have completed a new SEIS in compliance with all applicable laws. Plaintiff City of Salem seeks an order barring Defendants from initiating or proceeding with a deep drawdown of Detroit Reservoir until there is a final decision on the merits of this case. In the alternative, Plaintiff City of Salem seeks a preliminary injunction requiring Defendants to

immediately cease the planned drawdown below 1,450 feet if turbidity levels reach 10 NTUs or more, and to refrain from any further drawdown until turbidity levels fall below 10 NTUs. The Plaintiff-Intervenors join in both motions, seeking the same relief.

The Court cannot order the requested relief because Plaintiffs and Plaintiff-Intervenors have not offered sufficient evidence to meet their burden to show that irreparable harm is likely in the absence of the relief they seek. Even assuming without deciding that Plaintiffs and Plaintiff-Intervenors have met their burden to show a likelihood of success on the merits, that the balance of equities weighs in their favor, and that an injunction is in the public interest, they are not entitled to the "extraordinary remedy" of a preliminary injunction because they have not made a "clear showing" that irreparable harm is likely. *Winter*, 555 U.S. at 22.

A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Subjective apprehensions and unsupported predictions" are insufficient to satisfy the moving party's burden to show a likelihood of irreparable harm. *Id.* at 675-76.

The Court begins its analysis by acknowledging that the ultimate harm Plaintiffs and Plaintiff-Intervenors discuss in their motions, should it occur, is undoubtedly irreparable. Plaintiffs' and Plaintiff-Intervenors' motions are supported by evidence of the profound impact that a loss of drinking water would have on hundreds of thousands of residents as well as hospitals, schools, businesses, and industries. Likewise, the record explains the impact of inadequate reservoir refill on necessary irrigation as well as industrial, recreational, and environmental uses of the water stored in the Detroit Reservoir. The problem for Plaintiffs'

motions, however, is that Plaintiffs fail to show that the proposed drawdown is likely to cause that harm.

With respect to turbidity, Plaintiffs rely on two general bodies of evidence: data showing the effects high turbidity levels would have if such turbidity was sustained over various periods of time; and evidence of what happened during drawdowns of other reservoirs, especially the Green Peter Reservoir in 2023. Plaintiffs essentially argue that those two categories of evidence together are enough for this Court to find it likely that the turbidity experienced following the Green Peter Reservoir drawdown will likewise occur as a result of the proposed 2026 drawdown of Detroit Reservoir, which would cause the harm discussed above. But Plaintiffs have failed to "connect the dots" by explaining and supporting with scientific evidence why the deep drawdown here will produce the same or similar turbidity effects seen at Green Peter or indeed any specific level of turbidity for any specific period of time.

As noted in the SEIS and other documents in the record, there are significant differences between the 2023 drawdown of the Green Peter Reservoir and the drawdown the Corps proposes at the Detroit Reservoir. In particular, as compared to the Green Peter Reservoir drawdown, the Detroit Reservoir drawdown (1) will expose much less sediment; (2) involves a drawdown to a level that the reservoir has been drawn down to twice before in recent years; and (3) will occur later in the year. The record suggests that each of these three factors would result in less turbidity than occurred as a result of the Green Peter Drawdown. The Court is therefore left with a record that suggests turbidity is likely to occur at some level, and that level is likely to be less than experienced as a result of the Green Peter Drawdown, but contains no way for the Court to discern what level of turbidity is actually expected as a result of the Detroit Reservoir drawdown and for how long. In other words, there is no site-specific analysis or data that shows turbidity

will reach damaging levels for any particular length of time. Without such information in the record, the Court cannot find that the drawdown is likely to cause the harm Plaintiffs identify in their motions.

At oral argument, citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011), counsel for Plaintiff City of Salem suggested that because of the magnitude of the potential harm, a lesser showing of its likelihood is required. Tr. 175:12-176:12. Given the public health risks at issue in depriving thousands of residents of drinking water, Salem contends that "even a threat [to that supply] is enough to find irreparable harm." Tr. 175:12-17. While that idea has an inherent and appealing logic to it, it is not the law. The irreparable harm element requires a party to "demonstrate a significant threat of irreparable injury, *irrespective of the magnitude of the injury*." *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (emphasis added). A similar sliding scale approach to the one Plaintiff City of Salem now urges is precisely what the U.S. Supreme Court rejected in *Winter*. *All. for the Wild Rockies*—the case Salem cited for the proposition that the magnitude of the harm mitigates the need to show a high probability that the harm will occur—only confirms that *Winter* "explicitly rejected" the Ninth Circuit's prior holding that a "'possibility' of irreparable harm was sufficient, in some circumstances, to justify a preliminary injunction." *All. for the Wild Rockies*, 632 F. 3d at 1131. Though the Court recognizes the gravity of the harm Plaintiffs allege could occur if turbidity reaches the level Plaintiffs fear it will, the law prohibits the Court from finding that the degree of that harm mitigates Plaintiffs' need to show its likelihood to occur.

On the issue of refill of the Detroit Reservoir, that harm is likewise speculative on the record before the Court because Plaintiffs fail to demonstrate that inadequate refill is likely to occur. Plaintiff Marion County and Plaintiff-Intervenor Santiam Water Control District both note

that this year's predicted El Niño event makes it more likely than the average year that the Detroit Reservoir will fail to refill to normal levels as quickly as desired because such years tend to yield drier fall and winter seasons. But "more likely than usual" does not tell this Court how likely it is to happen at all, as compared to a normal year or otherwise. While Marion County's motion notes that rainfall fails to sufficiently replace water in Detroit Reservoir "one in four years," it fails to cite to any evidence supporting that proposition. Marion County Mot. 36. During oral argument, counsel for Marion County directed the Court to a graph in an appendix to the SEIS for its "one in four years" assertion. Tr. 145:15-146:10; NFS Resp., ECF No. 66. While that appendix is not in the record, the Court located it and the graph at page B-358 on the Corps' website.[1] The Court is unsure that the graph shows what Marion County asserts that it shows, but in any event, a 25% likelihood—even when bolstered by the amorphous prospect of a strong El Niño event—fails to show "likelihood." Without meaningful and interpretable data on expected rainfall coupled with evidence of what length and severity of inadequate refill is likely to result in the harm Plaintiffs allege, the Court cannot find that such harm is likely.

Finally, the Court notes that the emergency plan in place for the drawdown provides a mechanism by which the drawdown may be paused or halted in the event that the State of Oregon "has data and/or information demonstrating that the affected Public Water System is at high risk of failing to provide adequate water (water quantity) or to meet regulatory requirements for safe drinking water (water quality)" if the halt would help remedy or ease the problem. Deep Drawdown Emergency Response Communications Plan 2. While this Court finds for the reasons

---

[1] *Willamette Valley System Operations and Maintenance, Appendix B: Hydrologic Process Technical Information*, US ARMY CORPS OF ENGINEERS (2025), https://publibrary.sec.usace.army.mil/api/download?id=d921d01f-aab9-4224-b3a7-4a813728b3b0&filename=USACE%20WVS%20FSEIS_Appendix%20B_Hydrologic%20Processes_May2026.pdf&token=&preview=true

outlined above that Plaintiffs fail to show a likelihood of irreparable injury regardless of the existence of this plan, the emergency plan provides an additional reason to deny the motions because Plaintiffs fail to demonstrate why the plan is inadequate to prevent the harm from occurring.

The Court shares Plaintiffs' concerns about the threats posed by the possibility of high turbidity and inadequate refill to their interests, and to the interests of the many people, communities, and businesses that rely on a clean and adequate water supply from the North Santiam River downstream of the Detroit Dam and Reservoir. But "possibility" is not "likelihood," and the law requires parties seeking injunctive relief to demonstrate that the irreparable harm they fear is "likely" to occur. Plaintiffs fail to make that showing here and their motions are therefore denied without reaching the other elements of the *Winter* test. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (explaining the court need not address remaining elements where moving party fails to demonstrate likelihood of irreparable harm). However, Plaintiffs have leave to file renewed motions for injunctive relief either during the 2026 drawdown or prior to the 2027 drawdown, should new facts and data—specific to the Detroit Reservoir drawdown—support it.

## CONCLUSION

For the reasons discussed above, the parties' Motions for Preliminary Injunction (ECF Nos. 18, 51, 55, 58) are DENIED without prejudice to renewed motions for injunctive relief as explained in this Opinion and Order.

DATED this 4th day of November 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge

**Deep Drawdown Emergency Response Communications Plan**
**Green Peter, Lookout Point and Detroit Reservoirs**
**Willamette Valley System, Oregon**
**Updated: September 30, 2026**

**General Background**

The U.S. Army Corps of Engineers (USACE) began implementing deep reservoir drawdowns at Green Peter and Lookout Point reservoirs in the fall of 2023 to improve conditions for fish passage and water quality in the Willamette Valley System (WVS) pursuant to the interim injunction ordered by the U.S. District Court for the District of Oregon in *NEDC v. USACE et al.*, No. 3:18-cv-00437-HZ[1]. In the initial year, the drawdowns resulted in elevated turbidity and higher water temperatures, which likely created stressful conditions for protected salmonids and local fish species. Additionally, downstream communities reported associated challenges at their municipal drinking water facilities.

Fortunately, environmental and operational conditions have improved since the initial implementation period. USACE, however, remains committed to closely monitoring turbidity levels, meeting regularly with state and local communities, and continuously updating the Emergency Response and Communications Plan (Plan). These ongoing efforts ensure the safe management of drawdown operations designed to support downstream Endangered Species Act (ESA)- listed fish downstream passage.

USACE will proceed with reservoir drawdown operations in 2026, which include lowering water levels at the Green Peter, Lookout Point, and Detroit reservoirs. These actions are outlined in the Final Environmental Impact Statement for Willamette Valley System Operations and Maintenance as well as the Record of Decision, and adopted in the 2024 National Marine Fisheries Service Biological Opinion.

This is the first year of the Detroit Reservoir drawdown, and essential contacts for communities downstream of Detroit Dam have been included in this updated version of the Plan.

**Purpose**

The purpose of this Plan is to identify criteria for implementing notification and response procedures that cities, Oregon, and USACE will undertake related to adverse impacts of the deep drawdowns on municipal drinking water facilities located downstream of Green Peter, Lookout Point and/or Detroit reservoirs. This plan is a "living document" and will remain adaptive to real time events. The scope, frequency, and intensity of monitoring and data collection and evaluation as well as response procedures are to be adapted as appropriate to conditions.

**Deep Drawdown Operations and Coordination**

*Operations*

The timing of reservoir drawdown and refill is dependent on annual plans and inflows; rainy conditions and high inflows can result in a slower draft of the reservoirs, but these high inflows are also critical in supporting refill. Current forebay elevation information can be tracked in real-time on USACE's public website (https://www.nwd-wc.usace.army.mil/nwp/teacup/willamette/). Operational information and

[1] The implementation of reservoir drawdowns at Fall Creek and Cougar occurred prior to the injunctive order and are not addressed here.

drawdown timing will be communicated through routine coordination calls between USACE, Oregon, drinking water facility staff and interested City officials.

*Coordination*
USACE will host regular meetings to discuss real-time and forecasted (expected future) dam operations and reservoir level information. In return, USACE will receive updates from drinking water facilities on the current condition of their plants, water reserves, etc. Meetings will generally be held from approximately August through February, or until turbid conditions diminish. Critical meeting times include:

- Once reservoir is nearing minimum conservation pool elevation.
- Once reservoir has been drafted below minimum power pool elevation.
- When reservoir is nearing lowest drawdown elevation (El. 780 feet for Green Peter, El. 750 feet for Lookout Point and El. 1425 feet at Detroit in 2026).
- Anytime a drinking water provider is concerned about facility conditions or is nearing critical low water supplies/reserves.
- Water provider is at risk of not meeting EPA standards after testing finished water.

USACE will also continue to coordinate with the State through regular meetings with Oregon agency directors from the Oregon Department of Environmental Quality (ODEQ), Oregon Health Authority (OHA), Oregon Department of Fish and Wildlife (ODFW) and the Oregon Water Resources Department (OWRD).

**Monitoring**
The USACE will continue to monitor the effects of the deep drawdowns as funding allows. This may include monitoring for turbidity, dissolved oxygen (DO), water temperature, total dissolved gas and sediment quantity and quality sampling. Information to date can be accessed through the USGS's public website (https://maps.waterdata.usgs.gov/mapper/index.html) or via the Willamette Injunction website (https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/).

**Declaration of Emergency Conditions**
The declaration of an emergency can be a controversial decision with wide ranging consequences; however, the issue cannot be considered too long since an early decision and declaration is critical to maximize available response time. The declaration of a municipal drinking water emergency is the sole responsibility of the affected drinking water facility, city, and State. This declaration will not be made by USACE.

The State may request a temporary pause or halt to the drawdown based on the criteria below. This criteria includes:

1. The State has data and/or information demonstrating that the affected Public Water System is at high risk of failing to provide adequate water (water quantity) or to meet regulatory requirements for safe drinking water (water quality).
2. A halt would help remedy, ease or stop the problem and/or have a positive impact on returning to the ability to provide adequate water that meets drinking water standards.
3. Reasonable options available to provide adequate water quantity or quality have been exhausted.

**Notifications and Actions to be Taken**

If drinking water facility concerns arise, the impacted city will contact OHA, who will consider whether to ask for a halt of operations according to the above criteria, with alignment among Oregon agencies and through the Governor's Office. The city may also contact USACE Willamette Valley Systems Operations Project Manager, who will work with OHA to determine a path forward.

In the event the above criteria are met, the Oregon Governor's Office may contact the Commander, Portland District, and follow up with an email. This request, if made, is independent of any declaration a municipality or county may make. USACE does not intend to take action unless requested by the Oregon Governor's Office or unless a drinking water emergency has been determined based on the above criteria developed by the State. USACE will evaluate and determine the response to the emergency declaration based off the same criteria, with the expectation that all necessary data and/or information will be provided to USACE to make that determination.

Once USACE receives a request to pause or terminate the drawdown, the Commander will work through the USACE chain of command as appropriate. USACE may pause or terminate the drawdown by raising the reservoir elevation as appropriate and as feasible.[2]

The Cities are expected to work with OHA and are responsible for informing their constituents as to the state of drinking water, while USACE will be responsible for emergency notification response within its agency. OHA will be responsible for directly engaging with other State agencies and with the Oregon Governor's Office.

Drinking Water Facility POCs[3]:

1. City of Sweet Home: Dominic Valloni, [redacted]
2. City of Lebanon: Tyson Keene, [redacted]
3. City of Albany: Scott LaRoque, [redacted]
4. City of Lowell: Max Baker, [redacted]
5. Springfield Utility Board: Jay McElhose, [redacted] 24-Hour Emergency: [redacted]
6. City of Gates: Greg Benthin [redacted], Traci Archer [redacted]
7. City of Lyons: Greg Benthin [redacted], Kelly Namitz [redacted]
8. City of Stayton: Michael Bradley [redacted]
9. City of Salem: Cody Marrs [redacted] Lacey Goeres-Priest [redacted] Jason Pulley, [redacted]
10. City of Jefferson: Jeff Buskirk [redacted] Kyle Ward [redacted]

OHA-Drinking Water Services Staff Contact During Business Hours:

1. Chantal Wikstrom, Emergency Response Coordinator & Marion Co. Regulator, [redacted]
2. Nicholas Alviani, DWS Regulator, [redacted]
3. Samina Panwhar, DWS Section Manager, [redacted]

---

[2] The ability to refill a reservoir is highly dependent on inflow rates. Inflow must be greater than outflow to refill a reservoir.

[3] The cities of Mill City and Sublimity have been omitted from this list since they use groundwater wells for their drinking water needs.

4. Kari Salis, Technical Services Manager, [redacted]
5. Casey Lyon, Region 2 Technical Services Manager, [redacted]

OHA-Drinking Water Services after hours (after 5pm, weekends, and holidays) – contact the on-call drinking water manager at [redacted]

State of Oregon Staff Email:

1. Grace Goldrich-Middaugh, Oregon Department of Environmental Quality, [redacted]
2. Alyssa Mucken, Oregon Water Resources Department, [redacted]
3. Travis Kelly, Oregon Water Resources Department, [redacted]
4. Kelly Reis, Oregon Department of Fish and Wildlife, [redacted]
5. Curtis Peetz, Oregon Emergency Management, [redacted]
6. Chandra Ferrari, Natural Resources Advisor, Governor's Office, [redacted]

USACE Communications Chain:

1. Colonel McEvoy, Commander, Portland District, [redacted]
2. Deputy District Engineer
3. Chief of Operations
4. Dustin Bengtson, Willamette Valley System Operations Project Manager, [redacted]
5. Greg Taylor, Willamette Valley System Operations Fisheries Biologist, [redacted]
6. USACE Emergency Management
7. Chief of Hydraulics and Hydrology Branch
8. Chief of Water Management
9. Office of Counsel

**Communications Plan Updates**

This communications plan, notification list, and emergency response procedures should be updated and reviewed periodically to ensure that contact information is up to date, and procedures are consistent with project conditions.

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division

ASHLEY M. CERRITOS, OSB #165397
Trial Attorney
MARIO ALFONSO LUNA, D.C. Bar ID No. 90006479
Trial Attorney
United States Department of Justice
Energy and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-5492 (Cerritos)
(202) 532-3357 (Luna)
Ashley.Cerritos@usdoj.gov
Mario.Luna@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **MARION COUNTY**,<br><br>Plaintiff,<br>And<br><br>**SANTIAM WATER CONTROL DISTRICT** and **CITY OF STAYTON**,<br><br>Plaintiff-Intervenors<br><br>v.<br><br>**U.S. ARMY CORPS OF ENGINEERS**, et al.,<br><br>Defendants,<br>And | Case No. 6:26-cv-956-MTK (Lead Case)<br><br>Case No. 6:26-cv-1381-MTK (Trailing Case)<br><br>**DECLARATION OF KATHRYN TACKLEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER** and **NATIVE FISH SOCIETY**,

Defendant-Intervenors.

**CITY OF SALEM,** an Oregon Municipal Corporation,

Plaintiff,

And

**SANTIAM WATER CONTROL DISTRICT** and **CITY OF STAYTON**,

Plaintiff-Intervenors

v.

**UNITED STATES OF AMERICA**, and **UNITED STATES ARMY CORPS OF ENGINEERS**, an agency of the United States government**,**

Defendants,

And

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER** and **NATIVE FISH SOCIETY**,

Defendant-Intervenors.

I, Kathryn Tackley, declare based upon personal knowledge, or information provided to me in my official capacity, as follows:

1. I am the Willamette Valley Program Manager for the U.S. Army Corps of Engineers (“Corps”) Portland District (“the District”), Portland, Oregon and I have held this position since July 2025. As Program Manager, I oversee the programmatic planning, prioritization and funding of Endangered Species Act (“ESA”)-related actions across the Willamette Valley System (“WVS”) of Corps dams and revetments in the Willamette

River Basin. This includes frequent regional engagement with State, Tribal, and Federal agencies, as well as Congress, city governments, and the public.

2. Prior to my current position, I worked in the Portland District's Reservoir Regulation and Water Quality Section for eighteen years, and as Water Quality Lead for the last ten of those years. I focused primarily on the identification, evaluation, implementation, and coordination of operational modifications at Corps dams to improve fish passage and water quality. By combining my limnological and water quality background with reservoir regulation principles, I established operations tailored to the specific dam configurations, operational constraints, and downstream hydrological effects of each Corps dam. These improved operational strategies maintain the multiple congressionally authorized project purposes while satisfying compliance requirements set forth in the National Marine Fisheries Service and U.S. Fish and Wildlife Service Biological Opinions. More specifically, I led the evaluation and implementation of water temperature management operations at Detroit Dam[1], operations still carried out today to improve ESA-listed fish conditions. I subsequently directed the multi-project technical assessment that produced the 2012 Willamette River Basin Operational Measures Evaluation Report[2], which established the first formal plan analyzing operational changes to improve fish passage, water temperatures, and total dissolved gas levels across the WVS. Some of these operations were later adopted as injunction operations under *Northwest Environmental Defense Center v. United States Army Corps of Engineers*, D.

---

[1] U.S. Army Corps of Engineers Portland District, Detroit/Big Cliff Dams Interim Temperature Operations Study, Phase I Technical Report (March 2009).
[2] U.S. Army Corps of Engineers Portland District, Willamette River Basin Operational Measures Evaluation Report (June 2012).

Or. Case No. 3:18-cv-00437-HZ. I also served as one of two Corps employees appointed to the Expert Panel established by the Court in that case and provided operational expertise during the development and implementation of court-ordered injunction operations. Additionally, I served as Water Quality Technical Manager for the Columbia River System Operations Environmental Impact Statement[3], leading the interdisciplinary team that constructed the first system-wide multi-dimensional Columbia River water temperature model to assess basin-scale water temperature control strategies.

3. Detroit Dam and Reservoir is one of the thirteen Corps' Willamette Valley projects operated as part of the WVS. As a system, operations at one dam often affect another; and all dams and reservoirs are used systematically to meet multiple project purposes and operational considerations, including flood-risk management, downstream flow management, water supply, fish passage, water quality, and public safety both in the tributaries where these dams are located and downstream in the mainstem Willamette River.

4. Detroit Reservoir operates in accordance with a reservoir control diagram, commonly referred to as the rule curve (Figure 1). Originally developed during project design and construction, this rule curve defines target reservoir elevations throughout the year based on weather and hydrologic conditions. Detroit Reservoir fluctuates throughout the year from a minimum conservation pool (elevation 1,450 feet) in the winter to capture flood events, to a maximum conservation pool (elevation 1,563.5 feet) in the summer for summer reservoir recreation and downstream flow augmentation for fish, water quality,

---

[3] Record of Decision; Columbia River System Operations Environmental Impact Statement, 85 Fed. Reg. 63834 (Oct. 8, 2020).

power generation, irrigation, and municipal and industrial uses.[4] Starting no later than August 31, the Corps begins drawing the reservoir down in preparation for flood risk reduction operations.[5] The reservoir is typically drawn down to the minimum conservation pool level (elevation 1,450 feet) by December 1 for flood risk management. Detroit Dam has outlets at several different elevations in the reservoir, including the spillway (elevation 1,541 feet), turbines (elevation 1,395.5 feet), upper regulating outlets (ROs) (elevation 1,340 feet), and lower ROs (elevation 1,265 feet). These outlets are used strategically to pass water and meet downstream biological and water supply goals.

---

[4] U.S. Army Corps of Engineers, Authorized and Operating Purposes of Corps of Engineers Reservoirs (November 1994), https://www.hec.usace.army.mil/publications/ProjectReports/PR-19.pdf.

[5] Reservoir pool elevations are primarily driven by prevailing hydrologic conditions, including precipitation events, snowpack, and net inflows and releases. Deviations from the rule curve, including initiating reservoir drafting prior to the August 31 operational target date, are common in dry water years since early drafting of stored water may be required to meet mandatory downstream flows for water supply or fish habitat purposes.




Figure 1. Detroit Dam Water Control Diagram

## DETROIT DRAWDOWN FOR ESA-LISTED FISH

5. A fall reservoir drawdown has been proposed for Detroit to improve volitional downstream fish passage by lowering the surface of the reservoir closer to the upper ROs of Detroit Dam during the winter so that surface-oriented spring Chinook salmon can find their way through Detroit Dam and downstream safely. This operation differs from the standard seasonal drawdown described above, both in its drawdown magnitude and timing. Under a standard winter drawdown, the surface of Detroit Reservoir is drawn down closest to the turbines, which are known to impact the survival of fish when they pass through this outlet. By drawing down the surface of the reservoir lower and closer to the upper ROs, fish are provided with a safer outlet to pass. Decl. of Greg Taylor ("Taylor Decl.") ¶ 3.

6. Under the proposed Detroit Reservoir fish passage drawdown operation, the reservoir will be drafted below the ordinary winter low-level of 1,450 feet, a shallow 25 feet this

year, to 1,425 feet. Then, over the next several years, the elevation will step down to an ultimate target depth of 1,395 feet, which is approximately 50 feet over the top of the upper RO outlet. This fish passage drawdown would occur in December and be held at the target elevation for approximately two weeks. Achieving this final target elevation will be structured as a multi-year, incremental process managed by closely monitoring and responding to data collected during implementation.

7. Considerable coordination, analysis, and planning have guided, and will continue to guide, the development of the Detroit drawdown operation. The Corps has met with community leaders and drinking water facility operators on numerous occasions to thoroughly understand their specific operational constraints and concerns. Additionally, we have completed extensive data collection and analysis, all of which has directly shaped our reservoir drawdown strategy. From its inception, the Detroit Reservoir drawdown plan has been developed with minimization measures at the forefront to actively reduce and avoid negative impacts associated with elevated turbidity. This includes careful optimization of drawdown magnitude, timing, and duration to ensure a conservative and safe operation each year.[6]

8. The plan is to draw down Detroit Reservoir gradually over multiple years to minimize the amount of sediment that is eroded and transported downstream in any given year. During the first year of the operation, Detroit Reservoir will be drafted to an elevation of 1,425 feet, a drawdown that is 25 feet below typical winter levels. For context, this initial drawdown depth is shallower than the 32-foot drawdown implemented annually at Cougar Reservoir, an operation that has resulted in little to no turbidity response in any of

---

[6] U.S. Army Corps of Engineers Portland District, Appendix C, Supplemental Environmental Impact Statement for the Operation and Maintenance of the Willamette Valley System 90 Fed. Reg. 30302 (June 2026).

the years it has been active. Physically, the Cougar drawdown is the most comparable to the proposed Detroit operation both in terms of total elevation change and the size of the remaining residual pool. However, a key operational difference lies in the infrastructure. The RO at Cougar features a less fish-friendly stilling basin that results in increased fish injury when fish exit the RO; this is not the case for Detroit Dam.

9. Another reason that the elevation 1,425 feet was selected as the optimal initial increment for the phased approach is because Detroit Reservoir has been successfully drafted to this elevation in the past, specifically during the 2015 drought and during a 2019 operation to support construction and maintenance. In neither instance was a significant turbidity response observed downstream; and no operational complaints were recorded by municipal drinking water facilities or local community representatives (Figure 2). While the 2015 and 2019 drawdowns were not conducted for fish passage purposes, they serve as reliable technical surrogates for the water quality conditions expected during this first year of the Detroit Reservoir drawdown, demonstrating that drafting to 1,425 feet is technically viable without triggering elevated turbidity.




Figure 1. Reservoir Inflow and Elevation and Corresponding Downstream Turbidity Conditions, 2015 and 2019, Detroit Dam

10. This stepwise approach, with frequent engagement from stakeholders, provides the Corps the ability to pause, modify, delay, or discontinue a drawdown if monitoring or forecast information indicates that doing so is warranted. The operation is therefore adaptive, rather than predetermined without regard to actual conditions. The proposed stepwise approach also allows the Corps to observe real-time conditions at successive reservoir elevations before determining whether to proceed further. This approach is intended to

limit the potential for unobserved or uncontrolled changes in sediment transport and to permit operational adjustments based on actual conditions.

11. The Detroit Reservoir drawdown operation commences once the pool is drafted below the minimum conservation elevation of 1,450 feet and officially concludes once the reservoir is refilled back to that same 1,450-foot threshold following the drawdown. All reservoir operations beyond that point will be governed by the standard rule curve and established reservoir regulation guidelines, thus are not considered an effect of the fish passage drawdown operation.

12. In the first year, the drawdown will likely begin in early December, immediately following the conclusion of annual water temperature management operations. Based on operational data from drawdowns implemented at other Willamette Valley reservoirs, delaying the drawdown until the reservoir has naturally cooled ensures that in-reservoir and downstream water temperatures are not compromised. This operational timing protects sensitive downstream aquatic habitats from receiving warm water discharges during the initial stages of the drafting process. *See* Taylor Decl. ¶ 12.

13. Carrying out the operation in December also ensures that impacts to recreation are minimized. The Mongold boat ramp becomes unavailable when Detroit Reservoir is drawn down below elevation 1,450 feet. Timing this drawdown so that it occurs during the lowest-use season of the year will concentrate the period of boat ramp unavailability when public demand is at its lowest, thereby minimizing the overall disruption to lake recreation.[7]

**REFILL FOLLOWING DETROIT DRAWDOWN**

---

[7] U.S. Army Corps of Engineers Portland District, Appendix K, Supplemental Environmental Impact Statement for the Operation and Maintenance of the Willamette Valley System 90 Fed. Reg. 30302 (June 2026).

14. The ability to refill Detroit Reservoir following a fall drawdown depends primarily on seasonal hydrology. The key variable in this process is the volume and timing of winter inflows to the reservoir, rather than any minor difference in the starting reservoir elevation. The Corps has thoroughly evaluated reservoir refill capabilities using hydrologic modeling and historical data from the period of record. This evaluation analyzed refill performance across a wide range of hydrologic conditions, including dry years and conditions associated with strong El Niño events. Our analyses indicate that the reservoir will successfully refill to its minimum conservation pool elevation from the targeted drawdown depth, even under the driest simulated conditions.

15. In 2015, a recent drought year in the Willamette Basin, Detroit Reservoir was drafted to an elevation of 1,425 feet in November due to a lack of water. As shown in Figure 3, the reservoir subsequently refilled back to the minimum conservation pool elevation, going as high as 70 feet above the minimum conservation pool during the month of December demonstrating the high refill capacity of the system even under dry conditions.




Figure 2. 2015 Detroit Reservoir Elevations (blue line) as compared to Rule Curve (black line)

Another example to consider is the fish passage reservoir drawdown implemented at Green Peter Reservoir since 2023 (Figure 4). Despite executing a much larger 142-foot drawdown below its minimum conservation pool, compared to the initial 25-foot drawdown and final 55-foot drawdown planned for Detroit, Green Peter has successfully recovered to its minimum conservation elevation each year well before January 31.[8]

[8] While not shown in Figure 4, Green Peter reached minimum conservation pool elevation of 922 feet on 09 January in 2023.




Figure 4. Green Peter Reservoir Elevations in 2023, 2024 and 2025 as compared to Rule Curve.

## OTHER DRAWDOWN OPERATIONS IN THE WVS

16. The Corps recognizes that reservoir drawdowns may affect turbidity and sediment transport. The magnitude, duration, and location of those effects depend on site-specific factors, including the size of the residual pool, reservoir morphology, sediment characteristics, storm timing, reservoir elevation, release patterns, and downstream flow conditions.

17. Detroit Reservoir's physical configuration and its operational characteristics are important to evaluating potential sediment mobilization. Observed conditions at Green Peter or Lookout Point reservoirs cannot be assumed to occur at Detroit Reservoir without accounting for differences among the reservoirs and each dam's configuration. A primary distinction between the projects lies in the target depth of each project's RO which drives the elevation of the drawdown operation. Green Peter's ROs are much deeper as compared to Detroit. Under a fish passage drawdown scenario, Green Peter is drawn down to an elevation of 142 feet below its minimum conservation pool, whereas

Lookout Point is drafted to 75 feet below its minimum conservation level. By comparison, Detroit Reservoir will be initially drawn down 25 feet to an elevation of 1,425 feet. These variations in drawdown depth are dictated by the physical location of the ROs used to pass water and fish.

18. The depth of a drawdown also dictates how much reservoir sediment is exposed once the reservoir is drawn down, how deep of a new channel the river must carve when drawdown is first initiated, and how much residual pool remains to act as a settling basin to capture sediment transported downstream from the upper reaches of the reservoir. Because Detroit Reservoir has a shallower drawdown, it will experience less sediment scour (from newly exposed sediments) and will retain a much larger residual pool for trapping those sediments as compared to Green Peter or Lookout Point (Figure 5).

19. When a reservoir is drafted, the uppermost portion of the pool is converted back into a river, which carves through sediment deposits that have settled out over time. At Detroit Reservoir, the shallower 55-foot drawdown requires far less channel carving and bed disruption than the deeper drawdowns at Lookout Point or Green Peter, significantly limiting the initial release of turbid water. Topographical analysis shows that drafting Detroit Reservoir to an elevation of 1,395 feet will ultimately expose only 0.8 square miles of sediment to rain and river flow, whereas the much deeper drawdown at Green Peter Reservoir exposed 4.5 square miles of sediment (Figure 5). Because Detroit Reservoir retains a much larger residual pool and exposes only a fraction of the surface area, there is far less material available to erode downstream, allowing the remaining pool to act as an active settling basin where newly carved channel beds can naturally

stabilize over time and return sediment contributions to normal baseline levels during subsequent drawdown operations.[9]




Figure 3. Surface Area Exposed Under Full Drawdown at Detroit Reservoir (top graphic) as Compared to Green Peter Reservoir (lower graphic)

19. To minimize the risk of sediment mobilization while achieving biological objectives, Detroit Reservoir will be held at its targeted low-level elevation for a limited duration of approximately two weeks. This operational window should provide sufficient time for

[9] U.S. Army Corps of Engineers Portland District, Appendix C, Supplemental Environmental Impact Statement for the Operation and Maintenance of the Willamette Valley System 90 Fed. Reg. 30302 (June 2026).

juvenile fish to navigate past the dam and continue downstream, while simultaneously limiting the exposure of newly uncovered reservoir sediments to erosion. Empirical data from drawdowns at other Willamette reservoirs demonstrate that restricting the duration of low-pool conditions successfully mitigates downstream turbidity spikes.[10] By compressing this operational window, the likelihood of a high-intensity precipitation event occurring during drawdown is significantly reduced, thereby preventing elevated turbidity associated with high-velocity inflows and rain-on-soil erosion events. The Corps will evaluate conditions at the time of the proposed operation, including dry-weather indicators, temperature, precipitation, forecasted inflows, reservoir elevations, and other pertinent operational information. These factors will inform both whether to begin the operation and whether, and for how long, to continue it.

**TURBIDITY AND SEDIMENT ANALYSIS**

20. With recently available funding, the Corps began preparing a turbidity report for Congress. The report will consolidate existing information collected during recent drawdowns at Green Peter and Lookout Point reservoirs with monitoring data from the U.S. Geological Survey ("USGS").

21. The Corps has collected and evaluated sediment in Detroit Reservoir, confirming that sediment quality within the reservoir does not present an environmental or operational concern. Sediment composition and quality have been verified through multiple sampling efforts, with the most recent event in the spring of 2026 focusing on active erosional zones within the reservoir basin. Using a standard PONAR grab sampler, discrete

[10] U.S. Geological Service Website, Water Gage Data for Oregon, https://waterdata.usgs.gov/monitoring-location/USGS-14180520/#dataTypeId=continuous-63680--1750367756&period=P7D&showMedian=true&showFieldMeasurements=true (last visited September 18, 2026).

samples were collected at predetermined locations with high sediment transport potential and submitted for grain size and total solids physical analysis. Composite samples were analyzed for total organic carbon, total solids, metals, polynuclear aromatic hydrocarbons, semivolatile organic compounds, pesticides, polychlorinated biphenyls as Aroclors, and total petroleum hydrocarbons. Analytical results confirm that contaminants and heavy metals are either non-detectable or present at concentrations well below regulatory thresholds of concern.[11]

22. To supplement our baseline understanding, bathymetric data was collected to map the reservoir floor topography prior to drafting, which will allow the Corps to identify sediment source and sink dynamics once drawdown operations commence.

23. The Corps is also using turbidity data from the North Santiam River during two distinct periods: a) 2000-2016, prompted by the 1996 flood; and b) 2020-present, initiated to assess the impacts of the 2020 wildfires on sediment yield (total sediment per basin area) to better understand the North Santiam River turbidity spikes driven by natural river and weather processes. In particular, the Niagara monitoring station routinely records levels exceeding 10 FNU for 12 or more hours.[12] This information was used to inform portions of the WVS Supplemental Environmental Impact Statement and in the development of the proposed Detroit Reservoir drawdown operation and to determine water quality sampling locations during drawdown operations.[13]

---

[11] U.S. Army Corps of Engineers Portland District, Willamette Valley System 2026 Detroit – Big Cliff Reservoirs Sediment Quality Report (July 2026).

[12] U.S. Geological Service Website, Water Gage Data for Oregon, https://waterdata.usgs.gov/monitoring-location/USGS-14180520/#dataTypeId=continuous-63680--1750367756&period=P7D&showMedian=true&showFieldMeasurements=true (last visited September 18, 2026).

[13] U.S. Army Corps of Engineers Portland District, Chapter 3 and Appendix C, Supplemental Environmental Impact Statement for the Operation and Maintenance of the Willamette Valley System (June 2026).

24. The Corps has also developed a comprehensive monitoring plan for the 2026 drawdown, dedicating an unprecedented level of instrumentation and personnel resources to track water quality parameters in real-time despite historical observations that indicate major turbidity issues are unlikely in the first year of drawdown. This monitoring network will track turbidity, water temperature, total dissolved gas, and flow, with physical sampling of suspended sediment concentrations conducted throughout the drawdown period (Figures 6 and 7). This robust tracking effort is designed in coordination with the USGS's water quality and suspended sediment field sampling experts. The complete monitoring plan, including maps of the monitoring stations and weblinks for accessing the real-time data, will be shared broadly with stakeholders and State partners to maintain full transparency throughout the drawdown.




Figure 6. Locations of Turbidity and Suspended Sediment Concentration Sampling Planned for 2026, Upstream and Downstream of Detroit Dam




Figure 7. In-Reservoir Turbidity Monitoring Sampling Locations Planned for 2026.

## COORDINATION OF THE DETROIT DRAWDOWN

24. The Corps will use real-time or near-real-time monitoring, as appropriate, together with weather and hydrologic forecasts, to evaluate turbidity conditions. In coordination with the Oregon Health Authority, Oregon Department of Environmental Quality, and other appropriate state agencies and local drinking water facilities, the Corps may pause or modify operations before turbidity presents an unacceptable risk to downstream drinking-water operations or other identified resources.

25. The Corps has incorporated operational lessons from prior drawdown operations at Green Peter and Lookout Point Reservoirs to proactively manage potential turbidity risks in the North Santiam subbasin. These lessons highlight the necessity of early, recurring communication with affected municipal drinking water providers, continuous monitoring during changing hydrologic conditions, and the need to maintain operational flexibility to modify or pause operations when circumstances warrant.

26. On August 05, 2026, the Corps hosted a regional after action meeting bringing together stakeholders from the South Santiam and Middle Fork Willamette regions to evaluate last year's drawdown operations at Green Peter and Lookout Point Dams, capture lessons learned, and identify crucial process improvements. Stakeholders from the North Santiam were also invited to this meeting to observe how this would similarly look for the drawdown operation at Detroit Dam.

27. As implementation for the 2026 drawdowns approaches, the Corps will be transitioning to a weekly meeting schedule with state regulators and municipal leaders to share real time dam operations, meteorological forecasts, and water quality data. These more frequent engagements will focus on updating and formally adopting the Willamette Reservoir Drawdown Emergency Response and Communications Plan, which will integrate North Santiam communities for the first time to establish shared emergency response thresholds and real time notification protocols across all municipal facilities.

28. The Emergency Response and Communications Plan serves as the plan document for implementing the notification and response procedures that cities, the State, and the Corps will undertake regarding the adverse impacts of deep drawdowns on municipal drinking water facilities located downstream of the Green Peter, Lookout Point, and recently Detroit reservoirs. This plan and its established processes were utilized in 2024 to direct an early halt to the Green Peter drawdown, following a recommendation from the Oregon Health Authority. Upon receiving the recommendation to halt, the Corps took immediate action to stop the drawdown and begin refilling to alleviate downstream conditions. During this event, the plan proved successful in facilitating communications

among all parties. Consequently, this plan will remain in place to guide coordination for all future drawdowns.

29. In summary, the Corps' planned approach relies on hydrologic modeling, historical operations, current observations, forecasts, phased decision points, water-quality monitoring, and coordination with downstream entities. The Corps will not treat the operation as fixed regardless of conditions; rather, it will evaluate available information throughout the operation and retain the ability to pause, delay, modify, or cease further drawdown as conditions require.

30. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this September 18, 2026, at Portland, Oregon.

TACKLEY.KATHRYN.L.1273873119 Digitally signed by TACKLEY.KATHRYN.L.1273873119 Date: 2026.09.18 15:27:42 -07'00'

KATHRYN TACKLEY
Willamette Valley Program Manager
U.S. Army Corps of Engineers
Portland District

Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
2512 SE 25th Ave., Suite 304
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org
*Attorneys for Defendant-Intervenors*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

MARION COUNTY, a Political Subdivision of the State of Oregon,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Intervenor-Plaintiffs,

v.

U.S. ARMY CORPS OF ENGINEERS, DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army, and WILLIAM H. GRAHAM, JR., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers,

Defendants,

and

NORTHWEST ENVIRONMENTAL

Case No. 6:26-cv-956-MTK (Lead Case)
6:26-cv-1381-MTK (Trailing Case)

**DECLARATION OF KIRK SCHROEDER**

DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

---

CITY OF SALEM, an Oregon Municipal Corporation,

Plaintiff,

and

SANTIAM WATER CONTROL DISTRICT, and CITY OF STAYTON, an Oregon municipal corporation,

Plaintiff-Intervenors,

v.

UNITED STATES OF AMERICA, and UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the United States government,

Defendants,

and

NORTHWEST ENVIRONMENTAL DEFENSE CENTER and NATIVE FISH SOCIETY,

Defendant-Intervenors.

---

I, Kirk Schroeder, declare as follows:

1. I have personal knowledge of the facts set forth below and if called as a witness I would and could truthfully testify to these facts.

2. I have been asked to provide my expert opinion on the drawdown at Detroit Reservoir as an interim passage measure required by the 2024 Biological Opinion ("BiOp", RPA 4.12.2, p. 6.4-524). The long-term proposal is for a structural fish passage measure (floating screen structure (2024 BiOp RPA 4.13.5, pp. 6.4-529–530)), although implementation requires a lengthy design and construction process and is dependent on obtaining the necessary funds (Record of Decision for SEIS, p. 12)[1].

3. I provided previous expert declarations in *Northwest Envtl. Defense Ctr. v. U.S. Army Corps of Engrs.,* No. 3:18-cv-437-HZ, ECF Nos. 37, 76, 97, 119, 144 (D. Or., filed Mar. 13, 2018). I served on the court-appointed expert panel to develop measures and implementation plans to address dam operations and fish passage. *Id.* at ECF Nos. 196, 208, 224, 228, 233, 238, 240, 249, 278, 293, 297

4. I have appended details about my professional qualifications and experience. In brief, I have spent over 40 years researching, analyzing data, and monitoring salmon and steelhead, 36 of which I was employed with the Oregon Department of Fish and Wildlife ("ODFW"). I have extensive experience with Willamette River salmonids through the Willamette Spring Chinook Research Project (1966–2013), and served as the Project Leader in 2004–2013. I have continued to work with the Willamette River research project and write

[1] Record of Decision, Willamette Valley System Operations and Maintenance Final Supplemental Environmental Impact Statement, dated 23 June 2026 (link to document at https://www.nwp.usace.army.mil/WVS-EIS/ )

research papers. Two recent papers that I discuss in this declaration are attached at Exhibits A and B (Schroeder et al. 2016; Schroeder et al. 2026).

**Background on Listing and Status**

5. Upper Willamette River (UWR) spring Chinook salmon and winter steelhead were listed as threatened species under the Endangered Species Act in 1999 and the listing was last reaffirmed in 2024. UWR Chinook and steelhead are the only two native runs of anadromous[2] salmonids upstream of Willamette Falls.

6. Peak passage of adult spring Chinook salmon at Willamette Falls generally is late April through May with part of the run extending into late August and early September. Adult salmon historically migrated to the upper portion of watersheds to hold in pools and sections of river that have low water temperatures through summer. Adult salmon in the North Santiam River must now hold and spawn in the lower reaches of the river because access to the upper watershed is blocked by Big Cliff and Detroit Dams. Adult salmon (primarily hatchery origin) have been transported and released (outplanted) into the Breitenbush and North Santiam rivers upstream of Detroit reservoir in an effort to reintroduce salmon into their historic habitat. Spawning generally begins in late August and continues into early October, with peak spawning in September. Success of the outplanting program has been poor as measured by the return of adults produced by the outplanted fish or cohort replacement rate (CRR). CRR must be >1.0 for a population to increase. For the adult Chinook outplanted upstream of the reservoir in 2011–2019, the average CRR was 0.46 (0.1–1.0), well below levels necessary for the population to increase in 8 of 9 years (O'Malley et al. 2023; 2026). Lack of safe and effective downstream

---

[2] Anadromous fish are those that spawn in freshwater, migrate to the ocean, and return to freshwater.

passage for juvenile salmon produced by the outplanted adults is likely a primary reason for low CRR.

7. Peak migration of UWR native steelhead is in late March–April, with some fish moving from mid-February to mid-May. They spawn in March through June in mainstem rivers and smaller tributaries, with peak spawning in late April and early May. As with UWR Chinook, access to historic spawning and rearing areas in the upper watershed is blocked by dams. Winter steelhead have not been outplanted upstream of Detroit reservoir because the population is entirely wild and in low abundance, and downstream passage at the dams is not currently effective enough to implement outplanting as a recovery measure.

8. The most recent 5-year review on the status of spring Chinook salmon in the North Santiam found that the population is at a high risk of extinction (NMFS 2024). To achieve recovery and delisting, the North Santiam population (one of four core populations in the UWR ESU[3]), must reach the status of a low risk of extinction. In order to reach this status, NMFS has estimated that the return of adult natural origin ("wild") fish must increase by 5,400 fish (2024 BiOp p. 4.6-256), and is currently at < 10% of that target number (NMFS 2022, p. 179). Restoring access to historic spawning and rearing habitat in the upper watershed has been identified as a key measure to reducing risk to the North Santiam Chinook population, which will require safe and effective downstream passage for juvenile salmon through dams (NMFS 2024). Habitat downstream of Detroit and Big Cliff dams is impaired because water is too warm to

[3] Evolutionarily Significant Unit (ESU) is a Pacific salmon population or group of populations that is substantially reproductively isolated from other populations and that represent an important component of the evolutionary legacy of the species. The UWR Chinook and steelhead ESUs are the entities listed as threatened under the Endangered Species Act.

support successful spawning, resulting in high mortality of adults before spawning ("prespawn mortality") and accelerated incubation of eggs.

9. The 2024 status review determined the winter steelhead population in the North Santiam was at a low to moderate risk of extinction, but there is much uncertainty about the status because data are lacking. A goal of increasing the number of spawners by about 4,700 fish was proposed to reach a very low risk of extinction (2024 BiOp p. 4.6-257), which is considered necessary to achieve recovery. Spawning survey data have been inconsistently collected and counts at Bennett Dam only cover 2013–2024. The 5-year mean count of winter steelhead at Bennett Dam was 514 (2015–2019), well below recovery goals. Although counts in 2019 and 2020 suggest a rebound in numbers from record lows in 2017, the current "high" numbers are equivalent to previous lows (NMFS 2024, p. 18). In general, available data indicate a long-term decline in abundance for the North Santiam winter steelhead population (NMFS 2022, p. 185). Overall, the native UWR steelhead ESU is considered to be at a moderate to high risk of extinction with a declining trend in viability (NMFS 2024, p. 19). As with Chinook salmon, lack of access to historic spawning and rearing habitat and lack of safe, effective passage at dams for juvenile fish is considered a key risk to the North Santiam population (NMFS 2024, p. 27).

10. The continued decline of the UWR Chinook salmon and steelhead populations in the North Santiam River is concerning not only for these individual populations, but also for the overall UWR salmon and steelhead populations. Declining trends in both abundance and productivity jeopardizes the prospects for recovery and delisting the North Santiam populations, and the UWR Chinook and steelhead ESUs. Federal reviews note that restoration of access to upper watersheds is a key element in reducing risks to the populations (NMFS 2022, p. 180), and

that "lack of safe downstream passage for juveniles at high-head dams continues to be a primary factor limiting recovery for both species" (NMFS 2024, p 30).

**Life History Diversity and Importance to Populations**

11. Spring Chinook salmon and winter steelhead from the same brood year spend variable time in freshwater habitats before migrating to the ocean and variable time in the ocean before returning to freshwater to spawn. Thus, the different migratory and rearing behaviors exhibited by fish that were born in the same year is known as life history diversity. Research of UWR juvenile Chinook documented six primary and four secondary life histories of juvenile fish based on rearing and migratory behaviors prior to migrating to the ocean from the Willamette River as smolts (Schroeder et al. 2016). UWR Chinook migrated to the ocean as smolts in either their first year of life (subyearling) or their second year (yearling).

12. Juvenile salmon rear in habitats throughout the entire UWR basin, including areas near spawning grounds and areas hundreds of miles downstream. In addition to taking advantage of a variety of rearing habitats, the downstream movement of part of the population limits the exposure of the entire population to natural events that may have localized effects such as landslide and floods, and human-caused events such as municipal sewage discharge during high rainfall. In other words, risks to individuals are spread out because the population occupies different habitats at different times (i.e., not all eggs are in one basket). Consequently, the population as a whole is buffered from environmental effects that may be detrimental to a particular group of fish within the population, which allows populations to respond to changing environmental conditions both in the short-term and in the long-term (adaptation).

13. Although less is known about the juvenile life history of winter steelhead, they also have a diverse freshwater life history. Juvenile steelhead rear in both mainstem habitats and

tributaries for 1–4 years, most frequently for 2 years, before migrating to the ocean as smolts in April and May.

14. In addition to a varied juvenile life history that provides stability to the total number of smolts, salmon and steelhead spend varying times in the ocean before returning to freshwater as adults to spawn. In a study that spanned 18–22 years, 10–17 life histories were identified in returning adult UWR Chinook salmon based on combinations of freshwater and ocean ages from analysis of scales (Schroeder et al. 2026). A diverse combination of freshwater and ocean ages is also present in UWR steelhead that spend 1–4 years in the ocean before returning to freshwater, with two ocean years being most common. Unlike Chinook salmon that die after spawning, steelhead can go back to the ocean and return to spawn more than once, which adds to their life history diversity.

15. This diversity in life history in UWR Chinook salmon and steelhead provides stability to the population in the number of adults that return to spawn and is known as a "portfolio effect"; that is, a diversified financial portfolio is more stable and less risky than one with few investment types. For example, the variable contribution of diverse life histories in the North Santiam Chinook salmon population resulted in adult returns that were 2.4 times more stable on average (2002–2019) than if the population contained fewer life histories that were synchronous with each other (Schroeder et al. 2026). Within the freshwater phase of life, the variable contribution of life histories to smolt production in UWR Chinook salmon resulted in smolt numbers that were over 1.5 times more stable than if there were fewer life histories with similar behaviors (synchronous with each other) (Schroeder et al. 2016). Life history diversity in steelhead has also been shown to provide resilience and stability to populations (e.g., Moore et al. 2014).

16. Although the existing diversity of Chinook salmon contributed to stability in adult returns, adult salmon in the North Santiam population were significantly younger at age of return and had a smaller proportion of yearlings in 2002–2019 compared to Willamette Chinook salmon sampled in 1946–1951 (prior to dam construction). In contrast, the life history composition of the McKenzie and Clackamas populations were largely unchanged from 1946–1951 to 2002–2019 (Schroeder et al. 2026). These data indicate that construction of dams and loss of access to the upper watershed had a significant impact on life history composition of the North Santiam population. A yearling smolt life history (juveniles remaining in freshwater until their second year of life) is favored in the cold water habitats that are found in upper watershed areas, and increasing the contribution of the yearling life history could increase adult returns (*see* ¶¶ 22–24).

17. To summarize, salmon and steelhead migrate and rear in different habitats at different times throughout their life. They spread out throughout a watershed, which not only allows the population to use a variety of habitats, lowers the number of fish rearing in the same area (reduces competition), and increases opportunities for growth, but also decreases the exposure of the population to risks. Similarly, different age classes of salmon and steelhead reside in the ocean at different places and at different times thereby reducing risk and increasing opportunities for growth. In combination, diversity in freshwater and ocean residence can buffer populations against both local and widespread unfavorable conditions. For example, if ocean survival was poor in one year, fish with variable freshwater ages would enter the ocean in different years and provide a buffering effect against bad conditions compared to a population with a single life history all entering the ocean at the same time.

**Juvenile UWR Chinook Life Histories**

18. Juvenile salmonids that migrate downstream during the fall are an important life history in UWR populations because of their contribution to the stability and resilience of the species. The Chinook salmon population within the McKenzie River, where access to upper watershed areas exists, demonstrates the benefits of a fall migration life history. Some juvenile salmon in the McKenzie population move shortly after hatching to rear in downstream areas, whereas other fish rear in the spawning areas in cold water habitat that favors a yearling life history (Figure 1). Of the juvenile salmon that reared near spawning areas, a large migration to downstream habitats occurred in fall and early winter. Although some fall migrants moved quickly to the Columbia River, almost 70% reared over the winter in lower reaches of the tributaries or in the Willamette River upstream of Willamette Falls and migrated as yearling smolts (Schroeder et al. 2016). In other words, juvenile salmon migrating to downstream areas in fall and early winter make an important contribution to the total number of yearling smolts, which was a successful life history in the McKenzie population.




Figure 1. Migratory and rearing pathways of juvenile Chinook salmon in the McKenzie River. Pathways include fish that migrate from spawning areas as fry to rear downstream (movers = purple line) and those that rear in spawning areas (stayers = blue line). Of the stayers, most migrated to downstream areas in fall-winter (fall migrants = orange lines) and the rest migrated in the spring of their second year of life (spring migrant = green line). Thicker lines and boxes represent the dominant pathways and smolt life histories (e.g., most of the fall migrants reared over the winter and migrated past Willamette Falls as yearling smolts). The number of days that juvenile salmon reared downstream of spawning areas is given next to pathway lines.

19. Access to the upper watershed of the North Santiam basin is presently blocked by Big Cliff and Detroit dams. Upper watershed areas contain high-quality habitat with water temperatures that are lower than downstream of the dams and can support more life history types

than the lower watershed alone. Access to upper watershed areas coupled with safe and effective downstream passage for juvenile salmonids at the dams are key measures for recovery of the North Santiam populations (¶¶ 8–9). Increasing the number of fall migrants (and in turn yearling smolts), which generally rear in upper watershed areas where habitat conditions are more favorable, is important to strengthening the survival and recovery of the species, as explained in more detail below.

20. Access to upper watershed areas will become increasingly important as air and water temperatures continue to increase because of climate change. For example, one study found that suitable adult migration and holding habitat for Chinook salmon in the North Santiam is likely to decline by 25–50% downstream of the dams by 2050, whereas habitats upstream of the dams are predicted to remain suitable for Chinook salmon and winter steelhead (Fullerton et al. 2026). In addition, the amount of area downstream of the dams with suitable incubation temperatures is predicted to decline for both species while the amount of area above the dams with suitable temperatures is expected to remain stable or increase.

**Importance of Fall Drawdown**

21. Reservoir drawdown as an interim operational measure for passing salmon and steelhead migrants downstream of dams has long been identified as an important component of population viability and recovery by increasing spatial distribution, diversity, productivity, and abundance of the listed species (e.g., *see* 2008 BiOp, Chapter 9, 4.8, pp. 9-43–44). In deciding that injunction measures were necessary, U.S. District Judge Hernández noted, "[t]he evidence demonstrates that volitional fish passage is biologically necessary, and spill operations and deep drawdown measures represent the most effective means for providing safe fish passage under current dam configurations." (*Northwest Envtl. Defense Ctr. v. U.S. Army Corps of Engrs.,* No.

3:18-cv-437-HZ, ECF 212, p. 9). The 2024 BiOp requires fall drawdown operations at Detroit Dam to test and improve effectiveness of interim juvenile fish passage (2024 BiOp, RPA 4.12.2, p. 6.4-524), and this measure was included in the 2025 Willamette Valley System operations and maintenance EIS (Chapter 2, 2.8.3.1, pp. 27–29) and the 2026 Supplemental EIS (SEIS Chapter 2, p. 19).

22. Benefits derived by providing access for adult salmon and steelhead to spawn in upper watershed areas will be realized only if safe and effective downstream passage for diverse life histories of juvenile fish is available at the dams. Providing passage at Detroit Dam for fall migrating juvenile Chinook salmon will allow expression of the inherent life history diversity in Chinook salmon that is critical for the resilience and stability of a population and its recovery. Passage of fall migrants will increase overall smolt production in the North Santiam population and ultimately adult returns.

23. For example, based on extensive research of juvenile Chinook migration, 72% of fish that reared through their first summer in the upper part of the McKenzie watershed migrated to downstream areas in October–January with peak migration in November through mid-December (Schroeder et al. 2016). Some fall migrants continued past Willamette Falls to the Columbia River estuary, but most overwintered in lower reaches of the McKenzie River and in the Willamette River before migrating to the ocean as yearling smolts in the spring (Figure 1). Thus, the fall migrants make a significant contribution to the total number of yearling smolts, and yearling smolts are a successful life history. The North Santiam salmon population has a lower percentage of adults with a yearling life history and a lower return of adults than the McKenzie, Clackamas, and Sandy populations: 53% vs 73–86%, and 655 adults vs 1,907–2,292 adults.

24. As noted previously, the percentage of adult salmon with a yearling life history in the North Santiam population is lower in the contemporary period than was found in the Willamette population prior to dam construction (¶16). Factors affecting the expression and abundance of a yearling life history include: A) fish that rear in upper watersheds with cold temperatures grow slower and reach smolt size in their second year of life, compared to fish rearing in the lower watershed that often migrate as subyearling smolts, B) conditions in downstream habitat such as high summer temperatures is unfavorable for a yearling life history strategy because yearlings rear in freshwater habitats through the summer and fall of their first year of life, and C) ability to freely migrate and rear throughout the entire watershed increases spatial distribution, life history diversity, and productivity, thereby increasing adult abundance. Because fall migrants significantly contribute to the overall yearling smolt production (Figure 1), increasing the safety and effectiveness of downstream passage at the dams through a fall drawdown is a measure that would likely increase the number of returning adults. A model developed to assess four management scenarios for increasing returns from outplanted adult salmon found that increasing dam passage survival of juveniles resulted in the highest increase in returning adult spawners (Keefer et al. 2026). In comparison, fewer adult spawners were produced under the scenarios of reducing adult prespawn mortality, increasing reservoir survival for juvenile salmon, or increasing egg-to-fry survival downstream of the dams.

25. Reservoir drawdown to pass juvenile salmon in the fall has been effective at other UWR projects. A study of the Green Peter reservoir drawdown and passage through the

regulating outlets (RO) found that both dam passage efficiency[4] (0.89) and dam passage survival (0.73) were high (Larson et al. 2024).

26. A different statistical analysis was conducted to assess project passage efficiency[5] and the effectiveness of injunction measures (such as fall drawdown) at Cougar Dam by comparing trap catch rates of juvenile salmon at the head of the reservoir to those downstream of the dam (McCallister et al. 2024). Results indicated that the proportion of available fish (those entering the reservoir) that passed the dam during the fall drawdown increased by more than 21 times in the post-injunction period compared to the pre-injunction period. In other words, the injunction measure of drawing down Cougar reservoir November 15–December 15 with passage through the RO greatly increased the number of juvenile salmon passing the dam. Large numbers of juvenile salmon passed through the RO at Cougar Dam in the fall drawdown based on expanded trap catches: 84,775 in 2021 (Flaherty et al. 2023); 211,768 in 2021–2023 (McCallister et al. 2024).

27. Studies of the deep drawdown at Fall Creek Dam found that more than 95% of tagged juvenile salmon passed downstream within 48 hours when the reservoir had dropped from 720 ft to 700 ft., or about 20 ft above the RO (2024 BiOp, p. 4.2-192). In addition, catch of juvenile salmon in a trap downstream of the dam peaked during the drawdown, and few were caught after the drawdown, indicating most had passed downstream during the drawdown (Murphy et al. 2019). These data indicate fall drawdown is an operational measure that provides safe and effective passage for juvenile salmonids, and can pass large numbers of fish.

---

[4] Dam passage efficiency is the proportion of total fish passing the dam through any route relative to the number of total fish detected in the near forebay of the dam and are therefore available to pass.

[5] Project passage efficiency is the ratio of fish abundance at the tailrace of the dam compared to that at the head of the reservoir within a single season (e.g., subyearling fish migrating in fall).

28. Providing fall passage at Detroit using reservoir drawdown is a required interim measure in the 2024 BiOp (RPA 4.12.2, p. 6.4-524) until a long-term structural measure can be implemented (RPA 4.13.5, pp. 6.4-529–530, 6.4-544). Because of the extensive time needed to design, fund, and implement the long-term measure (until at least 2035), fall drawdown remains the only viable and effective option of providing passage for fall migrants for nearly a decade, or much longer. Uncertainty about funding for structural passage increases the importance of using drawdowns to provide passage because that may end up being the long-term option. As noted in the Record of Decision for the SEIS: "The design and construction process is a lengthy process, and the structures carry significant costs which can lead to challenges with funding. Interim Operations provide a way to improve passage and water quality given these challenges" (ROD for SEIS, p. 12).

29. The rationale for the deep drawdown is to increase access to RO outlets by lowering the reservoir elevation to provide a passage option with higher passage survival and to increase life history diversity in the North Santiam population (2024 BiOp, p. 6.4-524). Juvenile salmonids are surface-oriented (*see* review of Smith et al. 2009), therefore passage efficiency will increase when the depth of water over the entrance to a passage route is reduced. The minimum conservation pool for Detroit reservoir is 1,450 ft elevation, which is 110 ft above the upper RO, a depth that is too great for juvenile salmon to effectively sound (2024 BiOp, p. 5.6-424). The Corps has proposed an incremental approach for the fall deep drawdown that would begin with a drawdown to 1,425 ft elevation, which lowers the forebay depth over the RO to 85 ft., with a target level of 1,395 ft, which would lower the depth over the RO to 55 ft (SEIS, Chapter 3, p. 137). Juvenile salmon are much more likely to find the RO outlet if the forebay surface is 55 ft above the outlet as opposed to 110 ft.

30. A fall study of juvenile salmon passage at Detroit Dam tested passage through both the powerhouse (1,403 ft) and the upper RO (1,340 ft) when the reservoir was lowering to minimum conservation pool of 1,540 ft and found that most passage occurred through the powerhouse route (Beeman et al. 2014), as expected when the powerhouse is operating because the powerhouse entrance is 63 ft above the RO and at least 130 ft away horizontally. The passage rate was 16% greater at a forebay elevation of 1,450 ft than at 1,500 ft. Passage preference could not be analyzed in the second year of the study because too few tagged fish used the RO. However, there was a 12% increase in passage rate per 10-ft reduction in forebay elevation for fish that passed through the powerhouse (Beeman and Adams 2015), indicating the effectiveness on juvenile salmon passage of decreasing the depth of the reservoir forebay. Studies of survival through the powerhouse and RO found that passage through the powerhouse was 54% compared to 72% and 94% through the RO at a 1 ft and 5 ft gate opening,[6] respectively (reviewed in Hansen et al. 2017), indicating the RO provides the safest passage route in the fall if the fish can find that outlet.

31. To summarize, a deep drawdown in the fall is needed to reduce the depth of the reservoir so that juvenile salmon can sound and locate the RO for downstream passage. A deep drawdown in the fall is the only available downstream passage measure that is safe, effective, and will improve the survival of fall migrants. In turn, increasing the survival of fall migrants can increase the contribution of the yearling life history to adult returns, and contribute to the recovery of the UWR Chinook ESU.

[6] Discharge through regulating outlets is controlled by hydraulically powered gates located about 40 ft. within the RO conduit. Discharge through the RO is dependent on forebay depth and the size of the gate opening. The RO is about 6 ft wide by 10 ft high in front of the gate and 7 ft wide by 16 ft high behind the gate. The RO conduit exits on the face of the spillway and discharges into the tailrace (Duncan and Carlson 2011).

**Turbidity Issues**[7]

32. Detroit Dam was previously lowered to 1,425 ft in 2015 to augment low flow in the North Santiam River, and in 2019 for an extended period to conduct spillway gate maintenance (SEIS Chapter 2, p 19). Turbidity measurements at the USGS Niagara monitoring station remained relatively low during these drawdowns: daily maximum of 15 FNU[8] and daily median < 10 FNU in 2015; daily maximum and median < 10 FNU in 2019 (data from USGS Niagara station 14181500 located 3.6 miles below Detroit Dam and 0.8 miles below Big Cliff Dam). During the 2015 drawdown the daily maximum turbidity lasted 6 and 10 days in two pulses with maximum levels of 13 FNU and 15 FNU. However, during the first pulse there was little change in the daily median level indicating the small spikes were brief. During the second pulse, the slightly elevated turbidity level (7–10 FNU) lasted 10 days based on daily maximums and 7 days based on daily median (Figure 2).

[7] Turbidity data in this section is found at the following websites: Niagara: https://waterdata.usgs.gov/monitoring-location/USGS-14181500/; North Santiam below Stout Creek: https://waterdata.usgs.gov/monitoring-location/USGS-14183020/; South Santiam at Waterloo: https://waterdata.usgs.gov/monitWatoring-location/USGS-14187500/.

[8] Turbidity is used as a surrogate for suspended sediment loads and is measured by sensors as the scatter of a light beam in water at 90° angle expressed as Formazin Nephelometric Unit (FNU). For North Santiam measurements, these units are equivalent to Nephelometric Turbidity Unit (NTU) used prior to 2004 and USGS has converted records to FNU (*see* Uhrich and Bragg 2003; Bragg et al. 2007).




Figure 2. Daily maximum and daily median turbidity levels in the North Santiam River at Niagara during drawdowns of Detroit Reservoir to 1,425 ft. elevation in 2015 (**A**) and 2019 (**B**). Note longer time scale in panel **B**. Reservoir elevation data are from U.S.G.S. station 14180500 at Detroit Dam and turbidity data are from U.S.G.S. station 14181500 at Niagara.

33. In contrast to the low turbidity levels at Niagara during the 2015 and 2019 drawdowns, turbidity has been much higher downstream in the vicinity of Geren Island and the City of Salem water treatment facility since monitoring began in September 2020. The daily maximum turbidity recorded about 4.5 miles upstream of Geren Island exceeded 50 FNU on 26 occasions, and exceeded 330 FNU three times (data from USGS North Santiam River station

14183020). Daily median levels have exceeded 50 FNU on five occasions, with levels over 140 FNU two times. The high turbidity levels were generally associated with rain events in November and December as well as in February–April. The North Santiam River experiences high turbidity levels from different sources throughout the watershed including landslides and runoff during high rainfall events from various land uses such as forestry (harvest and roads), agriculture, and urban/industrial, but the Little North Santiam River has been identified as a major source of sediment recorded in the North Santiam River downstream near Stayton. The Little North Santiam River enters the main North Santiam River 0.5 miles above the town of Mehama, 19 miles downriver of Big Cliff Dam.

34. High turbidity levels at Gerren Island near Stayton have historically been caused more by suspended sediment from the Little North Santiam River rather than by sediment generated upstream of Mehama on the North Santiam River (Sobieszczyk et al. 2007; Bragg and Uhrich 2010; Piatt et al. 2011). For example, in the 2007 water year (a high flow year), the percent of turbidity values > 50 FNU was greater than in prior years at most monitoring stations, but the Little North Santiam River near Mehama exceeded 50 FNU more than other stations, and turbidity values at the Little North Fork station and at the Mehama station (below Little North Fork confluence) were as much as an order of magnitude higher than at the Niagara station downstream of Big Cliff Dam (Piatt et al. 2011). During 2005–2008 water years, two-thirds of sediment measured in the North Santiam River near Gerren Island originated in the Little North Santiam River subbasin (Bragg and Uhrich 2010). The volume of clay-water (persistently turbid water) was higher in the Little North Santiam River in water years 1999–2004 than at all other monitoring stations in the North Santiam watershed (Sobieszczyk et al. 2007). In other words, high turbidity events in the North Santiam River have occurred on numerous occasions in the

recent past as a result of natural and human-caused events, and a major source appears to be the Little North Fork Santiam River.

35. Any effects in the North Santiam River downstream of Detroit Dam from the fall drawdown are likely to be much less than that experienced in the South Santiam River after the 2023 Green Peter drawdown for several reasons: A) the Detroit drawdown would be proportionally smaller than the Green Peter drawdown relative to the size of the reservoir, thus potentially mobilizing a smaller amount of sediment (*see* Corps SEIS information sheet[9]); B) drawdown at Detroit will take an incremental approach coupled with real time turbidity monitoring (ROD for SEIS, pp. 12–13); C) the Detroit reservoir has been drawn down to the proposed level of 1,425 ft twice in the past eleven years without creating a high level of sedimentation (*see* ¶ 32), and accumulations of sediment that would be exposed would be far less than newly exposed sediment in the Green Peter drawdown; and D) South Santiam median turbidity levels at the Waterloo station in 2024 were about 30% lower than in 2023 and duration was 53% lower in 2024 (data from USGS station 14187500; 14 miles below Foster Dam and 20 miles below Green Peter Dam). The decrease in the second year of the drawdown was likely a result of lower precipitation in fall during the drawdown, less sediment exposure because of an altered drawdown schedule, and reduction of reservoir sediment after the first drawdown (2024 BiOp, p. 5.5-410–412). During the deep drawdown of Cougar reservoir to construct the temperature control tower (April 2002–December 2004), the measured sediment load downstream in the South Fork McKenzie River decreased 36% after the first year and 62% after the second year (Anderson 2007).

[9] Supplemental EIS information: https://publibrary.sec.usace.army.mil/api/download?id=6d06c15d-6d2d-4b55-f961-05ac3850292a&filename=WVS_FAQs_Comprehensive.pdf&preview=true

**Downstream Sediment Effects on Salmon**

36. Fine suspended sediments can affect salmonid spawning and incubation success and juvenile growth and survival (e.g., Bash et al. 2001; Jensen et al. 2008)). Turbidity levels of 50–70 NTU (NTU is generally similar to FNU) have been reported to affect salmonid behavior such as foraging and can cause damage to gills. Effects on newly emerged salmonids have been reported at 25–50 NTU. Some studies have shown that juvenile Chinook salmon and steelhead appear to prefer feeding in slight to moderate turbid water, likely as a tradeoff between foraging at lower efficiency but with a reduced risk of predation (reviewed in Bash et al. 2001). Factors affecting how suspended sediment might affect salmon redds and juvenile salmon include duration of events, river bed composition, and gradient. Characteristics such as groundwater upwelling and river morphology (meanders, side channels, near-shore shallow habitat) can provide refuge from elevated levels of suspended sediment (Bash et al. 2001; Zimmerman and Lapointe 2005; Tritthart et al. 2019). Effects of sediment on fish can be relatively short-term, and sedimentation events do occur frequently during high water events in salmon-bearing rivers of western Oregon. Over a longer time scale, the disturbance of river bed substrate caused by salmon digging redds cleans fine sediments from gravel (e.g., Moore et al. 2004).

37. ODFW sampled the South Santiam River following the 2023 Green Peter drawdown to evaluate the potential effect of high sediment levels on redds, egg development, and early rearing of juvenile salmon. Three sites were sampled: Waterloo, Gills Landing at Lebanon, and Highway 226 Bridge, about 14 miles, 19 miles, and 30 miles downstream of Foster Dam, respectively. Juvenile spring Chinook were captured with nets at all sites with minimal effort, and almost 300 fish were caught in total. The sizes of the juvenile salmon and capture rates were similar to that in previous years of sampling the South Santiam River, indicating little

effect of the sedimentation event on spawning and early rearing. During the deep drawdown of Cougar reservoir in 2002–2004, sediment was released into the South Fork McKenzie River with some carried into the McKenzie River downstream of the South Fork confluence (Anderson 2007). The mean number of spawners in the South Fork McKenzie was slightly lower (233) for returns of fish exposed to the high sediment loads than for fish that spawned and reared in years before the drawdown (248), suggesting a small effect on spawning and rearing in this tributary. However, the number of spawners counted in the McKenzie River downstream of the South Fork confluence was unchanged between the drawdown years and the pre-drawdown years. Although many factors can affect returns of adult salmon, these data indicate the effects of high levels of sediment in the South Fork McKenzie from the Cougar deep drawdown did not have a major or lasting effect on Chinook salmon spawning and rearing either in the South Fork or in areas of the McKenzie River downstream of the South Fork.

**Responses to Amerman and Rumreich Declarations**

38. Generally, Amerman and Rumreich contend the drawdown of Detroit Reservoir will cause "irreparable harm" to listed Chinook salmon and steelhead but provide little data or documentation to back up these claims. Amerman contends a drawdown at Detroit Reservoir will harm protected species, citing as evidence the drawdown at Green Peter reservoir and that "…fish could not survive the turbidity that resulted" (Amerman Decl. ¶ 13). Amerman also cites a low percentage of wild Chinook salmon in 2026 (apparently in the fish count at Willamette Falls) as evidence the 2023 Green Peter drawdown and resulting sedimentation harmed protected fish populations (Amerman Decl. ¶ 12).

39. First, the proposed drawdown at Detroit Dam is likely to have a minor effect on sedimentation in the North Santiam River (*see* ¶¶ 32 and 34; SEIS Chapter 2, p. 19). Secondly,

the size and number of juvenile fish captured with minimal effort in the South Santiam after the 2023 Green Peter drawdown indicated little effect of higher sediment loads on salmon (¶ 37; *see* also data from Cougar reservoir deep drawdown in 2002–2004). Finally, about 90% of adult salmon returning to the South Santiam River in 2026 would be age 4 and 5 based on the 2002–2020 average age composition; therefore, return numbers in 2026 would be affected largely by freshwater conditions in 2021 and 2022, rather than those of 2023.

**Conclusion**

40. Measures such as the deep drawdown in the fall have been identified in the 2024 BiOp and are needed to improve the status of the listed UWR Chinook salmon and steelhead populations, including the North Santiam populations. The prospect for recovering and delisting the North Santiam populations, and the UWR ESUs, is jeopardized because of declining trends in abundance and productivity. Restoring access to historic spawning and rearing habitat in the upper watershed has been identified as a key measure to reducing risk to the North Santiam salmon and steelhead populations, which will require safe and effective downstream passage for juvenile fish through the dams.

41. Juvenile salmon that migrate downstream in the fall are part of the life history portfolio in UWR populations that contributes to the stability and resilience for the species. Fall migrants make an important contribution to the total number of yearling smolts, and yearling smolts are the largest contributor to adult returns in populations that are more successful than the North Santiam population, such as the McKenzie, Clackamas and Sandy populations (which have adult returns 3–3.5 times higher than North Santiam population). Construction of the North Santiam dams blocked access to the upper watershed and changed the life history composition of the Chinook salmon population: the proportion of yearlings in adult returns to the North Santiam

is about 40% lower than in the Willamette population as a whole before dam construction. Increasing the number of fall migrants by providing safe and effective passage at the dams is important to increase the life history diversity of the North Santiam population and is critical for increasing the survival and recovery of the species.

42. The fall drawdown of Detroit reservoir is expected to benefit Chinook salmon because of increased passage efficiency and survival by providing passage through RO routes instead of the powerhouse route. A deep drawdown in the fall is currently the only available means of providing safe and effective passage for fall migrants. A deep drawdown is necessary to decrease the depth of water above the RO so that juvenile salmon can sound and locate the RO for passage. In addition, the fall drawdown is expected to provide benefits because a decrease in reservoir volume would reduce travel times for fish migrating through the reservoir, and would lower risks from predation and disease (SEIS Chapter 3, p. 125).

43. Winter steelhead have not been outplanted upstream of Detroit Dam because the population is entirely wild and abundance is too low to risk the high mortality of juveniles attempting to pass the dams under current operational conditions. Improvement in passage effectiveness and safety would allow winter steelhead to be reintroduced into high-quality spawning and rearing habitat upstream of Detroit reservoir.

44. Finally, a volitional passage measure is needed now because the status of the North Santiam salmon and steelhead populations is precarious, with both experiencing a long-term decline in adult returns and productivity. Measures must be implemented now because it is likely that a structural, long-term solution will take a decade or more to be completed, if it ever is. A fall drawdown as a downstream passage measure has been identified for at least 18 years,

and additional delay in implementing this measure will only increase the jeopardy to the listed salmon and steelhead populations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed this 17 day of September, 2026 in Philomath, Oregon.

K. Schroeder

Kirk Schroeder

**References**


Anderson, C. 2007. Influence of Cougar Reservoir drawdown on sediment and DDT transport and deposition in the McKenzie River basin, Oregon, water years 2002–04. *U.S. Geological Survey Scientific Investigations Report 2007–5164*, 42 p. https://pubs.usgs.gov/sir/2007/5164/

Beeman, J.W., Hansel, H. C., Hansen, A.C., Evans, S.D., Haner, P.V., Hatton, T.W., Kofoot, E.E., Sprando, J.M., and Smith, C.D. 2014. Behavior and dam passage of juvenile Chinook salmon and juvenile steelhead at Detroit Reservoir and Dam, Oregon, March 2012–February 2013: *U.S. Geological Survey Open-File Report 2014-1144*, 62p. https://doi.org/10.3133/ofr20141144

Beeman, J.W. and Adams, N.S. eds. 2015. In-reservoir behavior, dam passage, and downstream migration of juvenile Chinook salmon and juvenile steelhead from Detroit Reservoir and Dam to Portland, Oregon, February 2013–February 2014. *U.S. Geological Survey Open-File Report 2015-1090*, 92 p. https://doi.org/10.3133/ofr20151090

Bragg, H.M., Sobieszczyk, Steven., Uhrich, M.A., and Piatt, D.R. 2007, Suspended-sediment loads and yields in the North Santiam River basin, Oregon, water years 1999–2004. *U.S. Geological Survey Scientific Investigations Report 2007-5187*, 26 p. https://doi.org/10.3133/sir20075187

Flaherty, R., Berge, H., and Jobanek, C. 2023. Willamette Valley fish passage monitoring via rotary screw traps, 2021. *Final Report prepared for U.S. Army Corps of Engineers, Cramer Fish Sciences, Portland, OR*. https://public.crohms.org/tmt/documents/FPOM/2010/Willamette_Coordination/Willamette%20RME/CramerFishSciences_2021_Willamette_RST_Final.pdf

Fullerton, A.H., Goodman, A., Jorgensen, J.C., Bond, M.H., Bowerman, T.E., Siegel, J.E., URycki, D., and Jordan, C.E. 2026. Predicted Stream Temperatures Suggest Challenges for Pacific Salmon in Coming Decades. *JAWRA Journal of the American Water Resources Association* 62(3):p.e70137. https://doi.org/10.1111/1752-1688.70137

Hansen, A.C., Kock, T.J., and Hansen, G.S. 2017. Synthesis of downstream fish passage information at projects owned by the US Army Corps of Engineers in the Willamette River Basin, Oregon. *U.S. Geological Survey Open-File Report 2017-1101*, 118p. https://doi.org/10.3133/ofr20171101

Keefer, M.L., Yuksel, M.K., and Caudill, C.C. 2026. Assessing the role of juvenile life history diversity and adult translocation on cohort productivity in a Chinook Salmon population. *Fisheries* 51(7):284-297. https://doi.org/10.1093/fshmag/vuaf110

Larson, S.L., Vaage, B., Fischer, E., Rech, S., Giggie, M., Carver, J., Cavaiani, J., Larson, K., Zionce, E., and Hughes, J. 2024. Evaluation of Spill Operations at Foster and Green Peter Dams for Juvenile Fish Passage: Year 2. *PNNL-36335. Final report submitted by the Pacific Northwest National Laboratory to the U.S. Army Corps of Engineers, Portland, Oregon.* https://public.crohms.org/tmt/documents/FPOM/2010/Willamette_Coordination/Willamette%20RME/FOS_GPR_2023_PNNL%20Final%20Report.pdf

McCallister, M.K, Deith, M., Porteus, T.A., Greenberg, A., and Licandeo, R. 2024. Statistical analysis of court-ordered dam operation measures to improve passage of juvenile Chinook salmon at US Army Corps operated projects in the Willamette Valley System: Phase 1 Report, *Technical Report 2024-10, Institute for the Oceans and Fisheries,* University of British Columbia, Vancouver, BC. https://public.crohms.org/tmt/documents/FPOM/2010/Willamette_Coordination/Willamette%20RME/20241004_UBCIPA_Phase1InjunctionAnalysisReport_Revised.pdf

Moore, J.W., Schindler, D.E., and Scheuerell, M.D. 2004. Disturbance of freshwater habitats by anadromous salmon in Alaska. *Oecologia*, 139(2):298-308. https://doi.org/10.1007/s00442-004-1509-3

Moore, J.W., Yeakel, J.D., Peard, D., Lough, J., and Beere, M. 2014. Life-history diversity and its importance to population stability and persistence of a migratory fish: steelhead in two large North American watersheds. *Journal of Animal Ecology* 83(5):1035-1046. https://doi.org/10.1111/1365-2656.12212

Murphy, C.A., Taylor, G., Pierce, T., Arismendi, I., and Johnson, S.L. 2019. Short-term reservoir draining to streambed for juvenile salmon passage and non-native fish removal. *Ecohydrology* 12(6):p.e2096. https://doi.org/10.1002/eco.2096

O'Malley, K.G., Dayan, D.I., Fitzpatrick, C.K., Bohn, S., and Grenbremer, G.A. 2023. Evaluating spring Chinook Salmon releases above Detroit Dam and below Big Cliff Dam, on the North Santiam River, using genetic parentage analysis. *Report of State Fisheries Genomics Lab and Oregon Department of Fish and Wildlife to the US Army Corps of Engineers*. https://agsci.oregonstate.edu/state-fisheries-lab/reports

O'Malley, K.G., Fitzpatrick, C.K., Olsen, K.C., and Shier, I. 2026. Evaluating spring Chinook Salmon releases above Detroit Dam and below Big Cliff Dam, on the North Santiam River, using genetic parentage analysis. *Report of State Fisheries Genomics Lab and Oregon Department of Fish and Wildlife to the US Army Corps of Engineers*. https://agsci.oregonstate.edu/state-fisheries-lab/reports

Piatt, D.R., Johnston, M.W., Bragg, H.M.,Brooks, A.M., Sobieszczyk, S., and Uhrich, M.A. 2011, Water-quality in the North Santiam River basin, Oregon—Comparison of water-quality data for water year 2007 with the preceding period of record. *U.S. Geological Survey Open-File Report 2011–1008*, 75 p. https://doi.org/10.3133/ofr20111008

Schroeder, R.K., Whitman, L.D., Cannon, B., and Olmsted, P. 2016. Juvenile life-history diversity and population stability of spring Chinook salmon in the Willamette River basin, Oregon. *Canadian Journal of Fisheries and Aquatic Sciences* 73(6):921-934. https://doi.org/10.1139/cjfas-2015-031

Schroeder, R.K., Whitman, L.D., and Cannon, B. 2026. Life history diversity and contribution to population stability in adult Chinook salmon of the Willamette and Sandy rivers, Oregon.

*Canadian Journal of Fisheries and Aquatic Sciences* 83:1-25. https://doi.org/10.1139/cjfas-2025-027

Smith, D.L., Nestler, J.M., Johnson, G.E., and Goodwin, R.A. 2009. Species-specific spatial and temporal distribution patterns of emigrating juvenile salmonids in the Pacific Northwest. *Reviews in Fisheries Science* 18(1): 40-64. https://doi.org/10.1080/10641260600864023

Sobieszczyk, S., Uhrich, M.A., and Bragg, H.M. 2007, Major turbidity events in the North Santiam River basin, Oregon, water years 1999–2004. U.S. Geological Survey Scientific Investigations Report 2007–5178, 50 p. https://doi.org/10.3133/sir20075178

Tritthart, M., Haimann, M., Habersack, H., and Hauer, C. 2019. Spatio-temporal variability of suspended sediments in rivers and ecological implications of reservoir flushing operations. *River Research and Applications* 35(7):918-931. https://doi.org/10.1002/rra.3492

Uhrich, M.A. and Bragg, H.M. 2003, Monitoring instream turbidity to estimate continuous suspended-sediment loads and yields and clay-water volumes in the Upper North Santiam River Basin, Oregon, 1998–2000. *U.S. Geological Survey Water-Resources Investigations Report 03–4098*, 43 p. https://pubs.usgs.gov/wri/WRI03-4098/pdf/wri034098.pdf

Zimmermann, A.E. and Lapointe M. 2005. Intergranular flow velocity through salmonid redds: sensitivity to fines infiltration from low intensity sediment transport events. *River Research and applications* 21(8):865-881. https://doi.org/10.1002/rra.856

**Addendum: Kirk Schroeder experience and expertise**

1. I received a Bachelor of Science (B.S.) from the University of Idaho in 1975 and have over 40 years of experience conducting research and monitoring on salmon and steelhead, including 36 years with the Oregon Department of Fish and Wildlife ("ODFW") conducting studies, evaluating management actions, and providing management recommendations. I served as the Research Project Leader on the Willamette Spring Chinook Research Project from 2004 to 2013 and was an Assistant Project Leader from 1996–2004. I retired from ODFW as a Research Project Leader in 2013 and continued to work part-time on advising the project and writing research papers. My principal job responsibilities at ODFW included the development and

implementation of research on the life history and habitat use of spring Chinook in the Willamette and Sandy basins to provide information for protecting and recovering populations, analysis and writing of research results, coordination with ODFW management, presentation of research results at agency, interagency, and professional meetings, coordination with state and federal agencies, and collaboration with scientists from Oregon State University, University of Oregon, and Oregon Watershed Enhancement Board.

2. I have worked with spring Chinook salmon on numerous rivers including the Salmon and Middle Fork Salmon Rivers in Idaho and the Deschutes, Warm Springs, John Day, McKenzie, North and South Santiam, Clackamas, and Sandy Rivers in Oregon. I also worked on studies of winter steelhead on Oregon coastal rivers, including acclimation studies of winter steelhead in the Siuslaw River and studies on reducing stray hatchery fish in coastal rivers. My experience includes extensive spawning ground surveys, design and implementation of research studies, and development of management plans. I have conducted research and monitoring studies on numerous aspects including status and trends of natural populations, life history diversity and population stability, effect of catch-and-release fisheries on spring Chinook salmon, composition of hatchery-wild fish in spawning populations, strategies to reduce hatchery strays, and hatchery fish release strategies.

3. I helped design and implement a broad set of research activities for ODFW starting in 1996 that included intensive spawning surveys and collection of biological data, juvenile fish sampling and tagging in spawning tributaries and in the mainstem Willamette River to identify migratory behavior, a research study of the effects of catch-and-release fishing in the lower Willamette River, and a marking program that enabled fish managers to identify and manage wild and hatchery Chinook salmon (this included a hatchery-wide fin clipping program

and thermal marking of otoliths to differentiate unclipped hatchery fish from wild fish in carcasses collected on spawning grounds). I have extensive knowledge of streams and rivers in the Willamette Basin while conducting adult and juvenile salmon surveys from 1996 through 2013. The results of our work were used to help develop conservation and recovery objectives for Upper Willamette River ("UWR") Chinook salmon.

4. The results of our surveys have been published in a series of annual reports and scientific papers. Our work was the basis for a comprehensive research paper on the diversity of life histories in juvenile and adult Chinook salmon that demonstrated how diversity provides stability and resilience to salmon populations in the Willamette Basin. I have collaborated with university scientists to develop criteria and identify winter habitat for juvenile Chinook salmon in the Willamette River and adjacent floodplains. In addition to publications listed in References, a selected list of publications includes:

Whitman, L.D, R.K. Schroeder, and T.A. Friesen. 2017. Evaluating migration timing and habitat for juvenile Chinook salmon and winter steelhead in the mainstem Willamette River and major spawning tributaries. Task Order No. W9127N-16-P-0157. Final report to Army Corps of Engineers, Corvallis, OR.

Billman, E.J., L. D Whitman, R. K. Schroeder, C. S. Sharpe, D. L. Noakes, and C. B. Schreck, 2014. Body morphology differs in wild juvenile Chinook salmon *Oncorhynchus tshawytscha* that express different migratory phenotypes in the Willamette River, Oregon, USA. *Journal of Fish Biology*, 85:1097-1110.

Lindsay, R.B., R.K. Schroeder, K.R. Kenaston, R. Toman, and M.A. Buckman. 2004. Hooking mortality by anatomical location and its use in estimating mortality of spring Chinook salmon caught and released in a river sport fishery. *North American Journal of Fisheries Management* 24:367–378.

Schroeder, R.K., R.B. Lindsay, and K.R. Kenaston. 2001. Origin and straying of hatchery winter steelhead in Oregon coastal rivers. *Transactions of the American Fisheries Society* 130:431–441.

Kenaston, K.R., R.B. Lindsay, and R.K. Schroeder. 2001. Effect of acclimation on the homing and survival of hatchery winter steelhead. *North American Journal of Fisheries Management* 21:765–773.

Schroeder, R.K., and J.D. Hall, editors. 2007. Redband trout: resilience and challenge in a changing landscape. Oregon Chapter, American Fisheries Society, Corvallis (also Introduction).

Schroeder, R.K. 2007. Rainbow trout in the Deschutes and White rivers, Oregon. Pages 65–75 *in* Redband trout: resilience and challenge in a changing landscape, R.K Schroeder and J.D. Hall, editors. Oregon Chapter, American Fisheries Society, Corvallis.

Schroeder, R.K., and C.A. Savonen. 1997. Lessons from floods. *Fisheries* 22(9):14-16.

5. I have served on science and professional society committees including the Clackamas Science Review Team to assess the effects of PGE dam operations on salmon and steelhead populations, Chair of Natural Production Committee for the Oregon Chapter of the American Fisheries Society ("AFS"), President of Oregon AFS, Snake River Review Committee for Western Division AFS, and Resolutions Committee for AFS at the national level.

6. I have received awards and recognition for my work including Oregon AFS awards of Fishery Worker of the Year (1998), Award of Merit (1993), and Past-president (1996–1997), as well as ODFW awards of Biologist of the Year (2011, Northwest Region) and Technical Achievement Award (1997, Northwest Region).

DEPARTMENT OF THE ARMY
U.S. ARMY CORPS OF ENGINEERS, NORTHWESTERN DIVISION
PO BOX 2870
PORTLAND OR 97208-2870

# RECORD OF DECISION

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

# WILLAMETTE VALLEY, OREGON

## Section 1. Introduction

The U.S. Army Corps of Engineers (Corps), Portland District prepared this programmatic Final Supplemental Environmental Impact Statement (FSEIS) in compliance with the National Environmental Policy Act[1] (NEPA), 42 U.S.C. §§ 4321, and Corps NEPA Implementing Regulations, 33 C.F.R. Part 230. The FSEIS focused on the continued operation and maintenance of the Willamette Valley System (WVS) for its Congressionally authorized purposes and to comply with the Endangered Species Act (ESA). Twelve Cooperating Agencies and other interested Tribes provided information and review throughout the NEPA process. The Corps' expertise, developed over decades of experience operating the projects, allowed for careful, comprehensive consideration of current, high quality technical and scientific information, as well as expert analysis for a thorough evaluation of the actions.

Prior to completion of the *Willamette Valley System Operations and Maintenance Final Environmental Impact Statement* (Final EIS) in May of 2025, Congress passed the Water Resources Development Act (WRDA) of 2024. Section 1326 of the Act directed the Corps to analyze an additional alternative that ceases Federal hydropower operations before completing review of the operation and maintenance of the system. (Pub. L. No. 118-272). The FSEIS supplemented the Final EIS to include a ninth alternative that formally analyzed ceasing hydropower operations at the Corps' hydropower projects in the Willamette Valley. As a supplement to the Final EIS, the FSEIS incorporates, revises, or adds to the analysis in the 2025 Final EIS. Where the analysis in the Final EIS didn't need to be updated or expanded it was incorporated by reference into the FSEIS.

---

[1] During the preparation of the NEPA documentation that this Record of Decision relies upon there have been several key changes to federal statute, regulations, and case law relating to NEPA. On February 25, 2025, the Council on Environmental Quality (CEQ) published an Interim Final Rule removing CEQ's NEPA implementing regulations, effective April 11, 2025 (90 Fed. Reg. 10610). As a result, the Fiscal Responsibility Act (FRA) of 2023 (Pub. L. No. 118-5, 137 Stat. 10) and USACE's implementing regulations at 33 C.F.R. §230 are applicable to this document but CEQ's previous regulations are not though references were maintained as the previous regulations informed the development of the NEPA documentation. Additionally, the Supreme Court clarified the scope of analysis for NEPA documents in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025).

The FSEIS also analyzed a new drawdown operation at Detroit Dam and some refinements to the Interim Operations that were selected in the May 13, 2025, Record of Decision (ROD). These operations largely replicate the injunction operations in *Northwest Environmental Defense Center, et al. v. United States Army Corps of Engineers, et al., No. 3:18-cv-00437-HZ, (D. Or. September 2021), (NEDC v. USACE)* and other actions in the National Marine Fisheries Services' (NMFS) 2024 Biological Opinion (BiOp), issued on December 26, 2024. Through the adaptive management framework detailed in Appendix N of the FSEIS, these operations have been improved to reduce adverse impacts to listed species and water quality and will continue to be optimized. **The Corps is selecting the Interim Operations in this Record of Decision, including the newly analyzed fall deep drawdown for fish passage at Detroit Dam, under an adaptive management framework, as well as the continued operation and maintenance of existing dams, reservoirs, adult fish facilities, revetments, and hatcheries that comprise the WVS.**

With the Interim Operations in place, the Corps also is reinitiating ESA Section 7 consultation to reevaluate longer-term strategies that benefit ESA-listed species as part of WVS operations while it continues to operate and maintain the existing 13 dams and reservoirs, adult fish facilities, revetments and hatcheries.

## Section 2. Background

The Corps operates the WVS in accordance with the project's authorizing documents and prepared this FSEIS in compliance with NEPA. It used the information developed for the NEPA process to inform its compliance with the ESA, National Historic Preservation Act (NHPA), and all other applicable laws and Treaties. The need for an Environmental Impact Statement (an EIS) was to update the management of the WVS in the context of new information and changed conditions in the Willamette River Basin after the 1980 EIS *Operations and Maintenance of the Willamette Reservoir System* and ROD. To address these needs, the May 2025 Final EIS took a hard look at operational and structural measures to improve upstream and downstream fish passage for ESA-listed species while continuing to operate and maintain the WVS projects for the designated authorized purposes. In total, the Final EIS evaluated eight alternatives, including the No Action Alternative. The Corps issued a ROD on May 13, 2025.

Section 1326 of WRDA 2024 was signed into law in January of 2025, limiting the actions the Corps could select in its May 13, 2025, ROD until it formally analyzed an additional alternative that ceases hydropower operations. On May 16, 2025, the Corps published a Notice of Intent to supplement the Final EIS to analyze the newly required alternative and a new fall drawdown at Detroit Dam required in the NMFS 2024 BiOp. The FSEIS and this ROD complete the Corps requirements under NEPA for the continued operation and maintenance of the system and Section 1326 of WRDA 2024.

The NMFS issued a Biological Opinion in late 2024 and the Reasonable and Prudent Alternative (RPA) included the Interim Operations under an adaptive management

framework. These operations will continue to be analyzed and optimized each year and may replace the need for long-term structures. The Corps is reinitiating consultation to reevaluate the long-term strategy for infrastructure improvements given the recent data collected for the Interim Operations and concerns with overall cost and feasibility of the 2024 NMFS BiOp and RPA.

### 2.1 Litigation History

In 2008, the Corps received a BiOp from NMFS concluding the operation and maintenance of the WVS would jeopardize the continued existence of certain listed species. Therefore, the BiOp included over 90 measures to implement as part of the RPA to avoid jeopardy. The Action Agencies (the Corps, U.S. Bureau of Reclamation (BOR), and Bonneville Power Administration) implemented many of the requirements in the 2008 NMFS BiOp. However, due to the inclusion of large-scale juvenile fish passage and temperature control structures with unprecedented high costs, the Action Agencies were unable to implement several of the measures. In 2020, the U.S. District Court for the District of Oregon ruled in *NEDC v. USACE* that the Corps failed to implement critical items in the 2008 BiOp's RPA and therefore violated Section 7 and 9 of the ESA.

On September 1, 2021, the Court issued an injunctive order requiring the Corps to implement interim actions intended to improve conditions for fish passage and water quality in the WVS to avoid irreparable harm to ESA-listed salmonids while NMFS developed a new BiOp. These actions included operational changes and three structural modifications to existing dams and reservoirs. The Corps is reviewing the direct and indirect effects of these construction actions under separate site specific NEPA compliance processes; therefore, they are not assessed in this FSEIS or included in this ROD (Table 1). In accordance with the order, the NMFS BiOp was issued in late December 2024. A judgement in the case was entered on July 3, 2025.

Table 1: Ongoing design and construction efforts for injunction structural improvements.

| Location | Court-ordered Structural Improvements | Status |
|---|---|---|
| Dexter Fish Facility | Upgrade the Dexter adult fish facility to improve survival and upstream passage. | Operational. |
| Big Cliff Dam | Determine whether operational measures are sufficient to maintain acceptable total dissolved gas levels below Big Cliff Dam and, if not, design and construct a structural solution for mitigating excess total dissolved gas levels during spill operations. | A rock weir was installed below Big Cliff Dam in the fall of 2025. Data is being collected for further adaptive management and potential follow-on work. |

| Location | Court-ordered Structural Improvements | Status |
|---|---|---|
| Cougar Dam | Determine whether structural improvements/modifications to regulating outlets need to be made to ensure safer fish passage and to reduce total dissolved gas levels. If so determined, design and construct a structural solution. | Resurfacing the regulating outlet chute was completed in 2023. Design work for additional modification to the regulating outlets (ROs) has started. |

### 2.2 Statutory Background and Environmental Compliance

The Corps must comply with all applicable laws and Treaties such as the NEPA, ESA, NHPA, various WRDAs, and the Administrative Procedure Act. A more detailed description of compliance with the WVS authorizing legislation, applicable WRDA provisions, NEPA, ESA, and NHPA are provided in subsections 2.2.1-2.2.5 of this ROD and Chapters 1 and 7 of the FSEIS, that largely incorporate the Final EIS by reference. An Adaptive Management Plan accompanies the FSEIS; it lays out a framework for research, monitoring, and evaluation of actions for the Corps to work with NMFS and the U.S. Fish and Wildlife Service (USFWS) to better understand its actions and how best to meet ESA-listed species needs.

#### 2.2.1 Flood Control Acts

Congress authorized the Corps to construct, operate, and maintain the initial reservoirs in the WVS for flood control and navigation purposes beginning in 1938. Subsequently, the Corps constructed 13 dams and extensive bank protection revetments along the Willamette River and its tributaries, completing the WVS by the 1970s. Congress authorized the various purposes of the WVS in the Flood Control Acts (FCA) between 1938 and 1962, the Water Supply Act of 1958, and the Water Resources Development Act of 1986.

Congress authorized Bonneville Power Administration to market and transmit the power generated by the eight hydropower producing dams, and authorized the U.S. Bureau of Reclamation to market water stored in WVS reservoirs to which it holds water rights, for irrigation purposes to users within the Willamette River Basin.

#### 2.2.2 Water Resources Development Act of 2024

On January 4, 2025, the President signed into law the 2024 Water Resources Development Act (Pub. L. No. 118-272). Section 1326 of the Act included language directing the Secretary of the Army to not "complete review of, and consultation with other Federal agencies on, the operation and maintenance of the projects for flood control, navigation, and other purposes, Willamette River Basin, Oregon […], until the Secretary prepares and formally analyses an alternative which ceases hydropower

operation at the projects, notwithstanding hydropower being an authorized purpose of such projects." The Corps complied with this directive by supplementing the Final EIS with an additional alternative that ceases Federal hydropower operations.

### 2.2.3 National Environmental Policy Act

The information presented in this ROD summarizes the agency's compliance with the NEPA, 42 U.S.C. §§ 4321, and the Corps' implementing regulations, 33 C.F.R. Part 230. The WVS FSEIS provided information that allowed the Corps, cooperating agencies, and stakeholders to evaluate the effects, costs, benefits, and tradeoffs of a reasonable range of nine alternatives. The public then provided critical input for the decision maker during scoping and on the Draft FSEIS, prior to the ROD.

#### 2.2.3.1 Purpose and Need

The purpose and need for the continued operations and maintenance of the WVS is to operate the system in accordance with the eight Congressionally authorized purposes and in compliance with the ESA and all other applicable Treaties, laws, and regulations. The Corps must operate and maintain the WVS for specific purposes but cannot jeopardize the continued existence of a species listed as threatened or endangered or take action which will result in the destruction or adverse modification of designated critical habitat under the ESA. The purpose and need allowed the comparison of actions that the Corps does and does not have authority to take without eliminating those purposes. The Corps applied the purpose and need in the Final EIS to reasonably narrow the range of actions it fully analyzed to eight multifaceted alternatives that balanced the need to act for listed species with life safety and other technical and practical constraints.

The WRDA 2024 passed six years after development of the purpose and need statement and the development and subsequent detailed analysis of the first eight alternatives. WRDA 2024 did not mandate that the analysis of the alternative be subject to the NEPA, but the Corps decided including the analysis via a supplemental environmental impact statement would provide the public valuable context and understanding of the tradeoffs, while also furthering the purposes of NEPA. Therefore, the Corps developed an alternative that ceases hydropower operations by relying on the Congressional language, public comment, and its professional judgment to scope the alternative without revising the purpose and need statement for that single alternative.

#### 2.2.3.2 Alternatives

All the alternatives analyzed the continued operation and maintenance of the dams and reservoirs, the adult fish facilities, revetments, and hatcheries that make up the WVS. Using public comments, internal cross disciplinary working groups, and input from cooperating agencies, the Corps compiled a list of operational and structural measures, or actions, which met seven objectives, detailed in Chapter 2 and Appendix A of the Final EIS and then FSEIS. The Corps then combined the measures into nine conceptual alternatives. Building alternatives was an iterative process with increased detail at each

step to inform decisions concerning which alternatives to carry forward for analysis and consideration. Each alternative emphasizes different objectives (Table 2).

Table 2: Alternative Plans that were evaluated in detail in the FSEIS.

| Alternative | Strategy |
|---|---|
| No Action | O&M practices as of the Notice of Intent to prepare the EIS in 2019 |
| Alternative 1 | Improve Fish Passage Through Storage-Focused Measures- Increase the probability of refilling WVS reservoirs and supplemental water delivery for authorized purposes. |
| Alternative 2A & 2B | Integrated Water Management Flexibility and ESA Listed Fish Alternative |
| Alternative 3A & 3B | Operations Focused: Improve passage of ESA listed fish through existing structures by modifying water control operations |
| Alternative 4 | Structures Focused: Improve passage of ESA listed fish by constructing new fish passage and temperature control structures |
| Alternative 5 | Refined Integrated Water Management Flexibility and ESA Listed Fish Alternative |
| Alternative 6 | Ceasing Federal Hydropower Operations |

Detailed descriptions of the alternatives and the alternative development process can be found in Chapter 2 and Appendix A of the FSEIS.

**2.2.3.2.1 No Action Alternative**

The No Action Alternative (NAA) is the 2019 operations and maintenance of the WVS during the 30-year analysis timeframe. Modeling for the FSEIS analyses began in April 2019, which is the benchmark for alternative analyses comparisons. This benchmark was necessary given the time needed to complete the NEPA process and several temporary operational changes that shifted throughout the process due to temporary dam safety operations and litigation. Therefore, the NAA does not include the Interim Operations because those operations were not in place in April 2019. No large-scale construction is contemplated under the NAA.

This alternative does not meet the purpose of and need for the Proposed Action because the static 2019 WVS operations do not adequately protect ESA-listed fish species, specifically Upper Willamette River (UWR) Spring Chinook salmon and UWR Winter Steelhead or designated critical habitat for these species.

**2.2.3.2.2 Alternative 1. Improve Fish Passage Through Storage-Focused Measures**

Alternative 1, also referred to as the Storage Alternative, maximizes the refill volumes of conservation pools by using a larger portion of the conservation pool and the inactive and hydropower pools at WVS reservoirs to meet authorized purposes, including municipal and industrial and irrigation water supply, recreation, and water quality, as well

as to improve fish passage through the WVS dams to increase the survival of ESA listed fish species.

The main operational features of Alternative 1 are to reduce minimum flows to the Congressionally authorized minimum flow requirements as well as to augment instream flows using the hydropower and inactive pools. Alternative 1 proposes only structural measures for downstream fish passage and water quality, such as the Floating Screen Structure (FSS).

**2.2.3.2.3 Alternative 2A. Integrated Water Management Flexibility and ESA-Listed Fish Alternative (Includes Structural Downstream Passage at Cougar Dam)**

Alternative 2A, also referred to as the Hybrid Alternative with Cougar FSS, was developed after initial modeling of the other action alternatives. It focuses on improvements for fish passage using a combination of modified operations and structural improvements and measures which improve water management flexibility to meet ESA listed fish obligations given the complexity in structural modifications. In Alternative 2A, the “Integrated Temperature and Habitat Flow Regime” operation replaces the 2008 BiOp flows in the NAA. This shifts the release of stored water from the spring to the summer and fall, most prominently in dry years. Alternatives 2B, 3A, 3B, and 4 also include this flow measure.

The other main operational feature of Alternative 2A is augmenting instream flows using water reserved for the hydropower and inactive pools. Alternative 2A does not include the structural improvements for total dissolved gas (TDG) abatement found in Alternatives 1 and 4 or the fish passage and temperature structures at Hills Creek Dam found in Alternative 4. Like all alternatives except Alternative 1, Alternative 2A proposes operational measures using the spillway and regulating outlets (ROs) for temperature management at Green Peter. Alternative 2A also includes a deep fall drawdown and spring spillway operations for fish passage at Green Peter, like Alternatives 2B, 3A, 3B, and 5. The only difference between Alternative 2A and 2B is in the downstream passage measure at Cougar Dam. Alternative 2A proposes structural downstream fish passage at Cougar Dam whereas Alternative 2B proposes operational fish passage at Cougar Dam via the diversion tunnel.

**2.2.3.2.4 Alternative 2B. Integrated Water Management Flexibility and ESA-Listed Fish Alternative (Includes Operational Downstream Passage at Cougar – Drawdown to Diversion Tunnel)**

Alternative 2B, also referred to as the Hybrid Alternative with Cougar Diversion Tunnel Modification, improves fish passage through the WVS dams using a combination of modified operations and structural improvements, along with other measures to balance water management flexibility and to meet ESA listed fish obligations. Alternative 2B is like Alternative 5 except for the 30b flow measure.

**2.2.3.2.5 Alternative 3A. Improve Fish Passage Through Operations-Focused Measures (Includes Operational Downstream Passage at Cougar – Drawdown to Regulating Outlet)**

Alternative 3A, also referred to as the Operations Focused Fish Passage Alternative, would use WVS dam operations for water quality and fish passage. Alternative 3A does not include structural measures for temperature control, TDG abatement, or downstream fish passage like Alternatives 1, 2A, 2B, 4 and 5. Like Alternatives 2A, 2B, 3B, and 4, the "Integrated Temperature and Habitat Flow Regime" operation replaces the 2008 BiOp flows in the NAA under Alternative 3A.

Alternative 3A would implement spring and fall drawdowns at some WVS reservoirs for volitional downstream fish passage. Additionally, Alternative 3A proposes new adult fish facilities at Hills Creek and Blue River. Under Alternative 3A, the spring and fall drawdowns would target the Cougar RO, whereas the Alternative 3B drawdowns would target the much lower diversion tunnel (like Alternatives 2B and 5). By distinguishing between Alternatives 3A and 3B cooperators could compare the impacts and tradeoffs associated with a wide array of operations including downstream passage at Cougar.

**2.2.3.2.6 Alternative 3B. Improve Fish Passage Through Operations-Focused Measures (Includes Operational Downstream Passage at Cougar – Drawdown to Diversion Tunnel)**

Alternatives 3B, also referred to as the Operations Focused Fish Passage Alternative, would use WVS dam operations for water quality and fish passage. Alternative 3B is like Alternative 3A but differs on downstream fish passage operations in the spring and drawdowns for fish passage operations at Cougar Dam. Under Alternative 3B, the spring and fall drawdowns at Cougar Dam would target the diversion tunnel resulting in a much lower drawdown.

**2.2.3.2.7 Alternative 4. Improve Fish Passage with Structures-Based Approach.**

Alternative 4 uses structures to improve fish passage to increase the survival of ESA-listed fish. Like Alternative 1, Alternative 4 proposes only structures for water quality and downstream fish passage, shifting the release of stored water from the spring to the summer and fall, and augmenting instream flows with water in the hydropower and inactive pools. Alternative 4 proposes the "Integrated Temperature and Habitat Flow Regime" operation, with higher and more variable targets than those in the Congressionally authorized minimum flow requirements proposed under Alternative 1. Alternative 4 also proposes the most structural measures for fish passage and water quality of any alternative. In contrast to Alternative 1, Alternative 4 includes a fish passage structure and water temperature control tower at Hills Creek Dam and a fish passage structure at Cougar Dam but uses operational measures to utilize the spillway and ROs for temperature management at Green Peter Dam.

#### 2.2.3.2.8 Alternative 5. Refined Integrated Water Management Flexibility and ESA-Listed Fish Alternative (Includes Operational Downstream Passage at Cougar – Drawdown to Diversion Tunnel) - Preferred Alternative in Draft FSEIS

The Corps identified Alternative 5 as the Preferred Alternative in the Draft FSEIS. Alternative 5 improves fish passage using a combination of modified operations and structural improvements, along with measures to improve water management flexibility and meet ESA-listed fish obligations. Alternative 5 is the same as Alternative 2B except the refined integrated temperature and habitat flow regime replace the integrated temperature and habitat flow regime.

#### 2.2.3.2.9 Alternative 6. Ceasing Federal Hydropower Operations

The Corps developed Alternative 6 to meet the WRDA 2024 requirement to analyze an alternative that ceases Federal hydropower operations in the WVS. The Corps determined that safely operating the dams without hydropower requires three interdependent measures: removal or decommissioning of all hydropower infrastructure; reconfiguration of the penstock outlets and reconfiguration of the powerhouse systems; and replacement of power required to operate the dam and auxiliary facilities. Alternative 6 did not look at reducing hydropower operations, eliminating other authorized purposes, or the removal of the dams. Alternative 6 looked at ending hydropower at all eight hydropower dams, while preserving the operational flexibility to meet dam safety needs, the other authorized purposes, and the ESA.

Ceasing hydropower operations in Alternative 6 provides limited increased operational flexibility to meet ESA-listed species passage needs because the hydropower pool holds a small amount of water as compared to the conservation pool that stores water for water quality, irrigation, and municipal and industrial downstream needs. The action Alternatives 2A through 6 include measures that would draw water from the hydropower pool to support downstream water quality or provide downstream fish passage. Ceasing hydropower alone does not meet ESA objectives or provide greater operational flexibility to protect migrating fish when compared to Alternatives 2A through 6 because reservoir elevations still exceed safe sounding depths to the outlets during the conservation season. So, it was determined that Alternative 6 needed to include structural modifications for fish passage, substantial retrofits to the dams to stop producing hydropower, and modifications necessary to provide redundant sources of power to meet ESA objectives and safely operate the dams. The modifications resulted in increased costs as compared to Alternative 5 with no improvement to fish passage and survival because they utilized the same fish passage structures and turbines were replaced with a different safe outlet to dissipate the energy from water passing through the dam that had similar adverse effects on listed species. The detailed rationale used to develop Alternative 6 is described in Chapter 2 and Appendix A of the FSEIS.

#### 2.2.3.2.10 Interim Operations – Selected Federal Action

Alternatives 2A through 6 include the Interim Operations as described in Chapter 2 of the FSEIS. In short, the Interim Operations combine several operations into a singular

measure (Table 3). These operations were based on the injunction operations ordered by the District Court in *NEDC v. USACE*. These operations were refined to incorporate operations in the NMFS BiOp's RPA issued on December 26, 2024. All the operations in the FSEIS Interim Operations measure are being selected except for one at Detroit Dam that prioritized regulating outlet use at night regardless of the elevation of the reservoir. This operation has contributed to wear and tear of the outlets making them less conducive to fish passage. Additionally, fish have better passage survival outcomes when the reservoir elevation gets closer to a given outlet. The drawdown to 1395 feet will improve passage survival rates through the regulating outlet while reducing the wear on the outlet itself.

The Interim Operations provide improved fish passage and water quality conditions for ESA-listed species. The Corps analyzed the effects of the Interim Operations over the 30-year implementation timeframe, ensuring analysis of a full range of potential impacts. The 30-year time frame was based on veracity of data and modeling limitations as explained in Chapter 1 and Chapter 3 of the FSEIS. The Corps also analyzed the real time data from running these operations over the last several years which shows improved passage and water temperatures. These operations do adversely impact turbidity, hydropower generation, and to a lesser degree water availability. However, in-season adaptive management continues to improve fish survival while minimizing the adverse effects of the operations.

Table 3: Interim Operations in the Selected Federal Action.

| Description of Interim Operations by Dam Location | Duration of Operation | Priority Outlet | Target Elevation |
|---|---|---|---|
| **Detroit** | | | |
| Spring downstream fish passage and operational downstream temperature management | Mid-March to Fall | Spillway/ Turbines/Regulating Outlets | N/A |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | Fall/Winter | Upper Regulating Outlets | 1,395 feet |
| **Big Cliff** | | | |
| Spread spill across spill bays to reduce downstream total dissolved gas (TDG) exceedances | Year-round | Spillway | Discharges greater than powerhouse capacity |

| Description of Interim Operations by Dam Location | Duration of Operation | Priority Outlet | Target Elevation |
|---|---|---|---|
| **Green Peter** | | | |
| Outplanting plan for reintroduction of adult Chinook salmon above Green Peter Dam | Summer | N/A | N/A |
| Utilize spillway for improved downstream fish passage in the spring; perform spill operation until May 1 or for 30 days, whichever is longer | Spring (mid-March to April/May) | Spillway | Greater than 971 feet (spillway crest) |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | Gradual drawdown beginning September 1; rapid drawdown beginning mid-October and ending approximately mid-December; maintain target elevation for up to 30 days. | Regulating Outlets | 780 feet |
| **Foster** | | | |
| Delay refill and utilize spillway in the spring for improved downstream fish passage; use the fish weir in the summer for improved downstream temperature management and upstream fish migration/passage | February 1 to June 15; June 16 to approximately late-July (similar to No-action Alternative) | Spillway (spring); Fish Weir (summer) | 613 feet (February to May); 637 feet (May to July) |
| Utilize the spillway for improved downstream fish passage in the fall | October 1 to December 15 | Spillway | 613 feet |
| **Cougar** | | | |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | Early November to December 15 | Regulating Outlets | 1,505 feet |
| Delayed reservoir refill and regulating outlet prioritization for improved downstream fish passage | Feb to May/June | Regulating Outlets | 1,520 to 1,532 feet |
| **Hills Creek** | | | |
| Nighttime regulating outlet prioritization for improved downstream fish passage | Approximately November to March | Regulating Outlets | Less than 1,460 feet |

| Description of Interim Operations by Dam Location | Duration of Operation | Priority Outlet | Target Elevation |
|---|---|---|---|
| **Lookout Point** | | | |
| Utilize spillway for improved downstream fish passage in the spring | Mid-March to May/June (Spring) | Spillway | 890 to 893 feet Spring spill |
| Regulating outlet use in the fall for downstream temperature management | July to October 15 | Regulating Outlets | Less than 887.5 feet late Summer/Fall |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | November 15 to December 15 | Regulating Outlets | 750 feet |
| **Minimum Flow Targets** | | | |
| Operate under 2008 BiOp flow targets throughout the Willamette River Basin and provide pulses for mainstem temperature management (same as part of Measures 30a and b) | Year-round | N/A | N/A |

The Draft EIS termed these actions Interim Operations because they were developed for implementation until long term structural modifications could be funded, designed, and constructed. The design and construction process is a lengthy process, and the structures carry significant costs which can lead to challenges with funding. Interim Operations provide a way to improve passage and water quality given these challenges. The Interim Operations were analyzed and their effects described separately from the rest of the long-term modifications under an alternative. This allowed the public to review and comment on these specific actions over the 30-year period of analysis.

In the FSEIS, the Corps developed considerable information for the fall/late winter deep drawdown to improve fish passage at Detroit Dam. The 2024 NMFS BiOp included this operation, but it was not analyzed in the Final EIS. Upon publication of the 2024 BiOp, the Corps determined it would need additional NEPA analysis for the operation and requested to delay the implementation until it could analyze and solicit comments from the public. After receiving a significant amount of scoping comments regarding potential impacts from a drawdown at Detroit Dam, the Corps shaped the operation to minimize adverse effects, like turbidity, based on what it has learned from previous drawdowns at Detroit, Fall Creek, Cougar, Green Peter, and Lookout Point.

For example, the drawdown will start by lowering the reservoir to the lowest previous elevation, 1425 feet, in the first year. This elevation is below the minimum conservation pool, but when previously lowered to this elevation, downstream users did not experience or report concerning levels of turbidity. The Corps will incrementally draw the

reservoir below 1425 feet each year, until it reaches 1395 feet. It will use real time turbidity data to modify, pause, or cease the drawdown to avoid unacceptable adverse impacts to drinking water systems. These changes will reduce the mobilization of sediment each year, that could pass downstream. For additional minimization measures that have been incorporated into the drawdown see Chapter 2 of the FSEIS.

Operational flow targets developed for the 2008 BiOp will be implemented, with the addition of increased flow at key times for temperature management. The Corps will continue to work with BOR, NMFS, USFWS, and the State of Oregon to develop a revised flow strategy to adequately address the lack of flow in dry years as part of the reinitiated consultation.

The Corps developed a robust adaptive management framework to help guide the implementation of any selected action (Appendix N: Adaptive Management Plan). Some of the Interim Operations have been improved through adaptive management since they were first implemented in August 2021. Optimization will continue under this framework to further improve fish passage and water quality while also reducing adverse impacts.

#### 2.2.3.2.11 Environmentally Preferred Alternative

The environmentally preferred alternative is Alternative 2A. The Corps deemed Alternatives 2A, 2B, and 5 similar in their effects on ESA-listed species. However, 2A does not include the Cougar Diversion Tunnel Operation, which is more effective in passing fish, like Alternatives 2B and 5. However, the operation is likely to result in a large amount of sediment moving downstream from behind the dam during the first few years of implementation. This adverse effect would not occur under 2A.

#### 2.2.3.3 Public Engagement

NEPA requires agencies to provide the public an opportunity to engage early in the FSEIS development process through a scoping comment period and the Draft Supplemental EIS review and comment period. The decision maker then considers the public's input prior to executing a ROD.

#### 2.2.3.3.1 Scoping on the Final EIS and FSEIS

Public involvement begins with scoping, which is the process of soliciting input from Tribes and stakeholders such as private citizens, non-governmental organizations, and other agencies to identify significant issues related to the Proposed Action. Scoping for the Final EIS began on April 1, 2019, with publication of a Notice of Intent in the Federal Register. The Corps accepted scoping comments until June 28, 2019. The Notice of Intent notified the public of five scoping meetings held from June 4 to 13, 2019.

For the FSEIS, scoping formally began on May 16, 2025, with the publication of a Notice of Intent in the Federal Register. The Corps held two scoping meetings in person, the first in Detroit, Oregon and the second in Salem, Oregon. Two additional virtual meetings were held virtually. An open question and answer period followed the virtual meeting presentations. At the in-person meetings, an open house format followed

the presentation to encourage discussion and information sharing and to ensure the public had opportunities to speak with USACE representatives. An average of 20 people attended each scoping meeting. Two hundred forty-six (246) comments were received on four main topics, hydropower, deep drawdowns, the NEPA process, and environmental impacts.

#### 2.2.3.3.3 Public Comments on the Draft EIS and Draft Supplemental EIS

The Corps published the Draft EIS in the Federal Register on November 25, 2022, which marked the start of a 45-day public comment period. The Corps provided notice in the Federal Register extending the public comment period to 90 days. The final 90-day comment period closed on February 23, 2023.

The Draft Supplemental EIS was published on November 14, 2025. The public comment period was extended on December 11, 2025. The comment period closed on January 13, 2026, for a total of 60 days. The Draft Supplemental EIS was made available for review on the USACE Portland District website. The Corps held two virtual public meetings and four in-person public meetings. All six public meetings had a cumulative attendance of approximately 235 participants comprised of Federal, state, and local agency representatives; representatives from interested stakeholder groups; non-governmental organizations; tribal representatives; and members of the public. All the comments received have been responded to in Appendix W of the FSEIS.

### 2.2.4 National Historic Preservation Act

Section 106 of the National Historic Preservation Act of 1966, as amended, requires Federal agencies evaluate and mitigate the adverse effects of Federal undertakings on historic properties eligible for listing in the National Register of Historic Places (54 U.S.C. §§ 300101). The Act also requires the Federal agency include the State Historic Preservation Office, Tribes, representatives of local governments, and the public in findings and determinations made as part of the Section 106 process. The Advisory Council on Historic Preservation oversees the Section 106 process and retains the right to comment on the proposed undertakings.

The Corps consulted with 20 Federal, State, county, Tribal, and heritage preservation organizations, including the Advisory Council on Historic Preservation, the State of Oregon, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of the Siletz Indians, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Cow Creek Band of Umpqua Tribe of Indians, under Section 106 of the National Historic Preservation Act and executed a Programmatic Agreement. The Advisory Council on Historic Preservation and State Historic Preservation Office are signatories to the Agreement and the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of the Siletz Indians, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Cow Creek Band of Umpqua Tribe of Indians were invited signatories.

### 2.2.5 Endangered Species Act

Congress enacted the Endangered Species Act (16 U.S.C. §§ 1531–1544) to protect and conserve endangered and threatened species and critical habitat. Requirements of the ESA ensure activities authorized, funded, and carried out by Federal agencies are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of the designated critical habitat of a listed species.

Listed species in the analysis area for the operations and maintenance of the WVS include bull trout (listed as threatened in 1998), UWR Spring Chinook salmon (listed as threatened in 1999), and UWR Winter Steelhead (also listed as threatened in 1999). Southern Resident killer whales are ESA-listed as endangered, but they do not inhabit the analysis area. Southern Resident killer whales are not likely to be adversely affected by the quantity of UWR salmon species as a prey source. UWR salmon species comprise only a small percentage of Southern Resident killer whale diet, and the hatchery mitigation program would continue to provide salmon as prey. The Corps independently analyzed effects to these species and additional species in Chapter 3 of the FSEIS and associated appendices.

After the Corps performed its own analysis of effects to these species, in order to comply with obligations under 50 C.F.R. § 402, the Action Agencies (Bonneville Power Administration, Reclamation, and the Corps) consulted with the NMFS and USFWS.

The Action Agencies submitted the final Biological Assessment (BA) on March 13th, 2023. NMFS executed its BiOp for the WVS on December 26, 2024. On May 12, 2025, USFWS determined the Corps operations are consistent with the effects analyzed in the 2008 BiOp and they extended the 2008 BiOp until the end of 2026, acknowledging that formal consultation is underway, and the agencies are working to finalize consultation on the full 2023 proposed action before that date. The Corps is also immediately reinitiating ESA Section 7 Consultation with NMFS following this ROD to reevaluate longer-term strategies that benefit ESA-listed species through operations while it continues to operate and maintain the existing 13 dams and reservoirs, adult fish facilities, revetments, and hatcheries.

The 2024 NMFS BiOp analyzed the effects of the Interim Operations until at least 2030 when it projected the first structural modification to be operational at Foster Dam. The FSEIS and BA's effects analysis for the selected action combined with the broader analysis in the NMFS biological opinion, establish that the Corps' actions in this ROD would not likely jeopardize listed species or adversely modify critical habitat, in part because the selected action includes spill operations and fall drawdown operations that improve juvenile passage; water quality operations that improve temperature while minimizing TDG and turbidity; and the continued operation and maintenance of the adult fish facilities and hatcheries. Collectively, these actions are improvement over past operations benefiting abundance, reproduction, distribution even when considering the potential range of environmental and climate conditions.

Additionally, the decision in this ROD triggers the need to reinitiate consultation and pursuant to its letter being issued concurrently, the Corps is requesting reinitiation on an action consistent, in part, with the action selected in this ROD. Section 7(d) of the ESA provides that after reinitiation of consultation under Section 7(a)(2), a Federal agency shall not make any irreversible or irretrievable commitments of resources with respect to the agency action that has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives (RPA). This prohibition will be in force during the ESA consultation process the Corps is initiating and will continue until the full requirements of Section 7(a)(2) are satisfied. Maintaining existing structures and modifying operations to improve water quality and passage for listed species does not commit the agency to irreversibly spending resources or preclude the identification or selection of any different action during consultation as neither changes the Corps authority or discretion based on the outcome of the consultation. The Interim Operations allow the agencies to meaningfully consult while ensuring fish passage and water quality continues to improve. In its reinitiation letter, the Corps finds that it will not violate Section 7(d) by carrying out the actions in the 2024 BiOp's RPA during the reinitiated consultation for the reasons stated above.

Given the analysis above, in the Corps' reinitiation letter, and the independent analysis in the FSEIS, the action selected ensures discretionary operations and maintenance of the WVS would not likely jeopardize the continued existence of any listed species or result in the destruction or adverse modification of the designated critical habitat of a listed species while the agencies reevaluate long-term strategies for infrastructure improvements. For the same reasons, the Interim Operations will not irreversibly or irretrievably commit Corps' resources in a way that precludes NMFS and USFWS from identifying reasonable and prudent alternative actions to WVS operations, should that become necessary during the reinitiated ESA consultation.

## Section 3. Final Agency Finding

Based on the analysis in the Draft and Final Supplemental Environmental Impact Statement, including the benefits, environmental effects, and unavoidable adverse impacts of the Interim Operations detailed in the *Willamette Valley System Operations and Maintenance Final Supplemental Environmental Impact Statement*, and this Record of Decision, and thorough considerations of the views of Tribes, Federal, State, and local agencies, and public comments, I select the Interim Operations as detailed in Chapter 2 of the FSEIS and Section 2.2.3.2.10 this ROD for implementation, including the fall drawdown for fish passage at Detroit Dam, under an adaptive management framework, while also continuing the operation and maintenance of the existing 13 dams and reservoirs, adult fish facilities, revetments, and hatcheries that comprise the WVS. These operations will continue while the Action Agencies proceed with the reinitiated ESA Section 7 consultation.

I find the selected Federal actions best balance the human and natural environment in a manner calculated to foster and promote the general welfare, to create and maintain

conditions under which people and nature can exist in productive harmony, and to fulfill the social, economic, and other requirements of present and future generations of Americans. The FSEIS complies with all applicable laws, including NEPA, and fulfills the requirement of Section 1326 of WRDA 2024 to formally analyze an alternative that ceases hydropower operations at Willamette Valley projects.

I have also considered Tribal treaty rights and the United States' trust responsibilities to the Tribes in selecting these actions. Continuing to operate and maintain adult fish facilities and hatcheries, as well as the system of revetments and the 13 dams and reservoirs that comprise the Willamette Valley system, as modified by the Interim Operations will improve fish passage and water temperatures, while also continuing the important life safety missions and other Congressionally delegated purposes of these projects.

23 JUN 2026

Date

HANNAN.WILLIAM.CARL.JR.1080136699

Digitally signed by HANNAN.WILLIAM.CARL.JR.1080136699
Date: 2026.06.23 09:48:52 -07'00'

WILLIAM C. HANNAN, JR.
Brigadier General, U.S. Army
Commanding

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

May 2026

## TABLE OF CONTENTS

HOW TO USE THIS DOCUMENT ........ xiv

ABSTRACT ........ xv

ACRONYM AND ABBREVIATIONS ........ xvii

EXECUTIVE SUMMARY ........ ES-1

CHAPTER 1 - INTRODUCTION ........ 1

1.1 Background ........ 1
1.2 Chapter Terminology and Organization ........ 1
1.3 Regulatory Background ........ 1
  1.3.1 National Environmental Policy Act ........ 1
  1.3.2 Endangered Species Act ........ 1
  1.3.3 Willamette Valley System Endangered Species Act and National Environmental Policy History Since 2008 ........ 2
1.4 Geographic and Temporal Scopes ........ 2
  1.4.1 Geographic Scope ........ 2
1.5 Proposed Action ........ 2
1.6 National Environmental Policy Act Cooperating Agencies and Endangered Species Act Action Agencies ........ 2
1.7 U.S. Army Corps of Engineers-managed Dams, Reservoirs, and Bank Protection Structures in the Willamette River Basin ........ 3
  1.7.1 Dams and Reservoirs ........ 3
  1.7.2 Revetments and Other Structures for Bank Protection ........ 3
1.8 Non-U.S. Army Corps of Engineers-managed Dams in the Willamette River Basin ........ 3
1.9 U.S. Army Corps of Engineers Programs and Planning in the Willamette River Basin ........ 3
  1.9.1 Willamette River Basin Bank Protection Program ........ 3
  1.9.2 Willamette Hatchery Mitigation Program ........ 3
  1.9.3 Adult Fish Facilities ........ 3
  1.9.4 Research, Monitoring, and Evaluation ........ 3
  1.9.5 Forecast-informed Reservoir Operations ........ 3
1.10 Congressionally Authorized Purposes ........ 3
  1.10.1 Flood Risk Management ........ 3
  1.10.2 Hydropower ........ 4
  1.10.3 Fish and Wildlife ........ 4
  1.10.4 Recreation ........ 4
  1.10.5 Navigation ........ 4
  1.10.6 Irrigation ........ 4
  1.10.7 Municipal and Industrial Water Supply ........ 4
  1.10.8 Water Quality ........ 4

1.11 Willamette Valley System Operations and Annual Operational Planning ........................... 4
1.11.1 Reservoir Pools and Water Control ........................................................................ 4
1.11.2 Water Control Annual Planning ............................................................................. 4
1.11.3 Operation, Maintenance, Repair, Replacement, and Rehabilitation ..................... 10
1.11.4 Coordination of Willamette Valley System Operations with Other Agencies......... 10
1.12 Ongoing U.S. Army Corps of Engineers Planning and Environmental Reviews in the Willamette River Basin................................................................................................ 11
1.12.1 Master Plans and Operational Management Plans............................................. 11
1.12.2 Interim Risk Reduction Measures......................................................................... 11
1.12.3 Court-ordered Injunction Measures ..................................................................... 11
1.12.4 Willamette Valley System Vegetation Management Plans .................................. 11
1.12.5 Dexter Reservoir Shoreline Management ............................................................ 11
1.12.6 Long Tom River Ecosystem Restoration Project ................................................... 11
1.12.7 2022 Water Resource Development Act Report to Congress on Willamette Valley System Hydropower ................................................................................................ 11
1.12.8 2024 Water Resource Development Act Willamette Valley System Ceasing Hydropower Alternative ......................................................................................... 12

CHAPTER 2 - ALTERNATIVES ............................................................................................. 13
2.1 Introduction ................................................................................................................. 13
2.2 Chapter Terminology and Organization ...................................................................... 13
2.3 Proposed Action............................................................................................................ 13
2.4 Purpose of and Need for the Proposed Action............................................................. 13
2.4.1 Summary of ESA Requirements Specific to the Need for the Proposed Action...... 14
2.5 Decision-making............................................................................................................ 14
2.6 Alternatives Development Overview............................................................................ 14
2.6.1 The Scoping Process................................................................................................ 14
2.7 Range of Reasonable Alternatives Development .......................................................... 15
2.8 Final Measures Developed for the Action Alternatives................................................. 16
2.8.1 Flow Measures......................................................................................................... 16
2.8.2 Water Quality Measures.......................................................................................... 17
2.8.3 Downstream Fish Passage Measures ...................................................................... 17
2.8.4 Upstream Fish Passage Measures .......................................................................... 17
2.8.5 Ceasing Federal Hydropower Operations Measures............................................... 17
2.8.6 Interim Operations .................................................................................................. 19
2.9 Alternatives Considered but Eliminated from Further Review ..................................... 21
2.10 Alternatives Considered in Detail and the Preferred Alternative ................................ 23
2.10.1 Adaptive Management Common to All Alternatives ............................................ 23
2.10.2 Existing Operations Common to All Alternatives ................................................. 23
2.10.3 No-action Alternative (NAA)................................................................................... 24

2.10.4 Action Alternatives ........ 24

CHAPTER 3 - AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES ........ 33

3.1 Introduction ........ 33

3.1.1 Large Woody Debris ........ 33

3.2 Hydrologic Processes ........ 33

3.2.1 Affected Environment ........ 33

3.2.2 Environmental Consequences ........ 33

3.3 River Mechanics and Geomorphology ........ 77

3.4 Geology and Soils ........ 77

3.4.1 Introduction ........ 77

3.4.2 Affected Environment ........ 77

3.4.3 Environmental Consequences ........ 77

3.4.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 80

3.4.5 Climate Change under All Alternatives ........ 81

3.5 Water Quality ........ 81

3.5.1 Introduction ........ 81

3.5.2 Affected Environment ........ 81

3.5.3 Environmental Consequences ........ 81

3.5.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 91

3.5.5 Climate Change Effects ........ 99

3.5.6 Summary of Effects ........ 99

3.6 Vegetation ........ 109

3.6.1 Introduction ........ 109

3.6.2 Affected Environment ........ 109

3.6.3 Environmental Consequences ........ 109

3.6.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 115

3.6.5 Climate Change Effects under All Alternatives ........ 115

3.7 Wetlands ........ 116

3.7.1 Introduction ........ 116

3.7.2 Affected Environment ........ 116

3.7.3 Environmental Consequences ........ 116

3.7.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 120

3.7.5 Climate Change under All Alternatives ........ 120

3.8 Fish and Aquatic Habitat ........ 121

3.8.1 Introduction ........ 121

3.8.2 Affected Environment ........ 121

3.8.3 Environmental Consequences ........ 121

3.8.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 137

3.8.5 Climate Change Effects under All Alternatives .................................................. 140
3.8.6 Summary of Effects on Fish and Aquatic Habitat ............................................ 140
3.9 Wildlife and Habitat .......................................................................................... 160
3.9.1 Introduction ........................................................................................... 160
3.9.2 Affected Environment ............................................................................ 160
3.9.3 Environmental Consequences ................................................................ 160
3.9.4 Interim Operations under All Action Alternatives Except Alternative 1 .............. 165
3.9.5 Climate Change Effects under All Alternatives .................................................. 165
3.10 Air Quality and Greenhouse Gas Emissions ....................................................... 165
3.10.1 Introduction ........................................................................................... 165
3.10.2 Affected Environment ............................................................................ 165
3.10.3 Environmental Consequences ................................................................ 166
3.10.4 Alternatives Analyses ............................................................................ 170
3.10.5 Interim Operations .................................................................................. 172
3.11 Socioeconomics .................................................................................................. 172
3.11.1 Introduction ........................................................................................... 172
3.11.2 Affected Environment ............................................................................ 172
3.11.3 Environmental Consequences ................................................................ 173
3.11.4 Interim Operations under All Action Alternatives Except Alternative 1 .............. 184
3.11.5 Climate Change under All Alternatives ................................................... 184
3.12 Power Generation and Transmission ................................................................. 185
3.12.1 Introduction ........................................................................................... 185
3.12.2 Affected Environment ............................................................................ 186
3.12.3 Environmental Consequences ................................................................ 186
3.12.4 Interim Operations under All Action Alternatives Except Alternative 1 .............. 200
3.12.5 Climate Change under All Alternatives ................................................... 201
3.13 Water Supply ...................................................................................................... 201
3.13.1 Introduction ........................................................................................... 201
3.13.2 Affected Environment ............................................................................ 201
3.13.3 Environmental Consequences ................................................................ 201
3.13.4 Interim Operations under All Action Alternatives Except Alternative 1 .............. 204
3.13.5 Climate Change under All Alternatives ................................................... 206
3.14 Recreation Resources ......................................................................................... 206
3.14.1 Introduction ........................................................................................... 206
3.14.2 Affected Environment ............................................................................ 206
3.14.3 Environmental Consequences ................................................................ 206
3.14.4 Interim Operations under All Action Alternatives Except Alternative 1 .............. 209
3.14.5 Climate Change Effects under All Alternatives .................................................. 210
3.15 Land Use ............................................................................................................ 210

3.16 Hazardous Materials ........ 210
3.17 Public Health and Safety—Harmful Algal Blooms ........ 210
3.18 Public Health and Safety—Hazardous, Toxic, and Radioactive Waste ........ 210
3.19 Public Health and Safety—Drinking Water ........ 211
3.19.1 Introduction ........ 211
3.19.2 Affected Environment ........ 211
3.19.3 Environmental Consequences ........ 211
3.19.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 215
3.19.5 Climate Change under All Alternatives ........ 219
3.20 Environmental Justice ........ 219
3.21 Cultural Resources ........ 219
3.21.1 Introduction ........ 219
3.21.2 Affected Environment ........ 220
3.21.3 Federal Laws and U.S. Army Corps of Engineers Regulations ........ 220
3.21.4 Environmental Consequences ........ 220
3.21.5 Effects to Downstream Cultural Resources under All Alternatives ........ 228
3.21.6 Interim Operations under All Action Alternatives Except Alternative 1 ........ 228
3.21.7 Climate Change under All Alternatives ........ 230
3.21.8 Mitigating Adverse Effects to Cultural Resources ........ 230
3.22 Visual Resources ........ 230
3.22.1 Introduction ........ 230
3.22.2 Affected Environment ........ 230
3.22.3 Assessing Visual Quality ........ 230
3.22.3 Visual Resource Inventory of Dams and Reservoirs ........ 231
3.22.4 Visual Quality of Dams and Reservoirs in the Analysis Area ........ 231
3.22.5 Environmental Consequences ........ 231
3.22.6 Interim Operations under all Alternatives Except Alternative 1 ........ 235
3.22.7 Climate Change under All Alternatives ........ 235
3.23 Noise ........ 236
3.24 Tribal Resources ........ 236
3.24.1 Introduction ........ 236
3.24.2 Affected Environment ........ 236
3.24.3 Environmental Consequences ........ 237
3.25 Summary of Direct and Indirect Environmental Consequences ........ 237
3.26 Unavoidable Adverse Effects ........ 237
3.27 Relationship between Short-term and Long-term Productivity ........ 237
3.28 Irreversible and Irretrievable Commitments of Resources ........ 238
3.29 Intentional Destructive Acts ........ 238

CHAPTER 4 - CUMULATIVE EFFECTS ........ 239

CHAPTER 5 - PREFERRED ALTERNATIVE ........ 240
5.1 Comparison of Alternatives ........ 240
5.1.1 Objective 1—Allow Greater Flexibility in Water Management ........ 240
5.1.2 Objective 2—Increase Opportunities for the Creation of Nature-Based Structures 241
5.1.3 Objective 3—Allow Greater Flexibility in Hydropower Production ........ 241
5.1.4 Objectives 4 through 6—ESA-Listed Fish ........ 241
5.1.5 Objective 7—Reduce Spawning and Rearing Habitat Competition Caused by Hatchery Fish ........ 242
5.1.6 Cost Criteria and Metrics ........ 243
5.1.7 Economic Metrics for Effects to Recreation ........ 243
5.1.8 Summary of Alternatives Comparison ........ 244
5.1.9 Summary of Effects ........ 248
5.2 Preferred Alternative ........ 260
5.3 Implementation Plan Summary ........ 260
5.4 Adaptive Management Plan ........ 260

CHAPTER 6 - PUBLIC INVOLVEMENT ........ 262
6.1 Introduction ........ 262
6.1.1 Public Scoping Outreach ........ 262
6.1.2 Scoping Comments ........ 263
6.2 Key Issues and Resource Concerns ........ 264
6.2.1 Hydropower ........ 264
6.2.2 NEPA Process ........ 264
6.2.3 Environmental Impacts ........ 265
6.2.4 Deep Drawdown ........ 265
6.3 Interagency Coordination ........ 265
6.4 Tribal Consultation ........ 265
6.5 Additional Public Outreach ........ 265
6.6 Draft EIS Public Outreach Summary ........ 265
6.7 Draft SEIS Public Outreach Summary ........ 265
6.7.1 Notifications and Document Availability ........ 265
6.7.2 Public Meetings ........ 266
6.7.3 Public Comments and Responses ........ 267

CHAPTER 7 - RELATIONSHIP TO OTHER ENVIRONMENTAL PLANS, POLICIES, AND REGULATIONS ........ 268

CHAPTER 8 - GLOSSARY ........ 269

CHAPTER 9 - LIST OF PREPARERS ........ 270

CHAPTER 10 - REFERENCES ........ 273

CHAPTER 11 - ANALYSIS AREA SUBBASINS ........ 275

## LIST OF TABLES

Table 2-1. Alternative Strategies and Associated Objectives[1]........ 15
Table 2-2. Interim Operations........ 20
Table 2-3. Alternative 6 Measures and Locations. ........ 25
Table 2-4. Summary of Measures under Each Action Alternative[1]. ........ 30
Table 3-1. Santiam River Subbasin Summary of Hydrologic Processes Environmental Consequences as Compared to the No-action Alternative. ........ 35
Table 3-2. Long Tom River Subbasin Summary of Hydrologic Processes Environmental Consequences as Compared to the No-action Alternative. ........ 38
Table 3-3. McKenzie River Subbasin Summary of Hydrologic Processes Environmental Consequences as Compared to the No-action Alternative. ........ 39
Table 3-4. Middle Fork Willamette River Subbasin Summary of Hydrologic Processes Environmental Consequences as Compared to the No-action Alternative........ 41
Table 3-5. Coast Fork Willamette River Subbasin Summary of Hydrologic Processes Environmental Consequences as Compared to the No-action Alternative........ 44
Table 3-6. Mainstem Willamette River Summary of Hydrologic Processes Environmental Consequences as Compared to the No-action Alternative. ........ 46
Table 3-7. Summary of Effects to Geologic Materials and Soils as Compared to the No-action Alternative. ........ 78
Table 3-8. Average Annual Days within 2 Degrees Fahrenheit of Temperature Target. ........ 82
Table 3-9. Average Days below 18°C (64.4°F) per Year. ........ 83
Table 3-10. Average Number of Days that Total Dissolved Gas Levels are above 110 Percent. 84
Table 3-11. Summary of Effects on Water Quality in the North Santiam River Subbasin as Compared to the No-action Alternative[1]........ 100
Table 3-12. Summary of Effects on Water Quality in the South Santiam River Subbasin as Compared to the No-action Alternative[1]........ 101
Table 3-13. Summary of Effects on Water Quality in the McKenzie River Subbasin as Compared to the No-action Alternative[1]........ 102
Table 3-14. Summary of Effects on Water Quality in the Middle Fork Willamette River Subbasin as Compared to the No-action Alternative[1]........ 103
Table 3-15. Summary of Effects on Water Quality in the Coast Fork Willamette River and Long Tom River Subbasins as Compared to the No-action Alternative[1]. ........ 105
Table 3-16. Summary of Effects on Water Quality in the Mainstem Willamette River as Compared to the No-action Alternative[1]........ 107

# How to Use This Document

The Supplemental Environmental Impact Statement (SEIS) only includes new information related to the addition of an alternative that ceases Federal hydropower operations in the Willamette Valley System, revisions to the Interim Operations including a late fall/early winter deep drawdown for downstream fish passage at Detroit Dam, change to the minimum flow targets, and any necessary updated analysis like the additional comment periods. Generally, the SEIS does not reproduce information from the Final Environmental Impact Statement (FEIS) but incorporates information by reference as encouraged by NEPA and USACE policy and procedures. This results in a more concise document.

Some FEIS graphs and tables are reproduced to provide context. One example is the effects summary tables have been reproduced with the effects of the seven alternatives presented in the FEIS, and then supplemented with new information.

Chapter and section numbers in the SEIS match the chapter and section numbers in the FEIS, which allows readers to quickly reference information from the FEIS and understand updates. Some sections have been descoped from the SEIS based on changes to laws, regulations, and recent executive orders; however, the SEIS retains those section number headings to mirror the FEIS for the ease of the reader. Tables and figures reproduced in the SEIS that have different numbers than the FEIS include a footnote with the corresponding table in the FEIS. New tables created for the SEIS do not have a footnote, and they may repeat table numbers in the FEIS.

The Detroit drawdown, as a part of the Interim Operations, was a primary interest of commenters during the scoping and the Draft SEIS comment periods. The effects of the Detroit drawdown are discussed throughout Chapter 3 but may be more efficiently accessed by searching the phrase “Detroit drawdown.” A summary of the effects of the drawdown is in section 7.2.2 of the Executive Summary.

The FEIS is available in the USACE Digital Library at:
https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/27619

# ABSTRACT

The U.S. Army Corps of Engineers (USACE), Portland District prepared this Final Supplemental Environmental Impact Statement (SEIS) to address the directive in the 2024 Water Resources Development Act (WRDA 24) to formally analyze an alternative that ceases Federal hydropower operations at USACE owned and operated Willamette Valley dams and reservoirs. This SEIS supplements the Willamette Valley System (WVS) Operations and Maintenance Final Environmental Impact Statement (FEIS), to study how to continue to operate the WVS in compliance with the Endangered Species Act (ESA) as well as all other applicable legal requirements. This SEIS complies with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321. Ten Cooperating Agencies and interested tribes provided information and review throughout the EIS process.

Public involvement during the scoping process and public comment period on the Draft SEIS informed the Final SEIS. Public scoping began on May 16, 2025, with publication of a Notice of Intent in the Federal Register (90 FR 21015). The public comment period for the Draft SEIS was November 14, 2025 to January 13, 2026. The Public Comment Scoping Report is in Appendix P. Public comments on the Draft SEIS are in Appendix W.

USACE operates a complex water management system in western Oregon's Willamette Valley by storing and releasing water from 13 reservoirs to balance needs and demand throughout the year. USACE coordinates the operations and maintenance of the 13 reservoirs and dams to function together as the WVS. Water needs and demands are balanced among eight Congressional authorized uses: flood risk management, hydropower, fish and wildlife, recreation, navigation, irrigation, municipal and industrial water supply, and water quality. The system also must operate, follow, and comply with all applicable laws, including the ESA.

The Proposed Action is to continue the operations and maintenance of the Willamette Valley System for specific, authorized purposes. Congress, in authorizing legislation, directed responsibility for operating each dam and reservoir individually and as part of a system to USACE. Consequently, the Proposed Action is to continue to operate this system to achieve the objectives set by Congress while meeting ESA requirements.

The SEIS analyzes a new alternative that ceases hydropower operations at the eight dams in the WVS that produce Federal hydropower. In the FEIS USACE analyzed a no action alternative and seven action alternatives. The seven action alternatives include different combinations of operational or structural measures to continue to improve conditions for ESA listed species including flow, water quality, and fish passage. The FEIS also included measures common to all action alternatives, including gravel augmentation and operation and maintenance of adult fish facilities. This SEIS details Alternative 6 that ceases hydropower operations, despite it being an authorized purpose, while incorporating the other alternatives by reference to the maximum extent practicable.

This SEIS also analyses new operations required by the National Marine Fisheries Service's (NMFS) 2024 *Endangered Species Act Section 7(a)(2) Biological Opinion (Biological Opinion) and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Willamette Valley System*. This Biological Opinion includes a new requirement for an annual deeper drawdown of Detroit Reservoir until a long-term fish passage solution is in place, and continuation of NMFS's 2008 Biological Opinion flow requirements until USACE and NMFS develop a new flow management plan. The operation is part of a suite of Interim Operations, and its effects are often described in combination with the other operations. *Information on the Detroit drawdown for fish passage is in the discussion of Interim Operations throughout Chapter 3.*

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

# EXECUTIVE SUMMARY



Painting by Lee Jensen, USACE Employee, 1991-2001 (USACE, Portland District Media Images)

## 1 - INTRODUCTION

The U.S. Army Corps of Engineers (USACE), Portland District prepared this Final Supplemental Environmental Impact Statement (SEIS) in response to Section 1326 of the Water Resources Development Act of 2024 (WRDA 24). Section 1326 of WRDA 24 states:

> The Secretary [of the Army] may not complete its review of, and consultation with other Federal agencies on, the operation and maintenance of the projects for flood control, navigation, and other purposes, Willamette River Basin, Oregon, authorized by section 4 of the Act of June 28, 1938 (chapter 795, 52 Stat. 1222; 62 Stat. 1178; 64 Stat. 177; 68 Stat. 1264; 74 Stat. 499; 100 Stat. 4144), until the Secretary prepares and formally analyzes an alternative that ceases hydropower operations at the projects, notwithstanding hydropower being an authorized purpose of such projects.

USACE published the Willamette Valley System Operations and Maintenance Final Environmental Impact Statement (FEIS) in April 2025 and signed a Record of Decision (ROD) on the Interim Operations and Foster Warm Water Supply Pipe in May 2025. This ROD allows USACE to comply with the National Environmental Policy Act (NEPA) requirements for Interim Operations while continuing to evaluate a new alternative addressed by this SEIS.

USACE is supplementing the FEIS to include a new alternative that ceases Federal hydropower operations at Willamette Valley System dams. Eight of the thirteen dams generate Federal hydropower. As described in WRDA 24, the new alternative, Alternative 6, only analyzes ending Federal operations to generate hydropower. WRDA 2024 did not direct USACE to analyze ceasing any other operations. So, alternative 6 maintains the operations for the remaining authorizations including flood control (flood risk management), fish and wildlife, recreation, navigation, irrigation, municipal and industrial water supply, and water quality.

The SEIS complies with the NEPA, 42 U.S.C. §§ 4321. The NEPA process for the FEIS began in 2019, prior to United States Congress amending NEPA in 2023 under the Fiscal Responsibility Act, and revisions to the Council on Environmental Quality's (CEQ) 1978 NEPA implementing regulations. USACE complied with statute in place as of the commencement of the FEIS in preparing this SEIS while also trying to carry out the provisions of the amendments as practical. CEQ rescinded all its implementing regulations on April 11, 2025. The current Administration rescinded several Executive Orders and related guidance regarding climate change and environmental justice analyses just prior to finalization of the FEIS and issued several others on the scope of impacts to consider. References to the CEQ regulations and analyses of greenhouse gas emissions, social cost of carbon, and climate change were not removed from the FEIS to avoid delay in decision-making and the significant time and resources required for document revisions.

Ten Cooperating Agencies provided information and review throughout the SEIS process. Public involvement during the scoping process informed the development of the SEIS including the types of analyses and how to scope the additional alternative. Public scoping began on May 16, 2025, with publication of a Notice of Intent in the Federal Register (90 FR 21015). The Public Comment Scoping Report is in Appendix P. USACE updated the Final SEIS based on comments received from the public. The public comment period for the Draft SEIS was November 14, 2025 to January 13, 2026. The Public Comment Scoping Report is in Appendix P. Public comments on the Draft SEIS are in Appendix W.



Unknown Photo Credit (USACE Media Images Database)

McKenzie River.

## 2 - BACKGROUND

The Congress, through the Flood Control Act of 1938 and subsequent acts, authorized USACE to construct, operate, and maintain a system of dams, reservoirs and bank protection revetments primarily for flood control, now known as flood risk management, in the Willamette River Basin (Figure ES-1). USACE operates and maintains the Willamette Valley System (WVS) as a system of 13 dams and reservoirs and associated hatchery and fish collection facilities:

- Hills Creek, Lookout Point, Dexter, and Fall Creek dams and reservoirs in the Middle Fork Willamette River Subbasin
- Dorena and Cottage Grove dams and reservoirs in the Coast Fork Willamette River Subbasin
- Cougar and Blue River dams and reservoirs in the McKenzie River Subbasin
- Fern Ridge Dam and Reservoir in the Long Tom River Subbasin

- Green Peter and Foster Dams and Reservoirs in the South Santiam River Subbasin
- Detroit and Big Cliff dams and reservoirs on the North Santiam River

Congress authorized eight purposes for the WVS, flood risk management, hydropower, fish and wildlife, recreation, navigation, irrigation, municipal and industrial water supply, and water quality. To meet these purposes, the WVS stores and releases water from the 13 reservoirs to balance needs and demands for water resources. Congress authorized nine WVS dams for Federal hydropower: Hills Creek, Lookout Point, Dexter, Cougar, Blue River, Detroit, Big Cliff, Green Peter and Foster. Blue River Dam was authorized for private hydropower, but power generators were never installed due to a private developer never coming forward.

Congress delegated responsibilities for the WVS to other Federal agencies, including the Bonneville Power Administration, which markets and transmits the electrical power generated by the eight Federal hydropower-producing dams, and the U.S. Bureau of Reclamation, which markets water for irrigation purposes to users within the Willamette River Basin.




**Figure ES-1. Willamette Valley System Dams, Reservoirs, Adult Fish Facilities, and Fish Hatcheries.**

## 3 - PROPOSED ACTION

The Proposed Action is to continue operations and maintenance of the Willamette Valley System (WVS) for specific, authorized purposes. Congress directed responsibility for operating each dam and reservoir individually and as part of a system to USACE in authorizing legislation. USACE analyzed implementing the Proposed Action over a 30-year timeframe.

## 4 - PURPOSE AND NEED FOR THE PROPOSED ACTION

The purpose and need for the continued operations and maintenance of the WVS is to operate the system in accordance with the eight Congressionally authorized purposes and in compliance with the ESA and all other applicable treaties, laws, and regulations (Chapter 1, Introduction, Section 1.10, Congressionally Authorized Purposes).

In the DEIS and FEIS, measures and alternatives were screened from further consideration if they did not meet the purpose and need statement. USACE interpreted the purpose and need statement very broadly when screening out measures or alternatives from further consideration to include numerous operations outside of operations as of 2019. For example, in Alternatives 2B, 3B and 5, the Cougar diversion tunnel operation only provides conservation storage and operates for hydropower purpose for a few days of the 84-year hydrological period of record analyzed (1935 to 2019). Because the measure did not eliminate these purposes entirely, USACE analyzed the Cougar diversion tunnel operation. This broad interpretation was the result of significant input from cooperators. Ultimately the screening process resulted in a reasonable range of seven different action alternatives composed of various measures being fully analyzed in the FEIS.

Four months before publication of the FEIS and six years into the NEPA process, Congress passed a provision in WRDA 24 that required USACE to formally analyze an alternative that ceases hydropower operations at the WVS projects (Section 2.1). WRDA 24 does not reference NEPA or require that the alternative be formally analyzed in a NEPA document. However, USACE determined it had the discretion to supplement the FEIS to include the alternative. USACE decided providing additional information for public comment and context for the decision maker would be in furtherance of NEPA. However, USACE did not revise its purpose and need statement to include numerous other alternatives to keep the process efficient and timely, as emphasized in the Fiscal Responsibility Act (FRA) of 2023 (Pub. L. No. 118-5, 137 Stat. 10), which would then require a reanalysis of all measures, or potential actions. Instead, USACE is relying on the clear text of Section 1326 of WRDA 24 to analyze a single alternative that ceases hydropower operations at the WVS projects. Although USACE did not revise the purpose and need, Alternative 6 analyzes the systems without hydropower operations as a constraint.

## 5 - CONSTRAINTS

USACE identified constraints on the initial array of alternatives to ensure the actions properly considered the purpose and the need for the EIS and USACE responsibilities. For example, potential alternative measures were eliminated from consideration for the following:

- Flood Risk Management: Preliminary modeling results aided screening measures with potential adverse flood risk effects. Specifically, measures that would result in flood risk increases from current protection levels were eliminated as an alternative measure.

- Dam Safety: USACE performed a preliminary evaluation of measures for dam safety. Measures that would compromise dam safety and could not be mitigated were eliminated. USACE will evaluate components in a more detailed dam safety analysis during site-specific planning and design.

**6 - OBJECTIVES**

Objectives represent desired outcomes, as identified by the Federal agencies and scoping comments during the development of the FEIS. The SEIS retained the objectives. The seven primary objectives are:

1. Allow greater flexibility in water management related to refill, drawdown timing, and other water management measures.
2. Increase opportunities for the creation of nature-based structures during maintenance of USACE-owned revetments (structures that help prevent bank erosion).
3. Allow greater flexibility in hydropower production.
4. Increase ESA-listed fish passage survival at WVS dams.
5. Improve water management during the conservation season to benefit anadromous ESA- listed fish and other authorized project purposes.
6. Reduce pollutant levels to restore impaired water quality associated with the WVS dams to benefit anadromous ESA-listed species.
7. Reduce spawning and rearing habitat competition caused by hatchery fish.

These objectives, along with the purpose and need, guided the development of a reasonable range of alternatives in the FEIS. As the SEIS supplements the FEIS it retains the same purpose and need and objectives. However, USACE developed Alternative 6 in response to the requirements in WRDA 24 and is not aligned with the purpose and need statement.

**7 - MEASURES AND ALTERNATIVES**

As part of the FEIS development, the USACE EIS team identified and compiled a list of operational and structural measures, or actions, that met at least one of the seven objectives for the Proposed Action. A measure is the action an agency would take to achieve a given objective. Measures describe a physical (structural) change that requires construction or an operational change at a precise location or for the system, that meets an objective in whole or in part.

The team screened potential measures based on criteria for meeting the purpose and need for the project, achieving stated objectives, and technical considerations. Using input from the

public and cooperating agencies during scoping and professional judgement, the team then created alternatives around unifying themes or strategies using combinations of the remaining measures. An alternative is a combination of one or more measures that, together, address one or more of the objectives.

After multiple rounds of screening, the team compiled the measures into three hybrid alternatives that demonstrated the best outcomes for meeting project objectives (Alternatives 2A, 2B, and 5) that represent a fusion of four action alternatives (Alternatives 1, 3A, 3B, and 4). Alternative 6 was developed as part of the SEIS and was not part of the FEIS (Section ES-7.2). How each action alternative meets the objectives is in Table ES-1.

**Table ES-1. Project Alternative Strategies and Associated Objectives.**

| Alternative | Strategy | Objectives |
|---|---|---|
| No Action | Operation and maintenance (O&M) practices as of 2019 | None |
| 1 | Improve Fish Passage Through Storage-Focused Measures: Increase the probability of refilling WVS reservoirs and supplemental water delivery for authorized purposes | 1, 2, 3, 4, 5, 6, 7 |
| 2A | Integrated Water Management Flexibility and ESA-Listed Fish Alternative | 1, 2, 4, 5, 6, 7 |
| 2B | Integrated Water Management Flexibility and ESA-Listed Fish Alternative | 2, 4, 5, 6, 7 |
| 3A & 3B | Operations Focused: Improve passage of ESA-listed fish through existing structures by modifying water control operations | 2, 4, 5, 6, 7 |
| 4 | Structures Focused: Improve passage of ESA-listed fish by constructing fish passage and temperature control structures | 1, 2, 3, 4, 5, 6, 7 |
| 5 | Refined Integrated Water Management Flexibility and ESA-Listed Fish Alternative | 2, 4, 5, 6, 7 |
| 6 | Ceasing Federal Hydropower Operations | 2, 4, 5, 6, 7 |

### 7.1 Assessment and Comparison of Alternatives

Chapter 3 discusses each resource topic, such as water quality, fish and wildlife, cultural resources, and environmental effects. The analysis of the resource effects in Chapter 3 is at a macroscopic scale and scope given the regional nature of the study. USACE would conduct subsequent NEPA analyses of future site-specific actions as needed. Additional information on how USACE would analyze and comply with environmental laws for subsequent site-specific actions is in Chapter 7.

In the effects analysis, USACE compares the benefits, environmental consequences, and tradeoffs of each action alternative against the No Action Alternative (NAA), which

represents the management of the WVS as of April 2019. USACE developed multiple criteria to evaluate how each alternative met the objectives. USACE then performed a tradeoff analysis using these criteria to compare the alternatives. To develop criteria, USACE considered the benefits and environmental and social consequences reflected in Chapters 3 and 4 and then assessed the tradeoffs presented under each alternative. Descriptions of the criteria, the procedure for comparing alternatives, and the results of that comparison to identify a preferred alternative are in Chapter 5 of the Draft EIS and the Final SEIS.

## 7.2 Alternative 6 and Interim Operations

USACE developed Alternative 6 to meet WRDA 24 requirements to analyze an alternative that ceases Federal hydropower operations in the WVS. The specific language in WRDA 24 informed key portions of Alternative 6. For example, Congress directed the USACE to analyze ceasing hydropower operations at the projects, not to reduce hydropower operations or to remove the projects (dams). The other features of Alternative 6 were developed like all the other alternatives in the FEIS, to meet the stated alternative strategies and associated objectives (Appendix A, Section 1.1.4 Development of Alternative 6).

Interim Operations are a suite of operations that would occur until the long-term solution for downstream fish passage and water temperature management is in place and operational at each dam and reservoir. Interim Operations in the SEIS are the same as the Interim Operations in the FEIS with two additions: a late fall/early winter deep drawdown for fish passage at Detroit Dam and the 2008 Biological Opinion minimum flow targets in place of Measure 30b integrated temperature and flow management targets.

### 7.2.1 Effects of Alternative 6 – Ceasing Federal Hydropower Operations

The effects of Alternative 6 are detailed in Chapter 3, but some noteworthy effects are summarized here. In general, Alternative 6 would adversely affect hydropower generation and cost more than other alternatives because it requires decommissioning hydropower equipment. Adverse effects to fish are less than the NAA primarily due to structural downstream passage improvements at Detroit, Foster and Lookout Point dams, and deep reservoir drawdowns to the diversion tunnel at Cougar Dam. At other dams, adverse effects on fish passing downstream at dams increase or are similar as compared to the other action alternatives with structural changes or operational changes respectively.

### 7.2.2 Effects of the Detroit Drawdown

The Detroit drawdown is part of the Interim Operations and its effects are discussed throughout Chapter 3, but some effects are summarized here. In general, the deep drawdown at Detroit Reservoir would adversely affect water supply, water quality, drinking water (facility operation), and recreation. The effects of the drawdown on fish depend on the species and the lifestage of the species.

Regarding water supply, the late fall/early winter drawdown could affect peak summer reservoir levels at Detroit Reservoir. In very dry winters, USACE may not be able to refill the reservoir to minimum conservation pool by February 1, which could result in a lower reservoir level than currently experienced in very dry years. Naturally dry years with low precipitation and/or snowmelt affect how much water USACE can store while meeting downstream minimum flow targets. During dry years, USACE would coordinate with regional partners to minimize effects to downstream users reliant on streamflows.

For water quality and drinking water, the deeper drawdown of Detroit Reservoir would moderately increase sediment and turbidity levels downstream of Detroit Reservoir during the operation compared to the No Action Alternative. This effect determination is based on the sediment and geologic characteristics of the basin and proposed approach to the drawdown operation. The deeper drawdown at Detroit Dam has not occurred yet. USACE expects the drawdown to mobilize sediment, increasing turbidity levels downstream of Detroit and Big Cliff dams, but to a lesser extent than downstream of Green Peter Reservoir in 2023 and 2024. The drawdown of Detroit Reservoir is shallower than Green Peter Reservoir and would expose a significantly smaller area of sediment. Additionally, USACE is proposing to draw down the reservoir to the target elevation over several years, minimizing the amount of new sediment mobilized and exposed each year. Due to the shallower drawdown, the larger reservoir would retain more sediment than Green Peter Reservoir, however, the fine clay material eroded from exposed sediment is likely to stay in suspension and pass downstream of Detroit dam.

Detroit Reservoir is one of the most popular reservoirs in the analysis area with high visitation numbers. A late fall/early winter deep drawdown of Detroit Reservoir would result in lower summer pool elevations in dry years. It is difficult to determine if users would experience a meaningful reduction in recreation days because the hydrologic conditions in dry years naturally occur and USACE conducts in season adaptive management to limit these effects. During dry years, low summer pool elevations would result in unusable boat ramp(s). Mongold Boat Ramp, which is at minimum conservation pool elevation, would be the only boat ramp available during extremely dry years, as under the NAA, but for a shorter duration. This would likely impact recreational opportunities for fishing and boating. These effects are not expected every year but may recur over the 30-year implementation timeframe.

Effects of the Detroit Reservoir deep drawdown on fish would vary by species, lifestage, and locations. The late fall/early winter deep reservoir drawdown would benefit downstream fish passage for Chinook salmon by adding a non-turbine route with greater downstream passage survival of juvenile migrants when hydraulic conditions are safer (due to lower pool elevations) and allowing more diversity in the life stages and timing of migrating fish to pass downstream. Changes in the reservoir habitat conditions, and rates of entrainment of resident fish below the dam would affect native fish and sport fishing in the reservoir and downstream of Detroit Dam (Appendix E, Chapter 6). Many entrained resident fish would be injured or not survive passage through the dam. For some non-ESA listed species, significant reductions in abundance within Detroit Reservoir would occur. Most kokanee and many rainbow trout in the reservoir would pass downstream, similar to Green Peter Reservoir in 2023, severely reducing local fisheries.

Future stocking of hatchery reared fish (e.g. rainbow trout and kokanee) in Detroit Reservoir may partially mitigate some of these effects. Effects on water quality due to turbidity would result in a minor adverse effect on fish in the North Santiam River below Big Cliff Dam and fish being held at the Minto Fish Facility.

USACE would develop an Emergency Response and Communications Plan and coordinate with North Santiam communities to include them in this plan. This effort is separate from the SEIS process.

### 7.3 Preferred Alternative

The FEIS and Draft SEIS identified Alternative 5 as the Preferred Alternative. Identification of a preferred alternative does not prevent USACE from selecting a different alternative or action that is part of an alternative. The Record of Decision will detail the actions the decision maker selects for implementation and the justification for selecting that action. It will be released 30 days after the Final SEIS. USACE developed Alternative 5 to (1) improve fish passage throughout the WVS, (2) to manage water quality downstream of WVS dams using a combination of modified operations and structural improvements, and (3) to balance water management flexibility to meet downstream water requirements for fish and wildlife.

## 8 - REGIONAL INPUT

USACE has the responsibility and legal authority for managing the WVS in coordination with tribal, Federal, and state partners, and for collaborating with these partners and other cooperating agencies under NEPA to develop this SEIS. When initiating and preparing the SEIS, USACE held three cooperating agency meetings and four public scoping meetings in May and June of 2025. A series of public meetings were also held for the Draft SEIS. A detailed description of the public involvement process is in Chapter 6 of the SEIS.

### 8.1 Cooperating Agencies

As the lead agency for this SEIS, USACE invited agencies with jurisdiction by law or special expertise relevant to the WVS and its O&M to be cooperating agencies. Agencies that accepted cooperating agency status are listed in Table ES-2 and are described briefly in Section 1.6 of the FEIS and in detail in Appendix L. These cooperating agencies contributed to the SEIS by providing information and input throughout the NEPA process.

**Table ES-2. Cooperating Agencies.**

| Agency |
|---|
| **Tribal** |
| Confederated Tribes of Grand Ronde Community of Oregon |
| **Federal** |
| Bonneville Power Administration |
| U.S. Bureau of Reclamation |

| Agency |
|---|
| National Marine Fisheries Service |
| U.S. Fish and Wildlife Service |
| United States Environmental Protection Agency |
| **State of Oregon** |
| Oregon Department of Agriculture |
| Oregon Department of Environmental Quality |
| Oregon Department of Fish and Wildlife |
| Oregon Water Resources Department |

### 8.2 Public Scoping for SEIS

USACE held two scoping meetings in person, the first in Detroit, Oregon and the second in Salem, Oregon. Two additional virtual meetings were held on Microsoft Teams. All meetings included a presentation. The virtual meeting presentations were followed by an open question and answer period. At the in-person meetings, an open house format followed the presentation to encourage discussion and information sharing and to ensure the public had opportunities to speak with USACE representatives. An average of 20 people attended each scoping meeting.

USACE received 117 correspondence documents via email, mail, and comment brochures collected at the meetings. Many of the correspondence documents contained multiple comments on different topics. A total of 246 comments were received from private citizens, non-governmental organizations, government agencies, and tribes (Table 6-1). The comments were organized, analyzed, and categorized according to four topics (Table ES-3).

**Table ES-3. Public Scoping Comments Received by Topic.**

| Topic | # of Comments Received |
|---|---|
| Hydropower | 30 |
| Deep Drawdown | 133 |
| NEPA process | 65 |
| Environmental impacts | 18 |
| **Total** | **246** |

About half of the comments USACE received concerned the deep drawdown at Detroit Reservoir. Comments were used to inform the scope of analysis, alternatives development, and identification of potentially significant issues to be addressed in the Draft SEIS.

### 8.3 Key Issues and Resource Concerns

Several key issues were raised during scoping including, but not limited to, those listed in Table ES-4.

**Table ES-4. Summary of Key Concerns Identified During Public Scoping for the SEIS.[1]**

| Issue Category | Summary of Concern |
|---|---|
| **Alternative/SEIS Development** | USACE should consider a dam-by-dam analysis of hydropower operations.<br>The scope of the alternative is too narrow.<br>Differing perspectives on how to balance all the authorized purposes and ESA requirements.<br>The SEIS should analyze impacts on water supply, sedimentation and turbidity. |
| **Hydropower Operations** | Support for continuing hydropower production, and support for ending hydropower production.<br>Questions about how ending hydropower operations would impact climate goals, cost for operation and maintenance of the dams.<br>Questions regarding what would happen to the re-regulation dams with hydropower production. |
| **Deep drawdown at Detroit Reservoir** | Downstream water quality impacts on water supplies.<br>Recreational and economic impacts.<br>Impact to kokanee fishery. |

[1] Appendix P, Public Scoping Report.

## 8.4 Public Review of the Draft SEIS

During the 60-day public review and comment period, more than 200 stakeholders submitted comments. A diverse range of respondents, including individual citizens, local, state, and federal organizations, tribal nations, and non-governmental organizations provided feedback. About half of respondents commented on the proposed removal of hydropower. Of those, about 80% expressed their support for the removal, while 20% voiced their opposition. Those supporting removal cited environmental reasons such as protecting migrating fish, while those opposed to removal cited support for maintaining energy production.

A primary concern among respondents was the deep drawdown of the Detroit Reservoir, with most stakeholders commenting on this issue. While approximately 65% of respondents opposed the drawdown, about 35% were in favor. Those opposed primarily cited concerns over water quality, specifically increased turbidity and the impacts to municipal water supply. Another major concern was the potential impact to the kokanee fishery. Those in support of a drawdown cited the protection of salmon as their primary reason.

Finally, several respondents raised concerns related to SEIS content and process. These concerns varied, including assertions that USACE should have considered other alternatives and that the assessment of effects was insufficient. Additionally, about half of respondents cited concerns of socioeconomic impacts on water supply, recreation, and local economies from the drawdowns.

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

# CHAPTER 1 THROUGH CHAPTER 11



Painting by Lee Jensen, USACE Employee, 1991-2001 (USACE Portland District Media Images)

# CHAPTER 1 - INTRODUCTION

On April 11, 2025, the U.S. Army Corps of Engineers (USACE), published the notice of availability for its Final Environmental Impact Statement (FEIS) for the Willamette Valley System (WVS) Operations and Maintenance. In Section 1326 of the Water Resources Development Act of 2024 (WRDA 24), Congress directed the Secretary of the Army to formally analyze an alternative that ceases Federal hydropower operations at the WVS before completing its overall review of the system. USACE determined the most appropriate way to address this directive is to supplement its analysis in the FEIS with a new alternative while also updating the proposed Interim Operations to reflect what was learned during adaptive management as well as actions in the 2024 National Marine Fisheries Service (NMFS) Biological Opinion not previously analyzed. On May 15, 2025, USACE published a notice of intent to prepare this Supplemental Environmental Impact Statement (SEIS).

Specifically, USACE is supplementing the FEIS with Alternative 6, which analyzes ceasing Federal hydropower operations at the WVS system projects. The supplement also revises the Interim Operations to include an interim late fall/early winter deep drawdown for fish passage at Detroit Dam and changes to minimum flow targets. This SEIS is a supplement to the FEIS; together, they comprise the full range of alternatives for the decision maker to consider and their evaluations for the operation and maintenance of the WVS and should be read together. The SEIS incorporates much of the information in the FEIS by reference; therefore, the FEIS should be reviewed alongside the SEIS to facilitate a full understanding of the SEIS.

Most of this chapter is incorporated by reference. Some sections are updated with new information related to Alternative 6 and the Interim Operations. Some figures are reproduced for context.

## 1.1 Background

Incorporated by reference.

## 1.2 Chapter Terminology and Organization

Incorporated by reference.

## 1.3 Regulatory Background

Incorporated by reference.

### 1.3.1 National Environmental Policy Act

Incorporated by reference.

### 1.3.2 Endangered Species Act

Incorporated by reference.

### 1.3.3 Willamette Valley System Endangered Species Act and National Environmental Policy History Since 2008

This section has been incorporated by reference with the following addition:

In December 2024, the National Marine Fisheries Service published the *Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Willamette Valley System* (NMFS 2024b). NMFS determined the proposed action would jeopardize the continued existence of Upper Willamette River (UWR) Chinook salmon (Oncorhynchus tshawytscha) and UWR steelhead (O. mykiss) and would result in adverse modification of their designated critical habitat. The 2024 Biological Opinion identified a Reasonable and Prudent Alternative (RPA), a suite of actions that, when implemented with the proposed action, would avoid jeopardizing the continued existence of all listed species and prevent adverse modification of designated critical habitat.

In April 2025, USACE completed a six-year study on the operations and maintenance of the WVS of dams and reservoirs and published the FEIS. The FEIS publicly discloses how USACE operations affect the environment, people, and ecosystems, and examines seven alternatives, or different ways USACE could operate the WVS.

In May 2025, USACE signed a Record of Decision (ROD) on the Interim Operations (minus the Detroit late fall/early winter drawdown) and Foster Warm Water Supply Pipe based on the analysis in the FEIS. This ROD allows USACE to comply with the National Environmental Policy Act (NEPA) requirements for Interim Operations while continuing to evaluate a new alternative ceasing hydropower operations at the WVS and other changes to the Interim Operations based on adaptive management and the 2024 Biological Opinion.

## 1.4 Geographic and Temporal Scopes

### 1.4.1 Geographic Scope

Incorporated by reference.

## 1.5 Proposed Action

The Proposed Action is to continue operations and maintenance of the Willamette Valley System (WVS) for specific, authorized purposes. Congress directed responsibility for operating each dam and reservoir individually and as part of a system to USACE in authorizing legislation. USACE analyzed implementing the Proposed Action over a 30-year timeframe.

## 1.6 National Environmental Policy Act Cooperating Agencies and Endangered Species Act Action Agencies

Incorporated by reference.

# CHAPTER 2 - ALTERNATIVES

## 2.1 Introduction

Federal agencies must evaluate a reasonable range of feasible alternatives to their Proposed Actions. Chapter 2 details USACE's process to formulate the alternatives it considered but dismissed and those it formally analyzed. A key reason for supplementing the FEIS was to include an additional Interim Operation at Detroit and to formally analyze ceasing hydropower operations at the WVS projects as required by WRDA 24.

Agencies are required to supplement an EIS when the agency makes a substantial change to the proposed action or there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis. An agency may also choose to supplement an EIS when it determines that the purposes of NEPA would be furthered by doing so (33 CFR 230.13(b) *citing* 40 CFR 1502.9). The criteria requiring supplementation have not been met. However, in Section 1326 of WRDA 24, Congress directed USACE to "formally analyze an alternative that ceases hydropower operations at the projects" in the WVS. WRDA 24 did not reference NEPA or proscribe the alternative be analyzed in a NEPA document. However, USACE determined that supplementing its recent FEIS for the Operation and Maintenance of the Willamette Valley System to include an alternative required by WRDA 24 would be in furtherance of NEPA while also meeting the requirements of WRDA 24. That requirement is fulfilled by the inclusion of  Alternative 6.

## 2.2 Chapter Terminology and Organization

Incorporated by reference.

## 2.3 Proposed Action

Incorporated by reference.

## 2.4 Purpose of and Need for the Proposed Action

The purpose and need for the continued operations and maintenance of the WVS is to operate the system in accordance with the eight Congressionally authorized purposes and in compliance with the ESA and all other applicable treaties, laws, and regulations (Chapter 1, Introduction, Section 1.10, Congressionally Authorized Purposes).

In the DEIS and FEIS, measures and alternatives were screened from further consideration if they did not meet the purpose and need statement. USACE interpreted the purpose and need statement very broadly when screening out measures or alternatives. For example, the Cougar diversion tunnel operation only provides conservation storage and operates for hydropower purposes for a few days out the entire 84-year hydrological period of record analyzed (1935-2019). Because the measure did not entirely eliminate these purposes, the Cougar diversion tunnel operation was retained for formal analysis, even though it is outside USACE's current

authorities. USACE must operate substantially in accordance with its authorized purposes as documented by the rule curves in its authorizing documents. USACE does not currently have the operational authority to only store water for three days in 84 years at a particular dam because that is not substantially operating to provide conservation storage for irrigation and water supply. This broad interpretation was the result of significant input from cooperators. Ultimately the screening process resulted in a reasonable range of seven different action alternatives composed of various measures.

As stated in Section 2.1, four months before publication of the FEIS and six years into the NEPA process, Congress passed a provision in WRDA 24 that required USACE to formally analyze an alternative that ceases hydropower operations at the WVS projects. WRDA 24 does not reference NEPA or state that the alternative be formally analyzed in a NEPA document. USACE determined it had the discretion to supplement the FEIS to include the alternative required by WRDA 24 and that providing additional information for the public to comment on and context for the decision maker would be in furtherance of NEPA. However, USACE did not revise its purpose and need statement to include numerous other alternatives in addition to the one required by Congress to keep the process efficient and timely, as emphasized in the Fiscal Responsibility Act (FRA) of 2023 (Pub. L. No. 118-5, 137 Stat. 10). Instead, it is relying on the clear directive in Section 1326 of WRDA 24 to analyze a single alternative that ceases hydropower operations at the WVS projects. See Section 1.12.8 for the language of WRDA 2024.

### 2.4.1 Summary of ESA Requirements Specific to the Need for the Proposed Action

Incorporated by reference.

## 2.5 Decision-making

Incorporated by reference.

## 2.6 Alternatives Development Overview

Before a lead agency can establish the range of alternatives analyzed in an EIS, it must engage in public scoping and develop an interdisciplinary analysis process (Appendix A, Alternatives Development).

### 2.6.1 The Scoping Process

This section from the FEIS is incorporated by reference.

Scoping for this SEIS began with publication in the Federal Register of the 2025 Notice of Intent to prepare a Supplemental EIS (FR Doc. 2025-08689), which invited participation in the NEPA process by the public and other Entities (Chapter 6, Public Involvement). Through the scoping process, USACE solicited input from affected tribes, and stakeholders, such as state and federal agencies and the public (both private citizens and non-governmental organizations). USACE

prepared a Scoping Report at the conclusion of the public scoping process that summarizes the process and comments received (see Appendix P, Public Scoping Report).

The public scoping process gathered feedback on several key issues regarding the proposed Alternative 6 and new Interim Operations. Stakeholders expressed concerns about hydropower operations, economic impacts, and grid reliability. There were also comments on the NEPA process, including requests for more time and concerns over legal compliance. Environmental issues raised included water quality, sediment transportation, fish species impacts, especially kokanee, and climate change. USACE received the most feedback on the proposed deep drawdown at Detroit Dam, its effects on water quality, municipal water supplies, recreation, and kokanee populations. Chapter 6 and Appendix P describe the scoping process and outcomes in more detail.

#### 2.6.1.1 Interdisciplinary Preparation and Cooperating Agency Involvement

Incorporated by reference.

### 2.7 Range of Reasonable Alternatives Development

The USACE process for developing alternatives as described in the WVS FEIS is incorporated by reference. This section has been updated from the FEIS to include the additional alternative development steps to meet the requirements of WRDA 24. The remainder of this section is incorporated by reference.

The specific language in WRDA 24 was used to develop key portions of Alternative 6. Congress directed the USACE to analyze *ceasing* hydropower *operations* at the projects, not reduce hydropower operations or remove projects (dams). The other features of Alternative 6 were developed like the other alternatives in the FEIS, to meet the stated alternative strategies and associated objectives (Appendix A, Section 1.1.4 Development of Alternative 6). How each action alternative meet the objectives is listed in Table 2-1.

**Table 2-1. Alternative Strategies and Associated Objectives[1].**

| Alternative | Strategy | Obj. 1 | Obj. 2 | Obj. 3 | Obj. 4 | Obj. 5 | Obj. 6 | Obj. 7 |
|---|---|---|---|---|---|---|---|---|
| No-action | Operations and maintenance practices, as of April 2019. | – | – | – | – | – | – | – |
| 1 | Improve fish passage through storage-focused measures. Increase the probability of refilling WVS reservoirs and water delivery for authorized purposes. | X | X | X | X | X | X | X |
| 2A | Integrate water management flexibility with operations and structures for ESA-listed fish. | X | X | – | X | X | X | X |
| 2B & 5 | Integrate water management flexibility with operations and structures for ESA-listed fish. | – | X | – | X | X | X | X |
| 3A, 3B | Improve passage of ESA-listed fish through existing structures by modifying water control operations. | – | X | – | X | X | X | X |

| Alternative | Strategy | Obj. 1 | Obj. 2 | Obj. 3 | Obj. 4 | Obj. 5 | Obj. 6 | Obj. 7 |
|---|---|---|---|---|---|---|---|---|
| 4 | Improve passage of ESA-listed fish by constructing fish passage and temperature control structures. | X | X | X | X | X | X | X |
| 6 | Ceasing Federal hydropower operations | – | X | – | X | X | X | X |

Table 2.7-1 in the FEIS

[1] Objectives:

1. Allow greater flexibility in water management (related to refill, drawdown timing, and other water management measures) as compared to current operational requirements in water control diagrams and manuals. This objective supported development of measures that would meet authorized purposes and ESA obligations without current system management constraints.
2. Increase opportunities for the creation of nature-based structures during maintenance of USACE-managed revetments (structures that help prevent bank erosion) as compared to opportunities under current operations (Chapter 1, Introduction, Section 1.7.2, Revetments and Other Structures for Bank Protection). This objective supported development of a measure to manage revetments to provide engineering functions relevant to flood risk management while providing economic, environmental, or social benefits.
3. Allow greater flexibility in hydropower production as compared to current operational requirements in water control manuals. This objective supported development of measures that would provide opportunities in hydropower pool management to meet Congressionally authorized purposes and ESA obligations.
4. Increase anadromous ESA-listed fish passage survival at WVS dams as compared to conditions under current operations. This objective supported development of fish passage measures in compliance with ESA obligations.
5. Improve water management during the conservation season (related to refill, drawdown timing, and other water management measures), as compared to current operational requirements in water control diagrams and manuals, to benefit anadromous ESA-listed fish and other Congressionally authorized purposes.
6. Improve water quality associated with the WVS dams to benefit anadromous ESA-listed species.
7. Reduce spawning and rearing habitat competition caused by hatchery fish.

## 2.8 Final Measures Developed for the Action Alternatives

This section has been updated from the FEIS to include the additional measures to cease hydropower operations at the projects and changes to the Interim Operations. These include the deep late fall/early winter drawdown at Detroit, minimum flow target requirements from the 2024 NMFS Biological Opinion, and large woody debris collection. The remainder of this section is incorporated by reference.

### 2.8.1 Flow Measures

Incorporated by reference.

#### 2.8.1.1 Integrated Temperature and Habitat Flow Regime (30a)

Incorporated by reference.

Appendix A further describes the development of these measures and Alternative 6.

#### 2.8.6 Interim Operations

Interim Operations are a suite of independent operations that would occur until the long-term solution for downstream fish passage and water temperature management is in place and operational.

The Interim Operations (Table 2-2) described in the FEIS are incorporated by reference with the following changes required by the 2024 Biological Opinion RPAs:

- Addition of a late fall/early winter deep drawdown of Detroit reservoir to an elevation of 1395 feet for downstream fish passage.
- Implementation of the 2008 Biological Opinion flows until new flow management targets can be developed in coordination with NMFS and USFWS. New flow management targets will be tiered to this effort.

The deep drawdown of Detroit Reservoir is to increase survival for juvenile ESA-listed fish as they migrate downstream. The Detroit drawdown operation has the primary goals of minimizing water temperature impacts on aquatic life and minimizing downstream turbidity levels while improving downstream fish passage. USACE would initiate the drawdown in late November or early December, once reservoir water temperatures have cooled. This timing reduces the potential for warm water releases in late fall/early winter and minimizes effects on fish in the reservoir itself. USACE would draft the reservoir to the target elevation over approximately two weeks and hold the reservoir at the target elevation for approximately two weeks. Studies suggest that fish are likely to migrate or "move out" of the reservoir while the reservoir is drafted to the target elevation (Keefer et al. 2013; Hansen et al. 2017). Aligning the timing and duration of the drawdown with these findings should facilitate fish passage while minimizing disruptions to the downstream river.

The Detroit deep drawdown would use a step-down approach over several years to go down 55 feet to reach the target elevation of 1395 feet. The first year USACE would lower the reservoir 30 feet to 1425 feet, an elevation previously reached for low flow augmentation (2015) and spillway gate maintenance (2019). Based on the levels of turbidity, USACE would lower the reservoir deeper each year until reaching 1395 feet. This approach incorporates lessons learned from the Green Peter reservoir drawdown which drew down the reservoir 142 feet in one month causing high levels of turbidity (Section 3.19.4.1) and large losses of kokanee (Section 3.8.4.1). The drawdown would occur in late fall/early winter, when the water is cooler and kokanee are more widely distributed in the reservoir, reducing the risk of a mass casualty event.

**Table 2-2. Interim Operations.**

| Description of Interim Operations by Dam Location | Duration of Operation | Priority Outlet | Target Elevation |
|---|---|---|---|
| **Detroit** | | | |
| Spring downstream fish passage and operational downstream temperature management | mid-March to Fall | Spillway/ Turbines/Regulating Outlets | N/A |
| Nighttime regulating outlet prioritization for improved downstream fish passage | Winter | Upper Regulating Outlets/ Lower Regulating Outlets | Less than 1,500 feet |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | Fall/Winter | Upper Regulating Outlets | 1,395 feet |
| **Big Cliff** | | | |
| Spread spill across spill bays to reduce downstream total dissolved gas (TDG) exceedances | Year-round | Spillway | Discharges greater than powerhouse capacity |
| **Green Peter** | | | |
| Outplanting plan for reintroduction of adult Chinook salmon above Green Peter Dam | Summer | N/A | N/A |
| Utilize spillway for improved downstream fish passage in the spring; perform spill operation until May 1 or for 30 days, whichever is longer | Spring (mid-March to April/May) | Spillway | Greater than 971 feet (spillway crest) |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | Gradual drawdown beginning September 1; rapid drawdown beginning mid-October and ending approximately mid-December; maintain target elevation for up to 30 days. | Regulating Outlets | 780 feet |
| **Foster** | | | |
| Delay refill and utilize spillway in the spring for improved downstream fish passage; use the fish weir in the summer for improved downstream temperature management and upstream fish migration/passage | February 1 to June 15<br><br>June 16 to approximately late-July (similar to No-action Alternative) | Spillway (spring)<br><br>Fish Weir (summer) | 613 feet (February to May)<br><br>637 feet (May to July) |
| Utilize the spillway for improved downstream fish passage in the fall | October 1 to December 15 | Spillway | 613 feet |

| Description of Interim Operations by Dam Location | Duration of Operation | Priority Outlet | Target Elevation |
|---|---|---|---|
| **Cougar** | | | |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | Early November to December 15 | Regulating Outlets | 1,505 feet |
| Delayed reservoir refill and regulating outlet prioritization for improved downstream fish passage | Feb to May/June | Regulating Outlets | 1,520 to 1,532 feet |
| **Hills Creek** | | | |
| Nighttime regulating outlet prioritization for improved downstream fish passage | Approximately November to March | Regulating Outlets | Less than 1,460 feet |
| **Lookout Point** | | | |
| Utilize spillway for improved downstream fish passage in the spring | mid-March to May/June (spring) | Spillway | 890 to 893 feet spring spill |
| Regulating outlet use in the fall for downstream temperature management | July to October 15 | Regulating Outlets | Less than 887.5 feet late summer/fall regulating outlets |
| Deep drawdown and regulating outlet prioritization for improved downstream fish passage | November 15 to December 15 | Regulating Outlets | 750 feet |
| **Minimum Flow Targets** | | | |
| Operate under 2008 Biological Opinion flow targets throughout the Willamette River Basin and provide pulses for mainstem temperature management (same as part of Measures 30a and b) | Year-round | N/A | N/A |

Table 2.8-6 in the FEIS

N/A = not applicable

## 2.9 Alternatives Considered but Eliminated from Further Review

This section is incorporated by reference with the following clarification for Alternative 6:

Measure screening reduces the breadth of alternatives to consider in depth, making the analysis in an EIS more reasonable to accomplish. For instance, dam breach and removal measures were screened out because they prevent USACE from operating the dams for their authorized purposes, including flood risk management. Therefore, any alternative including dam removal measures was eliminated. Similarly, in the FEIS, an alternative that eliminated hydropower operations was screened because hydropower is an authorized purpose. Analyzing an alternative that ceases hydropower does not meet the purpose and need for this analysis, to continue to operate and maintain the system in accordance with its authorized purposes and meets ESA requirements. However, in WRDA 24 Congress directed the USACE to analyze “an alternative that ceases hydropower operations at the projects, notwithstanding hydropower

# CHAPTER 3 - AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

## 3.1 Introduction

Incorporated by reference.

Since the start of the SEIS there have been several key changes to federal law, regulations, and case law. On February 25, 2025, the Council on Environmental Quality (CEQ) published an Interim Final Rule removing CEQ's NEPA implementing regulations, effective April 11, 2025 (90 Fed. Reg. 10610). As a result, the Fiscal Responsibility Act of 2023 and USACE's implementing regulations at 33 C.F.R. §230 apply to this document but CEQ's previous regulations do not.

The decision maker will not consider areas analyzed that no longer require consideration by law, regulation, or executive order in their decision. However, to keep the process efficient and timely, as emphasized in the FRA, some references to environmental justice, greenhouse gas, and climate change appear in the SEIS. Social, economic, and community impacts are disclosed and considered, where appropriate, in accordance with USACE's NEPA regulations at 33 C.F.R. §230, which applied at the start of this SEIS but have been subsequently repealed.

### 3.1.1 Large Woody Debris

The FEIS did not include the collection and removal of large woody debris though it is an action USACE took prior to 2019. This measure would continue and is common to all alternatives. WVS dams block contributions of large wood from upstream. USACE would collect large wood during annual maintenance operations that accumulates at WVS dams and make it available for habitat restoration projects. USACE would store material on USACE land for other appropriate entities to collect and use for habitat projects in the region. The effects of this measure would be minor and beneficial and are not discussed further in this SEIS. This analysis is commensurate with the minor beneficial impact of this action.

## 3.2 Hydrologic Processes

### 3.2.1 Affected Environment

Incorporated by reference.

### 3.2.2 Environmental Consequences

#### 3.2.2.1 Methodology

Incorporated by reference.

#### 3.2.2.2 Environmental Consequences Summary

The No Action Alternative represents the management of the WVS as of April 2019. Each action alternative would change the seasonal flow and use of stored water in the system. The

#### 3.2.2.3 Alternatives Analyses

**No-action Alternative**

Incorporated by reference.

**Alternative 1—Improve Fish Passage through Storage-focused Measures**

Incorporated by reference.

**Alternative 2A—Integrated Water Management Flexibility and ESA-listed Fish Alternative**

Incorporated by reference.

**Interim Operations**

The timing and duration of Interim Operations would vary by alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, 5, and 6. However, under Alternative 3A and Alternative 3B Interim Operations may not be implemented because long-term operational strategies are intended to be implemented immediately upon Record of Decision.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.6, Interim Operations). Interim Operations analyses did not consider impacts assessed under action Alternatives 2A, 2B, 3A, 3B, 4, 5, and 6 because Interim Operations would be implemented before, not in addition to, the action described in the action alternative.

Interim Operations effects on hydrologic processes are assessed by subbasin. USACE modeled only the activities that would affect the flow from a WVS dam. Other activities part of the Interim Operations, such as the reintroduction of salmonids into selected river reaches, would not affect flow and were not included in the analyses below.

Appendix B, Hydrologic Processes Technical Information, explains the hydrologic operations model. Although there are some additional Interim Operations that would affect flow as compared to the NAA, the most notable operations from the perspective of hydrologic processes are:

- Deeper fall drawdown and change in outlet release allocation based on reservoir water surface elevation at Detroit Dam.
- Deeper fall reservoir drawdown at Green Peter Reservoir and increased use of the spillway during the spring.
- Delayed spring refill and earlier reduction in pool elevation at Foster Reservoir.
- Delayed spring refill and deeper fall reservoir drawdown at Cougar Reservoir, with a downstream flow restriction during some drawdown periods.

- Change in outlet operations based on reservoir water surface elevation at Hills Creek Dam.
- Lower spring maximum reservoir elevation to support 30-day ungated spillway spill at Lookout Point Reservoir and a deeper fall reservoir drawdown. Increased use of the spillway based on reservoir water surface elevation.

Interim Operations would reduce maximum achieved WVS storage in the conservation season as compared to the NAA in the Middle Fork Willamette River Subbasin and McKenzie River Subbasin. The delayed refill or lower maximum pool elevation would require USACE to release WVS water in the spring that would otherwise be stored under the NAA and other alternatives. This release would result in lower reservoir elevations and outflows throughout the summer and early fall until fall deep drawdowns at Cougar, Lookout Point, Green Peter, and Detroit begin.

On the mainstem Willamette River, Albany would show a greater change in flows from the lower WVS storage than Salem compared to the NAA. This would be primarily due to USACE releasing water at Detroit and Green Peter Reservoirs to contribute to Salem flow target, whereas Albany is upstream of the Willamette River confluence with the Santiam River.

***Santiam River Subbasin***

Under the Interim Operations, Detroit reservoir targets the same elevations and releases as in the NAA, except for the deep late fall/winter drawdown, and gains the ability to draft into the power pool in late summer to meet minimum flow requirements. Exceptionally dry Januarys may impede spring refill as indicated by the P5 line in Figure 3-1.




**Figure 3-1. Interim Operations Detroit Reservoir Water Surface Elevation Non-exceedance as Compared to the No-action Alternative.**

Figure 3.2-70 in the FEIS

Similar to Detroit, Green Peter fills to similar levels in the spring during Interim Operations as in the NAA except in years with exceptionally dry Januarys when the reservoir struggles to refill from the previous fall deep drawdown (Figure 3-2). Elevations are consistently lower in the late summer through late winter when the reservoir is drafting to meet and maintain the fall drawdown.

## 3.3 River Mechanics and Geomorphology

This section was descoped from the FEIS.

## 3.4 Geology and Soils

### 3.4.1 Introduction

Incorporated by reference.

### 3.4.2 Affected Environment

Incorporated by reference.

### 3.4.3 Environmental Consequences

This section discusses the potential effects of Alternative 6 and the Interim Operations related to geology. The discussion includes the methodology used to assess effects, incorporated by reference, and a summary of the anticipated effects (Table 3-7).

Environmental Consequences from landslides are analyzed as impacts to slope stability. They are not analyzed as potential impacts to infrastructure or as impacts on other resources such as water quality from sediment movement. Information is not available to assess impacts from landslides on WVS infrastructure except for ongoing infrastructure repairs and maintenance related to ongoing slope instability. This is because slope failures are widely varied in location, size, and direction and site-specific information is not available for all slope conditions. Environmental consequences from the removal of geologic materials consider whether construction activities from measures would result in the removal of geologic materials.

Information on potential sediment movement is available in Appendix C, River Mechanics and Geomorphology Technical Information. Analyses of sediment movement as turbidity is in Section 3.5, Water Quality.

#### 3.4.3.1 Methodology

Incorporated by reference.

#### 3.4.3.2 Alternatives Analyses

Effects discussions for alternatives other than Alternative 6 and the Interim Operations are in the FEIS and incorporated by reference.

**Alternative 6—Ceasing Federal Hydropower Operations**

*All Subbasins Activation of Landslides due to Deep Drawdowns and Removal of Geologic Material*

Activities in all subbasins under Alternative 6 would be similar to those under Alternative 5 with respect to potential drawdown-related and construction-related effects on geologic resources. Consequently, impacts to geologic resources from landslide activation or removal of material under Alternative 6 in all subbasins would be the same as those described under Alternative 5.

### 3.4.4 Interim Operations under All Action Alternatives Except Alternative 1

This section is incorporated by reference with the following addition pertaining to the deep drawdown at Detroit Reservoir:

Unlike operations under the NAA, the Interim Operations would reduce the minimum pool elevation. Specifically, USACE would draw down the reservoir to within 35 feet of the regulating outlet invert at Green Peter Dam and within 50 feet of the upper regulating outlets at Detroit Dam.

Under the Interim Operations this operation would result in a drawdown below the minimum rule curve in all years at Green Peter and Detroit dams unlike the NAA. The drawdowns would expose more shoreline at Green Peter and Detroit reservoirs as compared to the NAA (Appendix C, River Mechanics and Geomorphology Technical Information).

As under the NAA, small-scale landslides that cause short-term infrastructure damage and require repairs would continue to occur at each dam under the Interim Operations over the 30-year implementation timeframe. Large landslides with a history of movement since the beginning of reservoir operations are mapped adjacent to Detroit Reservoir. The stability history of landslides around Detroit Reservoir has demonstrated that reductions in minimum pool elevations and surface exposure due to drawdowns have the potential to induce slope failures. Therefore, the potential for landslide activation at Detroit Dam would be moderate under the Interim Operations. The potential of the drawdown operations to activate landslides at Green Peter Dam would be minor under the Interim Operations because moderate-sized landslides adjacent to Green Peter Reservoir do not have a history of movement. Therefore, the stability history of landslides around Green Peter Reservoir has demonstrated that reductions in minimum pool elevations and surface exposure due to drawdown do not have the potential to induce slope failures.

#### 3.4.5 Climate Change under All Alternatives

Incorporated by reference. This section was not updated to include Alternative 6. Prior to the release of this SEIS, Executive Order 14154 "Unleashing American Energy" was issued. Consistent with this Executive Order, a greenhouse gas analysis is not included here; however, this SEIS is consistent with the NEPA statute and existing agency regulations pertaining to air quality and emissions.

### 3.5 Water Quality

#### 3.5.1 Introduction

Incorporated by reference.

#### 3.5.2 Affected Environment

Incorporated by reference.

#### 3.5.3 Environmental Consequences

This section discusses the potential direct, indirect, and climate change effects of the alternatives on water quality in the analysis area (Section 3.5.2, Affected Environment). The discussion includes the methodology used to assess effects, an analysis of effects by alternative, and a summary of the anticipated effects.

##### 3.5.3.1 Methodology

Incorporated by reference. To support analysis of each subbasin in Section 3.5.3.2, the models and methodologies applied to specific parameters are detailed below.

**Water Temperature Modeling**

Incorporated by reference.

Modeled water temperatures below the dams were not simulated for Alternative 6 (Ceasing Federal Hydropower Operations) and Interim Operations. Instead, temperature summary values at each gage station are based on the outflow from the upstream dam, typically less than 3 miles upstream (Appendix D, Water Quality Analysis, Section 1.6.10, Supplemental EIS).

***Interim Operations***

Interim Operations are based on Interim Operations in the FEIS with updates to include the deep winter drawdown at Detroit Dam and Reservoir and use of the 2008 Biological Opinion minimum flow targets basin wide. Summary tables of Interim Operations monthly mean water temperature and monthly mean difference between Interim Operations and the NAA for each

*Turbidity, Harmful Algal Blooms, and Mercury*

Under Alternative 6, impacts to water quality from turbidity, harmful algal blooms, and mercury in the Mainstem Willamette River would be slightly more adverse than those described under the NAA. This is due to deeper drawdowns in many WVS reservoirs, increasing the likelihood of turbidity, harmful algal blooms, and mercury being passed downstream.

### 3.5.4 Interim Operations under All Action Alternatives Except Alternative 1

The timing and duration of Interim Operations would vary by alternative. Interim Operations could extend to the 30-year implementation timeframe under Alternatives 2A, 2B, 4, 5, and 6. However, under Alternative 3A and Alternative 3B Interim Operations may not be implemented because long-term operational strategies would be implemented immediately upon Record of Decision.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.6, Interim Operations). Interim Operations analyses did not include consideration of the impacts assessed under action Alternatives 2A, 2B, 3A, 3B, 4, 5, and 6 because Interim Operations would occur before, not in addition to, an action alternative.

Deep drawdowns, earlier drawdowns, and delayed refills for downstream fish passage would greatly increase erosion and bank instability, which would be a continuation of major, adverse effects to water quality.

#### 3.5.4.1 North Santiam River Subbasin

**Water Temperature**

Under Interim Operations, effects on water quality from temperature conditions in the North Santiam River Subbasin would continue to be adverse, similar to the NAA. Temperature targets under the Interim Operations differ from targets modeled for the NAA.

Under the Interim Operations as compared to the NAA:

- Modeled water temperatures would be within 2°F of targets below Detroit and Big Cliff dams by 20 fewer days per year on average and be below 64.4°F temperature threshold by 10 fewer days per year on average (Table 3-8 and Table 3-9).

Exceptions may occur at the local level and in the short term, depending on specific annual or seasonal climate conditions and specific dam operations, but overall, operations and maintenance under the Interim Operations would result in continuation of adverse effects on water quality from temperature conditions in the North Santiam River Subbasin even though the Interim Operations are expected to provide some benefit to water temperature conditions.

**Total Dissolved Gas**

The Interim Operations would substantially adversely affect water quality from TDG in the North Santiam River Subbasin as compared to the NAA. This is because there would be a combination of measures that would increase the spill frequency, and increase instances of TDG exceeding the 110 percent water quality standard as compared to the NAA.

Specifically, under the Interim Operations as compared to the NAA:

- TDG would exceed the water quality standard by 86 more days per year on average below Detroit Dam and by 72 more days per year on average below Big Cliff Dam (Table 3-10) (Appendix D, Water Quality Analysis, Section 2.2, Total Dissolved Gas Results and Effects Analysis).

Exceptions may occur at the local level and in the short term, depending on specific annual or seasonal climate conditions and specific dam operations, but overall, operations and maintenance under the Interim Operations would result in adverse effects on water quality from TDG in the North Santiam River Subbasin.

**Turbidity**

Under the Interim Operations, effects on water quality from turbidity would be moderately more adverse than those described under the NAA during the 30-year implementation timeframe. The Interim Operations would increase sediment and turbidity levels downstream of Detroit Reservoir because of the deeper drawdown increasing the potential for bank erosion and sloughing as compared to NAA operations.

While some fine-grained sediment that enters Big Cliff Reservoir from Detroit Reservoir may partially settle, most fine-grained sediment would pass through Big Cliff Reservoir and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns compared to NAA operations. While the incremental drawdown approach at Detroit Dam would span  three multiple years and would dampen downstream elevated turbidity response from reservoir sediment erosion, some adverse effects would still exist due to deeper drawdown operations exposing bank shoreline.

As reservoir bed sediment is transported and re-deposited within the reservoir, turbidity levels from deeper drawdowns are expected to continue to lessen in severity until they reach a new sediment equilibrium after years of the operation. Downstream turbidity effects will lessen over time, becoming less adverse than the first few years of the deep drawdown.

**Harmful Algal Blooms and Mercury**

Under the Interim Operations, effects on water quality from harmful algal blooms, and mercury would have a slightly more adverse effect on the North Santiam River below Big Cliff Dam as compared to the NAA. This would be due to deeper drawdown operations exposing bank shoreline.

## 3.19 Public Health and Safety—Drinking Water

### 3.19.1 Introduction

Incorporated by Reference

### 3.19.2 Affected Environment

Incorporated by Reference.

### 3.19.3 Environmental Consequences

This section discusses the potential effects of Alternative 6 and the Interim Operations to public health and safety risk from drinking water quality and water supply effects. The discussion includes the methodology used to assess effects, incorporated by reference, and a summary of the anticipated effects (Table 3-42).

#### 3.19.3.1 Methodology

Incorporated by reference.

#### 3.19.3.2 Alternatives Analyses

Effects discussions for alternatives other than Alternative 6 and the Interim Operations are in the FEIS and incorporated by reference.

**Construction and Routine and Non-routine Maintenance Activities under All Alternatives**

Incorporated by reference.

**Groundwater Supply for Drinking Water under All Alternatives**

There would not likely be any direct effect to groundwater supply or indirect effect to water supply users for drinking water in the analysis area from operations under any alternative, including Alternative 6, during the 30-year implementation timeframe. The rest of this section is incorporated by reference.

**Water Quality and Treatment Facility Operations under All Alternatives**

USACE operations and precipitation during drawdowns could cause an increase in the amounts of turbidity and harmful algal blooms discharged downstream. Drinking water facility operations could be adversely affected by the liberation of previously stored sediments, and bacteria associated with those sediments, caused by construction activities or by deep reservoir drawdowns over the 30-year implementation timeframe. These effects would be basin-wide. These conditions would result in indirect, adverse, temporary treatment costs of additional chemicals, testing, and facility maintenance as well as administrative costs and delays in drinking water supplied to affected communities (Section 3.11, Socioeconomics).

***Turbidity***

Sediment-related processes would occur in all subbasins under all alternatives, resulting in adverse water quality from turbidity. The degree of effect to water quality depends on a variety of factors, including but not limited to, geography, geology, wildfires, land use/cover, climate conditions, and seasonal reservoir operations.

The deep fall drawdown at Fall Creek Reservoir would continue resulting in temporary elevation of suspended sediment levels discharged from the dam (USGS 2023). Minor, short-term, adverse effects from temporary elevated turbidity would continue at this location over the 30-year implementation timeframe.

Turbidity would become more adverse under all action alternatives as compared to the NAA except for Alternative 1 and Alternative 4 (Section 3.5, Water Quality) due to operations exposing additional reservoir bed sediments resulting in erosion of the sediments. Increased adverse conditions would vary by alternative and location downstream of a dam. Adverse conditions would range from slightly more adverse than NAA operations as measured at the Salem gage under Alternative 2B, Alternative 5, and Alternative 6 to substantially more adverse below Hills Creek, Lookout Point and Dexter, Cougar, Foster, and Detroit and Big Cliff dams

under Alternative 3B. Except during drawdown operations, the reservoirs would continue to provide benefits to drinking water facilities by trapping sediments during high flow events. Most of the facilities were built after the dams were constructed and their designs are based on the existing conditions at the time of construction.

***Harmful Algal Blooms***

Incorporated by reference.

***Turbidity and Harmful Algal Bloom Effects to Drinking Water and Facility Operations***

Incorporated by reference.

**Water Availability in Dry Years under All Alternatives**

Incorporated by reference.

**Water Availability**

USACE operations could cause a change in the quantity of water available for downstream drinking water entities to withdraw within limits of their state issued water rights. These effects are described below for Alternative 6 and the Interim Operations; the other alternatives are in the FEIS and incorporated by reference.

***Alternative 6—Ceasing Federal Hydropower Operations***

*Stored Water*

Direct effects to stored water supply and indirect effects to drinking water users are the same as described under Alternative 5, though there would be less stored water amounts under Alternative 6 than under Alternative 5. USACE cannot store as much water in the spring while meeting the 2008 Biological Opinion minimum flow targets which are higher than the minimum flow targets in Alternative 5. (Section 3.13, Water Supply, Table 3-37).

*River Flow*

Direct effects to river flow on water supply and indirect effects to drinking water users under Alternative 6 would be the same as described for the NAA (Section 3.13, Water Supply, Table 3-37).

### 3.19.4 Interim Operations under All Action Alternatives Except Alternative 1

This section is incorporated by reference with the following additional information on the Detroit drawdown for fish passage:

The Interim Operations are a set of operations for downstream fish passage and temperature management that would be implemented until the long-term measure for fish passage or temperature management is being used. These operations would result in decreased system-wide stored water in the conservation pool.

The timing and duration of Interim Operations would vary by alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, 5, and 6. However, under Alternative 3A and Alternative 3B Interim Operations may not be fully implemented because long-term operational strategies for these alternatives are intended to be implemented immediately upon the Record of Decision.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.6, Interim Operations). Interim Operations analyses did not consider the impacts of Alternatives 2A, 2B, 3A, 3B, 4, 5, and 6 because Interim Operations would be implemented before, and not in addition to, an action alternative.

#### 3.19.4.1 Turbidity

Interim Operations would increase sediment and turbidity levels downstream of Lookout Point, Dexter, Green Peter, Foster, Detroit, and Big Cliff Reservoirs because of deeper drawdowns of the large reservoirs. Deep drawdowns increase the potential for bank erosion and sloughing as compared to NAA operations. While some fine-grained sediment that enters Dexter, Foster, and Big Cliff Reservoirs may partially settle, most fine-grained sediment would pass through these reservoirs and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns compared to NAA operations.

The deep drawdown operation at Lookout Point and Green Peter reservoirs in 2023 and 2024 was required by the injunction (Section 1.12.3). In 2023 USACE drafted Green Peter reservoir 140 feet lower than the winter minimum pool elevation, causing turbidity levels that exceeded the design capabilities of some downstream drinking water facilities, resulting in unplanned maintenance and repairs to the equipment and additional staffing levels. USACE subsequently developed and implemented a Deep Drawdown Emergency Response and Communications Plan that outlines coordination protocols with downstream drinking water facilities and operations staff. Bi-annual status reports finalized in February of 2024 and 2025 summarized effects to downstream turbidity from the drawdowns (USACE 2024c; USACE 2025). Turbidity levels downstream from Lookout Point Dam in 2024 were much less than in 2023. As noted in the USACE February 2025 Bi-Annual Status Report, while turbidity downstream of Green Peter Dam was less than during the 2023 operation, the elevated turbidity was still a concern for downstream drinking water facilities and the public downstream of Green Peter and Foster dams (USACE 2025). Using the Deep Drawdown Emergency Response and Communications Plan, USACE coordinated closely with downstream utilities and suspended the 2024 operation early. In 2025, USACE delayed the deep drawdown operation further into the fall to minimize impacts to downstream river temperature and turbidity levels. This delay, combined with dry weather, resulted in significantly reduced sediment mobilization and subsequent turbidity downstream during the 2025 operation.

The deeper drawdown at Detroit Dam has not started yet. USACE expects the drawdown to mobilize sediment, increasing turbidity levels downstream of Detroit and Big Cliff dams, but to a lesser extent than in Green Peter Reservoir. The drawdown of Detroit reservoir will expose a significantly smaller area of sediment and retain a larger residual pool relative to the Green Peter drawdown operation (Figure 3-33), estimated to result in less turbidity in the North Santiam River. Additionally, USACE is proposing to draw down the reservoir to the target elevation over several falls/winters, minimizing how much new sediment is exposed each year. The larger residual pool is expected to act as a sediment sink more than the Green Peter residual pool, though fine clay material eroded from exposed sediment is likely to stay in suspension and pass downstream of Detroit dam.




**Figure 3-33. Green Peter (bottom) and Detroit (top) Exposed Areas between the Normal Minimum Conservation Pool and the Deep Drawdown Elevations.**

See Appendix C for more information on this figure.

Increased turbidity would result in adverse effects to drinking water facilities that use water from the North Santiam River below Detroit and Big Cliff reservoirs. Adverse effects could include increased maintenance of filters and increased staffing of the drinking water facility.

While USACE expects the Detroit drawdown to result in much lower levels of turbidity than on the South Santiam during the Green Peter drawdown in 2023 and 2024, the cities of Salem and Stayton both identified that moderate levels of sustained increased turbidity levels will threaten the operation of the slow sand filtration (SSF) systems at their drinking water treatment facilities on the North Santiam and near Geren Island. These concerns were also raised by other communities in the North Santiam Canyon. The City of Stayton identified that SSF systems are much more sensitive to turbidity and fine sediment than treatment facilities systems on the South Santiam River. Recent studies by the City of Salem concluded that the treatment system could "handle turbidity of up to 50 NTU for up to 13 days before running into operational issues." The significant rain event in February of 1996 caused turbidity to spike to over 100 NTU in the North Santiam River. The City of Salem took their system offline from the river for eight days and issued water alerts restricting use. While the City of Salem can handle the system offline for some extended period, the City of Stayton's backup supply has less capacity and could fail to deliver finished drinking water in a much shorter timeframe.

The City of Salem indicated the expected particle size of the increased turbidity levels from the drawdown is also of concern for slow sand filtration systems as these very small particle size materials can pass through the system and into finished drinking water, potentially exceeding finished drinking water quality standards established by the State of Oregon and Environmental Protection Agency (EPA). Annual drawdowns resulting in elevated turbidity levels may accelerate the need for routine minor replacement of some of the sand layers. In a worst-case scenario elevated turbidity could require replacement of the entire amount of sand making up the SSF system early. These processes are usually planned for approximately every 10 years. The City of Stayton and others identified an indirect adverse effect to wastewater facilities if potable water supplies are shut off. These facilities include the wastewater facilities for both the cities of Stayton and Sublimity, the operation of which are linked to the operation of the City of Stayton drinking water facility.

USACE would use real time monitoring and the Deep Drawdown Emergency Response and Communications Plan for Detroit Reservoir deep drawdown operations to ensure strong communications with the State and cities of Salem, Stayton, and Gates's drinking water facilities during the drawdown of Detroit Reservoir to minimize impacts. A sediment transport modeling team would continue developing tools to inform adaptive management of future drawdown operations.

### 3.19.4.2 Harmful Algal Blooms

Under Interim Operations, effects to water quality from harmful algal blooms would be moderately adverse compared to the slightly adverse conditions described under the NAA during the 30-year implementation timeframe. Interim Operations would increase sediment

and nutrient loading into Detroit and Big Cliff reservoirs because the deeper drawdown of Detroit Reservoir would increase the potential for bank erosion and sloughing.

The Detroit drawdown could result in moderate adverse effects to drinking water facilities that use water from the North Santiam River below Big Cliff reservoir.

#### 3.19.4.3 Stored Water

There would be a slight, beneficial, indirect effect on users under Interim Operations during most times of the year because the amount of water stored system wide would be slightly more than the amount needed to support minimum flow targets during the 30-year implementation timeframe with 80 percent likelihood (Section 3.13, Water Supply, Table 3-39). Stored water would be available to meet some municipal and industrial storage agreements and agricultural irrigation water service contracts under Interim Operations.

The drawdown operation at Detroit Dam would occur during the winter timeframe, allowing USACE to capture winter rains and refill the reservoir to minimum conservation pool by March 1 in most years. Same as under the NAA, during very dry years, there would likely not be enough water to refill the reservoir after winter flood risk management operations to meet consumptive demands from stored water, resulting in an adverse effect to users. In-season water management decisions could lessen the adverse effect, but there would likely still be an adverse effect.

#### 3.19.4.4 River Flow

Direct effects to river flow on water supply and indirect effects to drinking water users under the Interim Operations would be the same as described under the NAA (Section 3.13, Water Supply, Table 3-37).

### 3.19.5 Climate Change under All Alternatives

Incorporated by reference. This section was not updated to include Alternative 6. Prior to the release of this SEIS, Executive Order 14154 “Unleashing American Energy” was issued. Consistent with this Executive Order, a greenhouse gas analysis is not included here; however, this SEIS is consistent with the NEPA statute and existing agency regulations.

## 3.20 Environmental Justice

This section was descoped from the FEIS.

## 3.21 Cultural Resources

### 3.21.1 Introduction

Incorporated by reference.

US Army Corps of Engineers®
Portland District

System Operations and Maintenance
Willamette Valley
Environmental Impact Statement

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## APPENDIX C: RIVER MECHANICS AND GEOMORPHOLOGY

**TABLE OF CONTENTS**

**Executive Summary**
3.3 River Mechanics and Geomorphology ..... ES-1
3.3.1 Affected Environment ..... ES-1

**CHAPTER 1 - Methodology ..... 1-1**
1.1 Overview ..... 1-1
1.2 Analysis Metrics Summary ..... 1-1
1.3 Storage Project Metrics ..... 1-3
1.3.1 Shoreline Exposure ..... 1-3
1.3.2 Head-of-Reservoir Sediment Mobilization ..... 1-4
1.3.3 Sediment Trap Efficiency ..... 1-7
1.4 Run-of-River Reservoirs and Free-Flowing Reaches Metrics ..... 1-9
1.4.1 Potential for Changes in Sediment Supply ..... 1-10
1.4.2 Potential for Geomorphic Change ..... 1-13
1.5 Climate Change ..... 1-14

**CHAPTER 2 - Alternative Comparison Summaries ..... 2-1**
2.1 Storage Project Metrics ..... 2-1
2.1.1 Blue River ..... 2-7
2.1.2 Cottage Grove ..... 2-10
2.1.3 Cougar ..... 2-13
2.1.4 Detroit ..... 2-16
2.1.5 Dorena ..... 2-19
2.1.6 Fall Creek ..... 2-22
2.1.7 Fern Ridge ..... 2-25
2.1.8 Foster ..... 2-28
2.1.9 Green Peter ..... 2-31
2.1.10 Hills Creek ..... 2-34
2.1.11 Lookout Point ..... 2-37
2.2 Run-of-River and Free Flowing Reach Metrics ..... 2-40
2.2.1 Sediment Supply ..... 2-40
2.2.2 Geomorphic Change ..... 2-54

## Executive Summary

This appendix provides additional detail on the river mechanics and geomorphology effects assessment methods, assumptions and calculations. The document is composed of two major parts. It includes (1) discussion of the overall analysis methodology and specific metrics, (2) quantitative metric results and a qualitative estimate of the potential impacts to metrics under the No Action Alternative (NAA), eight action alternatives and the interim operations. Relative impacts are compared between the action alternatives and NAA.

### 3.3 River Mechanics and Geomorphology

#### 3.3.1 Affected Environment

The Affected Environment pertaining to river mechanics and geomorphology is divided into two descriptions: (1) the rivers downstream of the WVS and, (2) the dams and reservoirs themselves. In this section, river mechanics refers to the flow levels in the river and closely associated phenomena, such as sediment movement. Floodplain geomorphology refers to the geometry and features of the area that interact with the river.

There are many factors that contribute to both descriptions, including the basin geology, hydrology, and riparian vegetation. The river and floodplain both shape and interact with each other. For example, the seasonal variability of flow velocity would erode or deposit sediment and change the shape of the channel and floodplain, leading to changed river velocities in a continuous process.

In the downstream portions of the Willamette River Basin (WRB), riverine processes help shape the morphology of the terrain. The Willamette Valley System (WVS) substantially affects the hydraulics and morphology of rivers in the WRB. During all seasons, dams and reservoirs remove sediment and energy from the system and revetments along the river retard its movement. During the major flood season, peak flows are reduced to decrease damage from flood inundation. All these activities – and others outside of the WVS control – have the effect of reducing the width of the floodplain engaged by the river (Section 1.8, Non-USACE-managed Dams and Reservoirs in the Willamette River Basin).

Reservoir elevations vary throughout the year, changing the ponded storage and shoreline. In winter, these changes result from flood risk management operations. In spring and summer, reservoirs store water for use during the conservation season and are filled up to full pools as conditions allow (Section 3.2, Hydrologic Processes). Water surface elevations in the reservoirs and the outflows from dam outlets have substantial effects on the immediate surroundings.

##### 3.3.1.1 Willamette Valley System

There are approximately 465 River Miles (RMs) along the Willamette River and its regulated subbasins below the WVS. Two subbasins, the Clackamas and Molalla River Subbasins, contain revetments but are not downstream of any WVS reservoirs, so they are ‘unregulated’ by USACE

flood damage reduction storage projects (Section 1.7.2, Revetments and Other Structures for Bank Protection).

The WVS is multipurpose; operational goals change throughout the year based on the season. During the major flood season, the goal is to decrease flood damages by reducing the peak flow downstream of the WVS (Section 3.2, Hydrologic Processes). These operations are readily apparent in the historic record. The WVS was constructed starting in 1942 with Fern Ridge Dam on the Long Tom River and was fully operational for water year 1969.

The peak flows at Albany, Oregon were reduced substantially after 1969. Figure 3.3-1 shows the annual peak from each WY at a long-term flow gaging site on the Willamette River downstream of the WVS reservoirs. Annual observed peak flows are reduced by hydropower regulation, but the USACE also reduces potentially damaging flows from the WVS that are lower than the annual peak flows shown in Figure 3.3-1.

The high flows, both annual peaks and lesser large flows from before construction of the WVS, formed the geomorphic floodplain in the WRB. The amount of energy and peak flows available to the rivers downstream of the WVS has been reduced, and the area of influence around the main channel has narrowed as an effect of flood damage reduction operations. Consequently, the many floodplain terraces, swales, and other geomorphic formations along the Willamette Basin rivers are no longer regularly connected to the channel as they were before construction of the WVS.




**Figure 3.3-1. Annual observed maximum flow at Albany, Oregon.**

The rivers are generally steep further upstream toward the headwaters of the WRB. While the Willamette River above Willamette Falls is nearly flat during low water periods, the upper portions of the North Santiam River and McKenzie River have steep average channel slopes of up to 10 feet per mile (Figure 3.3-2). A general geomorphic and hydraulic description of the downstream reaches (Wallick et al. 2013) is discussed below.

All regulated tributaries in the WRB except Blue River, South Fork McKenzie, Fall Creek, and Row River contain constructed bank protection revetments, embankments, or levees. These structures are part of the WVS and generally constrain the movements of river channels (Section 1.7.2, Revetments and Other Structures for Bank Protection).




**Figure 3.3-2. Willamette River Basins and Willamette Valley System.**

### 3.3.1.2 Willamette River Basin Sediment Movement

Sediment movement in the WRB is substantially altered by the WVS, both in the reservoirs themselves and in the downstream rivers and floodplains due to the construction of revetments and hydrologic modifications for flood damage reduction. Unregulated tributaries within the WRB, upstream of their confluences with USACE regulated rivers, are not affected by WVS. USACE constructed bank protection structures authorized by the 1936, 1938 and 1950 Flood Control Acts exist on the Clackamas, Molalla, and Pudding Rivers. Although not within the WVS for flood control, these structures are associated with flood damage reduction projects within the WRB.

**<u>Reservoir Sediment Mechanics</u>**

Coarse sediments (sand and gravel) entering a reservoir typically settle out and deposit as a delta in the upstream end of reservoirs and along the upstream river channels as the flow of the river encounters the reservoir pool. Sediment in the delta (commonly referred to as "head-of-reservoir" deposits) can be remobilized farther downstream when the reservoir operating pool lowers (e.g., for seasonal management changes).

In dam projects that operate over a wide range of elevations throughout the year, the upstream extent of reservoir backwater and the location where coarse sediments deposit may shift considerable distances. Reservoirs with large changes in water surface elevation and shallow slopes near the head-of-reservoir would have large coarse sediment deltas. Coarse sediments rarely pass a dam with a pool substantially full of water.

Fine suspended silts and clays tend to transport past the delta and slowly settle out of the water column along the reservoir bottom as a lakebed deposit. Fine sediment would typically travel further in the reservoir: the smallest sediment particles may never reach the bottom of the reservoir and would pass through the dam with the outflow.

Reservoirs with large storage volumes relative to the annual volume of water passing through tend to trap more suspended sediment than reservoirs with small relative storage volumes (Figure 3.3-3). Reservoir geometry can also affect fine sediment trapping: sediment would take longer to travel to the bottom of a reservoir that is relatively long and deep as compared to a similar volume reservoir that is wide and shallow.




**Figure 3.3-2. Idealized Sediment Profile within a Dam-controlled Reservoir.**

The estimated median sediment trapping efficiencies for the WVS (excluding the Big Cliff and Dexter Dam reregulating projects) are shown below. These calculations use the WVS PEIS hydrology inflow dataset for storage and inflow volume

Target elevations generate useful comparisons of median trapping efficiency across the WVS as most sediment generated from upstream sources transports into the reservoirs during the flood season flows. More broadly, since trapping efficiency is based on a log-scale comparison of water volumes, the estimated trapping efficiency would not change substantially if the actual amount of impounded water is different than the rule curve[1] target.

**Reservoir Storage Projects**

There are 11 WVS dams that are designed and operated for storage purposes as listed below along with estimated trapping efficiency at each reservoir.

[1] A rule curve is seasonal reservoir elevation targets or restrictions, represented graphically as curves, that guide reservoir operations.

**Table 3.3-1. Reservoir Storage Project Setting**

| ***Reservoir*** | ***Basin (Figure 3.3-2) and Downstream River Reaches*** | ***Estimated Sediment Trapping Efficiency*** |
|---|---|---|
| Blue River Reservoir | Within the McKenzie Basin. Downstream river reach is Blue River, a tributary to McKenzie River. | 81 percent |
| Cottage Grove Reservoir | Within the Coast Fork Willamette Basin. Downstream river reach is the Coast Fork Willamette River. | 81 percent |
| Cougar Reservoir | Within the McKenzie Basin. Downstream river reach is the South Fork McKenzie River, a tributary to the McKenzie River. | 91 percent |
| Detroit Reservoir | Within the North Santiam Basin. Downstream river reach is Big Cliff reservoir, a run-of-river reservoir on the North Santiam River. | 91 percent |
| Dorena Reservoir | Within the Coast Fork Willamette Basin. Downstream river reach is the Row River, a tributary to the Coast Fork Willamette River. | 81 percent |
| Fall Creek Reservoir | Within the Middle Fork Willamette Basin. Downstream river reach is Fall Creek, a tributary to the Middle Fork Willamette River. | 82 percent |
| Fern Ridge Reservoir | Within the Long Tom Basin. Downstream river reach is the Long Tom River. | 80 percent |
| Foster Reservoir | Within the South Santiam Basin. Downstream river reach is the South Santiam River. | 67 percent |
| Green Peter Reservoir | Within the South Santiam Basin. Downstream river reach is the Middle Santiam River which flow into Foster Reservoir. | 93 percent |
| Hills Creek Reservoir | Within the Middle Fork Willamette Basin. Downstream river reach is the Middle Fork Willamette River and Lookout Point Reservoir. | 94 percent |
| Lookout Point Reservoir | Within the Middle Fork Willamette Basin. Downstream river reach is the Middle Fork Willamette River. | 88 percent |

Note that these values are estimates based on comparing water volumes and not measured sedimentation. Also, as noted above, every reservoir in the WVS traps nearly all coarse sediments (gravels and sands) in the pool (O'Connor et al. 2014). These are included in the values above, and generally the only sediment passing a reservoir would be fines (i.e., silt and clay sized sediments).

**Reservoirs Run-of-River**

Run-of-river reservoirs are formed by dams that are operated to discharge water downstream at rates that generally match the upstream inflows. Big Cliff, and Dexter dams are run-of-river projects that operate in a small range of pool elevations for daily or weekly hydropower purposes but do not attempt to store water for release in later seasons. Foster Dam is considered both a storage and a run-of-river project in this analysis as it is partially operated to re-regulate the outflows from Green Peter.

Reservoir sedimentation and loss of storage capacity has been historically assumed to be small such that it does not affect operations. Repeat surveys of a subset of the WVS storage projects shows that this assumption is accurate. The 2017 Lookout Point water control manual provides a good summary of the sedimentation study history and system design assumptions:

> The Portland District conducted a sediment sampling program in the Willamette River Basin from 1 December 1948 to 1 July 1951, for the purpose of obtaining factual data on sedimentation rates and bedload movement in this area. As a result of this investigation, it was found that suspended sediment rates and bed-load movement is comparatively low in Willamette River Basin streams. Consequently, loss of reservoir storage in existing reservoirs was estimated as small and would not materially affect storage capacities during the 50-year economic life of these projects (USACE 2015a).

USACE has performed a limited resurvey of WVS reservoirs since the original sedimentation transects were established. Where repeat surveys exist, data support the low overall sediment yield design assumptions. Lookout Point Reservoir was surveyed in 1956 and 2014. Updated rating curves show a 1.0 percent loss in storage capacity below maximum pool with all of the total loss occurring below minimum flood pool.

Dorena Reservoir was surveyed in 1953 and 2017. Updated rating curves show a 4.8 percent loss in storage capacity below maximum pool with approximately half of this loss occurring below minimum flood pool. Fern Ridge Reservoir was surveyed in 1947 and 1993. Reporting identifies a 3.8 percent loss in storage capacity below maximum conservation pool with 80 percent of the loss in storage capacity occurring in the lower half of the pool.

Shoreline erosion of bank sediments along the edges of the reservoir where the water meets the land is a complex process that is influenced by the cumulative effects of: wind and boat wave erosion, reservoir currents, precipitation runoff, freeze-thaw, soil properties, exposure, and vegetation density and type. One commonly observed process is that, during times of extended reservoir drawdown, exposed un-vegetated shoreline soils that were previously saturated are prone to erosion and localized slope failures (slumping) (Section 3.5, Water Quality). Shoreline processes leave long-term marks on the land, reworking soils and exposing underlying layers (Section 3.22, Visual Resources).

There are two existing reservoir sediment mobilization models in the WVS, at Detroit Dam (USACE 2016a) and Lookout Point/Dexter Dam (USACE 2015c). The intent of both studies was to assess the movement of accumulated sediments in and out of the reservoir during a deep drawdown reduction in the pool elevation to the lowest outlet in each dam. In addition, USACE has lowered the reservoir elevation at Fall Creek Dam during the fall in recent years with a deep drawdown.

Figure 3.3-4 illustrates results of the scour analysis during a modeled drawdown of Lookout Point Dam. The Lookout Point model was designed to investigate sediment movement in and out of the reservoir in preparation to replace the spillway gates, which required a lowering of the reservoir.




**Figure 3.3-4. Modeled Sediment Mobility during Modeled Lookout Point Dam Drawdown.**

Results show sediment accumulated at the upstream end of Lookout Point Dam since construction (bottom right in the figure) moving closer to the dam (top left) and a limited amount of sediment passing through to Dexter Reservoir downstream.

**River Sediment Mechanics**

Most coarse sediments in the WRB are from the Cascade Mountains, which primarily supplies volcanic basalts. This material degrades relatively slowly and typically disappears from river channels due to coarse sediments being broken into smaller particles as they are carried downstream (O’Connor et al. 2014) (Section 3.4, Geology).

The McKenzie and North Santiam Rivers currently contribute the highest amount of sediment to the mainstem Willamette (Wallick et al. 2013). These two rivers support large portions of drainage basins that are both relatively steep and outside the control of any WVS dam and reservoir. Figure 3.3-5 shows gravel bar formation in the North Santiam River south of Stayton, Oregon that demonstrates sediment transport in the reach. The side channels and various ages of vegetation and gravel bars are evidence that the river channel is mobile within its immediate floodplain in this area.

Although the Coast Range does contribute substantial sediments, the soft sedimentary sandstone from this mountain range rapidly degrades to silt and clay (O'Connor et al. 2014) and is transported as suspended and wash load ("wash load" is the portion of sediments that remain suspended even without water flow, thereby contributing to turbidity).




**Figure 3.3-5. Gravel Bars and Side Channel Morphology in North Santiam River South of Stayton, Oregon.**

Most sediment transport capacity in riverine environments occurs during near channel bankfull water conditions. Bankfull refers to the water level stage that just begins to spill water out of the channel into the floodplain. As noted in Section 3.2, Hydrologic Processes, the frequency of these events has been reduced by the upstream storage operations of the WVS.

### 3.3.1.5 Upper Willamette Basin

Upstream of the sediment supply coming from the Santiam River, gravel bars are much less prevalent. The largely single-thread channel, up until the Corvallis, Oregon area, remains low gradient, (1.5 feet/mile), and the geomorphic floodplain is between 3,000 feet and 3.5 miles. The river channel is relatively stable due to geographic constraints. Fewer revetments were constructed in this reach than upstream, primarily due to the natural stability of the reach (Figure 1.7-1).

Upstream of Corvallis is the most active and varied portion of the mainstem Willamette River. Previous work has described this area as a “wandering gravel-bed river” (Wallick et al. 2007). The overall channel slope steepens considerably to 4 to 5 feet/mile, and the channel is unconstrained by geography like it is downstream. This is the widest geomorphic floodplain in the mainstem Willamette River (upper, middle, and lower), at up to 5 miles.

Gravel bars are prevalent, and larger flows can sometimes realign the channel in a relatively short period of time. However, these events, called river avulsions, have decreased by about 70 percent in the 20th Century (Wallick et al. 2007). Figure 3.3-7 shows one such location south of Peoria, Oregon, comparing August 2005 and August 2006, where a flood in January 2006 cut off an existing meander, straightening the channel. This area of the mainstem has the greatest number and longest total length of revetments because the historic response to the Willamette River’s ability to wander was to construct revetments.




**Figure 3.3-7. Willamette River Realignment before and after January 2006 Flood, South of Peoria, Oregon.**

### 3.3.1.6 North Santiam Basin

The North Santiam River is the steepest reach downstream of any WVS project, with an average slope of 14 feet/mile, with the highest slopes as it approaches Big Cliff Dam. There are many secondary channels and gravel bars.

The North Santiam River is the source for much of the sediment in the mainstem Willamette River downstream of the confluence. Channel movement and avulsions (where a river channel shifts location) are relatively common in the North Santiam River as compared to other rivers in the WRB. The geomorphic floodplain is a still relatively narrow with widths between 3,500 feet to 1.5 miles due to bedrock and other hardened geologic features.

#### 3.3.1.7 South Santiam Basin

The South and mainstem Santiam Rivers have wide geomorphic floodplains, up to 3 miles across. This is due to a combination of moderate overall channel grades – ranging from 4 to 6 feet/mile – and unconstrained geology. Historically, this would have resulted in an active channel, but most of the river is single thread currently due to the construction of revetments.

Vegetation has colonized previously active gravel bars, further hardening the modified morphology. Since the area surrounding the river channel is relatively flat across the floodplain, the inundated area can expand quickly once floodwaters overtop the riverbanks.

#### 3.3.1.8 Long Tom Basin

The Long Tom River is lined with embankments along nearly its entire length downstream of Fern Ridge Reservoir to its confluence with the Willamette River. These embankments were designed so that the highly modified channel can pass the output from Fern Ridge Dam. There is limited interaction between the channel and its historic floodplain because of the embankments, but culverts in the embankments allow for regular inundation of floodplain regions.

The river was shortened from 36.5 miles to 23.6 miles by USACE between 1944 and 1951 with the intent of increasing channel capacity and, therefore, reducing flooding downstream of Fern Ridge Dam. A series of seven drop structures were also built with the intent to reduce channel velocity and decrease erosion, while still moving water downstream efficiently.

#### 3.3.1.9 McKenzie Basin

Near the confluence with the mainstem Willamette River (north of Eugene, Oregon and south of Coburg, Oregon), the McKenzie River floodplain is up to 2 miles wide, but the channel is single thread due to modifications such as revetments and gravel mining along the banks. The floodplain is lower with respect to the channel than most other rivers in the WRB; inundation is possible at levels as low as the 50 percent annual exceedance probability flow (commonly referred to as the 2-year flood).

# CHAPTER 1 - METHODOLOGY

## 1.1 OVERVIEW

The general approach for evaluating river mechanics response in the system was to leverage the period of record (POR) flow and stage output from the quantitative hydroregulation planning models (Appendix B, Hydrologic Processes Technical Information) across the study area as inputs to a suite of qualitative hydraulic and geomorphic metrics. Discrete metrics were developed for the storage projects as well as run-of-river reservoirs and free-flowing reaches as detailed in sections 1.3, Storage Project Metrics and 1.4, Run-of-River and Free-Flowing Reaches Metrics below. Metrics were limited to evaluating annualized effects across the period of record. Results by season are not presented, but seasonal variations in flow and reservoir storage were incorporated when calculating annualized values of metrics. In addition, because the metrics directly leveraged the hydroregulation planning models, they are subject to the baseline limitations and caveats of those models, including real-time management deviations, sub-daily variability resulting from power operations, and other irregular events such as equipment servicing, and fisheries demands (Appendix B, Hydrologic Processes Technical Information). The effects of projected climate change on river mechanics and geomorphology are also discussed.

The river mechanics and geomorphology analysis is intended to provide a basis for assessment of complex sediment and morphologic phenomena within the Willamette River Basin as they relate to modified operations of the WVS. The analysis and metrics described in this appendix are necessarily described as changes relative to the No-action Alternative, which is considered quantitatively equivalent to operations and conditions that created the Affected Environment for River Mechanics and Geomorphology.

Analyses in this appendix are intended to be referenced by affected resources within the WVS EIS.  Since thresholds for affected resource effects related to river mechanics and geomorphology metrics vary by resource, changes from the No-action Alternative can be used as a qualitative indicator for degrees of effect anticipated for each related affected resource as is individually appropriate.

## 1.2 ANALYSIS METRICS SUMMARY

Both quantitative and qualitative assessment methods were used to assess relative potential changes to river hydraulics, sediment supply and geomorphology for each EIS alternative. Five quantitatively informed, but qualitative metrics were developed to represent various physical characteristics and processes that could affect sediment processes in storage reservoirs, run-of-river reservoirs, and free-flowing reaches as enumerated below:

- Storage Project Metrics
  - Head-of-Reservoir Sediment Mobilization
  - Sediment Trap Efficiency

  - Shoreline Exposure
- Run-of-River and Free-Flowing Reach Metrics
  - Potential for Changes in Sediment Supply
  - Potential for Geomorphic Change

The analysis method for river mechanics and geomorphology is qualitative, driven by quantitative storage and flow metrics. Visible or measurable expected change to a field observer drives the analysis. The basis for the quantitative metrics and the resulting qualitative descriptions is the hydrology and HEC-ResSim outputs for each alternative, as compared to the NAA. There are four levels of magnitude of effects, three levels of duration and three levels of extents when comparing the NAA to the others as shown in Table 1-1 below.

**Table 1-1. Evaluation Criteria for Potential Effects to River Mechanics and Geomorphology**

| **Effect Magnitude** | **Criteria** |
|---|---|
| None/Negligible | The resource area would not be affected, or changes would be either nondetectable or, if detected, would have effects that would be slight and localized. The area extent of effects would be small (limited) and would not require additional consideration or mitigation. |
| Minor | Changes to the resource would be measurable, although the changes would be small and localized. The duration of effects may vary. |
| Moderate | Changes to the resource would be measurable and have either localized or regional-scale effects. |
| Major | Changes would be readily measurable and would have substantial consequences on a local or regional level. |
| **Effect Duration** | **Criteria** |
| Short-term | Changes to river mechanics and/or geomorphology would last less than two years. |
| Medium-term | Changes to river mechanics and/or geomorphology would last between two and five years. |
| Long-term | Changes to river mechanics and/or geomorphology would last throughout the duration of the project (2050). |
| **Effect Extents** | **Criteria** |
| Local | Changes to river mechanics and/or geomorphology would be confined to the dam/reservoir or river. |
| Regional | Changes to river mechanics and/or geomorphology would be perceived throughout a single county, multiple counties, or the entire WVS. |
| State-wide | Changes to river mechanics and/or geomorphology would be perceived throughout the entire state. |

As an example, a newly implemented deep fall drawdown of a reservoir would likely result in a major effect as it alters the accumulation point of coarse sediments and exposes more shoreline and lake-bottom fine sediments to potential movement. The deep fall drawdown

operation would be in effect through the project life and, therefore, long-term in duration. Effects within the reservoir would be local to the reservoir. A smaller alteration in the rule curve, such as refill at a later calendar date, would likely be negligible or minor effects, long-term in duration and local to the reservoir.

There are no new hydraulic or sediment models (e.g., HEC-RAS) run as part of the analysis. Existing hydraulic models inform the professional engineering judgment wrapped into the qualitative levels of change listed above. Furthermore, the measures under consideration are primarily about operational changes outside of the major flood season.

## 1.3 STORAGE PROJECT METRICS

Three storage project metrics were developed to investigate potential for changes in sediment processes at the eleven WVS storage projects in the study area (Blue River, Cottage Grove, Cougar, Detroit, Dorena, Fall Creek, Fern Ridge, Foster, Green Peter, Hills Creek, Lookout Point). Development and impact threshold determination for the storage project metrics is described in this section.

### 1.3.1 Shoreline Exposure

Shoreline erosion of bank sediments along reservoir margins is a complex process that is influenced by the cumulative effects of: wind and boat wave erosion, reservoir currents, precipitation runoff, freeze-thaw, soil properties, exposure, and vegetation density and type. One commonly observed process is that, during times of extended reservoir drawdown, exposed un-vegetated shoreline soils that were previously saturated are prone to erosion and localized slope failures (slumping). The shoreline exposure metric was developed as a surrogate for shoreline erosion processes. This metric compares the number of days that the reservoir water surface spends at any elevation to identify change in shoreline exposure and indicate the potential for change in shoreline erosion in the WVS storage projects. Shoreline processes leave long-term marks on the land, reworking soils and exposing underlying layers.

The simplest metric is a reservoir elevation exceedance percentage analysis. Comparison of the reservoir elevation exceedance percentage between alternatives would demonstrate the range of reservoir operations. If the range and duration of the reservoir elevations changes, there is a potential that the shoreline erosion rates, or patterns, may change. While the shoreline exposure metric does not directly consider reservoir draft rate, it does represent the duration effects that could result from draft rate operational measures.

Shoreline exposure effects may vary in magnitude, but would be long-term, as long as the alternative operation set remains in effect, and local to the reservoir where the draft is occurring.

#### *1.3.1.1 Shoreline Exposure Metric*

Elevation-duration curves used in this metric are developed from daily average data extracted from the POR hydroregulation operations model. The curves are integrated to calculate an average and are compared with the No Action Alternative using the following formula:

$$AVE_{alt} - AVE_{na}$$

Where:

$AVE_{alt}$ is the average reservoir elevation of the alternative being analyzed
$AVE_{na}$ is the average reservoir elevation of the No Action Alternative

#### *1.3.1.2 Shoreline Exposure Impact Thresholds*

Average differences less than ±5 feet are likely not discernable within the reservoir due to sub-daily power fluctuation and other processes such as waves, which occur within a similar range. A ±5- to ±10-foot difference is estimated to be the threshold when shoreline effects would be observable on the landscape and are considered small changes in shoreline exposure. Differences greater than ±10 feet would be observable and would result in moderate change in shoreline exposure.  A difference greater than ±20 feet or a modification in the operational range of the project would produce large changes in shoreline exposure with shoreline becoming submerged or exposed more often (Table 1-2).

**Table 1-2. Magnitude of Effects: Shoreline Exposure**

| Shoreline Exposure Change | Impact Threshold |
|---|---|
| $\|\Delta x\| < 5$ feet | Negligible Effect |
| 5 feet < $\|\Delta x\|$ < 10 feet | Minor Effect |
| 10 feet < $\|\Delta x\|$ < 20 feet | Moderate Effect |
| $\|\Delta x\| > 20$ feet or Change in Operational Range | Major Effect |

### 1.3.2 Head-of-Reservoir Sediment Mobilization

The head-of-reservoir sediment mobilization metric is designed to indicate the potential for changes in sediment scour and deposition patterns in the most upstream portion of storage reservoirs. In dams that use large amounts of storage volume and operate over a wide range of elevations throughout the year, the transition from riverine to reservoir conditions can shift upstream and downstream considerable distances. If reservoir drawdown leaves the delta exposed during high-flow periods, the upper layers of delta would be eroded and transported further into the reservoir, potentially increasing turbidity within the reservoir and thickness of lakebed deposits. Changes in storage project elevations or changes to the flow of water and sediment into the reservoir can result in changes to the head-of-reservoir erosion and deposition patterns. This metric compares the paired relationships of flow and stage over time to indicate the potential for change in sediment mobilization at the head-of-reservoir for each alternative. Changes in delta sediment mobilization could alter the sediment load farther

downstream within the reservoir and potentially the amount of sediment passing a dam, particularly during high-flow periods.

Head-of-reservoir sediment mobilization effects may vary in magnitude, but would be long-term under all of the alternatives, and local to the reservoir where the change in the metric would occur.

#### *1.3.2.1 Sediment Transport Potential Calculation*

Frequently, Lane's Balance is used to analyze the qualitative relationship between sediment transport rates ($Q_s$), bed material size ($d_{50}$), flow (Q), and water surface slope (S). It can be written as:

$$Q_s d_{50} \sim QS$$

Where the symbol ~ is generally taken to mean "is related to." A similar relationship can be derived from principles proposed in Henderson 1966 and used in Schmidt and Wilcock 2008 to analyze the effect of dams:

$$\frac{q_s}{{d_{50}}^{1.5}} \propto \left(\frac{\tau}{d_{50}}\right)^3$$

Where $\tau$ is the bed shear stress and the symbol ∝ means "is proportional to." Using Manning's equation, flow continuity, and assuming bed material size is fixed, the relationship can be rewritten as:

$$q_s \propto q^{1.8} S^{2.1}$$

In the riverine reaches, the river slope would be essentially unaffected by reservoir operations, but in the reservoir reaches, the slope increases when the reservoir elevation is low. The metric assumes the slope in the reservoir reach at any given day is the ratio of reservoir drawdown relative to full pool ($\Delta H$) to the length of reservoir ($L$). The transport indicator variable can be written as:

$$Q_s \propto Q^{1.8} \left(\frac{\Delta \mathrm{H}}{\mathrm{L}}\right)^{2.1}$$

The value of $\Delta H$ is assumed to vary according to the daily average reservoir elevation, but the length ($L$) is assumed to be constant and equal to the length of the full pool. The analysis is limited to comparing the relative value of this indicator between alternatives, and therefore the value of $L$ would not change the alternative comparison. The metric is not intended to provide a comparison between reservoirs. A sediment transport duration curve could be constructed from this equation. An indicator of changes to sediment transport in the upper portion of the reservoirs is, therefore, the change to $Q_s$. A schematic of various reservoir pool elevation and the upper portion of the reservoir is given in Figure 1-1.




**Figure 1-1. Schematic Showing Definition of Reservoir Pools and Idealized Sediment Deposit**

### *1.3.2.2 Head-of-Reservoir Metric*

Sediment transport duration curves used in this metric are developed from daily average data extracted from the 84-year period of record reservoir operation model. Curves were developed for each of the major tributaries to the WVS storage projects. The curves are integrated to calculate an average that is compared with the No Action Alternative using the following formula for each reservoir.

$$\frac{\overline{\text{Qs}}\text{alt}}{\overline{\text{Qs}}\text{NA}} - 1$$

Where:

$\overline{Qs}alt$ is the average of the sediment transport duration curve of the alternative being analyzed.

$\overline{Qs}NA$ is the average of the sediment transport duration curve of the No Action Alternative.

The metric calculates a percent change in sediment transport potential relative to the No Action Alternative due to changes in paired inflow and reservoir elevation. Without a change in reservoir operational range, the ultimate erosion and deposition patterns of head-of-reservoir bed materials is likely unchanged between alternatives and would be related to the lowest drawdown elevation at the reservoir. Change identified by this metric may only be temporary in nature as sediment deposits can be remobilized when the reservoir elevation drops in subsequent seasons or years.

### *1.3.2.3 Head-of-Reservoir Impact Thresholds*

A less than 10 percent change in sediment transport potential at the head-of-reservoir is considered likely unmeasurable with any confidence and negligible. A 10 percent to 50 percent increase or decrease would be a measurable but small change. A 100 percent or greater change in sediment transport potential would be considered a large change at the head-of-reservoir (Table 1-3).

**Table 1-3. Magnitude of Effects: Head of Reservoir Sediment Mobilization**

| Sediment Transport Potential Change | Impact Threshold |
|---|---|
| $|\Delta x| < 10\%$ | Negligible Effect |
| $10\% < |\Delta x| < 50\%$ | Minor Effect |
| $50\% < |\Delta x| < 100\%$ | Moderate Effect |
| $|\Delta x| > 100\%$ | Major Effect |

### 1.3.3 Sediment Trap Efficiency

The sediment trap efficiency metric estimates the potential for changes in the amount of sediment that can deposit within or pass through the storage reservoirs. Trap efficiency is the proportion of inflowing sediment deposited in the reservoir relative to the total incoming sediment load. The trap efficiency is computed based on the ratio of reservoir storage volume to annual inflow. Because the volume of water stored at any given time in the storage projects can vary between alternatives, there is potential for the amount of material being deposited in the reservoir to change between alternatives. This metric compares the paired relationship of flow and reservoir storage to indicate the potential for changes in the amount of sediment being trapped by the storage projects for each action alternative relative to the NAA. The actual amount of sediment trapped is dependent not only on trap efficiency but also the incoming sediment load.

Sediment trap efficiency effects may vary in magnitude, but would be long-term under all of the alternatives, and local to the reservoir where the change in the metric would occur. Indirect effects of sediment being transported downstream of a dam are expressed in the run-of-river reservoir and free-flowing reach metric - potential changes in sediment supply.

#### *1.3.3.1 Sediment Trap Efficiency Calculation*

The Brune Curve (Brune 1953) is an empirical function used to determine the fraction of sediment trapped within a reservoir and is a function of the reservoir volume and incoming flow (Figure 1-2). The ratio is computed for each day of the 84- year operation model outputs (annual hydrographs). Then, a duration curve is constructed. Changes to the estimated trap efficiency would indicate changes to the amount of sediment that originates in the watershed and is transported into the reservoir by flowing rivers is stored in the reservoir. This can also be viewed as changes in the amount of sediment that moved through the reservoir. The lower the trap efficiency, the less sediment that would be stored in the reservoir and the more sediment that would pass through the reservoir.




**Figure 1-2. Brune Curve Used in Alternative Assessment for Trap Efficiency**
Source: Adapted from Brune 1953

Reservoir sedimentation and loss of storage capacity has been historically assumed to be small such that it does not affect operations. Repeat surveys of a subset of the WVS storage projects shows that this assumption is accurate. The 2017 Lookout Point water control manual provides a good summary of the sedimentation study history and system design assumptions:

> The Portland District conducted a sediment sampling program in the Willamette River Basin from 1 December 1948 to 1 July 1951, for the purpose of obtaining factual data on sedimentation rates and bedload movement in this area. As a result of this investigation, it was found that suspended sediment rates and bed-load movement is comparatively low in Willamette River Basin streams. Consequently, loss of reservoir storage in existing reservoirs was estimated as small and would not materially affect storage capacities during the 50-year economic life of these projects (USACE 2015a).

USACE has performed a limited resurvey of WVS reservoirs since the original sedimentation transects were established. Where repeat surveys exist, data support the low overall sediment yield design assumptions. Lookout Point Reservoir was surveyed in 1956 and 2014. Updated rating curves show a 1.0 percent loss in storage capacity below maximum pool with all of the total loss occurring below minimum flood pool. Dorena Reservoir was surveyed in 1953 and 2017. Updated rating curves show a 4.8 percent loss in storage capacity below maximum pool with approximately half of this loss occurring below minimum flood pool. Fern Ridge Reservoir was surveyed in 1947 and 1993. Reporting identifies a 3.8 percent loss in storage capacity below maximum conservation pool with 80 percent of the loss in storage capacity occurring in the lower half of the pool. Loss of storage capacity is not a metric utilized for analyses of

alternative conditions because loss of storage capacity is not expected to impact operations in the analysis period.

#### *1.3.3.2 Sediment Trap Efficiency Metric (Fine-Grained Sediment Only)*

Trap efficiency-duration curves used in this metric are developed from daily average data extracted from the POR reservoir operation model. The curves are integrated to calculate an average that is compared with the No Action Alternative using the following formula. The metric estimates a percent change in the amount of sediment stored in the project.

Where:

$$\frac{1-\overline{TE}alt}{1-\overline{TE}na}-1$$

$\overline{TE}alt$ is the average trap efficiency of the alternative being analyzed
$\overline{TE}na$ is the average trap efficiency of the No Action Alternative

#### *1.3.3.3 Sediment Trap Efficiency Impact Thresholds*

A less than 10 percent change in sediment passing a project is considered likely unmeasurable with any confidence and negligible. A 10 percent to 50 percent increase or decrease would be a measurable but small change. A 100 percent or greater change in sediment passing a project would be considered large change in trapping efficiency. With high trapping efficiencies in most of the WVS projects, a change in sediment passing (such as doubling) may only increase the depositional rate by a few percentage points (Table 1-2).

**Table 1-4. Magnitude of Effects: Sediment Trap Efficiency**

| Sediment Trap Efficiency Change | Impact Threshold |
|---|---|
| \|Δx\| <10% | Negligible Effect |
| 10% < \|Δx\| <50% | Minor Effect |
| 50% < \|Δx\| <100% | Moderate Effect |
| \|Δx\| >100% | Major Effect |

### 1.4 RUN-OF-RIVER RESERVOIRS AND FREE-FLOWING REACHES METRICS

Run-of-river reservoirs and free-flowing reaches include all the river reaches downstream of WVS storage projects. Run-of-river reservoirs are formed by dams that are operated to discharge water downstream at rates that generally match the upstream inflows. Big Cliff, and Dexter dams are run-of-river projects that operate in a small range of pool elevations for daily or weekly hydropower purposes but do not attempt to store water for release in later seasons. Foster Dam is considered both a storage and a run-of-river project in this analysis as it is partially operated to re-regulate the outflows from Green Peter. Free-flowing reaches are portions of the river downstream of WVS storage reservoirs that are not influenced by the

backwater of a downstream reservoir. The run-of-river and free-flowing reach metrics are necessarily qualitative due to a lack of continuous bed material sediment data or lack of continuous and integrated hydraulic modeling.

### 1.4.1 Potential for Changes in Sediment Supply

This metric estimates the potential for changes in sediment passing WVS projects relative to NAA. This can occur when WVS storage projects experience large changes in sediment trapping efficiency. This can also occur where there is a change in operational range of the WVS reservoirs that can potentially re-entrain sediment currently stored in the reservoir or induce slope failures and introduce new sediment to the system. This metric also addresses the gravel augmentation below dams (#384) measure where sediment supply would be actively augmented.

The sediment supply analysis assumes that sediment supply from rivers upstream of WVS projects, or tributaries to WVS impacted reaches that are not downstream of a WVS reservoir, would be unchanged relative to the NAA.

The sediment trap efficiency metric integrates coincident daily reservoir inflow with storage to estimate trapping efficiency. This calculation focuses on sediment delivered to the reservoir from the basin with the sediment load assumed to be correlated to inflow. Decreases in sediment trapping efficiency indicate that the reservoir has the potential to deliver more sediment downstream and is considered in the potential for change in sediment supply metric assessing potential variations among alternatives. This transfer of basin supplied sediment to downstream reaches due to decreased reservoir trapping efficiency is an indirect, long term, effect.

A separate potential source of sediment to the reservoir and downstream reaches can come from bank erosion or bank failures within the reservoir itself. Drafts deeper than those historically experienced have the potential to re-suspend stored sediments or induce landslides (USACE 2003) introducing new sediment to the reservoir. The timing of these deep drawdowns is not correlated to reservoir inflow and are not fully captured in the sediment trap efficiency metric.

Deep drafts, particularly drafts deeper than historical operating conditions, are assumed to increase the potential for sediment re-entrainment (re-suspending sediment that has previously been transported and stored) supplying additional suspended sediment to the reservoir. Whether this sediment would resettle within the reservoir or pass downstream would depend on sediment particle size and hydraulics within the reservoir. Lacking detailed data for both factors, reduction in minimum pool storage relative to the NAA, which is coincident with drafts, is used to indicate if there is an expected variation in potential for sediment to pass a reservoir among alternatives. Increase in sediment supply due to deep drafts is expected to be greatest during the first draw down. The reservoir supplied sediment increase is expected to decrease toward the affected environment condition over the course of one to several years as the system equilibrates to the new operating range. Any subsequent

changes in operational range, where the reservoir is drafted deeper than it has historically operated, will have the potential to increase sediment supply from the reservoir once again resetting the timeframe for return to affected environment conditions. Variation in sediment supply from the reservoir to downstream reaches due to deeper drafts are indirect, short to medium term impacts.

Sediment augmentation though spawning gravel nourishment or geomorphic process-based sediment nourishment below target WVS projects in included in the gravel augmentation below dams (#384) measure. A direct introduction of bed material to the system would change sediment supply in a known and controlled manner. Gravel augmentation is a direct, long-term impact to sediment supply.

### *1.4.1.1 Sediment Coming Out of Storage Reservoirs*

Reservoir sediment release metrics are described in this section.

#### *1.4.1.1.1 Watershed Supplied Sediment*

Sediment Trap Efficiency Metric (1.3.2) is used directly to indicate potential for fine suspended sediment entering the reservoir during higher flows to pass the reservoir into downstream run-of-river reservoirs and free-flowing reaches. Decreases in the Trapping Efficiency Metric indicate increased potential for suspended sediment supply below the dam. The qualitative metric is directly applied in the sediment supply and expressed as: $qualitative\ TEmetric$

#### *1.4.1.1.2 Reservoir Supplied Sediment*

Changes in operational range, calculated from the Inactive Pool Elevation entered into each ResSim alternative, is used to indicate changes in sediment supply internal to the reservoir. Wind-wave erosion on stored fines and rarely exposed banks as well as mainstem and tributary erosion into stored sediments are drivers for changes in sediment supply internal to the reservoir. Deeper drawdowns relative to NAA ($MinPool\ \Delta x$) indicate higher potential for increased sediment supply.

**Table 1-5. Sediment Re-Entrainment or Bank Failure Potential**

| Minimum Pool Elevation Reduction from NAA | Sediment Re-Entrainment or Bank Failure Potential |
|---|---|
| Δx < 5 feet | Negligible |
| 5 feet < Δx < 10 feet | Minor |
| 10 feet < Δx < 20 feet | Moderate |
| Δx > 20 feet | Major |

This sediment supply potential is then qualified by the percent reduction in minimum pool storage relative to NAA ($MinPool\ \Delta v$). Reduction in minimum pool storage volume increases the potential for sediment to pass the reservoir and move downstream during drawdown.

**Table 1-6. Reservoir Bank Sediment Passing Dam Potential**

| Minimum Pool Storage Volume Reduction from NAA | Bank Sediment Passing Dam Potential |
|---|---|
| Δv < 10% | Negligible |
| 10% < Δv < 25% | Minor |
| 25% < Δv < 75% | Moderate |
| Δv > 75%% | Major |

The reservoir bank supplied sediment component of the Sediment Supply Metric, expressed as $BSSmetric$, is the lesser of the qualitative assessment for $(MinPool\ \Delta x)$ and $(MinPool\ \Delta v)$ for each alternative. For example, a drawdown 25 feet deeper than NAA has a major potential for increasing local sediment supply, but if the minimum storage volume only decreases by 5% relative to NAA, there would be negligible potential for that sediment to pass the reservoir.

$$qualitative\ BSSmetric = the\ qualitative\ lesser\ of\ (MinPool\ \Delta x) \text{ and } (MinPool\ \Delta v)$$

#### *1.4.1.2 Sediment Augmentation*

Any direct sediment augmentation is considered a major impact as it would be readily observable and performed with the intention of creating or modifying the trajectory of geomorphic features and habitat.

#### *1.4.1.3 Sediment Transfer Between Reaches*

Sediment coming from a WVS storage project or directly from a sediment augmentation effort would originate from a point source, typically at the upstream end of an impact assessment reach. In most cases, the downstream end of an impact reach is at a confluence which is the upstream end of the next impact reach. Sediment, particularly very fine suspended sediment, may transfer downstream into the next reach. A particularly complicated version of this is the Middle Fork of the Willamette where the Hills Creek storage project flows into a free-flowing segment fork the Middle Fork, then into the Lookout Point storage project, then into the run-of-river Dexter re-regulation dam and then again into the free-flowing Middle fork where confluences with the regulated Fall Creek and Coast Fork of the Willamette may bring changed sediment loads from upstream regulation. Changes in operations may impact the transfer of sediment between all segments. Absent hydraulic models and integrated bed and bank material classification as well as details on upstream sediment loading, the analysis of sediment transfer between reaches is necessarily qualitative.

This analysis assumes that run-of-river projects can successfully trap all coarse sediments delivered and a portion of the suspended sediment entering from upstream. Sediment transfer is assumed to occur, but concentrations are assumed to be reduced. This qualitative assessment reduces the level of impact by one level when moving from upstream or a run-of-river project to a downstream reach (meaning a major sediment load input into a run-of-river reservoir would result in a moderate sediment output into the downstream reach).

For successive free-flowing river segments, such as the Middle Fork of the Willamette flowing into the Upper Willamette at the Coast Fork Confluence, it is assumed that some sediment dispersion and deposition would occur within the reach and lower sediment concentrations would transport into the downstream reach. Each downstream reach would have a successively lower sediment supply qualitative impact until negligible change is assumed in the system. For example, if the Middle Fork of the Willamette below Dexter has minor potential for change in sediment supply at its upstream end, it would be assumed that there is negligible changes in sediment supply relative to NAA at the transfer to the Upper Willamette. In this scenario, if the Coast fork had moderate potential for change in sediment supply, the downstream Upper Willamette would have a minor change caused by sediments entering from the Coast Fork.

#### 1.4.1.4 Sediment Supply Impact Thresholds

Sediment Supply impact thresholds are a combination of reservoir passage potential for watershed supplied ($qualitative\ TEmetric$), reservoir supplied sediment ($qualitative\ BSSmetric$) and direct sediment augmentation. The total Sediment Supply Metric ($SedSupply$) for reaches below WVS storage project is the greater of the qualitative $qualitative\ TEmetric$ and $qualitative\ BSSmetric$ metrics. Any direct sediment augmentation is a Major Effect:

$$SedSupply = the\ qualitative\ greater\ of\ (qualitative\ TEmetric)\ \text{and}\ (qualitative\ BSSmetric)$$

**Table 1-7. Magnitude of Effects: Sediment Supply**

| Sediment Supply | Impact Threshold |
|---|---|
| ($SedSupply$) = Negligible | Negligible Effect |
| ($SedSupply$) = Minor | Minor Effect |
| ($SedSupply$) = Moderate | Moderate Effect |
| ($SedSupply$) = Major or Sediment Augmentation | Major Effect |

For successive Run-of-River reservoir and Free-Flowing reaches, the level of impact is assumed to be reduce by one level for each reach segment due to fine suspended sediment dispersion and deposition. The exception to this is major changes due to sediment augmentation programs. It is assumed that placed sediment would be screened of fines and would only transport as bed load. This placed sediment is assumed to be deposited and stored within the reach where it is placed unless noted otherwise.

### 1.4.2 Potential for Geomorphic Change

This metric estimates the potential for changes in river character due to operations proposed by the action alternatives. System-wide morphological change as compared to the NAA would be dependent on changes to flood flow frequency, changes to bank stabilization, or changes in sediment supply. There are no measures or suites of measures that would change flood flow

frequency proposed under any action alternative. Therefore, morphologic changes or processes that are driven by high flows would be unchanged from the NAA.

Under Measure 9, revetments considering nature-based engineering would be retained or revetments would be modified for aquatic ecosystem restoration. Alternatives incorporating Measure 9 would result in local habitat changes as compared to the NAA; however, the river stabilization purposes, and geomorphic trajectory of these revetments would be unchanged.

Alternatives that incorporate Measure 9 would include opportunities for USACE partnerships with non-federal sponsors to study and work through processes for substantial modifications. These projects would be brought under the Continuing Authority Program Section 1135 and would require analysis and compliance actions consistent with the authority.

While there is opportunity for localized or potentially larger geomorphologic effects due to revetment modifications, locations and scales are unknown at this time and would be analyzed for effects in future site-specific analyses. Other actions that could impact geomorphic trends are those that change sediment supply to the system. Potential for geomorphic change effects may vary in magnitude but would be long-term as geomorphic effects manifest over long periods of time and persist beyond immediate action. Potential for geomorphic change as compared to the NAA would be local to regional with change in sediment supply effecting both the immediate reach below a WVS dam and downstream reaches. Potential for geomorphic change due to changes in system operations would be indirect effects, while gravel augmentation below dams) would be direct (Measure 384).

#### *1.4.2.1 Potential for Geomorphic Change Metric*

The Sediment Supply Metric ($SedSupply$) would be utilized to indicate if there is potential for geomorphic change in run-of-river reservoirs or free flowing reaches. Minor and Moderate Sediment Supply changes may impact water quality, however potential changes of that order are not expected to change the morphological character of the river. Only Major changes to Sediment Supply are assumed to be capable of inducing Geomorphic Change.

#### *1.4.2.2 Geomorphic Change Impact Thresholds*

**Table 1-8. Magnitude of Effects: Geomorphic Change**

| Sediment Supply | Impact Threshold |
|---|---|
| $(SedSupply)$ = Negligible, Minor, Moderate | Negligible Effect |
| $(SedSupply)$ = Major | Major Effect |

### 1.5 CLIMATE CHANGE

Appendix F1, Willamette Basin Climate Change Qualitative Assessment and Appendix F2, Supplemental Climate Change Information describe projected climate change trends likely to be experienced in the WVS under the alternatives. The supplemental appendix also identifies

relevant climate factors or hydrology and climate variables that may change and have a consequential impact to the PEIS resource areas. The climate change factors of most importance to the hydraulics resource area are projected future changes in precipitation (rainfall and snow), rates of peak and average streamflow, snowpack and flow volumes, and wildfire intensity/frequency.

There is a causal relationship between wildfires and increased sediment supply observed in the Pacific Northwest and elsewhere. The dominant processes for increased supply in the Pacific Northwest are dry ravel in the short-term following fire and hillslope failure with associated debris flows in the longer-term (Alden Research Laboratory Inc. 2021). Ravel occurs when wildfires disturb or eliminate vegetation and other organic structures that hold loose material on steep slopes. This material can lead to debris flows during the wet season in the Pacific Northwest as material collected in valley and channel bottoms is moved downstream during high peak flow events. Hillslope failure is exacerbated in the years post wildfire by the loss of shear strength in the soils as tree roots decay, typically 5-10 years post-fire (Wondzell and King 2003). Surface erosion and shallow channels cut into the soil by the erosive action of flowing water (rilling) during direct runoff in a minor factor in sediment supply changes in the Pacific Northwest due to low rainfall intensity and high infiltration rates (Alden Research Laboratory Inc. 2021). Increases in annual very high fire danger days are assumed to be directly related to an increase in acres burned by severe forest fires, and therefore, an increase in basin sediment supply, particularly in portions of the basin with steeper topography because steep slopes foster sediment transport into water systems.

Sediment transport and many geomorphic processes associated with river and streams are dominated by high flows and associated high energies in the river. Changes in peak flows or changes in the duration of high flow can both increase the sediment transport capability of a river and increase the potential for larger scale geomorphic change (such as bar growth, bank erosion or avulsions). It is assumed that higher peak flows or longer durations of high flow are correlated to increases in sediment transport and geomorphic change. However, flood storage projects that can trap sediment and regulate peak flood flows in the WRB are expected to mitigate for potential sediment loading. Unregulated rivers would more directly support increases in potential sediment supply, transport and geomorphic changes associated with climate change.

These climate change factors as well as the climate change analysis performed in the section 3.2, Hydrologic Processes, were used to qualitatively assess the expected effects to the system under NAA and all action alternatives.

# CHAPTER 2 - ALTERNATIVE COMPARISON SUMMARIES

## 2.1 STORAGE PROJECT METRICS

This section includes tables and figures that enumerate the storage project comparison summaries for three metrics (Table 2-1 – Table 2-6; Figure 2-1 – Figure 2-33):

- Head-of-Reservoir Sediment Mobilization
- Sediment Trap Efficiency
- Shoreline Exposure

**Table 2-1. Storage Metrics – Head-of-Reservoir Quantitative Analysis**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Op. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | -0.4% | 0.7% | 1.5% | 23.1% | 23.1% | 0.8% | 1.8% | 1.1% | 0.2% |
| Cottage Grove | 0.4% | 0.9% | 0.1% | 0.9% | 2.2% | 2.2% | 0.3% | 2.2% | 2.9% |
| Cougar | 1.6% | -0.7% | 496.6% | 163.4% | 499.3% | -0.8% | 617.3% | 617.3% | 116.2% |
| Detroit | -3.0% | -2.2% | -1.8% | 391.2% | 113.5% | -2.3% | 1.7% | 17.4% | 43.9% |
| Dorena | -0.5% | 0.4% | 0.4% | -0.7% | 1.4% | 2.3% | 0.4% | 0.6% | 1.0% |
| Fall Creek | -2.2% | -1.1% | -1.4% | -2.4% | 0.6% | -0.9% | -0.9% | *53.2% | 58.2% |
| Fern Ridge | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Foster | 2.4% | -20.5% | -20.5% | -20.8% | -11.2% | -2.6% | -20.7% | -21.0% | 2.2% |
| Green Peter | -2.0% | 337.3% | 337.3% | 336.4% | 621.8% | 1.6% | 339.8% | 331.8% | 314.4% |
| Hills Creek | -0.6% | 5.0% | 5.0% | 28.5% | 145.8% | 4.7% | 9.0% | 24.7% | 31.0% |
| Lookout Point | 2.3% | 2.1% | 2.3% | 312.3% | 122.3% | 1.9% | 2.3% | 27.1% | 186.0% |

*The change from *Negligible* to *Moderate* qualitative rating between Alternative 5 and 6 at Fall Creek, is a result of deep drawdowns at other projects (namely GPR and LOP) being able to absorb more inflows, therefore releasing more water instead of holding, during FRM operations (see main report section 3.02, Appendix B).

**Table 2-2. Storage Metrics – Head-of-Reservoir Qualitative Analysis**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Op. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | Negligible | Negligible | Negligible | **Minor** | **Minor** | Negligible | Negligible | Negligible | Negligible |
| Cottage Grove | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Cougar | Negligible | Negligible | **Major** | **Major** | **Major** | Negligible | **Major** | **Major** | **Major** |
| Detroit | Negligible | Negligible | Negligible | **Major** | **Major** | Negligible | Negligible | **Minor** | **Minor** |
| Dorena | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Fall Creek | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | **Negligible** | ***Moderate** | **Moderate** |
| Fern Ridge | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Foster | Negligible | **Minor** | **Minor** | **Minor** | **Minor** | Negligible | **Minor** | **Minor** | Negligible |
| Green Peter | Negligible | **Major** | **Major** | **Major** | **Major** | Negligible | **Major** | **Major** | **Major** |
| Hills Creek | Negligible | Negligible | Negligible | **Minor** | **Major** | Negligible | Negligible | **Minor** | **Minor** |
| Lookout Point | Negligible | Negligible | Negligible | **Major** | **Major** | Negligible | Negligible | **Minor** | **Major** |

*See  Table 2-1 annotation.

**Table 2-3. Storage Metrics – Trap Efficiency Quantitative Analysis.**

| Project | NAA Trap Eff | Alt 1 Trap Eff | Alt 1 vs. NAA | Alt 2A Trap Eff | Alt 2A vs. NAA | Alt 2B Trap Eff | Alt 2B vs. NAA | Alt 3A Trap Eff | Alt 3A vs. NAA | Alt 3B Trap Eff | Alt 3B vs. NAA | Alt 4 Trap Eff | Alt 4 vs. NAA | Alt 5 Trap Eff | Alt 5 vs. NAA | Alt 6 Trap Eff | Alt 6 vs. NAA | Interim Ops. Trap Eff | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blue River | 81.4 | 81.5 | -0.50% | 81 | 2.10% | 80.9 | 2.40% | 79.2 | 11.70% | 79.2 | 11.70% | 81 | 2.10% | 81.1 | 3.40% | 81.1 | 1.7 | 81.1 | 1.3 |
| Cottage Grove | 81 | 80.9 | 0.40% | 81 | -0.20% | 81.1 | -0.30% | 80.3 | 3.70% | 79.9 | 5.70% | 79.6 | 7.30% | 81 | -0.10% | 80.9 | -0.5 | 80.9 | 0.5 |
| Cougar | 90.6 | 90.7 | -1.60% | 90.7 | -1.20% | 47.9 | 453.60% | 84.8 | 61.50% | 47.8 | 454.00% | 90.7 | -1.20% | 39.1 | 546.50% | 39.1 | 546.5 | 86.2 | -46.1 |
| Detroit | 91.1 | 91.2 | -1.50% | 91.2 | -1.00% | 91.2 | -0.90% | 79.2 | 133.60% | 88.8 | 25.80% | 91.2 | -1.00% | 91.2 | -0.90% | 90.9 | -2.5 | 90.3 | -9.5 |
| Dorena | 80.7 | 80.9 | -0.50% | 80.8 | -0.50% | 80.8 | -0.40% | 80.4 | 1.90% | 80 | 4.10% | 79.7 | 5.50% | 80.8 | -0.20% | 80.7 | -0.2 | 80.7 | -0.2 |
| Fall Creek | 81.8 | 82 | -1.10% | 81.8 | 0.00% | 81.9 | -0.40% | 81.8 | -0.20% | 81.7 | 0.30% | 81.8 | -0.10% | 81.8 | -0.10% | 79.1 | -14.8 | 79 | -15.3 |
| Fern Ridge | 80.2 | 80.2 | 0.00% | 80.2 | 0.00% | 80.2 | 0.00% | 80.2 | 0.00% | 80.2 | 0.00% | 80.2 | 0.00% | 80.2 | 0.00% | 80.2 | 0 | 80.2 | 0 |
| Foster | 67.3 | 67.7 | -1.20% | 66.5 | 2.40% | 66.5 | 2.40% | 66.5 | 2.40% | 68.2 | -2.80% | 67.1 | 0.60% | 66.4 | 2.60% | 66.4 | 2.5 | 63.6 | 11.2 |
| Green Peter | 92.6 | 92.7 | -0.80% | 86 | 88.60% | 86 | 88.70% | 86 | 88.60% | 69.2 | 315.30% | 92.5 | 0.60% | 86 | 89.40% | 86.3 | -85.3 | 86.7 | -79.7 |
| Hills Creek | 93.8 | 93.9 | -1.10% | 93.8 | -0.10% | 93.8 | 0.10% | 93.6 | 2.40% | 92.1 | 26.70% | 93.8 | -0.30% | 93.7 | 1.40% | 93.6 | -3.6 | 93.6 | -3.4 |
| Lookout Point | 87.9 | 87.8 | 1.00% | 87.8 | 0.90% | 87.8 | 1.00% | 71.4 | 136.80% | 83.2 | 38.80% | 87.8 | 0.80% | 87.8 | 1.10% | 87.2 | -5.7 | 80.1 | -64.6 |

**Table 2-4. Storage Metrics – Trap Efficiency Qualitative Analysis**

| Project | NAA | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|---|
| Blue River | N/A | Negligible | Negligible | Negligible | **Minor** | **Minor** | Negligible | Negligible | Negligible | Negligible |
| Cottage Grove | N/A | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Cougar | N/A | Negligible | Negligible | **Major** | **Moderate** | **Major** | Negligible | **Major** | **Major** | **Minor** |
| Detroit | N/A | Negligible | Negligible | Negligible | **Major** | **Minor** | Negligible | Negligible | Negligible | Negligible |
| Dorena | N/A | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Fall Creek | N/A | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | **Minor** | **Minor** |
| Fern Ridge | N/A | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Foster | N/A | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | **Minor** |
| Green Peter | N/A | Negligible | **Moderate** | **Moderate** | **Moderate** | **Major** | Negligible | **Moderate** | **Moderate** | **Moderate** |
| Hills Creek | N/A | Negligible | Negligible | Negligible | Negligible | **Minor** | Negligible | Negligible | Negligible | Negligible |
| Lookout Point | N/A | Negligible | Negligible | Negligible | **Major** | **Minor** | Negligible | Negligible | Negligible | **Moderate** |

*See Table 2-1 annotation.

**Table 2-5. Storage Metrics –Change in average shoreline exposure, measured in feet.**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | 4.2 (Yes) | 2.9 (Yes) | 2.4 (Yes) | -8.0 (Yes) | -7.6 (Yes) | 2.9 (Yes) | 0.4 (Yes) | -0.65 (Yes) | 3.2 (Yes) |
| Cottage Grove | 0.6 (Yes) | 0.7 (No) | 0.7 (No) | -0.2 (Yes) | -0.1 (Yes) | 0.0 (Yes) | 0.4 (No) | 0.0 (No) | 0.5 (No) |
| Cougar | 6.7 (Yes) | 6.1 (Yes) | -188.2 (Yes) | -86.1 (Yes) | -188.4 (Yes) | 6.3 (Yes) | -206.1 (Yes) | -206.1 (Yes) | -62.9 (Yes) |
| Detroit | 4.4 (Yes) | 1.6 (Yes) | 1.5 (Yes) | -116.2 (Yes) | -19.6 (Yes) | 1.6 (Yes) | 1.5 (Yes) | -2.0 (Yes) | -7.1 (Yes) |
| Dorena | 2.1 (Yes) | 1.5 (No) | 1.4 (No) | 0.7 (Yes) | 0.8 (Yes) | 0.7 (Yes) | 0.8 (No) | 0.1 (No) | 0.7 (No) |
| Fall Creek | 1.1 (No) | 0.8 (No) | 0.9 (No) | 0.7 (No) | 0.6 (No) | 0.9 (No) | 0.5 (No) | -3.5 | -2.9 |
| Fern Ridge | 0.0 (No) | 0.0 (No) | 0.0 (No) | 0.0 (No) | 0.0 (No) | 0.0 (No) | 0.0 (No) | 0.0 (No) | 0.0 (No) |
| Foster | 0.1 (No) | 0.2 (No) | 0.2 (No) | 0.2 (No) | -3.0 (No) | 0.1 (No) | 0.2 (No) | 0.2 (No) | -4.6 (No) |
| Green Peter | 5.7 (Yes) | -31.8 (Yes) | -31.8 (Yes) | -31.8 (Yes) | -133.5 (Yes) | -4.4 (Yes) | -32.0 (Yes) | -30.1 (Yes) | -29.7 (Yes) |
| Hills Creek | 4.9 (Yes) | 3.6 (Yes) | 2.0 (Yes) | -6.4 (Yes) | -40.0 (Yes) | 3.9 (Yes) | -2.0 (Yes) | -6.0 | 3.4 |
| Lookout Point | -0.6 (Yes) | 0.5 (Yes) | -0.3 (Yes) | -72.9 (Yes) | -18.5 (Yes) | 0.6 (Yes) | -0.4 (Yes) | -4.4 | -36.6 |

**Table 2-6. Storage Metrics – Shoreline Exposure Qualitative Analysis**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | Major | Major | Major | Major | Major | Major | Major | Major | Major |
| Cottage Grove | Major | Negligible | Negligible | Major | Major | Major | Negligible | Negligible | Negligible |
| Cougar | Major | Major | Major | Major | Major | Major | Major | Major | Major |
| Detroit | Major | Major | Major | Major | Major | Major | Major | Major | Major |
| Dorena | Major | Negligible | Negligible | Major | Major | Major | Negligible | Negligible | Negligible |
| Fall Creek | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | *Negligible |
| Fern Ridge | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Foster | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Green Peter | Major | Major | Major | Major | Major | Major | Major | Major | Major |
| Hills Creek | Major | Major | Major | Minor | Major | Major | Major | Major | Minor |
| Lookout Point | Major | Major | Major | Major | Major | Major | Major | Major | Major |

*See Table 2-1 annotation.

### 2.1.4 Detroit




**Figure 2-10. Detroit Sediment Transport Indicator**




**Figure 2-11. Detroit Trapping Efficiency Daily Exceedance**




**Figure 2-12. Detroit Elevation Daily Exceedance**

## 2.2 RUN-OF-RIVER AND FREE FLOWING REACH METRICS

This section includes tables and figures that enumerate the run-of-river reservoir and free-flowing reach comparison summaries for two metrics (Table 2-7 – Table 2-19):

- Sediment Supply
- Geomorphic Change

### 2.2.1 Sediment Supply

**Table 2-7. Quantitative Sediment Re-Entrainment or Bank Failure Potential ($MinPool\ \Delta x$)**

| Project | NAA Min (ft) | Alt 1 Min (ft) | Alt 1 - NAA | Alt 2A Min (ft) | Alt 2A - NAA | Alt 2B Min (ft) | Alt 2B - NAA | Alt 3A Min (ft) | Alt 3A - NAA | Alt 3B Min (ft) | Alt 3B - NAA | Alt 4 Min (ft) | Alt 4 - NAA | Alt 5 Min (ft) | Alt 5 - NAA | Alt 6 Min (ft) | Alt 6 - NAA | Interim Ops. Min (ft) | Interim Ops. - NAA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blue River | 1180.0 | 1149.9 | -30.1 | 1150.0 | -30.0 | 1150.0 | -30.0 | 1165.0 | -15.0 | 1165.0 | -15.0 | 1150.0 | -30.0 | 1150.0 | -30.0 | 1149 | -30.9 | 1149 | -30.6 |
| Cottage Grove | 750.0 | 735.4 | -14.6 | 750.0 | 0.0 | 750.0 | 0.0 | 735.4 | -14.6 | 735.4 | -14.6 | 735.0 | -15.0 | 750.0 | 0.0 | 750 | 0.0 | 750 | 0.0 |
| Cougar | 1531.0 | 1515.9 | -15.1 | 1516.0 | -15.0 | 1330.0 | -201.0 | 1517.0 | -14.0 | 1330.0 | -201.0 | 1516.0 | -15.0 | 1330.0 | -201.0 | 1330 | -201.0 | 1505 | -26.0 |
| Detroit | 1450.0 | 1425.0 | -25.0 | 1425.0 | -25.0 | 1425.0 | -25.0 | 1375.0 | -75.0 | 1375.0 | -75.0 | 1425.0 | -25.0 | 1425.0 | -25.0 | 1395 | -55.0 | 1425 | -25.0 |
| Dorena | 771.0 | 754.9 | -16.1 | 771.0 | 0.0 | 771.0 | 0.0 | 754.9 | -16.1 | 754.9 | -16.1 | 754.0 | -17.0 | 771.0 | 0.0 | 771 | -0.1 | 771 | -0.1 |
| Fall Creek | 680.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 | 680.0 | 0.0 |
| Fern Ridge | 353.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 | 353.0 | 0.0 |
| Foster | 613.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 | 613.0 | 0.0 |
| Green Peter | 922.0 | 886.9 | -35.1 | 780.0 | -142.0 | 780.0 | -142.0 | 780.0 | -142.0 | 780.0 | -142.0 | 886.9 | -35.1 | 780.0 | -142.0 | 780.0 | -142.0 | 780.0 | -142.0 |
| Hills Creek | 1447.0 | 1413.9 | -33.1 | 1414.0 | -33.0 | 1414.0 | -33.0 | 1446.0 | -1.0 | 1446.0 | -1.0 | 1414.0 | -33.0 | 1414.0 | -33.0 | 1414.0 | -33.0 | 1422.0 | -25.0 |
| Lookout Point | 825.0 | 818.9 | -6.1 | 819.0 | -6.0 | 819.0 | -6.0 | 761.0 | -64.0 | 761.0 | -64.0 | 819.0 | -6.0 | 819.0 | -6.0 | 819.0 | -6.0 | 750.0 | -75.0 |

**Table 2-8. Qualitative Sediment Re-Entrainment or Bank Failure Potential ($MinPool\ \Delta x$)**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | Major | Major | Major | Moderate | Moderate | Major | Major | Major | Major |
| Cottage Grove | Moderate | Negligible | Negligible | Moderate | Moderate | Moderate | Negligible | Negligible | Negligible |
| Cougar | Moderate | Moderate | Major | Moderate | Major | Moderate | Major | Major | Major |
| Detroit | Major | Major | Major | Major | Major | Major | Major | Major | Major |
| Dorena | Moderate | Negligible | Negligible | Moderate | Moderate | Moderate | Negligible | Negligible | Negligible |
| Fall Creek | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Fern Ridge | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Foster | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Green Peter | Major | Major | Major | Major | Major | Major | Major | Major | Major |
| Hills Creek | Major | Major | Major | Negligible | Negligible | Major | Major | Major | Major |
| Lookout Point | Minor | Minor | Minor | Major | Major | Minor | Minor | Minor | Major |

**Table 2-9. Quantitative Bank Sediment Passing Dam Potential ($MinPool\ \Delta v$)**

| Project | NAA Acre-ft | Alt 1 Acre-ft | Alt 1 % Diff from NAA | Alt 2A Acre-ft | Alt 2A % Diff from NAA | Alt 2B Acre-ft | Alt 2B % Diff from NAA | Alt 3A Acre-ft | Alt 3A % Diff from NAA | Alt 3B Acre-ft | Alt 3B % Diff from NAA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Blue River | 3971 | 1155 | -71% | 1208 | -70% | 1208 | -70% | 2299 | -42% | 2299 | -42% |
| Cottage Grove | 3139 | 399 | -87% | 3139 | 0% | 3139 | 0% | 399 | -87% | 399 | -87% |
| Cougar | 51700 | 43000 | -17% | 43500 | -16% | 234 | -100% | 44100 | -15% | 234 | -100% |
| Detroit | 154400 | 115000 | -26% | 115000 | -26% | 115000 | -26% | 56700 | -63% | 56700 | -63% |
| Dorena | 7355 | 1348 | -82% | 7355 | 0% | 7355 | 0% | 1348 | -82% | 1348 | -82% |
| Fall Creek | 93 | 93 | 0% | 93 | 0% | 93 | 0% | 93 | 0% | 93 | 0% |
| Fern Ridge | 2802 | 2802 | 0% | 2802 | 0% | 2802 | 0% | 2802 | 0% | 2802 | 0% |
| Foster | 31100 | 31100 | 0% | 31100 | 0% | 31100 | 0% | 31100 | 0% | 31100 | 0% |
| Green Peter | 159900 | 95700 | -40% | 4500 | -97% | 4500 | -97% | 4500 | -97% | 4500 | -97% |
| Hills Creek | 153800 | 105400 | -31% | 106700 | -31% | 106700 | -31% | 152200 | -1% | 152200 | -1% |
| Lookout Point | 118800 | 104600 | -12% | 104600 | -12% | 104600 | -12% | 24600 | -79% | 24600 | -79% |

| Project | NAA Acre-ft | Alt 4 Acre-ft | Alt 4 % Diff from NAA | Alt 5 Acre-ft | Alt 5 % Diff from NAA | Alt 6 Acre-ft | Alt 6 % Diff from NAA | Interim Ops. Acre-ft | Interim Ops. % Diff from NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | 3971 | 1208 | -70% | 1208 | -70% | 1160 | -71% | 1176 | -70% |
| Cottage Grove | 3139 | 399 | -87% | 3139 | 0% | 3139 | 0% | 3139 | 0% |
| Cougar | 51700 | 43500 | -16% | 234 | -100% | 234 | -99.5% | 38095 | -26% |
| Detroit | 154400 | 115000 | -26% | 115000 | -26% | 114985 | -26% | 77300 | -50% |
| Dorena | 7355 | 1348 | -82% | 7355 | 0% | 7299 | -1% | 7299 | -1% |
| Fall Creek | 93 | 93 | 0% | 93 | 0% | 93 | 0% | 93 | 0% |
| Fern Ridge | 2802 | 2802 | 0% | 2802 | 0% | 2802 | 0% | 2802 | 0% |
| Foster | 31100 | 31100 | 0% | 31100 | 0% | 31100 | 0% | 31100 | 0% |
| Green Peter | 159900 | 95700 | -40% | 4500 | -97% | 4500 | -97% | 4500 | -97% |
| Hills Creek | 153800 | 106700 | -31% | 106700 | -31% | 106687.0 | -31% | 117620.809 | -24% |
| Lookout Point | 118800 | 104600 | -12% | 104600 | -12% | 106580.0 | -10% | 16494.0 | -86% |

**Table 2-10. Qualitative Bank Sediment Passing Dam Potential ($MinPool\ \Delta v$)**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate |
| Cottage Grove | Major | Negligible | Negligible | Major | Major | Major | Negligible | Negligible | Negligible |
| Cougar | Minor | Minor | Major | Minor | Major | Minor | Major | Major | Moderate |
| Detroit | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate | Moderate |
| Dorena | Major | Negligible | Negligible | Major | Major | Major | Negligible | Negligible | Negligible |
| Fall Creek | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Fern Ridge | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Foster | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Green Peter | Moderate | Major | Major | Major | Major | Moderate | Major | Major | Major |
| Hills Creek | Moderate | Moderate | Moderate | Negligible | Negligible | Moderate | Moderate | Moderate | Minor |
| Lookout Point | Minor | Minor | Minor | Major | Major | Minor | Minor | Minor | Major |

**Table 2-11. Qualitative Reservoir Bank Supplied Sediment ($qualitative\ BSSmetric$ )**

| Project | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Blue River | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** |
| Cottage Grove | **Moderate** | Negligible | Negligible | **Moderate** | **Moderate** | **Moderate** | Negligible | Negligible | Negligible |
| Cougar | **Minor** | **Minor** | **Major** | **Minor** | **Major** | **Minor** | **Major** | **Major** | **Moderate** |
| Detroit | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** | **Moderate** |
| Dorena | **Moderate** | Negligible | Negligible | **Moderate** | **Moderate** | **Moderate** | Negligible | Negligible | Negligible |
| Fall Creek | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Fern Ridge | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Foster | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Green Peter | **Moderate** | **Major** | **Major** | **Major** | **Major** | **Moderate** | **Major** | **Major** | **Major** |
| Hills Creek | **Moderate** | **Moderate** | **Moderate** | Negligible | Negligible | **Moderate** | **Moderate** | **Moderate** | **Minor** |
| Lookout Point | **Minor** | **Minor** | **Minor** | **Major** | **Major** | **Minor** | **Minor** | **Minor** | **Major** |

**Table 2-20. Interim Ops. - Qualitative Sediment Supply**

| Impact Reach | Upstream Project or WVS Impacted Reach | Watershed Supplied (*qualitative $TE_{metric}$*) | Reservoir Supplied (*qualitative $BSS_{metric}$*) | Sediment Augmentation | Upstream Reach Sediment Transfer | Sediment Supply to Reach |
|---|---|---|---|---|---|---|
| Big Cliff Reservoir | Detroit Dam | Negligible | **Moderate** | No | NA | **Moderate** |
| Dexter Reservoir | Lookout Point Dam | **Moderate** | **Major** | No | NA | **Major** |
| Foster Reservoir | Green Peter Dam | **Moderate** | **Major** | No | NA | **Major** |
| Lower Willamette | Middle Willamette River | NA | NA | No | Negligible | Negligible |
| Middle Willamette | Upper Willamette and Santiam Rivers | NA | NA | No | Negligible | Negligible |
| Upper Willamette | Coast And Middle Fork Willamette and McKenzie River | NA | NA | No | **Minor** | **Minor** |
| Middle Fork of The Willamette Below Dexter | Dexter Dam And Fall Creek | NA | NA | No | **Moderate** | **Moderate** |
| Middle Fork of The Willamette Above Lookout Point | Hills Creek Dam | Negligible | **Moderate** | No | NA | **Moderate** |
| Fall Creek | Fall Creek Dam | *Minor | Negligible | No | NA | Negligible |
| Coast Fork of The Willamette | Cottage Grove Dam | Negligible | Negligible | No | NA | Negligible |
| Row | Dorena Dam | Negligible | Negligible | No | NA | Negligible |
| Mainstem Santiam | North Santiam and South Santiam Rivers | NA | NA | No | **Minor** | **Minor** |
| North Santiam | Big Cliff Dam | NA | NA | No | **Minor** | **Minor** |
| South Santiam | Foster Dam | NA | NA | No | **Moderate** | **Moderate** |
| Long Tom | Fern Ridge Dam | Negligible | Negligible | No | NA | Negligible |
| McKenzie | Cougar Dam And Blue River | **Minor** | **Moderate** | No | NA | **Moderate** |
| Blue | Blue River Dam | Negligible | **Moderate** | No | NA | **Moderate** |

*See annotation from Table 2-1.

### 2.2.2 Geomorphic Change

**Table 2-21. Qualitative Potential for Geomorphic Change**

| Reaches | Alt 1 vs. NAA | Alt 2A vs. NAA | Alt 2B vs. NAA | Alt 3A vs. NAA | Alt 3B vs. NAA | Alt 4 vs. NAA | Alt 5 vs. NAA | Alt 6 vs. NAA | Interim Ops. vs. NAA |
|---|---|---|---|---|---|---|---|---|---|
| Big Cliff Reservoir | Negligible | Negligible | Negligible | **Major** | Negligible | Negligible | Negligible | Negligible | Negligible |
| Dexter Reservoir | Negligible | Negligible | Negligible | **Major** | **Major** | Negligible | Negligible | Negligible | **Major** |
| Foster Reservoir | Negligible | **Major** | **Major** | **Major** | **Major** | Negligible | **Major** | **Major** | **Major** |
| Lower Willamette | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Middle Willamette | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Upper Willamette | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Middle Fork of The Willamette Below Dexter | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Middle Fork of The Willamette Above Lookout Point | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Fall Creek | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Coast Fork of The Willamette | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Row | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| Mainstem Santiam | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| North Santiam | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | Negligible |
| South Santiam | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | Negligible |
| Long Tom | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible | Negligible |
| McKenzie | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | Negligible |
| Blue | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | **Major** | Negligible |

**REFERENCES**

Brune, G., 1953; Transactions, American Geophysical Union; V. 34, No. 3; p. 407-418
Henderson, F. M. 1996. "Open Channel Flow." MacMillan Company, New York.

Klingeman, P.C., 1987, Geomorphic influences on sediment transport in the Willamette River, IAHS publication no. 165; p. 365-374.

Schmidt, J. C., and P. R. Wilcock. 2008. Metrics for assessing the downstream effects of dams, Water Resour. Res., 44, W04404, doi:10.1029/2006WR005092.

U.S. Army Corps of Engineers (USACE). 2003; Cougar Dam and Reservoir Final Supplemental Information Report & Environmental Assessment Amendment; Portland District.

Wondzell, S. M., and King, J. G., 2003, Postfire erosional processes in the Pacific Northwest and Rocky Mountain regions: Forest Ecology and Management, v. 178, p. 75-87.

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## APPENDIX W: FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT PUBLIC COMMENTS AND RESPONSES

# Public Comments and Responses on the U.S. Army Corps of Engineers Draft Supplemental Environmental Impact Statement for Willamette Valley System Operations and Maintenance

**Public Comment Period: November 14, 2025 – January 13, 2026**




1949 Artist's Rendering

**TABLE OF CONTENTS**

INTRODUCTION .......... 4
PUBLIC COMMENTS ON THE DRAFT SEIS .......... 5
PUBLIC COMMENT CORRESPONDENCE .......... 218

| | | | |
|---|---|---|---|
| Julia Hajduk | City of Stayton | B. Necessary Revisions to the Draft SEIS to Fully Analyze Impacts<br>The FEIS and Draft SIES do not sufficiently identify and analyze impacts to communities and infrastructure anticipated to result from the Detroit Reservoir drawdown. Considering the high risk that the proposed interim operations will cause physical and functional destruction of the City of Stayton's drinking water treatment infrastructure, rather than merely temporary drinking water standards exceedances, the City respectfully requests that the Final SEIS include the following analysis to ensure full understanding, informed decision making, and protection of essential municipal services.<br>a. Explicit Identification of Vulnerable Treatment Infrastructure<br>The Final SEIS should explicitly identify the presence of SSF municipal drinking water treatment systems and, more explicitly, direct online SSF systems, downstream of Detroit Dam and acknowledge that these systems are inherently vulnerable to fine sediment-dominated and sustained high turbidity conditions to a degree not experienced by other types of treatments systems, including those on the South Santiam River.<br>b. Treatment- and Infrastructure-Specific Impact Analysis<br>The Final SEIS should evaluate treatment-process-level impacts, not solely source-water quality changes, including:<br>o Deep-bed penetration of fine sediments following filter cleaning,<br>o Accelerated and unrecoverable filter media loss,<br>o Collapse of biological treatment function,<br>o Compounding maintenance and cleaning requirements,<br>o Risk of particulate and turbidity breakthrough during filter ripening, and<br>o The potential for complete loss of treatment operability over even short drawdown periods.<br>The Draft SEIS recognizes that there will be a "moderate increase in sediment and turbidity levels downstream of Detroit Reservoir." (ES-9). However, nothing in the draft indicates the meaning of moderate in this context or The Final SEIS cannot reasonably compare alternatives without a clear recognition and understanding of the vulnerabilities of water treatment systems downstream of Detroit Reservoir. The Final SEIS should explicitly assess the risk that the proposed drawdown of the Detroit reservoir would result in physical impairment or destruction of the City's treatment infrastructure, leading to the cessation of potable water production, rather than only temporary noncompliance with drinking water standards. This assessment should address impacts to:<br>o Residential water supply,<br>o Fire protection and emergency response,<br>o Public health and sanitation,<br>o Other essential municipal and community functions.<br>c. Cumulative and Recurrent Impacts Analysis<br>Because the Detroit Reservoir drawdown is an action planned to be repeated at least annually, the Final SEIS should analyze the cumulative effects of recurring or multi-year drawdown-related turbidity events on SSF systems, including progressive degradation, loss of remaining useful life, and the increasing likelihood of permanent infrastructure failure over the interim operations period. This analysis is particularly important given that, even after a significant 2023 drawdown that caused massive turbidity increases in the South Santiam River, during the 2024 drawdown, the City of Sweet Home again experienced such significant turbidity that its drinking water treatment system struggled, and a state of emergency was declared. The Corps' use of adaptive management to mitigate effects of the drawdown by immediately ceasing the interim operation to prevent further harm to the | Based on the detailed information provided by commentors, USACE updated Section 3.19 to clarify and disclose impacts unique to the North Santiam facilities, including SSF systems. The SEIS analyzes turbidity impacts, which are the direct effect of USACE operations, as well as how USACE will utilize operate to mitigate those specific impacts to downstream users by taking a measured approach to minimize and avoid certain impacts. The measured approach includes using a stepwise approach to lower the reservoir to a deeper elevation each year. By only lowering the reservoir by a small amount each year instead of the full 55 feet in one year there will be less sediment mobilized. Additionally, USACE will use its operational discretion and real time information to change, pause or cease the operation based on acceptable levels of turbidity to be determined with the downstream water purveyors and the State of Oregon's Department of Environmental Quality and Oregon Health Authority in an Emergency Response and Communications Plan. These minimization measures were developed utilizing the data collected from the Fall Creek, Cougar, Green Peter, and Lookout Point fish passage drawdowns and the previous operations at Detroit Reservoir as well as modeling data. However, the exact amount of turbidity in any given year cannot be accurately predicted due to all of the natural and extraneous factors that go into managing a reservoir system and how real time operations are then used to reduce those impacts. Therefore, USACE used high quality information and its professional judgement as well as comments to understand of the impacts to downstream users.<br><br>Figure 3-1 in Section 3.2.2.3 shows potential effects to reservoir refill from the late fall/early winter drawdown at Detroit. This figure shows model results and does not show how real-time water management can minimize negative effects to reservoir elevations. The drawdown would occur during the late fall and early winter, when the reservoir is at the minimum conservation pool elevation. The drawdown operation would end about one month before the normal refill season. The drawdown is not expected to impact refill of the reservoir, except during very dry years as the WVS reservoirs depend on late winter and spring rainfall to refill. The SEIS also includes a a discussion of socioeconomic impacts.<br><br>The cumulative impacts analysis required under NEPA is bound by reasonably foreseeable effects to USACE's actions like turbidity and water supply, as well as effects to downstream communities including impacts to drinking water facilities and wildfire. The drawdown at Detroit in 2025 was to minimum conservation pool which is the same elevation that USACE targets every year. |

| Commenter Name | Commenter Affiliation | Comment | USACE Response |
|---|---|---|---|
| | | City of Sweet Home is laudable. However, considering that experience, it is concerning that the SEIS does not fully evaluate the effects of a 2025 Detroit Reservoir drawdown on downstream municipal water systems, and in particular SSF systems which are much more sensitive to turbidity and fines than those on the South Santiam. | |
| Julia Hajduk | City of Stayton | II. The Draft SEIS Fails to Identify Mitigation Measures for Water Treatment & Infrastructure Impacts.<br>If the Corps determines that the proposed action will occur despite the high risk of major impacts to the City of Stayton, the Corps must identify and describe options for avoiding and minimizing the impacts in the Final SEIS. Given the significance of the risk, the Corps also should identify compensatory mitigation options to be implemented either as alternatives to avoidance and minimization, or because of effects on City infrastructure despite efforts to avoid and minimize them.<br>While the Draft SEIS indicates that an "Emergency Response and Communications Plan" will be utilized, it does not identify what that plan will cover, how and when it will be developed, and whether stakeholders, including the City of Stayton, will provide input on its development. ***3*** The mere indication that an undefined "plan" will be used by the Corp does not satisfy the requirement to identify mitigation options.***4***<br>***3*** *To the extent such a plan already exists for the Detroit Drawdown, the City has not found it in the FEIS, Draft SEIS, ROD or on the Corps' website.*<br>***4*** *The Corps' April 2025 Final Environmental Impact Statement for the Willamette Valley System Operations and Maintenance barely acknowledge impacts to community water systems and does not even mention mitigation for such impacts, much less an emergency communication plan, despite being published after the adverse effects of the 2023 and 2024 Green Peter Reservoir drawdowns were known.* | Previous drawdowns at Cougar, Green Peter, Lookout Point, and Fall Creek dams released varying amounts of sediment eroded from cutting a new channel and newly exposed reservoir beds. USACE assessed the sediment data patterns from past drawdowns and determined a step-down approach would expose less surface area each year, reducing the amount of sediment that could erode and pass downstream of the Detroit and Big Cliff dams. USACE would use real-time hydrology and turbidity data each year to modify, pause or cease the operation to improve conditions for fish and reduce adverse impacts that may occur. Mitigating impacts are not a statutory requirement of NEPA nor does it give USACE the authority to mitigate for impacts. USACE shaped the Detroit drawdown operation to mitigate adverse effects by minimizing impacts to water quality, drinking water facilities, and recreation including sport fisheries. It then analyzed the effect of the operation on each of the resource categories identified in Chapter 3.<br><br>USACE updated Section 3.19 of the SEIS to expound upon the on effects to the North Santiam drinking water facilities from the drawdown.<br><br>Emergency Response and Communications Plan for other drawdowns and would be updated to include how and when to coordinate with North Santiam communities, specifically the drinking water facilities. The plan would be updated with key metrics to determine how to safely perform the drawdowns in coordination with state experts. This effort is separate from the SEIS. |

| | |
|---|---|
| From: | Steve Elzinga |
| To: | CENWP-PME-Williamette-Valley-System-EIS |
| Cc: | Oliver, E A (Liz) CIV (USA); Lyon, Amanda A CIV USARMY CENWP (USA); Alvin M. Klausen |
| Subject: | [Non-DoD Source] Willamette Valley System Draft SEIS - Additional Marion County Comments |
| Date: | Tuesday, January 13, 2026 4:57:14 PM |
| Attachments: | image002.png<br>2026-01-13 WVS Draft SEIS Comment - Local Governments.pdf<br>2026-01-13 WVS Draft SEIS Comment - Fish.pdf |

Liz, Amanda, and Team,

Please see the attached additional Marion County comment letters on the Willamette Valley System Draft Supplemental Environmental Impact Statement. Copies will also be sent by mail.

Thank you for your review and consideration.

Thank you,

*Steve Elzinga*
County Counsel
Marion County
Office of Legal Counsel

Email: selzinga@co.marion.or.us
Phone: 503-588-5220

CONFIDENTIALITY NOTICE
This email may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential and immediately delete the message and any attachments from your system.

**County Commissioners**
Colm Willis, Chair
Kevin Cameron
Danielle Bethell

**Chief Administrative Officer**
Jan Fritz

**County Counsel**
Steve Elzinga

MARION COUNTY LEGAL COUNSEL

January 13, 2026

**Via Email: Willamette.EIS@usace.army.mil**
**Via Regular Mail:**
U.S. Army Corps of Engineers
Attn: CENWP-PME-E / Willamette EIS
P.O. Box 2946
Portland, OR 97208-2946

**Re: Need to Revise Willamette Valley System Draft SEIS**

To Whom It May Concern,

On behalf of Marion County, we submit these additional comments regarding the Willamette Valley System Draft SEIS. Careful review and fidelity to federal law is important for protecting all aspects of the environment, especially water quality for Marion County residents.

Under 42 U.S. Code § 4332(2)(C), all environmental impact statements must include "a detailed statement" on "reasonably foreseeable environmental effects of the proposed agency action" among other things. The draft SEIS is deficient for many reasons.

1. **Insufficient Prioritization of Water Quality and Human Environment**

The federal Environmental Protection Agency (EPA) recognizes that high turbidity is "often associated with higher levels of disease-causing microorganisms such as viruses, parasites and some bacteria. These organisms can cause symptoms such as nausea, cramps, diarrhea, and associated headaches."[1] The "action" alternatives fail to adequality address turbidity concerns for hundreds of thousands of Marion County residents.[2]

The SEIS does not adequately analyze nor prioritize the needs for water quality and protecting the human environment, as required by 42 USC § 4321. Multiple jurisdictions in Marion County use slow sand filtration, which is highly impacted by turbidity. Such slow sand filters would be damaged by the deep drawdown proposal, especially since the fine silt of a deep drawdown is more damaging to slow sand filters than the larger particles of storm-created turbidity. The total collective cost to local governments in Marion County is expected to be millions of dollars to repair, replace, or find alternative water sources, plus preparations will take more time than proposed in the SEIS. A deep drawdown anytime in 2026 or 2027 would be catastrophic. Yet, the

[1] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations
[2] For this reason and all those raised by Marion County, the Army Corps risks violating APA prohibitions against decision-making that is arbitrary, capricious, an abuse of discretion, or inconsistent with the law. 5 U.S.C. § 706(2).

SEIS does not even mention impacts on slow sand filters, let alone analyze or weigh such impacts sufficiently.

For example, the City of Stayton has a slow sand filter that can be temporarily closed during storm events with high turbidity because it usually has around three days of water storage. However, extended deep drawdowns lasting longer than a few days could not be handled with reserve water and would force the city to either spend significant funds that it does not have or turn off municipal water. That is not acceptable. Further, the SEIS does not include any assurance of monitoring for turbidity at a location far enough upstream from municipal water uses that a drawdown could be paused for unacceptable turbidity (i.e. in pool monitoring). Failure of any of the North Santiam potable water systems can be and must be avoided – recovery of damaged water systems takes months, at extreme costs, and must be part of the SEIS impacts analysis.

The SEIS also fails to analyze potential impacts on nearby wells (both public and private) that could be affected by fine sediment in the same river whose water is also going into the aquifer from which the wells draw water.

Of the limited alternatives analyzed, only the "no action" alternative protects water quality needs. If the Army Corp believes that some action is needed, additional alternatives must be developed and considered with additional public input opportunity.

**2. Insufficient Analysis of Unique Differences of North Santiam Sub-Basin**

While the Army Corps can and must learn from the mistakes in other nearby sub-basins like the issues caused by the recent Green Peter Lake deep drawdown, it is problematic to overly rely on information and analysis from other sub-basins without accounting for differences. The North Santiam is a very different sub-basin than all others in the Willamette System. Infrastructure on the system is unique and exponentially less resilient to the impacts of turbidity and sedimentation when compared to other sub-basins. The SEIS fails to properly analyze the unique differences of a deep drawdown in the North Santiam sub-basin.

**3. Failure to Analyze Sufficient Reasonably Prudent Alternatives**

There are numerous possible alternatives that would represent potential compromises between the "no action" alternative and the alternatives actually analyzed. Compromise alternatives could, for example, better protect water quality and downstream water uses with: (1) a smaller drawdown delayed and phased in over a longer period of time and (2) a Nephelometric Turbidity Unit (NTU) turbidity cap with NTU levels monitored at multiple locations (including both in-pool and at reasonable distances upstream from municipal water intakes) and an immediate pause in drawdowns immediately upon NTU levels exceeding scientific best practice levels.[3] Municipal water uses are working to align funding and adapt infrastructure to become more resilient but such improvements take time, and communities need time to adjust to potential impacts. Delay or other mitigation is warranted. Any changes must be very incremental, should involve written action plans for real-time collaboration with local governments, utilities, and the Oregon Health Authority, with clear, pre-impact anticipatory "off-ramps" objectively defined to

[3] Notably, the Army Corps should consult EPA turbidity research and rules on turbidity limits for public water systems. *See, e.g.,* 40 CFR 141.71-141.73 and https://www.epa.gov/dwreginfo/turbidity-provisions.

avoid damages. Failure to fully analyze and consider such compromise alternatives and allow public input on more alternatives makes the entire SEIS deficient.

**4. Failure to Coordinate with Local Governments**

The development of the draft SEIS does not meet the requirements for coordination with local governments under 42 USC §§ 4331 and 4332, 40 C.F.R. §§ 1501.1, 1501.2(4)(ii), and 1501.7(a)(1),[4] as well as under other rules, laws, and the federalism principles in the Tenth Amendment to the US Constitution. The Army Corps did not sufficiently consult with local governments along Detroit Lake and the Santiam River, such as Marion[5] and Linn Counties, the Cities of Salem, Stayton, Sublimity, Turner, Jefferson, Mill City, Gates, and Detroit, and water districts. Each local government should have been specifically invited to be coordinating agencies at each stage of the SEIS development process and provided a draft of the SEIS for preliminary comment prior to finalizing the draft for public release. It is similarly insufficient for the SEIS Section 1.6 to simply incorporate by reference the coordination section from the EIS since the coordination needs are different for the different purpose of the SEIS. Additional consultation would have flagged that alternatives like those above needed to be analyzed.

**5. Failure to Sufficiently Analyze Recreation Impacts**

The Army Corps tracks and reports data about value of recreation specific to Detroit Lake. See attached Army Corps report pulled from the Army Corps website just last week with data from 2023. The SEIS fails to adequately analyze the recreation impacts of a deep drawdown and does not even fully consider the data that the Army Corps itself collects and reports. Further, the SEIS fails to recognize the massively different recreational impacts between the proposals in the EIS and the SEIS.

**6. Inconsistency with Army Corps Mission**

All the alternatives other than the "no action" alternative do not respect the core principles of the Army Corps' mission and goals: statutory, regulatory, and otherwise, such as "maintaining America's infrastructure," "energizing the economy," and "providing recreation opportunities."[6]

Regards,
Steve Elzinga
Marion County Counsel

P.S. In solidarity with our local government partners, Marion County attaches comments from the City of Stayton, the City of Salem, and the Santiam Water Control District to elevate their voices in this process and further demonstrate issues with the SEIS and the significant impacts

---

[4] Although the statutes are still in effect, the CFRs were repealed in April 2025. Since this SEIS and the EIS it modifies were started prior to CFR repeals, these rules are still relevant to this SIES.
[5] Marion County is substantially affected by not being properly consulted on the SEIS and, if it was not already abundantly clear based on multiple comment letters and informal outreach, Marion County hereby requests substantive consultation under NEPA and all applicable rules and laws. Marion County also specifically requests to be provided a copy of the preliminary final SEIS for review before it is finalized and publicly released.
[6] https://www.usace.army.mil/About/CampaignPlan.aspx

on Marion County residents. The Army Corps must address all the issues they identify, including under the National Environmental Policy Act, Clean Water Act, Safe Drinking Water Act, the Endangered Species Act, Reclamation Act, Oregon Water Quality Standards, and all other concerns.

555 Court Street NE, Suite 5242 ▪ P.O. Box 14500 ▪ Salem, OR 97309-5036 ▪ www.co.marion.or.us
Phone: (503) 588-5220 FAX: (503) 373-4367

# City of Stayton

**Administration • Finance**
362 N. Third Avenue • Stayton, OR 97383
Phone: (503) 769-3425 • Fax (503) 769-1456


January 12, 2026

By U.S. Mail and E-mail ( willametts.eis@usace.arm.mil )

Liz Oliver, Portland District Project Manager
United States Army Corps of Engineers

Attn: CENWP-PME-E / Willamette SEIS
PO Box 2946
Portland, OR 97208-2946

**RE: COMMENTS on SUPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT (SEIS) DETROIT DAM DEEP DRAWDOWN (DDDD)**

Dear Ms. Oliver,

The City of Stayton submits the following comments on the U.S. Army Corps of Engineers' November 2025 Draft Supplemental Environmental Impact Statement ("Draft SEIS") for the operation and maintenance of the Willamette Valley System. The City draws its water from the North Santiam River, downstream of Detroit Reservoir. While the Draft SEIS recognizes adverse impacts to downstream water systems and water quality from a drawdown of the reservoir, it does so generically and vaguely, without any indication that the Corps understands the significant impacts to the City's water treatment systems and ability to provide water to residents and for critical City functions. As a result, the Draft SEIS also fails to identify any mitigation for this effect. The Draft SEIS thus does nothing to reassure the City and its residents that the Corps not only understands that the drawdown of the Detroit Reservoir could destroy millions of dollars of City infrastructure and prevent the delivery of *any* water for personal and municipal uses but intends to ensure that, if the drawdown goes forward, the Corps will ensure that the effects are mitigated.

## I. The Draft SEIS Does Not Sufficiently Identify Effects of the Detroit Reservoir Drawdown on City of Stayton Infrastructure & Water Use.

The Draft SEIS generically acknowledges that an effect of the proposed interim operations, including the late fall/early winter deep drawdown at Detroit Reservoir, will be to mobilize fine sediments and result in increased downstream turbidity, with associated effects to water quality and water treatment facilities. However, the Draft SEIS lacks the type of detailed evaluation of this effect that is required and that would allow the Corps to undertake a complete mitigation analysis. For example, the Draft SEIS identifies only increased maintenance and staffing of water treatment facilities and potential, unstated effects on water quality (e.g. at 170, 211). This reflects a lack of understanding that the type of municipal water treatment systems downstream of the Detroit Reservoir differ from those on the South Santiam in meaningful ways that will result in a significant and direct adverse effect on those systems and the communities they supply.

While the Draft SEIS references filtration broadly, it does not mention or evaluate the effect of a drawdown on the use of slow sand filtration (SSF) systems by multiple municipal water purveyors on the North Santiam River. SSF systems differ materially from rapid rate filtration, membrane treatment, or chemically assisted filtration processes (types used by South Santiam municipalities) in both design intent and operational resilience. As a result, generalized treatment references in the Draft SEIS do not adequately or accurately address how the sediment characteristics anticipated under the proposed action would affect SSF systems.

### A. SSF Systems are Inherently Vulnerable to Very Fine Suspended Sediments and Elevated Turbidity

SSF systems vulnerability to fine suspended sediments is especially acute when those particles are dominated by silts, clays, colloids, organic fines, or algae. This vulnerability is a direct consequence of how slow sand filters function and where their treatment effectiveness is concentrated.

The primary treatment mechanism of a slow sand filter occurs at the surface biological layer (schmutzdecke) and within the upper ½ inch of the sand bed. Under normal operating conditions, this biologically active layer effectively removes pathogens and low concentrations of particulate matter through a combination of physical straining, adsorption, and biological degradation. However, when raw water contains sustained or episodic high turbidity, especially when dominated by very fine particles, those particles rapidly accumulate at the filter surface for

turbidities greater than 10 NTU.[1] This leads to premature clogging, a sharp increase in headloss, reduced hydraulic capacity, and shortened filter run times.

Very fine sediments are particularly problematic because they:

- Penetrate and compact the sand,
- Are poorly removed by simple sedimentation or hydraulic buffering upstream,
- Can smother or disrupt the schmutzdecke, reducing biological treatment effectiveness,
- Are slow to clear once loading subsides, even after turbidity levels return to baseline.

As turbidity increases, slow sand filters experience a non-linear loss of performance, where small increases in fine sediment loading can result in disproportionate reductions in filter run time and treated water output. This condition often necessitates frequent scraping or removal of the top sand layer, accelerating media loss, increasing labor demands, and reducing overall system reliability.

Once a slow sand filter is cleaned by scraping and the schmutzdecke is removed, the filter temporarily loses its primary fine-particle retention and biological treatment barrier. During this post-cleaning period, particularly if raw water turbidity remains elevated or is dominated by very fine sediments, fine particles penetrate deeper into the sand bed rather than being intercepted at the surface.

This deep bed penetration results in the progressive accumulation of fines within the interstitial pore spaces of the sand matrix, leading to internal clogging that is not readily reversible through surface scraping alone. Therefore, subsequent filter runs become progressively shorter, headloss development accelerates, and cleaning frequency increases – creating a compounding cycle of reduced performance and increased maintenance demand.

Repeated cleaning under these conditions also leads to:

- Accelerated loss of filter media due to frequent removal of the upper sand layers,
- Reduction in effective bed depth and treatment capacity,

[1] The Corps typically refers to FTU, Formazin Turbidity Units, while modern water treatment relies on NTU (Nephelometric Turbidity Units). FTU is a legacy turbidity unit derived from non-standardized nephelometric measurements, whereas NTU is the current standardized and regulatory unit; such values should not be assumed to be directly interchangeable, and when evaluating turbidity for the purpose of effects on treatment systems, the Corps should utilize NTU consistently.

POLICE
386 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-3423
FAX (503) 769-4797

PLANNING
362 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-2998
FAX (503) 767-2134

POOL
400 W. VIRGINIA STREET
STAYTON, OR 97383
(503) 767-7665

PUBLIC WORKS
362 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-2919
FAX (503) 767-2134

WASTEWATER
950 JETTERS WAY
STAYTON, OR 97383
(503) 769-2810
FAX (503) 769-7413

LIBRARY
515 N. FIRST AVENUE
STAYTON, OR 97383
(503) 769-3313
FAX (503) 769-3218

- Increased risk of fines breakthrough during the filter ripening period before the schmutzdecke is fully re-established,
- Elevated potential for turbidity spikes or particulate passage into finished water, particularly during start-up following maintenance.

Over time, the combination of deep bed fouling, media loss, and shortened ripening periods can compromise both the hydraulic and treatment integrity of the filter, ultimately necessitating partial or full media replacement. These impacts are especially pronounced under conditions of recurring fine sediment loading, such as those associated with reservoir drawdowns, storm-driven watershed disturbance, or prolonged elevated turbidity events.

Accordingly, SSF systems exposed to fine sediment dominated turbidity face a cumulative degradation of performance, rather than isolated operational challenges, reinforcing the need for effective pretreatment, conservative operational thresholds, and alternative treatment or supply strategies during high-risk raw water conditions.

SSF systems are therefore best suited to consistently low-turbidity source waters with limited fine sediment variability. They are not resilient to highly variable or storm-driven turbidity events, nor to conditions involving reservoir drawdowns, watershed disturbances, or algal and organic fines. Without adequate upstream pretreatment such as roughing-filters, bank filtration, off-stream storage, or advanced pretreatment processes, SSF systems face a heightened risk of operational failure during fine sediment loading events.

In summary, **SSF systems are operationally fragile when exposed to very fine sediments and elevated turbidity**, making source-water protection, pretreatment, and conservative operational thresholds critical to maintaining compliance and system reliability.

Recent operability testing and system evaluations conducted by the City of Salem to evaluate the effect of higher turbidity on its slow sand filters indicate that sustained fine sediment–dominated and high turbidity conditions comparable to those anticipated during deep drawdown operations would rapidly compromise the operability of direct online SSF systems. Such conditions are expected to result in accelerated surface clogging, deep bed penetration of fine materials following cleaning, shortened filter run times, loss of effective biological treatment capacity, and heightened risk of particulate breakthrough during filter ripening. These outcomes would likely render continuous operation of SSF systems unsustainable over a very short operational period without alternative supply activation or substantial pretreatment. Unlike the City of Salem, which utilizes some pre-treatment that may reduce turbidity or the percentage of finer sediment particles, the City of Stayton utilizes a direct online SSF system. Direct online SSF systems receive "raw" water directly from the running river. Thus, Stayton's water treatment infrastructure is at even greater risk of turbidity-related impacts from the Detroit Reservoir drawdown than the City of Salem.

POLICE
386 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-3423
FAX (503) 769-4797

PLANNING
362 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-2998
FAX (503) 767-2134

POOL
400 W. VIRGINIA STREET
STAYTON, OR 97383
(503) 767-7665

PUBLIC WORKS
362 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-2919
FAX (503) 767-2134

WASTEWATER
950 JETTERS WAY
STAYTON, OR 97383
(503) 769-2810
FAX (503) 769-7413

LIBRARY
515 N. FIRST AVENUE
STAYTON, OR 97383
(503) 769-3313
FAX (503) 769-3218

The impacts described herein do not constitute a mere issue of temporary exceedance of drinking water quality standards or treatability. Rather, the projected fine sediment–dominated turbidity conditions associated with the Detroit Reservoir drawdown present a material risk of physical and functional destruction of critical drinking water treatment infrastructure.[2]

Under sustained or recurring fine sediment loading, SSF systems are subject to irreversible or near-irreversible operational failure mechanisms, including deep bed fouling, accelerated and unrecoverable media loss, collapse of biological treatment function, and structural degradation of the filter bed. These impacts are not correctable through standard operational adjustments or short-term compliance measures and extend beyond the scope of conventional drinking water standards enforcement or treatment optimization.

As a result, the foreseeable consequence of the Detroit Reservoir drawdown is not merely degraded water quality or the need for increased staffing or maintenance, but the inability of affected municipal water systems to operate at all, leading to a cessation of potable water production. This would directly impair the provision of water for essential municipal purposes, including residential supply, fire protection, public health and sanitation, and other critical community functions. Once such infrastructure failure occurs, service cannot be restored without substantial reconstruction, extended outages, and reliance on alternative water supplies.

Accordingly, this effect must also be evaluated as an infrastructure impairment and service continuity risk, rather than only a drinking water standards or maintenance cost issue. Failure to do so will result in understatement of the severity of reasonably foreseeable effect, mischaracterize the nature of the harm, and preclude informed decision-making regarding avoidance, minimization, and compensation measures necessary to protect public health and essential municipal services.

### B. Necessary Revisions to the Draft SEIS to Fully Analyze Impacts

The FEIS and Draft SIES do not sufficiently identify and analyze impacts to communities and infrastructure anticipated to result from the Detroit Reservoir drawdown. Considering the high risk that the proposed interim operations will cause physical and functional destruction of the City of Stayton's drinking water treatment infrastructure, rather than merely temporary drinking water standards exceedances, the City respectfully requests that the Final SEIS include

---

[2] This contrasts with the types of water treatment systems used by municipalities on the South Santiam River, which while degraded in effectiveness and life span during the 2023 and 2024 Green Peter drawdown, were not functionally destroyed.

POLICE
386 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-3423
FAX (503) 769-4797

PLANNING
362 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-2998
FAX (503) 767-2134

POOL
400 W. VIRGINIA STREET
STAYTON, OR 97383
(503) 767-7665

PUBLIC WORKS
362 N. THIRD AVENUE
STAYTON, OR 97383
(503) 769-2919
FAX (503) 767-2134

WASTEWATER
950 JETTERS WAY
STAYTON, OR 97383
(503) 769-2810
FAX (503) 769-7413

LIBRARY
515 N. FIRST AVENUE
STAYTON, OR 97383
(503) 769-3313
FAX (503) 769-3218

the following analysis to ensure full understanding, informed decision-making, and protection of essential municipal services.

### a. Explicit Identification of Vulnerable Treatment Infrastructure

The Final SEIS should explicitly identify the presence of SSF municipal drinking water treatment systems and, more explicitly, direct online SSF systems, downstream of Detroit Dam and acknowledge that these systems are inherently vulnerable to fine sediment–dominated and sustained high turbidity conditions to a degree not experienced by other types of treatments systems, including those on the South Santiam River.

### b. Treatment- and Infrastructure-Specific Impact Analysis

The Final SEIS should evaluate treatment-process-level impacts, not solely source-water quality changes, including:

- Deep-bed penetration of fine sediments following filter cleaning,
- Accelerated and unrecoverable filter media loss,
- Collapse of biological treatment function,
- Compounding maintenance and cleaning requirements,
- Risk of particulate and turbidity breakthrough during filter ripening, and
- The potential for complete loss of treatment operability over even short drawdown periods.

The Draft SEIS recognizes that there will be a "moderate increase in sediment and turbidity levels downstream of Detroit Reservoir." (ES-9). However, nothing in the draft indicates the meaning of moderate in this context or The Final SEIS cannot reasonably compare alternatives without a clear recognition and understanding of the vulnerabilities of water-treatment systems downstream of Detroit Reservoir.

The Final SEIS should explicitly assess the risk that the proposed drawdown of the Detroit reservoir would result in physical impairment or destruction of the City's treatment infrastructure, leading to the **cessation of potable water production**, rather than only temporary noncompliance with drinking water standards. This assessment should address impacts to:

- Residential water supply,
- Fire protection and emergency response,
- Public health and sanitation,
- Other essential municipal and community functions.

### c. Cumulative and Recurrent Impacts Analysis

Because the Detroit Reservoir drawdown is an action planned to be repeated at least annually, the Final SEIS should analyze the cumulative effects of recurring or multi-year drawdown-related turbidity events on SSF systems, including progressive degradation, loss of remaining useful life, and the increasing likelihood of permanent infrastructure failure over the interim operations period.

This analysis is particularly important given that, even after a significant 2023 drawdown that caused massive turbidity increases in the South Santiam River, during the 2024 drawdown, the City of Sweet Home again experienced such significant turbidity that its drinking water treatment system struggled, and a state of emergency was declared. The Corps' use of adaptive management to mitigate effects of the drawdown by immediately ceasing the interim operation to prevent further harm to the City of Sweet Home is laudable. However, considering that experience, it is concerning that the SEIS does not fully evaluate the effects of a 2025 Detroit Reservoir drawdown on downstream municipal water systems, and in particular SSF systems which are much more sensitive to turbidity and fines than those on the South Santiam.

## II. <u>The Draft SEIS Fails to Identify Mitigation Measures for Water Treatment & Infrastructure Impacts.</u>

If the Corps determines that the proposed action will occur despite the high risk of major impacts to the City of Stayton, the Corps must identify and describe options for avoiding and minimizing the impacts in the Final SEIS. Given the significance of the risk, the Corps also should identify compensatory mitigation options to be implemented either as alternatives to avoidance and minimization, or because of effects on City infrastructure despite efforts to avoid and minimize them.

While the Draft SEIS indicates that an "Emergency Response and Communications Plan" will be utilized, it does not identify what that plan will cover, how and when it will be developed, and whether stakeholders, including the City of Stayton, will provide input on its development.[3] The mere indication that an undefined "plan" will be used by the Corp does not satisfy the requirement to identify mitigation options.[4]

---

[3] To the extent such a plan already exists for the Detroit Drawdown, the City has not found it in the FEIS, Draft SEIS, ROD or on the Corps' website.

[4] The Corps' April 2025 Final Environmental Impact Statement for the Willamette Valley System Operations and Maintenance barely acknowledge impacts to community water systems and does not even mention mitigation for such impacts, much less an emergency communication plan, despite being published after the adverse effects of the 2023 and 2024 Green Peter Reservoir drawdowns were known.

## A. Avoidance and Minimization Measures

Avoidance and minimization options necessary to prevent infrastructure damage should include, but are not limited to the following practices and limitations:

### i. Turbidity Monitoring – Location and Particle Size

The location at which turbidity is monitored during a drawdown of the Detroit reservoir is critical to the meaningful protection of downstream drinking water treatment infrastructure. The draft SEIS identified the turbidity monitoring location as Niagara, i.e. after release of water from the Detroit dam. Turbidity monitoring conducted at Niagara or below spillway and outlet releases is inherently insufficient for operational decision-making because it detects sediment conditions after fine materials have already been entrained, mixed, and irreversibly released downstream.

Fine sediment–dominated turbidity, particularly silts, clays, colloidal particles, and organic fines, behaves fundamentally differently from coarser suspended material. These fine particles remain in suspension for extended periods, are not effectively attenuated once mobilized, and can penetrate deep into SSF beds once introduced into downstream treatment systems. Detection of elevated turbidity at a post-spillway or downstream monitoring location therefore occurs too late to prevent infrastructure damage or operational failure, as the sediment pulse has already entered the river system and is no longer controllable.

To be operationally meaningful, **turbidity monitoring must be conducted in-pool and upstream of release structures, where sediment mobilization can be detected prior to discharge** and where adaptive management actions—such as modifying drawdown rates, suspending the drawdown, or activating alternative operations—remain feasible. In-pool monitoring provides early indication of fine sediment entrainment, including the mobilization of legacy sediments exposed during drawdown, which are most likely to produce the fine particle size fractions that pose the greatest risk to SSF systems.

Reliance on post-spillway turbidity monitoring conflates impact confirmation with impact prevention and fails to account for the time lag between sediment mobilization, downstream transport, and treatment system exposure. Because SSF systems are vulnerable to rapid and irreversible degradation once fine sediment enters the treatment process, monitoring that occurs after release does not provide a practicable opportunity to avoid infrastructure damage or service interruption. The Final SEIS's identification of mitigation options must acknowledge that monitoring limited to post-spillway or downstream locations is insufficient for infrastructure protection and shall not be relied upon as the sole basis for operational decision-making.

Accordingly, to satisfy NEPA's requirement for meaningful impact disclosure and mitigation, turbidity monitoring associated with interim operations must be relocated or supplemented with in-pool, upstream monitoring points specifically designed to detect fine sediment mobilization before discharge. Without such monitoring, the proposed operations lack

an effective mechanism to prevent foreseeable infrastructure destruction and cessation of drinking water service in the City of Stayton.

### ii. Adaptive Management and Triggered Operational Responses

The Final FEIS should articulate the components of an adaptive management plan aimed at avoiding and minimizing any effects on the City's infrastructure and ability to provide water for standard uses. Adaptive management for mitigation must include metrics and actions tied to the operational parameters and real-time status of the City's SSF system, and not solely to river turbidity monitoring results. Any adaptive management plan must include the following:

- Monitoring metrics specific to treatment operability (not solely river turbidity),
- Clear, enforceable operational triggers tied to infrastructure protection, and
- Defined response actions when operability thresholds are approached or exceeded.

Specific tools for this purpose should include:

- Operational turbidity and fine sediment thresholds identified in advance of each drawdown that, if reached, preclude the drawdown, require that the drawdown depth be limited, or trigger immediate halting of the drawdown,
- Modified drawdown timing, rate, or sequencing to limit sediment mobilization,
- Sediment management or pretreatment requirements upstream of City water intake, and
- Temporary and potentially permanent suspension of the drawdown during high-risk conditions, including when turbidity levels in the North Santiam River are higher than typical due to storms or other causes.

Implementation of an adaptive management plan with these tools will require continuous **direct** communication and coordination between the Corps and the City of Stayton during any drawdown, and the Final SEIS should identify the importance of such communication to success of the adaptive management tools.

### iii. Determine Depth of Each Incremental Drawdown Annually Based on Monitoring of Conditions

The City appreciates that the Corps has recognized that the lack of an incremental approach to drawdowns of the Green Peter Reservoir led to major impacts on the water treatment systems of South Santiam municipalities and that a different approach is warranted for the Detroit Reservoir drawdowns on the North Santiam. However, given that the 2024 drawdown of the Green Peter Reservoir quickly resulted in emergency shutdown conditions for the City of Sweet Home despite the major flushing of accumulated sediment that had occurred during the 2023 drawdown, a rigid and pre-determined drawdown increases the likelihood that the impacts

to the City's water treatment system described above will occur. Instead, the depth of the drawdown should be determined prior to commencement of each drawdown based on annual monitoring of the pool depth, turbidity, and depth and location of newly deposited sediments.

## B. Compensatory Mitigation

The most reliable option for avoiding the effect identified above also provides the most certainty: compensatory mitigation. The Final SEIS must identify compensatory measures sufficient to preserve drinking water and municipal water services continuity. Several compensatory measures obviate the need for any avoidance and minimization measures, because they all allow the City to cease water intake from the North Santiam River at the inception of a drawdown. Other compensatory measures ensure that City residences and businesses, and critical City functions, always have water available and allow repair and replacement of the SSF system. Compensatory mitigation measures considered in the Final SEIS should include at least:

- Guaranteed pre-drawdown access to alternative water supplies (e.g., interties to non-affected systems, off-channel storage, ASR),
- Funding or implementation support for construction of pretreatment systems or existing systems' hardening,
- Infrastructure replacement or rehabilitation provisions where damage is unavoidable,
- Emergency response planning and cost recovery mechanisms.

To the extent compensatory mitigation is required, the Corps should delay implementation of the Detroit Reservoir drawdown to 2028 because every option to protect the City of Stayton's municipal water system takes significant time to implement.[5]

---

[5] The Corps FEIS and draft SEIS do not mention socioeconomic impacts. Without compensatory mitigation, the damage to the City's SSF system will cause significant indirect socioeconomic impacts. The median income of the City of Stayton residents is approximately $72,000, significantly limiting the ability of the City and its residents to bear the costs associated with damage to its infrastructure or to independently fund provision of clean drinking water during any shutdown of its system.

A failure of the potable water system would have immediate and severe consequences, potentially affect more than 10,000 residents and force the shutdown of businesses across Stayton and Sublimity (Sublimity's wastewater is disposed of through Stayton's wastewater system, which would fail to be operational without a potable water supply). Additionally, critical public safety, healthcare, and other essential facilities would be unable to operate, creating significant risks to public health, safety, and economic stability.

POLICE 386 N. THIRD AVENUE STAYTON, OR 97383 (503) 769-3423 FAX (503) 769-4797

PLANNING 362 N. THIRD AVENUE STAYTON, OR 97383 (503) 769-2998 FAX (503) 767-2134

POOL 400 W VIRGINIA STREET STAYTON, OR 97383 (503) 767-7665

PUBLIC WORKS 362 N. THIRD AVENUE STAYTON, OR 97383 (503) 769-2919 FAX (503) 767-2134

WASTEWATER 950 JETTERS WAY STAYTON, OR 97383 (503) 769-2810 FAX (503) 769-7413

LIBRARY 515 N. FIRST AVENUE STAYTON, OR 97383 (503) 769-3313 FAX (503) 769-3218

### C. The Corps Should Refrain from Issuance of the Final SEIS and Postpone Detroit Reservoir Drawdowns Until Sediment and Turbidity Are Better Understood.

The Draft SEIS notes that the Corps is engaging a sediment transport modeling team to develop tools to inform adaptive management. This modeling will shed light on the magnitude of the initial, cumulative and recurrent effects on municipal water treatment systems that will be caused by the turbidity that will accompany planned annual repetition of the Detroit Reservoir drawdown. Effective adaptive management is critical to prevent loss of use and destruction of treatment infrastructure.

In addition, pursuant to the Water Resources Development Act of 2024, by January 2025, the Corps is expected to complete a report on the turbidity in the Willamette Valley System resulting from recent drawdowns. Given that the report will include analyses of lessons learned, changes in operations based on those lessons, and opportunities to minimize monetary strains on non-federal entities due to drawdown-related turbidity, the City of Stayton and other affected municipalities should be able to review and consider that report as it is highly relevant to the subject matter of these comments.

Thus, finalization of the SEIS and any drawdown of the Detroit Reservoir should be postponed, allowing completion of modeling and the turbidity report, review of results of both by affected parties, and submission of comments on the SEIS considering that information.

---

The City of Stayton appreciates the Corps' attention to this issue of critical importance to the City, its residents and businesses. Clear identification of the effects of the Detroit Reservoir Drawdown on City infrastructure not only are necessary to identify mitigation options but also to allow the Corps and City to work together to ensure that mitigation is sufficient and workable well in advance of the commencement of a drawdown.

Sincerely,

Julia Hajduk
City Manager

cc.
Brian Quigley City of Stayton, Mayor
Stephen Sims City of Stayton, Council President
Barry Buchanan, P.E. City of Stayton. Interim PWD

CITY OF Salem AT YOUR SERVICE

CITY MANAGER'S OFFICE
555 Liberty St SE / Room 220 • Salem, OR 97301-3513 • 503-588-6255 • Fax 503-588-6354

January 12, 2026

Delivered via Electronic mail and U.S. Post

U.S. Army Corps of Engineers
Attn: CENWP-PME-E / Willamette SEIS
P.O. Box 2946
Portland, OR 97208-2946

Re: City of Salem Public Comments on Draft Supplemental Environmental Impact Statement

The purpose of this letter and its supporting attachment is to provide comments from the City of Salem (City) regarding the *Willamette Valley System Operations and Maintenance Draft Supplemental Environmental Impact Statement* (Draft SEIS) that was issued by the U.S. Army Corps of Engineers (USACE) in November 2025. The Draft SEIS fulfills two directives contained in the 2024 Water Resources Development Act: (1) It identifies options to permanently end federal hydropower production at eight Willamette Valley Dams; and (2) It evaluates options to comply with the Biological Opinion (BiOp) by the National Marine Fisheries Service (NMFS) regarding annual deep drawdowns of Detroit Reservoir. The City's comments are specific to the deep drawdowns, in which the level of Detroit Reservoir is proposed to be dropped to a historically low elevation each year to facilitate the out-migration of threatened fish species.

First and foremost, the City continues to support the actions of the USACE, NMFS, and other federal, state, and local agencies intended to enhance habitats and support out-migration of spring Chinook and winter steelhead, both of which are listed as threatened under the Endangered Species Act (ESA). The City also recognizes and respects the historic, cultural, and spiritual interests these species represent to members of the Tribal Nations. Finally, the City acknowledges and appreciates that the Draft SEIS addresses many of the concerns we have expressed to the USACE over the past 12 months. Among the significant commitments made by the USACE in the Draft SEIS that are responsive to our concerns:

(1) The USACE will "initiate the drawdown closer to late November or early December" (Page 18).
(2) The deep drawdown will be conducted "in a stepwise manner" (Pages ES-9, 210).
(3) The duration of the deep drawdown "is set to last for two weeks" (Page 18).
(4) The incremental deep drawdown approach "would span over three years" (Page 90).

**However, the City remains deeply concerned at the absence in the Draft SEIS of any reference to turbidity triggers and accompanying action measures. As described and justified in our comments**

**below and in our previous comments (see Attachment), these two important operational factors must be incorporated into the Final SEIS.**

**Key Recommendation: Establish a Turbidity Trigger of 10 NTU/12 hours to Cease the Drawdown**
It is critical that the USACE adopt a turbidity trigger which, if exceeded over a specified period of time, will cause the immediate cessation of drawdown operations and the resultant return of Detroit Dam and Detroit Reservoir to normal operating conditions. The purpose of the turbidity trigger is to protect human health, protect the City's water treatment system, and protect the City's customers. Once drawdown operations cease, it is anticipated that turbidity levels in the river will decrease over time and normal operations at the City's water treatment plant will be able to resume. Further, to provide time to restore normal operations and to evaluate lessons learned, once the turbidity trigger has been exceeded, drawdown operations should not resume again until the following year. This recommendation is based on years of operational experience coupled with scientific research conducted over the past 12 months.

Additionally, a turbidity trigger should be the minimum safeguard for downstream water users to protect from reasonably foreseeable environmental effects of the proposed action. The Thomas R. Carper Water Resources Development Act of 2024 (WRDA 2024) required that the Corps complete a report on instances in which turbidity concerns have arisen following a drawdown at a reservoir in the Willamette Valley, including "identify(ing) lessons learned associated with turbidity resulting from drawdowns and … how changes based on those lessons learned are being implemented." Absent completion of the report, the Corps should proceed with the drawdown of Detroit Reservoir under strict guidelines for downstream water quality while data is being collected and analyzed from similar operations in the Willamette Valley. Given that the Corps failed to analyze specific turbidity level effects from the proposed action on downstream users, a strict turbidity trigger that protects downstream users is a reasonably prudent alternative.

The specific recommendation is that the turbidity trigger should be set at a reading of 10 NTU[1] or above, experienced over a period of 12 consecutive hours, as measured at the United States Geological Survey's (USGS) Niagara gauge. (USGS-14181500).

## ADDITIONAL BACKGROUND INFORMATION.

**The City's Responsibilities as Regional Water Provider**
The City is the only regional water provider in the Mid-Willamette Valley. We are responsible for supplying safe and reliable drinking water to approximately 220,000 individuals and thousands of properties that include hospitals, schools, businesses, industries, irrigators, multifamily housing units, and

[1] Nephelometric Turbidity Units (NTU) and Formazine Nephelometric Units (FNU) are measures of the clarity of the water. The City typically reports turbidity levels in NTU; the USACE typically reports turbidity levels in FNU. Although the two units reflect the same characteristics, the analytical methods used to determine FNU and NTU are different and the two are not numerically interchangeable. Generally, water with turbidity of 10 NTU or 10 FNU or less looks clear. Water with turbidity of 50 NTU or 50 FNU looks cloudy; water with turbidity exceeding 500 NTU or 500 FNU looks muddy.

single-family homes. The City's water service area includes the City of Salem, the City of Turner, four water districts, and portions of unincorporated Marion and Polk counties. In addition, the City must provide water in sufficient quantities for firefighting and other emergency needs. Moreover, the City is the *only* emergency source of drinking water to the 48,000 citizens of the cities of Stayton and Keizer should either, or both, municipalities suffer impairment to their own drinking water systems.

**High Turbidity Endangers Treatment System, Places Customers at Risk, Limits Future Growth**

At issue is the fact that the deep drawdown of Detroit Reservoir will increase the presence of fine particles in the North Santiam River, the source of drinking water for the region served by the City. These particles pose a significant risk to the City's slow sand filtration treatment system that is located on Geren Island on the North Santiam River near downtown Stayton.

Highly turbid water, if allowed into our treatment system, will clog the sand filters. Run times between filter maintenance periods will be significantly reduced, the cost and time to recondition each filter will substantially increase, and drinking water production from our treatment plant will be considerably diminished. If, to protect the sand filters, the City closes the intake gates from the North Santiam River, our ongoing ability to meet water demand will depend solely on the amount of water stored in reservoirs, water drawn from a handful of wells, and water provided through interties with the City of Keizer. At this writing, the City has embarked on substantial capital investments, expected to cost approximately $8 million, to prepare for potential disturbances caused by the drawdown. These improvements are not yet complete. With these significant investments, the City believes we can meet winter demand during the 2026 deep drawdown but there is *no assurance* that we will be able to meet future demands, which are expected to grow higher with each passing year. Further, under this mode of operation there is *limited redundancy* in the system. Should a critical component of one or more of these alternative sources of drinking water fail, our ability to supply water may fall below the demand of our many customers. Depending on the severity and duration of the shortfall, the consequences range from temporary inconvenience to untenable and unsustainable risks to life, property, and livelihood.

In addition to limited potentially life-saving redundancy, operating a regional water supply system at or near capacity with no back-up will also create a significant and highly consequential condition – it could *limit opportunities for future growth*. Economic growth invariably relies on a region's ability to reliably provide essential services, water being the most critical of these. No housing deficiency can be addressed if there is insufficient water for new residential development. No new businesses, small or large, will locate in our service area if our ability to provide drinking water is questionable. No water-dependent industry seeking a new location will select Salem if we cannot provide assurances of reliable, year-round water for its production.

**How the City Treats Water under Normal Turbidity Conditions**

Under normal operating conditions, the City draws raw water from the North Santiam River through intake gates at our facility on Geren Island. This water is treated using slow sand filtration, a highly

reliable, time-tested method for producing drinking water. For sand filters to properly operate, the intake water must have very low levels of turbidity. Typically, the water drawn from the North Santiam River has a turbidity level of less than 10 NTU. At this level, our sand filters can operate for about three months before the filter must be taken offline for cleaning (scraping 0.25 to 0.5 inches from the top layer of sand) and reconditioning (allowing a biological layer of microorganisms to regrow on the surface of the sand).

**How the City Treats Water under Elevated Turbidity Conditions**

There are naturally occurring, short-term periods during which the turbidity levels in the North Santiam River increase well above 10 NTU. High turbidity is typically caused by storm events, which increase runoff volumes and sediment transport from up-river creeks and streams. The City's operational procedure in anticipation of high turbidity in the river involves filling the slow sand filters to their maximum capacity prior to the arrival of high turbidity and then closing the intake gates. With the gates shut, the filters can operate for about three days until low water levels in the filters required them to be taken offline. Historically, high turbidity levels triggered by storm events have lasted less than three days.

**Results of Research on the Consequences of High Turbidity**

There is little question that the deep drawdown will elevate turbidity levels in the North Santiam River, both during the initial drawdown, during subsequent drawdowns, and for a significant period of time after each drawdown operation has ended. As stated earlier, typical turbidity levels in the North Santiam River at our intake gates is less than 10 NTU. Of concern is information collected by the USACE during initial drawdowns in 2023 impacting the South Santiam River. Data provided by the USACE showed turbidity levels ranging from roughly 50 FNU (see footnote on Page 2) to over 450 FNU. Data from the most recent drawdown conducted in 2025 indicate sustained turbidity levels had decreased but still ranged between approximately 20 and 80 FNU. The adverse impacts of sustained elevated levels of turbidity in the City's intake from the North Santiam River are summarized below.

1. Short-term Impacts to Our Filters
   The City conducted extensive research in 2025 to determine the risks of keeping the intake gates open and allowing highly turbid surface water into a slow sand filtration system. Based on this bench-scale scientific testing, we now know that turbidity levels as low as 50 NTU will reduce the runtime of a slow sand filter from approximately three months to three weeks. Higher turbidity levels will result in even lower runtimes, some of which are less than 24 hours. Additionally, fine particles from highly turbid intake water can penetrate deep into a sand filter, essentially fouling the entire depth of the sand bed well beyond the typical 0.25-0.5 top inches. This will significantly increase the cost and complexity of reconditioning a filter and measurably reduce the life cycle of a filter from four years to less than two months. Restoring a filter to full operational status once the filter has been terminally fouled can require up to six months to drain the water, remove the clogged layer of sand, procure and then replace the bed with new sand, and restore the biological layer in the rebuilt filter bed. The time required to return a filter from failure to full operational status is expected to extend beyond winter drawdown and into the summer months, a period during which water demand will be at its highest. The estimated cost to replace

a filter bed ranges between $3 million and $4 million *each*. The City will have no choice but to pass this cost burden to our customers in the form of rate increases.

2. The Longer-term and Recurring Impacts
The adverse impacts of highly turbid water entering the City's sand filtration system extend well beyond the immediate period of the deep drawdown. Rehabilitating filters lost to sustained turbidity is a labor-intensive and expensive endeavor. There are long-term consequences related to increases in operating and capital budgets which will drive utility rates higher. There are challenges related to limited staffing, uncertainty in supply chains and procurement, and indeterminate planning timelines. The time required to restore filters to full operation may extend into the spring and summer months, a period during which water demand is at its highest. Among the potential consequences is the real possibility of compromising the City's ability to meet peak summer demands while, concurrently, adversely impacting the City's ability to prepare for the next deep drawdown later in the same year.

3. Risks of Total Reliance on Alternative Water Sources
If the intake gates remain shut because of high turbidity in the river, or if the sand filters are offline for cleaning and reconditioning post-drawdown, the City must rely on water drawn from groundwater wells, water stored in our reservoirs, and water provided via an intertie with the City of Keizer. Depending on the time of year, the duration of the high turbidity, and the time needed to restore operations of slow sand filter(s), these alternate sources may not be able to meet the demand of our water customers. We estimate that existing alternative water sources – wells, reservoirs, and interties – will meet the projected water demand during the timeframe of the first proposed drawdown. However – and this is a significant consideration – under this mode of operation there is *limited redundancy in the system*. Should a critical component of one or more of these alternative sources fail, our ability to supply water will fall below the demand, creating an unacceptable risk to human health and safety.

**Advantages of Implementing Turbidity Triggers and Action Measure**
Among the advantages to having turbidity triggers.

Frames Intergovernmental Collaboration
Including this turbidity trigger level and action measure in the Final SEIS will require the City and USACE engage in follow-up conversations to establish details such as: communication protocols, pre-approved authorities for implementation of action steps, reporting requirements, and specific details regarding the immediate and follow-on measures to be taken.

Facilitates Compliance with the Federal Clean Water Act
Adopting turbidity triggers would also allow USACE to reconcile the proposed drawdown action with potential violations of the federal Clean Water Act (CWA). The CWA addresses, among many other things, contaminants in water resources. There is no doubt that causing high levels of turbidity

*should* be considered a violation of the CWA. Water quality sampling data show that typical turbidity levels at the City's intake from the North Santiam River are well below 10 NTU. In the EPA-approved Oregon Water Quality Standards "turbidity" is defined as "pollution" and the standard in ORS 340-041-0036 states, in part:

> *Turbidity (Nephelometric Turbidity Units, NTU): No more than a ten percent cumulative increase in natural stream turbidities may be allowed, as measured relative to a control point immediately upstream of the turbidity causing activity.*

The turbidity levels reported by the USACE during drawdown operations on the South Santiam River clearly violated federally approved state water quality standards. There is little doubt that turbidity levels in the North Santiam River during the deep drawdown will rise above "natural stream turbidities" by more than 10 percent. From a regulator perspective, once a violation in water quality standards has occurred, among the correction actions is to cease the activity causing the violation. The Oregon Department of Environmental Quality may consider a turbidity trigger and corrective action to stop the drawdown as appropriate measures which will allow the USACE to avoid liability related to violations of state and federal law.

Supports Compliance with the Federal Safe Drinking Water Act

Adopting turbidity triggers would also allow USACE to reconcile the proposed drawdown action with potential violations of the federal Safe Drinking Water Act (SDWA). The Safe Drinking Water Act (SDWA) requires persons to protect public water systems. The Draft SEIS does little to address potential violations of the SDWA. The proposed drawdown is expected to contaminate the City's source of drinking water, potentially contaminate the City's water treatment system, and generally impair the City's ability to provide safe drinking water, any one of which could constitute a violation of the SDWA.

## SUMMARY OF RECOMMENDATIONS AND CONCLUSION

### Six Recommendations

While there is much to be commended in the Draft SEIS, the City presents to the USACE six specific recommendations for incorporation into the Final SEIS.

Recommendation #1: Acknowledge the Significance of Increased Turbidity

The City disputes that the proposed drawdown of Detroit Reservoir, even following a stepwise approach, would cause only a "moderate increase in sediment and turbidity levels" in the North Santiam River (see Page ES-9). The word "moderate" is subjective and situational. Based on our best professional judgement, which is now backed up by extensive research and bench-scale testing, levels of turbidity as low as 50 NTU – a measure potentially viewed as "moderate" by some – will have

significant and sustained consequences to our treatment systems. For the Final SEIS, a more accurate sentence would read:

> *For water quality and drinking water, the deeper drawdown of Detroit Reservoir would cause ~~a moderate~~ an increase in sediment and turbidity levels downstream of Detroit Reservoir during the operation. This increase will threaten the operation of the slow sand filtration systems operated by the City of Salem and the City of Stayton.*

Recommendation #2: Establish the Need for a Turbidity Trigger and USACE Response

A stepped approach alone is insufficient to protect human health and safety for communities relying on the North Santiam River for drinking water, firefighting, industrial production, and commercial purposes. The USACE *must* adopt in the Final SEIS a clear turbidity trigger consisting of a NTU level that, if exceeded over a specific period of time, will require cessation of the drawdown operation. A turbidity trigger with mandated actions will provide a degree of certainty and significantly enhance the City's ability to develop contingency and recovery plans. This recommendation comes with a commitment by the City to work with the USACE and to share information, data, and research results to help support a turbidity trigger that protects public health, lowers risks, supports long-term objectives of the drawdown, and reflects current scientific research and sound engineering practices.

Recommendation #3: Establish a Turbidity Trigger of 10 NTU over 12 Hours to Cease Operations

The City's specific recommendation, which is consistent with multiple conversations with the USACE and supported by scientific research, is that a firm turbidity trigger of 10 NTU should be established in the Final SEIS. Based on the anticipated variability of turbidity in the North Santiam River during the drawdown, the City further recommends that a time duration of 12 hours be incorporated as part of the trigger. Once this trigger is reached, the USACE should cease all drawdown activities for that year and allow the City's water treatment system to recover and resume full operation. Based on the studies and research conducted, the City strongly recommends that the USACE establish in the Final SEIS a turbidity trigger as follows:

> **The USAC will immediately take steps to cease the deep drawdown operation and restore Detroit Dam and Detroit Reservoir to normal operations the moment turbidity levels in the North Santiam River, as measured at the USGS Niagara gauge, have been at or above 10 NTU for 12 consecutive hours.**

Recommendation #4: Evaluate Merits of Delaying Implementation

The Final SEIS should evaluate potential environmental impacts if the deep drawdown is delayed for one, two, or three years hence. Doing so would provide the City additional time to develop and test

wells currently under construction to determine if they have sufficient yield to provide resiliency and mitigate risks to life, property, and livelihood.

Recommendation #5: Focus on a Long-term Strategy of Implementing Structural Solutions

Our read of the BiOp, the Final Programmatic Environmental Impact Statement[2], the Draft SEIS, and various reports and evaluations, is that the long-term strategy does not focus on year over year deep drawdowns. However, the long-term strategy *requires implementation* of structural remedies designed to facilitate out-migration of threatened species. The current Draft SEIS considers annual deep drawdowns of Detroit Reservoir as an "Interim Operation" that will occur "until the long-term solution for downstream fish passage and water temperature management at the respective location is in place and operational" (Page 17). We agree, but as written in the Draft SEIS, as implied in recent public meetings, and as demonstrated by the years that have passed since the structural solutions were first proposed, implementation of structural measures have not been a priority. The Final SEIS should clearly state the intention of the USACE to pursue all means available to secure funding, initiate project planning, and ultimately construct what is expected to be the long-term strategy to support the out-migration of threatened species. Until these measures are in place, the financial burden and high-risk scenarios are being borne not by the responsible federal agencies but by local jurisdictions and our ratepayers.

Recommendation #6: Employ Adaptive Management with Each Annual Drawdown

The underlying Biological Opinion for the Willamette Valley System requires development of an Adaptive Management Plan that includes "decision criteria" that guide strategies (see Section 2.5.10 of the BiOp). At issue for the City is a pressing need for the USACE to incorporate decision criteria that can be modified over time based on new information, changes in conditions, and lessons learned. More specifically, decision criteria should consider changes in risks and consequences from year to year. To illustrate, consider two scenarios:

(1) The City's risk assessment is based, in part, on historic winter water demand. If the City adds a new industrial customer with a high, year-round water demand, the risks/consequences assessment must be reevaluated.

(2) The City's water system relies on a wide range of factors and components to deliver safe drinking water to our customers. If, prior to commencing a deep drawdown, one or more of our critical components has failed, decision criteria should be in place that delays or cancels that year's deep drawdown.

---

[2] "Willamette Valley system operations and maintenance: Final environmental impact statement." United States Army Corps of Engineers. Portland District. April 2025.

In the context of Adaptive Management, there is the ambiguity in the Draft SEIS regarding the duration of the drawdown, which "is set to last two weeks" (Page 18) and the timespan of the incremental steps toward the ultimate desired elevation in the reservoir which "would span over three years" (Page 90). For our purposes of operational planning and risk management, the City requires assurances that the duration of the deep drawdown "~~is set to last~~ will not exceed two weeks" and the incremental drawdown approach "would span ~~over~~ at least three years." Further, a requirement for the USACE to conduct additional analysis, reviews, and consultation with affected parties should incorporated into the Final SEIS to provide assurances that the USACE will employ both science-based *and* risk-based decision making during the course of adaptively managing the drawdown operations over the years.

**Conclusion**

In conclusion, the City is grateful that the Draft SEIS addresses several of the concerns we have expressed over the past year in our conversations with the USACE regarding the risks each deep drawdown will present to our water treatment plant and our customers. However, the absence of any references to turbidity triggers and action measures is deeply troubling. Clear triggers and actions are essential for the City's operational and contingency planning. Establishing mutually acceptable triggers and action measures also represents the best way forward for providing assurances to our current and future regional customers that safe drinking water will continue to be reliably delivered. Lastly, turbidity triggers and action measures will facilitate the USACE's compliance with the federal Clean Water Act, federal Safe Drinking Water Act, and Oregon State Water Quality Standards, among other regulations. Simply put, the risks to the City's water supply created by the deep drawdown are too high and consequences of failure are too staggering to accept without some kind of documented assurances that the drawdown operations will cease before the high levels of turbidity have resulted in highly consequential harm has occurred to our treatment system and our customers have been placed at risk.

The City is committed to working with the USACE and others to evaluate and, ultimately, to implement measures that support downstream passage of juvenile species, protect habitat and water quality, ensure water demands are met, and provide for the many users of the North Santiam River.

Sincerely,

Krishna Namburi

Krishna Namburi
City Manager

Attachment: "City of Salem Public Comments on USACE's Proposed Detroit Reservoir Drawdown." *Letter*. Salem, Oregon. June 20, 2025

CITY OF Salem
AT YOUR SERVICE

CITY MANAGER'S OFFICE
555 Liberty St SE / Room 220 • Salem, OR 97301-3513 • 503-588-6255 • Fax 503-588-6354

June 20, 2025

U.S. Army Corps of Engineers
Attn: CENWP-PME-E / Willamette EIS
P.O. Box 2946
Portland, OR 97208-2946

**Re: City of Salem Public Comments on USACE Proposed Detroit Reservoir Drawdown**

This letter and the attached memorandum provide comments from the City of Salem (City) to the US Army Corps of Engineers (USACE) regarding the Supplemental Environmental Impact Statement (SEIS) the USACE is preparing. The SEIS addresses two issues: (1) a permanent end to hydropower production at Willamette Valley Dams, as directed by the Water Resources Development Act of 2024, and (2) a deep drawdown of Detroit Reservoir, as published in the Biological Opinion (BiOp) issued in December 2024 by the National Marine Fisheries Services (NMFS). The City's comments are specific to a deep drawdown in which the level of Detroit Reservoir is dropped to a historically low elevation of 1,395 feet in the fall/winter in a single, continuous operation to facilitate the out-migration of threatened fish species.

To begin, the City firmly supports the efforts of USACE, NMFS, and others that improve passage through Detroit Dam for spring Chinook and winter steelhead, both of which are listed as threatened under the Endangered Species Act (ESA). The City also recognizes and respects the historic, cultural, and spiritual interests these species represent to the tribal nations. However, the City cannot support a deep drawdown conducted as proposed in the BiOp because it will cause excessively high levels of turbidity in the North Santiam River which will put at risk the City's drinking water system. The attachment provides additional details and considerations to the City's comments below.

1. **As proposed, the deep drawdown puts in danger public health, public safety, and the regional economy because of the risks it places on the City's drinking water system.**
   The City is the only regional water provider in the Mid-Willamette Valley and is responsible for supplying safe and reliable drinking water to approximately 200,000 individuals and thousands of customers that include hospitals, schools, businesses, industries, irrigators, multifamily housing units, and single-family homes. The City's water service area includes the City of Salem, the City of Turner, four water districts, and portions of unincorporated Marion and Polk counties. In addition, the City must provide water in sufficient quantities for firefighting and other emergency needs. Moreover, the City is the only emergency source of drinking water to the City of Stayton and the City of Keizer should either, or both, municipalities suffer impairment to their drinking water system.

   There is little question that the deep drawdown will elevate turbidity levels in the North Santiam River. The City's operational procedure in the event of high turbidity involves filling the slow sand

filters to their maximum capacity and then closing the intake gates. With the gates shut, the filters can operate for no more than three days before being shut down because of low water levels. Historically, high turbidity events that triggered this procedure lasted less than three days. However, if high turbidity levels persist and the gates remain shut, the City must rely on remaining volumes in our reservoirs, several groundwater wells, the aquifer storage and recovery system, and an intertie with the City of Keizer. We estimate that these alternative water sources can marginally meet the projected water demand during the timeframe of the proposed drawdown. However – and this is a significant consideration – under this mode of operation there is *no redundancy* in the system. Should a critical component of one or more of these alternative sources fail, our ability to supply water will fall below the demand and our customers would be faced with untenable and unsustainable risks to life, property, and livelihood.

The City is conducting research to determine the limitations and feasibility of keeping the intake gates open to allow high-turbidity surface water into the slow sand filtration system. Bench-scale testing is being carried out to evaluate the relationship between intake turbidity and filter performance. The results will help inform decision-making on how best to manage high-turbidity events triggered by the drawdown. Our research is continuing but based on the preliminary results, at a turbidity level of 50 Nephelometric Turbidity Units ("NTU") we expect complete loss of filter performance within one week to ten days. If turbidity exceeds 50 NTU, in which is likely based on other drawdown operations conducted by the USACE, we expect our filter performance will degrade within days. Restoring a filter to full operational status may require months to drain the water, remove the clogged layer of sand, replace the bed with new sand if necessary, and restore the biological layer in the rebuilt filter bed. In addition, rehabilitating filters lost to sustained turbidity as a result of the drawdown operation is a laborious effort and has the real possibility of reducing the City's ability to meet peak summer demands as the filters remain offline for the duration of the work.

2. **As proposed, the deep drawdown will result in violations of federal law.**
The National Environmental Policy Act (NEPA) requires the lead agency, in this instance NMFS, to rigorously evaluate reasonable alternatives. However, the BiOp does not thoroughly analyze alternatives other than the drawdown. Further, the BiOp does not thoroughly consider the degree to which the degradation of water quality would impact users, including our water customers, or how the drawdown might impact other aquatic species in the basin. The failure to more fully consider these impacts is notable given that the USACE and NMFS are aware that the elevated turbidity will have dramatic and adverse impacts on the City's drinking water infrastructure.

The Clean Water Act (CWA) addresses, among many other things, contaminants in water resources. Causing high levels of turbidity is a clear violation of the CWA. Typical turbidity levels at the City's intake from the North Santiam River are well below 10 NTU. The anticipated turbidity during the drawdown is expected to be well in excess of 100 NTU. In the EPA-approved Oregon Water Quality Standards "turbidity" is defined as "pollution" and the standard in ORS 340-041-0036 states, in part:

*Turbidity (Nephelometric Turbidity Units, NTU): No more than a ten percent cumulative increase in natural stream turbidities may be allowed, as measured relative to a control point immediately upstream of the turbidity causing activity.*

The Safe Drinking Water Act (SDWA) requires persons to protect public water systems. The proposed drawdown would likely contaminate the City's source of drinking water, potentially contaminate the

City's water treatment system, and generally impair the City's ability to provide safe drinking water, any one of which could constitute a violation of the SWDA.

Given the many considerations, the City recommends the SEIS incorporate, at minimum, the following:

1. Developing a stepwise approach to the annual drawdown. It is imperative to avoid a scenario in which the elevation of Detroit Reservoir is continuously and without pause dropped to the target level of 1,395 feet *regardless* of downstream water quality, *regardless* of impacts to aquatic species, and *regardless* of the attendant harm to the City's drinking water system. A stepwise drawdown conducted in successive years, coupled with turbidity triggers (see below) would help fill many critical information gaps. These include: (1) How fast and how high will turbidity levels rise during the drawdown? (2) How quickly will turbidity levels drop once drawdown operations cease? (3) How long will it take before turbidity levels sufficiently decrease for the City to resume drawing water from the river?

2. Establishing turbidity levels that trigger a clear and decisive response. The purpose of this recommendation is to balance the USACE's need to perform a deep drawdown with the impacts and duration of those impacts on the City's water system. Turbidity triggers could provide a degree of certainty and significantly enhance the City's ability to develop contingency and recovery plans. One approach to developing turbidity triggers would be to establish a specific turbidity at which the USACE would cease drawdown operations, commence refilling the reservoir, and conduct no further deep drawdowns until the following year or complete recovery of the City's water treatment system, whichever is later. This recommendation comes with a commitment by the City to work with the USACE and to share information, data, and research results (see above) to help develop turbidity triggers that reflect current scientific research and sound engineering practices.

3. Evaluating the merits of delaying implementation. The SEIS should evaluate potential environmental impacts if the deep drawdown is delayed for one, two, or three years hence. Doing so would provide the City additional time to identify locations, obtain funding, and construct enough wells with sufficient yield to provide resiliency and mitigate risks to life, property, and livelihood.

4. Creating a long-term strategy. The BiOp requires development of an Adaptive Management Plan that includes "decision criteria" that guide strategies (see Section 2.5.10 of the BiOp). At issue is the City's need for the USACE to incorporate decision criteria that can be modified over time based on new information, changes in conditions, and lessons learned. More specifically, decision criteria should consider changes in risks and consequences from year to year. To illustrate, consider two scenarios. (1) The City's risk assessment is based, in part, on historic water demand. If the City adds a new industrial customer with a high, *year-round* water demand, the risks/consequences assessment will be altered. (2) The City's water system relies on a wide range of factors and components to deliver safe drinking water to our customers. If, prior to commencing a deep drawdown, one or more of our critical components has failed, decision criteria should be in place that delays or cancels the deep drawdown.

   Further, the BiOp instructs the USACE and NMFS to coordinate a review of the 2017 engineering design report for Detroit Dam downstream fish passage via a floating screen structure, to be initiated in early 2026 (see RPA 4.13.5). The Action Agencies will complete construction of structural fish passage facilities by December 2033. By March 2034, the Action Agencies will begin operating downstream fish passage facilities at Detroit that enable collection of steelhead and Chinook salmon from above Detroit, with volitional passage of transport to

habitat downstream of Big Cliff Dam. The City is adamant that the USACE adhere to these timelines to ensure a long-term plan is enacted for downstream passage that does not present an annual threat to the City's drinking water supply.

In summary, and for the reasons stated, the City has no choice but to stand in opposition to the deep drawdown of Detroit Reservoir as proposed in the BiOp unless the heightened risks and substantial consequences of failure can be mitigated. Our position on this matter is regrettable given our long-standing support for the endeavors of the USACE and others, including our own work, to protect endangered species. However, we *must* give equally significant consideration to the health, life, safety, and livelihood of our customers and our region. Simply put, the risks to the City's water supply created by the deep drawdown are too high and consequences of failure are too staggering to accept. Regardless of our current opposition, the City commits to working with the USACE and others to evaluate and, ultimately, to implement measures that contribute to downstream passage of juvenile species, protect habitat and water quality, and support the many users of the North Santiam River.

Sincerely,

Krishna Namburi

Krishna Namburi
Interim City Manager

Attachment: "City of Salem Public Comments on USACE's Proposed Detroit Reservoir Drawdown." *Memorandum*. Davis Wright Tremaine, LLP. June 17, 2025

cc:

Brian D. Martin, PE, Public Works Director
Dan Atchison, City Attorney

Davis Wright Tremaine LLP

Suite 700
560 SW 10th Avenue
Portland, OR 97205-2702

**Olivier Jamin**
5037785346 tel
Olivierjamin@dwt.com

# MEMORANDUM

To: U.S. Army Corps of Engineers, Portland District
From: Davis Wright Tremaine, LLP on behalf of City of Salem
Date: June 19, 2025
Subject: City of Salem Public Comments on USACE's Proposed Detroit Reservoir Drawdown

---

On May 16, 2025 the U.S. Army Corps of Engineers ("USACE"), Portland District, published a press release seeking public comments as part of a Supplemental Environmental Impact Statement ("SEIS") focused on two new requirements related to the operations and maintenance of the Willamette Valley System ("WVS") of dams and reservoirs, including implementing a deep fall drawdown of Detroit Reservoir. This memorandum provides the City of Salem's (the "City") comments on the proposed drawdown that the City understands to refer to a proposal to draw Detroit Reservoir down to 1,395 feet in the December 26, 2024, Biological Opinion for the Continued Operation and Maintenance of the Willamette Valley System (the "BiOp") prepared by the National Marine Fisheries Service ("NMFS").

The City has a strong interest in this matter and intervened in prior litigation regarding potential changes to the WVS that would impact its drinking water supply. As a result of that litigation, the court specified interim measures (including drawdowns) that the City found acceptable. The BiOp's proposed elevation target for the drawdown at Detroit Reservoir goes much further than those previous measures and USACE is seeking input from the public on what impacts should be investigated prior to the drawdown.

At the outset, the City is emphasizing its overall support of efforts by NMFS, USACE, and others to protect and benefit listed fish species and the environment, including iconic fish species of the Pacific Northwest. The City also recognizes and supports tribal interests in those resources, including the Confederated Tribes of Grand Ronde and other tribal nations in the salmonid species, their habitat, and the environment. However, the City opposes the proposed drawdown as described in the BiOp and as scheduled because it would violate the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Safe Drinking Water Act ("SDWA"), and would result in unacceptable risks to the City's drinking water infrastructure. USACE's proposal is particularly troubling because other alternatives exist to benefit listed fish species that would allow USACE to comply with the Endangered Species Act ("ESA"). USACE's drastic proposal is the result of the agency's own repeated failure to comply with the ESA for more than a decade and may jeopardize the water supply for over 200,000

Oregon residents, as well as threaten access to safe water for schools, hospitals, firefighters, and other essential services. USACE's decision to favor the drawdown as an interim measure seems to be guided by economic considerations and may pose a risk to public health for one of the most populated areas of the state. NMFS and USACE should consider alternatives to the proposed drawdown that would allow the agencies to comply with the ESA without putting the City's water supply at risk. The City strongly believes that USACE can and should find alternatives to the proposed drawdown allowing maximum benefit for listed fish species while protecting drinking water supplies for the City's residents. As part of those efforts, the City encourages the Corps to consider and study a stepped approach to the drawdown that would protect water quality in the North Santiam River. The City's comments first summarize the potential impacts of the drawdown on its water supplies, then address the lack of considerations for those impacts in the BiOp, and finally discuss the legal implications of the drawdown in the context of NEPA, the CWA, and the SDWA.

## I. The Proposed Drawdown Creates an Unacceptable Risk of Public Health Emergency

### a. Background on the City's Water Supply

For more than 80 years, the North Santiam River—where the Detroit Dam and Reservoir are located—has served as the primary drinking water source for the City of Salem. The City relies on the North Santiam River for water to serve over 200,000 customers and three wholesale customers: the City of Turner, Suburban East Salem Water District, and Orchard Heights Water Association. The City also provides emergency water supply connections to the Cities of Stayton and Keizer or an additional 47,000 residents.

The City's drinking water treatment plant (the "Treatment Plant") is located on Geren Island in the North Santiam River, approximately 30 miles downstream from Detroit Dam. The high-water quality of the North Santiam River allows the City to use slow sand filtration as the core treatment process. Slow sand filtration is a natural filtration process, allowing naturally existing biota in the river to form a biological layer which then degrades and/or removes particulates and microbial contaminants in the water. This process uses locally sourced native materials that are reusable and recyclable, providing environmental and ecological benefits. Under normal operating conditions, the slow sand filters are operated without pretreatment. Historical operation of the Treatment Plant indicates that a raw water turbidity (the measure of water clarity or how much matter is suspended in water) of less than 10 Nephelometric Turbidity Units ("NTU") is necessary. An engineering evaluation and literature review concluded that sustained turbidity greater than 10 NTU in the feedwater to a slow sand filter will lead to rapid head loss accumulation of filters, leading to excessive cleaning of filters which could become impractical for continued operation depending on filter run times. Slow sand filter subject experts have indicated the recommended sustainable feed turbidity to effectively treat water in slow sand filters is typically less than 10 NTU. These theoretical evaluations align with plant historical operating data.

During normal plant operations, filter run times are typically in excess of 3 months. These long run times allow the City operational flexibility to schedule filter cleaning and maintenance activities to avoid peak demand and/or challenging water quality conditions. During normal operation, cleaning and maintenance activities generally consist of both scraping and ripening. Filter scraping is completed by draining the respective filters, scraping 1/4-inch to 1/2-

inch of media off the top of the bed using machinery, then re-filling the filter. The overall scraping process normally lasts 3 to 5 days. Following scraping a filter is normally allowed to ripen before being placed into production. During the ripening period, which lasts anywhere from 1 week to 2 months, the filter develops a biologically active layer on top of the media, which is required to effectively produce potable water.

To quantify the impacts of the proposed deep drawdown to the Treatment Plant, the City has developed a series of bench and pilot scale tests based on anticipated water quality conditions as observed during similar regional drawdown activities in other comparable basins. Below is a summary of the preliminary results:

- Pilot testing confirmed what is suggested by the literature and plant historical data - turbidities above the recommended feedwater turbidity range (<10 NTU) significantly increase filter clogging and reduce filter run durations.

- Pilot testing of 50 NTU feedwater with native sediments collected from Detroit Reservoir at filter loading rates required to produce 20-25 mgd from the Treatment Plant, resulted in filter run times of 11-13 days, or ~88% reduction compared to normal conditions.

- Pilot testing of 100 NTU feedwater with surrogate sediments at filter loading rates required to produce 20-25 mgd from the Treatment Plant resulted in filter run times of 9 days, or 93% reduction compared to normal conditions.

- Preliminary results at higher turbidity loading verify this trend.

- Results from the pilot testing were obtained under controlled laboratory conditions. It is expected that actual run times will be shorter than what has been observed.

Sustainably producing adequate potable water at these reduced run times for an extended duration is unlikely. Significantly reduced filter run durations will lead to a significant increase in annual operating expenses while increasing the load on already heavily burdened City staff and resources. In addition to immediate increased operational costs from filter cleaning, there are longer term cost impacts associated with increased turbidity loading. Pilot results indicate the nature of solids removal during the drawdown period will require deeper sand removal from filters compared to normal cleaning activities and will therefore increase the need for and the frequency of filter re-sanding. Re-sanding is required when sand depths in a filter reach a critical minimum value to ensure effluent water quality meets all drinking water standards and treatment goals. Supplies of additional filter sand, to replace the excessively scraped sand, are also limited and costly to procure, and adding sand to a filter is a costly (estimated at between $2 and $3.5 million for each filter) and time-consuming process, typically only occurring every 10 or more years during normal operation.

The Treatment Plant is capable of handling short-term turbidity events of a few days, which are frequently caused by unregulated flows in the fork of the river where the Treatment Plant's intake is located. In such instances, the intake to the City's Treatment Plant is shut and the City relies on limited back-up water supplies and in-town finished water storage. The City may

also rely on temporary alterations of operations to mix groundwater (which itself may be impacted by surface water quality) with the river water. However, the City's back-up supplies of water are limited and still rely on treatment from the Treatment Plant. As a result, if high turbidity levels persist beyond a few days, the City's inability to normally operate its Treatment Plant for an extended period would create a significant risk to the City.

b. The Proposed Drawdown and Impacts on the Treatment Plant

Turbidity in the river water is a problem for the City's water supply because 1) it may force a shutdown of the Treatment Plant, and 2) the turbidity and other pollutants may be too high for the treatment process to effectively remove it to drinking water standards and regulations. The result could produce water for the City's customers that violates standards set by the SDWA. Currently, the water level in Detroit Reservoir is maintained at no lower than 1,450 feet as established by USACE. In the summer, the water level elevation is approximately 1,560 feet. Lowering the water level to 1,395 feet in the fall and/or winter, as proposed in the BiOp, is likely to result in high levels of turbidity due to both scouring of settled solids in the Reservoir and precipitation events causing significant erosion to the newly exposed shoreline. Further, lower water volume means the suspended sediment remains more concentrated in the lake. A reduced water level in the Reservoir will allow for less settling time of suspended solids entering the Reservoir. As a result, much of the sediment may flow through the dam and downstream, creating high turbidity, as shown in the case studies summarized in subsection e) below.

The proposed drawdown would seriously exacerbate the problems described above— such as exposed shoreline erosion and low volume of reservoir water— creating a higher risk of excessively turbid water. Moreover, the drawdown conducted over multiple weeks creates a higher risk of sustained high-turbidity events and an unreasonable risk for the City and its ability to supply adequate potable water for its residents and customers. The impacts of drawing down the reservoir would not be limited to the fall or winter. If the reservoir is nearly empty into the spring, for example, it is unlikely to refill to the regular level of 1,560 feet during the summer, which would result in additional stress on the City's water supplies during peak demand times. As the weather gets warmer, the City's water needs more than double from approximately 25 million gallons per day to approximately 50 million gallons per day. If the Detroit Reservoir is near empty in late spring, the City would be largely reliant on natural flow levels of the river during dry months and simply may not have enough water to meet its customers' needs.

The City's Treatment Plant relies on flows that pass by the facility's intake structure in the river channel on the north side of Geren Island. In order for the Treatment Plant to function properly, the water level at this point of the river must be 2.3 feet or higher, which requires flows of 700 cubic feet per second (cfs) or greater. A sustained drawdown into the spring poses the threat that flow levels in the following months will not be sufficient for the facility to operate. Also, lower water elevations in the reservoir as the weather warms are likely to lead to higher water temperatures in the North Santiam River. Any deviations from normal water quality parameters may impact the operations of the Treatment Plant, including but not limited to changing the filter performance and chemical dosages. Higher water temperatures may also increase the occurrence and magnitude of algal blooms in Detroit Reservoir and the North Santiam River. Algal blooms negatively impact the water treatment process (and wildlife and the environment) by (1) clogging filters and inhibiting the City's ability to meet water demand, (2) producing algal toxins, and (3) creating taste and odor issues caused by Geosmin and 2-

Methylisoborneol (MIB). In summary, the proposed drawdown would be detrimental to water quality and the environment in the North Santiam River.

c. City's Alternative Water Supplies and Risk Scenarios

The City holds municipal water rights in the North Santiam River, and decreasing flows in the river as a result of drawdowns at Detroit Lake would interfere with those rights. If the City were to obtain alternative water supplies sufficient to mitigate the potential impacts described above, the process would take years, not months. Upon the release of the BiOp, the City immediately started studying the impact of the proposed drawdown on its water supply and assessed its ability to rely on alternative sources of water. While not final, the City's studies indicate that the Treatment Plant cannot sustainably accommodate the increase in turbidity that will result from the proposed drawdown. A preliminary operational impacts analysis resulted in the following findings:

- Sustained and peak turbidity of the North Santiam River will significantly increase because of the proposed drawdown, potentially up to a sustained value of 200 NTU based on regional case studies of similar events.
- As a result of the proposed drawdown, increased suspended solids concentrations will be deposited along the banks of the river, which may be re-suspended during future storm events, resulting in elevated turbidity into the Treatment Plant even when a deep drawdown is not actively occurring.
- Recent case studies show that water treatment facilities in similar basins have incurred increases in operational costs and encountered challenges meeting finished water quality goals because of increased raw water turbidity from similar drawdowns.
- The City's Treatment Plant is not designed to sustainably treat raw water sources with sustained turbidities above 10 NTU.
- Excessive filter scraping will reduce the stocks of available filter sands, leading to limitations on the Treatment Plant's production capacity.
- Elevated raw water turbidity events may lead to permanent capacity reduction until the entire filter sand bed is replaced, extending impacts beyond the time of initial turbidity loading.

During the anticipated drawdown events of the Detroit Reservoir, large amounts of organic and inorganic sediment will be exposed to changes in hydraulic patterns that have not been previously experienced. This will result in water quality impacts by changing suspended solids concentrations. Based on those findings, the City has been researching alternative water supplies in preparation of a potential shutdown of the Treatment Plant caused by the Reservoir drawdown. The City's water demand in the fall and winter months averages about 25 million gallons per day, with peak day demand reaching 27 to 28 million gallons per day. At full capacity, the City's existing groundwater supply system can provide up to 17 million gallons per day. The City may be able to secure up to 4.3 million gallons per day from the City of Keizer's water supply, if Keizer has excess supply available. This leaves the City short of at least 3 million gallons per day

to barely accommodate its demand, assuming that the groundwater system of wells can run at full capacity for long periods of time, which is unrealistic. During pilot tests, the City of Keizer connection that would be used by the City to provide up to 4.3 million gallons per day operated at full capacity for only two days before breaking down. Even with the additional supply from the City of Keizer and potential additional wells commissioned as part of the City's existing groundwater supply, the City would be operating without any redundancy, which would constitute an unreasonable and unacceptable risk to human health. Finally, the cost of relying on the City of Keizer's system and on additional wells is estimated at an additional cost of at least $6,600 per day.

In summary, unless the City takes extraordinary measures to mitigate the impacts, the proposed drawdown would cause irreparable harm to the City's infrastructure in such a way that could either (1) cause a shutdown of the treatment plant or (2) reduce the amount of water and water quality level to such a degree that adequate filtration of the water for health and safety may not be possible. In either scenario, the City would be unable to comply with the provisions of the SDWA and Oregon statutes adopting these standards and thus would be in breach of its duty to provide clean and safe drinking water. Additionally, the harm to the City's residents described above may harm the City's reputation and goodwill that cannot be adequately addressed by money.

d. General Impacts of the Drawdown on Water Quality

High loading of fine suspended solids in water entering the Treatment Plant is a significant risk to maintaining effluent quality below limits for drinking water. States and the EPA establish effluent water quality standards. In Oregon, drinking water quality standards are established under the Oregon Drinking Water Quality Act (OAR 333-061), which includes implementation of national drinking water quality standards (40 CFR 141.73 for turbidity requirements). To maintain public health, each contaminant has either an established maximum contaminant level (MCL) or a recommended treatment technique. For turbidity, the Treatment Plant must produce an effluent turbidity of less than 1.0 NTU 95 percent of the time and less than 5.0 NTU 100 percent of the time.

Multiple literature sources indicate that colloidal clays (i.e., fine sediment type of a diameter less than 2 µm, matching the most expected suspended solids type from the Detroit Reservoir drawdown) can cause higher effluent turbidity from slow sand filters compared to larger particle sizes (AWWARF, 1991; Collins, Youngstrom, and Broder, 2012; EPA, 2024). For example, in one set of pilot slow sand filters in a Boulder, Colorado experiment, the process only removed 20 percent of raw water turbidity when feedwater particles were primarily composed of colloidal clay particles. Elevated filter outlet turbidity can be correlated to decreased cyst and bacteria removal across the filters (AWWARF, 1991). The City's Treatment Plant may not be equipped to remove the biological particles due to the elevated turbidities corresponding with lower water levels in the Reservoir. In addition to risk of passage of biological particulates through the Treatment Plant, biologicals in the filtered water would also increase due to the shorter than normal filter run times expected. Shorter run times will lead to more frequent scraping of the sand filter, which limits the biological maturity of the filters and increases the chances of biological and particulate breakthrough. Accordingly, during a deep drawdown of the Detroit Reservoir, elevated turbidity and biological contaminants in the filtered water of the Treatment Plant are at risk of not meeting MCLs.

It is important to note that increased surface water turbidity could also impact groundwater quality of the City's groundwater sources, depending on the level of infiltration occurring in a specific location, which may be impacted by riverbed material, riverbed depth, and surface water quality. Finally, the proposed drawdown may impact the pH of water from the North Santiam River, which would impose a disproportionate burden on many food and beverage businesses served by the City.

e. Case Studies of Deep Drawdown Events

The impact to the City's Treatment Plant as a result of high turbidity is not just a hypothetical. Several water treatment plants designed for low turbidity raw water have been exposed to elevated raw water turbidity as a result of a deep drawdown of an upstream reservoir. These have consistently resulted in significant operational challenges, operational costs, and risks to finish water quality at the treatment plants:

- Deep drawdowns of the Green Peter Dam have occurred for the past two years on the South Santiam River, resulting in abnormally high turbidity levels in the water and leading to severe disruptions at treatment plants in Lebanon and Sweet Home. The City of Lebanon filed a claim for damages against USACE under the Federal Tort Claims Act on October 11, 2024, claiming $26 million in damages.

- The initial drawdown of the Cougar Reservoir, which feeds the McKenzie River, created severe operational challenges and treatment costs for the City of Eugene's Hayden Bridge Water Treatment Plant, with turbidity ranging from 50 to 200 NTU for a three-month period. Water quality was monitored during fall drawdowns of the Fall Creek Reservoir, showing recorded values of turbidity ranging from 501 to 814 Formazin Nephelometric Units (FNU). Turbidity remained elevated during the drawdown period for all years in which drawdowns were observed, with erosion and re-suspension of sediment as primary causes for the increased turbidity.

- With regard to the City's Treatment Plant, one noteworthy event provides valuable insight to the Treatment Plant's operations when raw water turbidity spikes in the North Santiam River. In February 1996, due to a 50+ year flood event in Northwest Oregon, the North Santiam River turbidity rose to values in excess of 100 NTU, leading to the shutdown of the Treatment Plant for eight days due to concerns of finished water quality not meeting safe drinking water standards. In response, the City issued a stage three water alert prohibiting the use of water outdoors and asking households and businesses to cut water use.

Those cases suggest that the proposed drawdown is likely to result in the type of impacts to the City's Treatment Plant that could shut down the Treatment Plant and jeopardize City's customers' access to safe drinking water.

f. Summary

In summary, the proposed drawdown will result in elevated raw water turbidity for extended periods of time, resulting in significantly shorter filter run times at the Treatment Plant. This, in turn, is likely to produce finished water quality that does not meet all MCLs and/or result

in a shutdown of the Treatment Plant. Despite its best efforts, the City may not be able to provide sufficient alternative water supplies to meet peak demand during the proposed drawdown periods and months following the proposed drawdown if the Reservoir does not fill back up as needed. As a result, the proposed drawdown may result in a public health emergency by jeopardizing access to safe drinking water for hundreds of thousands of residents, and for hospitals, schools and other public services.

## II. USACE Did Not Properly Consider the Impacts of the Drawdown to the City's Water Supply

Under the ESA, lead agencies must identify reasonable and prudent alternatives to a proposed action. Those reasonable and prudent alternatives ("RPAs") are those that can be implemented consistent with the scope of the agency's legal authority and jurisdiction. 50 C.F.R § 402.02. In Section 8 of the BiOp, NMFS concluded that the continued operation of the WVS would jeopardize the continued existence of Upper Willamette River ("UWR") Chinook salmon and UWR steelhead and destroy or adversely modify their designated habitat. As a result, NMFS developed an RPA that it believes would avoid jeopardizing the continued existence for those species and avoid impacts to their habitat. The RPA is in fact comprised of a number of measures related to adaptive management, flow management, water quality management, fish passage, hatchery management, and habitat improvement. In the BiOp, the proposed drawdown is part of RPA 4 addressing fish passage and more particularly RPA 4.12 addressing juvenile downstream passage in the North Santiam Basin. As part of RPA 4.12.2, the BiOp provides the following:

> "[t]he Action Agencies will test and improve effectiveness of interim juvenile fall drawdown operations through Detroit and Big Cliff Reservoirs and Dams with the following operations in years 2025-2028, and will conduct studies to measure effectiveness, as part of the Adaptive Management process with input from the WATER Technical Teams:
>
> - In the fall, draw Detroit Reservoir elevation down to no more than 50 feet above upper RO for passage (1395 ft), when possible given hydrology and hydropower activity in the North Santiam and other subbasins.
>
> - Design and conduct a study, or use existing data, to optimize RO gate openings at Detroit for survival and reduced harm. While also considering temperature implications downstream, as well as turbidity effects."

The BiOp does not provide any information regarding alternatives that were considered in place of the Detroit Reservoir drawdown that could have met ESA objectives related to UWR Chinook salmon and UWR steelhead. The BiOp also does not discuss at all how the proposed drawdown would impact users in the basin, including the City. The failure to consider or discuss those impacts is even more glaring due to the fact that the USACE and NMFS know that the resulting elevated turbidity will have dramatic impacts on the City's drinking water infrastructure. In fact, after USACE implemented a similar drawdown at Green Peter Reservoir in 2023, the cities of Lebanon and Sweet Home experienced extreme operational costs, equipment damage, and were forced to implement costly pretreatment system upgrades due to elevated turbidity levels in the South Santiam River. The cities filed a tort claim against USACE to seek compensation for over $26 million in damages for Lebanon and over $11 million for Sweet Home.

While NMFS and USACE have a duty to comply with the ESA, this does not necessarily translate into a duty to move forward with the Detroit Reservoir drawdown. Agencies retain considerable discretion in choosing what specific actions to take in order to implement the mandatory goal of the ESA. NFMS's failure to consider alternatives to the drawdown that would not result in a public health emergency for over 200,000 residents is arbitrary, capricious, and inconsistent with its various mandates under federal law. The City has repeatedly expressed concern about the impacts that a drawdown at Detroit Reservoir would have on its drinking water supplies and NMFS seems to have ignored those impacts altogether.

## III. USACE Has a Duty to Comply with All Federal Laws

Moving forward with the drawdown would likely violate NEPA, the CWA, and SDWA. Compliance with one statute (ESA) shall not come at the expense of another.

### a. NEPA violation

The consideration of alternatives to a proposed action is the heart of the environmental impact statement. 40 C.F.R. § 1502.14. The alternatives section of an EIS should identify the reasonably foreseeable environmental effects of the proposed action. In doing so, the analysis should "sharply define the issues for the decision maker and the public and provide a clear basis for choice among options." *Id.* As part of its ESA duties, NFMS (the lead agency) must "[r]igorously explore and objectively evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." 40 C.F.R. § 1502.14(a). NMFS has not addressed how the drawdown would impact water quality in the North Santiam River below Detroit dam and how the proposed action could have lasting effects on the health of the basin beyond the period of the drawdown itself. USACE and NMFS are required to consider and respond to the City's comments as part of its decision-making process and to consider alternatives to the proposed drawdown. Failure to do so would be a violation of NEPA.

### b. CWA violation

The goal of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any pollutant from a point source into navigable waters, unless the discharger possesses a valid permit authorizing the release of the particular pollutant discharged in the specific amount, or concentration, contained in the discharge. 33 U.S.C.A. § 1311. While courts have generally recognized that dams are not point sources and operators may not always be required to obtain a National Pollutant Discharge Elimination System (NPDES), it does not mean that USACE and NMFS have no obligation under the CWA. First, some courts have found that dam operators do not need an NPDES permit when dam operation does not involve an addition of a pollutant to navigable waters. *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982); *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580 (6th Cir. 1988); *accord Los Angeles Flood Control District v. Natural Resources Defense Council*, 568 U.S. 78 (2013). Second, USACE has been required to obtain an NPDES permit to account for the discharge of oil, grease, and heated water for certain dams on the Columbia River. In fact, USACE seems prepared to apply for an obtain NPDES permits for certain WVS dams in 2025. Third, USACE's obligations under the CWA may be implicated in this case where USACE's actions will directly result in polluted water being discharged from Detroit Dam, including high turbidity and increased temperature.

USACE and NMFS cannot ignore the CWA goals and mandates just to comply with the ESA. Courts previously rejected an argument by USACE that it was not able to comply with Washington water quality standards because of the Endangered Species Act and stated "the Endangered Species Act and the Clean Water Act 'should be read together, so that compliance with one statute does not come at the expense of the other.'" *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 132 F.Supp. 2d 876, 891 (D. Or. 2000). USACE's own policy is to meet downstream water quality standards whenever possible: "[w]hen releases are found to be incompatible with state standards they should be studied to establish an appropriate course of action for upgrading release quality, for the opportunity to improve water quality in support of ecosystem restoration, or for otherwise meeting their potential to best serve downstream water quality needs. Any physical or operational modification to a project (for purposes other than water quality) shall not degrade water quality in the reservoir or project discharges." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 92 F. Supp. 2d 1072, 1076 (D. Or. 2000) (quoting USACE's *Digest of Water Resources Policies and Authorities*, Engineering Pamphlet 1165-2-1, dated February 15, 1996).

c. SDWA Violation

The SDWA, 42 U.S.C.A. §§ 300f et seq., establishes a federally mandated, state-administered regulatory scheme for the protection of drinking water. Its general purpose is to assure that the water supply systems serving the public meet minimum national standards for protection of public health. *Manufactured House. Inst. v. U.S. Env't Prot. Agency*, 467 F.3d 391, 394 (4th Cir. 2006). The Act regulates contaminants in drinking water supplied by public water systems and empowers the EPA to promulgate regulations protecting the quality of drinking water sources in the United States, which regulations specify dangerous contaminants and prescribe either maximum contaminant levels or satisfactory treatment techniques. It delegated to EPA the responsibility for setting the standards for drinking water contaminants, 42 U.S.C.A. § 300g-1. Under the statute, the EPA must regulate the majority of contaminants in drinking water by formulating maximum contaminant level goals (MCLGs), representing its expert determination of "the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." 42 U.S.C.A. § 300g-1(b)(4)(A). It then must set a maximum contaminant level (MCL) "as close to the [MCLG] as is feasible." 42 U.S.C.A. § 300g-1(b)(4)(B). Generally, federal agencies are subject to and comply with all federal, state, interstate, and local requirements respecting wellhead protection area, public water systems and any underground injection in the same manner and to the same extent as any person is subject to such requirements. 42 U.S.C.A. § 300j-6(a). The proposed drawdown may impact the City's surface water and groundwater sources by dramatically increasing turbidity and other pollutants in the North Santiam River. Clean drinking water is a necessity and a failure to provide it can create irreparable harm. *See, e.g.*, *Concerned Pastors for Social Action v. Khouri*, 217 F. Supp. 3d 960, 972 (E.D. Mich. 2016) ("It is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap. . . . In modern society, when we turn on a faucet, we expect safe drinking water to flow out."). The action proposed by NMFS and the Corps would jeopardize access to clean drinking water for communities relying on the North Santiam River. USACE needs to take this into account when looking at different RPAs.

## IV. Conclusion

As proposed in the BiOp for the WVS, the drawdown of Detroit Reservoir would dramatically increase turbidity in the North Santiam River at the time of the drawdown but also

potentially for months afterwards. This in turn could cause permanent harm to the City's drinking water infrastructure and impact hundreds of thousands of residents and businesses who rely on that water. The drawdown as proposed would violate the CWA and the SDWA, and NMFS and USACE's lack of consideration of those impacts would also violate NEPA. The City understands USACE's obligations under the ESA and is committed to the protection of listed fish species in the WVS and would like to work with USACE to find a solution that is protective of fish and wildlife *and* of the City's water supplies. The City also acknowledges and recognizes the Confederated Tribes of Grand Ronde's and other tribal nations' interest in the WVS and welcomes opportunities to speak with the tribes to find a solution. More specifically, the City's preliminary engineering studies suggest that its Treatment Plant could handle a turbidity of up to 50 NTU for up to 13 days before running into operational issues. As such, the City encourages the Corps to better study a stepped approach to the drawdown that would remain below such turbidity triggers to allow the City and the Corps to respond and adapt to changing water quality conditions and ensure continued access to safe drinking water for the City's residents and businesses.

SANTIAM WATER CONTROL DISTRICT
284 E Water St, Stayton, OR 97383
Santiamwater.gov

Date: January 13, 2026

To: U.S. Army Corps of Engineers
Attn: Attn: CENWP-PME-E
P.O. Box 2946
Portland, OR 97208-2946

**RE: Comments on the Willamette Valley System Supplemental Environmental Impact Statement (SEIS)**

Dear Project Team,

## Executive Summary

SWCD appreciates the opportunity to comment on the SEIS. Our position is clear: irrigation remains the primary purpose of Bureau of Reclamation water rights in the North Santiam Basin. While we recognize the need for narrowly tailored measures to comply with ESA requirements, we strongly oppose broad or permanent reallocation of irrigation water for other uses. The SEIS must address critical gaps in modeling, legal compliance, and operational planning. Failure to do so risks violations of NEPA's hard look requirement (42 U.S.C. § 4332(2)(C)), arbitrary and capricious decision-making under the APA (5 U.S.C. § 706(2)(A)), and potential ESA non-compliance. Key concerns include reservoir refill uncertainty, climate resilience, water quality risks, coordination failures, equity in allocation, and USBR's lack of leadership on irrigation impacts. Importantly, maintaining a moratorium on new agricultural irrigation contracts while holding water in Detroit Reservoir for recreational purposes is inequitable and contrary to BOR's irrigation mission. This inequity could result in thousands of acre-feet of water being withheld from agricultural use annually, causing severe economic harm to the District as well as regional producers. These issues have significant economic consequences for agriculture and municipal supply and expose agencies to litigation risk if not resolved.

## Introduction

On behalf of the Santiam Water Control District (SWCD), thank you for the opportunity to provide comments on the Supplemental Environmental Impact Statement (SEIS) for the Willamette Valley System. SWCD manages critical water rights and infrastructure serving agricultural producers, municipal partners, and environmental stakeholders in the North Santiam Basin. Our operations include delivery of raw water to the City of Stayton and management of irrigation water including Bureau of Reclamation (BOR) contract water. The proposed operational changes outlined in the SEIS have significant implications for water reliability, municipal supply, agricultural productivity, and ecological objectives. These comments build upon our prior submissions and incorporate new considerations introduced in the SEIS. Our intent is to ensure the Final SEIS fully addresses operational, contractual, and environmental consequences of proposed alternatives, consistent with NEPA (42 U.S.C. § 4332), ESA (16 U.S.C. § 1536), Oregon water law, and federal reclamation law.

## I. Carry-Forward Comments from Previous EIS Submission

1. Contract Holder Protections: Existing contract holders must be grandfathered and protected from disproportionate reductions. All new contracts should utilize a proportionate reduction system during shortages (Draft SEIS, Section 3-1004). Preference should be given to existing users and ESA needs before new uses are contemplated to align with Oregon water law.

2. Water Rights and Storage: The SEIS should provide a tabulation of storage amounts and releases per reservoir and use (Draft SEIS, Appendix N). Clarify potential conflicts with Oregon water law and priority dates to prevent litigation risk.

3. Biological Opinions (BiOps): Explain the relationship among the 2008, 2019, and forthcoming BiOps and clarify the moratorium on new irrigation contracts in the Santiam Basin (Draft SEIS, Section 3-1033). Failure to reconcile these obligations creates uncertainty and potential ESA compliance issues.

4. Water Management Framework: Develop an adaptive management plan that balances ESA flow targets with other objectives (Draft SEIS, Appendix N). Outline proportionate reduction strategies for future contracts to ensure fairness and compliance. Resolve current US BOR contract language with SEIS and EIS operational concepts.

5. Modeling and Data Accuracy: Use current datasets such as the 2020 Modified Flow Dataset (Draft SEIS, Section 2.3.3). Clearly state assumptions and correct inaccuracies,

including evaporation embedded in inflow calculations, which could misrepresent available storage.

6. Impact Analysis: Conduct reservoir-specific analysis rather than system-wide only (Draft SEIS, Section 3-1033). Quantify ESA flow needs at the tributary level to avoid masking major localized impacts.

## II. New Concerns Specific to the Supplemental EIS

### Reservoir Refill and Water Allocation

The SEIS should explicitly analyze how proposed drawdowns could impact the likelihood of reservoirs adequately refilling for subsequent water rights allocations. A thorough evaluation of the reduced probability of reservoir refilling and its implications for both water users and ecosystem needs is indispensable to informed decision-making and equitable water management.

### Tributary-Specific Impacts

A detailed tabulation of storage amounts and releases for Detroit Reservoir and North Santiam River should be included to clarify tributary-specific impacts. The SEIS must explain the anticipated water management framework, including whether stored water intended for fish passage or other ecological purposes is sourced from storage allocations designated for fish and wildlife. It should also explicitly reference how such releases will be accounted for in the total water availability budget, ensuring transparency and equitable management of water resources. The release of flows in the fall could affect two separate water years (pre and post Oct 1) and therefore storage allocations, releases and water right compliance should be clarified.

### Equity in Allocation

The SEIS does not clearly define prioritization during shortages (Draft SEIS, Section 3-1004). Proportionate reduction strategies across user types are necessary to ensure fairness and compliance with Oregon water law. Maintaining a moratorium on new agricultural irrigation contracts while continuing to store water in Detroit Reservoir primarily for recreational purposes is inequitable and contrary to BOR's irrigation mission. This practice fails to meet NEPA's requirement for a balanced evaluation of alternatives and consideration of socioeconomic impacts. Allocation decisions should prioritize irrigation and ESA compliance over discretionary uses such as recreation, consistent with NEPA's requirement for balanced evaluation of alternatives.

A detailed tabulation of storage amounts and releases for Detroit Reservoir and North Santiam River should be included to clarify tributary-specific impacts. The SEIS must

explain the anticipated water management framework, including whether stored water intended for fish passage or other ecological purposes is sourced from allocations designated for fish and wildlife. It should also explicitly reference how such releases will be accounted for in the total water availability budget, ensuring transparency and equitable management of water resources. Additionally, sufficient information should be provided to determine if adequate flows for all needs—including agricultural, municipal, environmental, and instream purposes—will be met, with emphasis on Detroit Reservoir and North Santiam River.

## USBR Accountability

USBR holds statutory obligations under the Reclamation Act (43 U.S.C. § 371 et seq.) to protect irrigation users, yet the EIS and SEIS demonstrates inadequate involvement by USBR in analyzing irrigation impacts. Responsibility is delegated to USACE, whose primary mission does not include irrigation economics or water rights administration (Draft SEIS, Appendix N). This creates a regulatory gap and potential legal liability for USBR under NEPA and the APA (5 U.S.C. § 706(2)(A)), as foreseeable impacts to irrigation users have not been analyzed. Furthermore, USBR's failure to address the Corps' practice of holding water for recreation while restricting agricultural expansion exacerbates inequities and undermines federal reclamation objectives. This policy choice, if left uncorrected, may constitute arbitrary and capricious action under APA standards and expose agencies to litigation risk for failing to consider reasonable alternatives that protect irrigation interests.

BOR Water Rights and ESA Compliance: The Bureau of Reclamation water rights held in the North Santiam Basin were established for irrigation purposes under federal reclamation law. SWCD does not support broad or permanent reallocation of these irrigation rights for other uses, as doing so would undermine the original purpose and reduce reliability for agricultural users who depend on these allocations for crop production and economic stability. The District is particularly concerned with adding or including operations that require stored water and would trigger a shared reduction related to our current contract language.  However, SWCD recognizes that limited, temporary adjustments may be necessary to meet legal compliance obligations under the Endangered Species Act (ESA). Any such measures should be narrowly tailored, science-based, and transparent, with clear mitigation strategies to minimize adverse impacts on irrigation deliveries. USBR must lead this analysis and coordination, as delegating responsibility to USACE—whose mission does not include irrigation economics or water rights administration—creates a regulatory gap and exposes both agencies to potential legal liability under NEPA and the Administrative Procedure Act for failing to adequately analyze foreseeable impacts to irrigation users.

SWCD commends the Corps for its efforts in preparing the SEIS and appreciates the opportunity to provide input. We request that the Final SEIS incorporate tributary-specific modeling and updated climate data, provide comprehensive analysis of contractual obligations and mitigation strategies, address water quality risks and outline robust contingency planning, ensure transparent communication and equitable water management, and engage USBR in a leadership role to avoid regulatory gaps and legal exposure. SWCD reserves all rights under NEPA, ESA, and APA to ensure compliance with applicable laws and regulations. Please contact our office at [phone/email] for any clarification or further discussion.

**Respectfully submitted,**

*Brent Stevenson*

Brent Stevenson
District Manager
Santiam Water Control District

**County Commissioners**
Colm Willis, Chair
Kevin Cameron
Danielle Bethell

**Chief Administrative Officer**
Jan Fritz

**County Counsel**
Steve Elzinga

MARION COUNTY LEGAL COUNSEL

January 13, 2026

**Via Email: Willamette.EIS@usace.army.mil**
**Via Regular Mail:**
U.S. Army Corps of Engineers
Attn: CENWP-PME-E / Willamette EIS
P.O. Box 2946
Portland, OR 97208-2946

**Re: Need to Revise Willamette Valley System Draft SEIS to Reflect Full Fish Death Impact**

To Whom It May Concern,

On behalf of Marion County, we submit these additional comments regarding the Willamette Valley System Draft SEIS. Careful review and fidelity to federal law is important for protecting all aspects of the environment, especially water quality for Marion County residents.

Under 42 U.S. Code § 4332(C), all environmental impact statements must include "a detailed statement" on "reasonably foreseeable environmental effects of the proposed agency action" among other things.

The draft SEIS admits that the proposed deep drawdown of Detroit Lake will harm overall fish populations: "Sport fishing in Detroit Reservoir is expected to be adversely affected due to changes in the reservoir habitat conditions and food availability affecting fish growth and survival, and increasing rates of entrainment for resident fish downstream of the dam []. Many entrained resident fish will be injured or not survive passage through the dam. For some species, significant reductions in abundance are possible." SEIS pages 134-135.

This is not just speculation: a massacre of over a million kokanee salmon occurred after a 2023 court-ordered deep drawdown at Green Peter Reservoir.[1] The Army Corps recognized that the deep drawdown directly caused many kokanee salmon to die "from barotrauma, a condition caused by a rapid pressure reduction as fish pass from deep below the surface on one side of the dam to the other side near the surface level. Among divers, this decompression effect is known as 'the bends.'"[2]

[1] An initial Army Corps' 2023 press release said over 8,000 had died. https://www.nwp.usace.army.mil/Media/News-Releases/Article/3553140/deep-reservoir-drawdown-at-green-peter-dam-causes-barotrauma-death-for-thousand/ By 2024, the Army Corps' Willamette Valley Project fisheries biologist was quoted at a public meeting as saying more than one million Kokanee died. https://www.sweethomenews.com/aggressive-deep-drawdown-begins-this-week/
[2] https://www.nwp.usace.army.mil/Media/News-Releases/Article/3553140/deep-reservoir-drawdown-at-green-peter-dam-causes-barotrauma-death-for-thousand/



Above is a screenshot excerpt of a picture from the Army Corps' own press release showing some of the many kokanee salmon killed by the 2023 deep drawdown.[3]

The draft SEIS does not comply with federal law because it fails to sufficiently assess how the proposed action will impact ESA-listed species, including how the admitted harm to overall fish populations will effect ESA-listed species who would otherwise consume those fish. For example, the Grey Wolf is listed as endangered, and the U.S. Fish & Wildlife Service says their range (shown in dark green below) includes the Detroit Lake area:[4]




Multiple studies have shown that Grey Wolves "are opportunistic-generalist carnivores and exhibit considerable dietary plasticity both among and within populations. Previous studies have documented extensive use of a wide variety of foods including birds . . . [and] fish."[5]

Impacts on the endangered Grey Wolf are not analyzed in the SEIS as required by federal law. As such, the SEIS fails to comply with federal law and must be revised. Once this revision occurs, the public should have another opportunity to comment.

Regards,
Steve Elzinga
Marion County Counsel

[3] *Id.*
[4] https://www.fws.gov/species/gray-wolf-canis-lupus
[5] *See, e.g.,* Watts, et al., *The Ilnik wolf* Canis lupus *pack: use of marine mammals and offshore sea ice*, Wildlife Biology, 16(2):144-149 (2010), available at https://bioone.org/journals/wildlife-biology/volume-16/issue-2/09-040/The-Ilnik-wolf-Canis-lupus-pack--use-of-marine/10.2981/09-040.full

| | |
|---|---|
| From: | MUCKEN Alyssa M * WRD |
| To: | CENWP-PME-Williamette-Valley-System-EIS |
| Cc: | REIS Kelly E * ODFW; GOLDRIC -MIDDAUG Grace * DEQ; WOODCOCK Douglas E * WRD; WIGAL Jennifer * DEQ; STA L Tom * ODFW; SOMMER Maggie * WRD; FERRARI Chandra Alene * GOV; Anne Mullan - NOAA Federal; Hudson, Michael; lawrence.schwabe@grandronde.org; Bangs, Brian L; SPARKS Ryan * OPRD; Panwhar Samina T; Oliver, E A (Liz) CIV (USA) |
| Subject: | [Non-DoD Source] OWRD, ODEQ, ODFW comments -- USACE Supplemental EIS |
| Date: | Tuesday, January 13, 2026 4:37:41 PM |
| Attachments: | 2026_01_13_Oregon comments public SEIS_draft.pdf |

Hello, attached you'll find comments on the draft Supplemental EIS from ODFW, ODEQ, and OWRD.

Thank you for the opportunity to review the draft SEIS and provide comment.

Kind regards,

Alyssa

**Alyssa Mucken,** Senior Water Advisor
Oregon Water Resources Department
725 Summer St. NE, Suite A, Salem, OR 97301
alyssa.m.mucken@water.oregon.gov | 503-871-6964

Oregon
Tina Kotek, Governor

Department of Environmental Quality
Department of Fish and Wildlife
Water Resources Department

U.S. Army Corps of Engineers
ATTN: CENWP-PME-E / Willamette EIS
PO Box 2946
Portland, OR 97208-2946

January 13, 2026

Submitted electronically to: willamette.eis@usace.army.mil

RE: State of Oregon Cooperating Agency Comments on Willamette Valley System Supplemental EIS

As cooperating agencies, the Oregon Department of Environmental Quality, Oregon Department of Fish and Wildlife, and the Oregon Water Resources Department appreciate the opportunity to review the draft Supplemental Environmental Impact Statement (SEIS), a document intended to address new Biological Opinion and Water Resources Development Act (WRDA) 2024 requirements following the publication of the Willamette Valley EIS in April 2025.

We share the following comments for your consideration. Please consider these comments along with others provided during the cooperating agency review in 2025.

## General Comments

Understanding what actions are included in the Preferred Alternative is challenging. We found it difficult to tease apart extended interim actions from the final actions or measures, despite the helpful inclusion of Table 2-2 listing the Interim Operations. Additionally, we have concerns about the duration of interim operations (Appendix N, Fig. 2-3) until long-term solutions are implemented. This extended timeline increases the need for and importance of adequate monitoring and evaluation, and data-informed adaptive management.

We appreciate the incorporation of lessons learned from previous Willamette reservoir deep drawdowns into the planned implementation of the Detroit Reservoir deep drawdown interim operation. Information from monitoring activities and communication and coordination with affected downstream drinking water facilities, year-round water users, and communities will continue to be important throughout the implementation of this interim operation. Figure 3-32 (p. 211) is very helpful for understanding the scale of the Detroit Reservoir deep drawdown compared to that at Green Peter Reservoir.

We recommend that USACE include additional information in the SEIS to clarify planned communication, monitoring, and assessment of the deep drawdown operation. For example, the SEIS should detail, specifically, the types of information collected during the Green Peter and Lookout Point drawdowns that were used to inform the proposed approach to implementation of the Detroit drawdown. The SEIS should also identify what types of data will be collected during the Detroit operation and how data and information will be used to inform adaptive management in future years. We look forward to continuing the collaboration with USACE and other entities to implement the deep drawdown operations while minimizing associated impacts.

### Fish Passage Considerations

Lack of access to habitat via safe and effective passage at Willamette Valley Project dams is a key limiting factor for salmon and steelhead recovery in the Willamette basin (ODFW & NMFS, 2011).[1] Safe and effective upstream and volitional downstream fish passage is critical for salmon and steelhead, Pacific lamprey, bull trout and other native migratory fish populations in the Willamette Basin.

- The SEIS Preferred Alternative for fish passage at Detroit Dam includes interim operational fish passage via a deep drawdown until a structural solution can be implemented. Any interim and long-term fish passage solution should be evaluated and adaptively managed to ensure effectiveness and to minimize negative effects.
- Alternative 6 includes a new adult upstream fish passage facility at Green Peter Dam (section 2.10.4.10). This section should also reference the NMFS 2024 Biological Opinion Reasonable and Prudent Alternative 4.6.2 which includes an evaluation of separating fish at the Foster Adult Fish Facility for release above Green Peter Dam to reduce fish handling.
- Please include additional text in the main document to explain why Hills Creek Dam Chinook salmon downstream passage survival estimates provided in Table 3-19 (p. 128) are listed as "N/A".

### Ceasing Federal Hydropower Operations

Ultimately, we would like USACE to have flexibility for how the Willamette Valley System's dams and reservoirs are managed to provide safe and effective volitional passage and other benefits for fish, to provide a reliable water supply for multiple purposes, and to benefit downstream water quality. The best solution for fish may not preclude the ability to generate power at a given dam during parts of the day or year when fish are less likely to be passing through the turbines (e.g., Cougar Dam interim operations and Foster Dam day/night operations).

- In addition to the "all or nothing" approach to ceasing federal hydropower operations (or "deauthorization") in the Willamette basin, a dam-by-dam analysis should be included.
- This analysis should provide information about costs and benefits of deauthorization at each dam (for fish passage, water quality, water supply, flow management flexibility, short-term and long-term project economic costs, etc.).
- This is consistent with WRDA 2022 (Section 8220) which requested "… a disposition study to determine the Federal interest in, and identify the effects of, deauthorizing hydropower as an authorized purpose, *in whole or in part* [emphasis added], of the Willamette Valley hydropower project."

---

[1] ODFW (Oregon Department of Fish and Wildlife) and NMFS (National Marine Fisheries Service). 2011. Upper Willamette River Conservation and Recovery Plan for Chinook Salmon and Steelhead. August 5, 2011. West Coast Region, NMFS.

**Flow Management & Water Supply**

- Given state expertise and water management authority, we continue to request involvement in the development of new flow management objectives required by the 2024 Biological Opinion.
- The SEIS frequently uses an 80 percent exceedance probability to describe reservoir storage (e.g., Tables 3-38 and 3-39 in the main document). It is unclear why this metric was selected; for example, it would be helpful to clarify if USACE intends to utilize this probability for future water supply agreements or whether the goal is to achieve this level of reliability when filling the reservoirs under the preferred alternative.
- Clarify whether the peak stored water amounts listed in Table 3-38 (Ch. 3, p. 197) include storage volumes from the power pool. If not, it would be useful to include an additional column to show available acre-feet of power pool storage that is unique to Alternative 6 for comparison to other alternatives.
- Comparing changes in water supply and storage between the No-Action Alternative, Interim Operations, the preferred Alternative 5, and Alternative 6 is very challenging, especially within the context of this SEIS. The No-Action Alternative includes the 2008 Biological Opinion flow objectives, as does Alternative 5, Alternative 6, and the Interim Operations, making it difficult to pinpoint the reason for changes in overall storage. For example, the document should include the probability of refill and how it may be impacted by an additional deep drawdown operation at Detroit, comparing that probability to other interim operations, and quantify any potential benefits of using the power pool volumes for other authorized purposes.
- Detroit deep drawdown operation – Table 3-1 (p. 72) summarizes hydrologic processes for each alternative and notes that Detroit elevations will be lower in the winter because of the deep drawdown and spring refill “may be impeded in years with exceedingly low inflow in late winter and spring.” Expanding upon this general statement with some level of probability of refilling Detroit would be helpful for understanding risks and tradeoffs and would also inform goals and objectives for the Forecast Informed Reservoir Operations project.
- Interim Operations (Appendix J-Water Supply, p. 86) mentions that the delayed refill at Cougar, fish passage operation at Lookout Point, and the 2008 flow targets would affect available stored water. A statement about whether the Detroit deep drawdown would impact storage refill, and to what extent, would be helpful. As an interim operation and focus of this SEIS, one would expect to see a detailed discussion about the Detroit deep drawdown operation in the water supply analysis appendix.
- Irrigation Estimates (Appendix J -Water Supply, p. 7) – the irrigation storage allocation discussion about newly converted instream water rights could be improved by mentioning the uncertainty with this irrigation estimate from the Willamette Basin Review study, which provides estimates of water rights that <u>may</u> be at risk. The study acknowledges the <u>potential</u> for regulation and how supplemental sources may come from other supplies beyond stored water. The SEIS discussion should note these as estimates with some uncertainty and some entities “may need” rather than “would need” a secondary source of water.

**Water Quality**

- In the Alternative 6 description of the Total Dissolved Gas (TDG) Modeling section (3.5.3.1), the document states, "Alternative 6 does not include specific measures to reduce TDG." Please include a brief explanation of any methods that were considered to reduce substantial projected increases to TDG, along with pros and cons of the different methods.
- Section 2.8.6 – Interim Operations should include additional details regarding monitoring and implementation of deep drawdowns:
  - Include discussion of what chemical and physical sediment characteristics USACE plans to sample, and at what frequency, and discuss any plans to estimate sediment transport rates and volumes during deep drawdowns.
  - The SEIS should describe how operations during the deep drawdown may be altered during different hydrologic conditions (adequate, dry (deficit), and wet (abundant) water years) and the range of impacts of these operations on temperature, turbidity, harmful algal blooms (HABS), and TDG.
  - The SEIS should clarify what factors USACE may consider in determining the timing, duration, and stepwise implementation of the drawdown.
  - The SEIS should include the expected timing (month) and duration of the Detroit drawdown in Table 2-2. It would be helpful if the language and timing descriptions for all deep drawdown operations were consistent across reservoirs. Currently, different information is presented for Green Peter, Lookout Point, Detroit, and Cougar reservoirs.
- Section 7.2.2 – Effects of Detroit Drawdown should reference USACE plans to coordinate with state agencies and downstream drinking water providers during the implementation of the drawdown.
- Section 3.19.4.1 – Turbidity should describe the data that will be collected to assess potential impacts of the deep drawdown.
- Appendix C mentions that there are no new hydraulic or sediment models run as a part of this analysis (Section 1.2 Analysis Metrics Summary, Page C-1-3). Are any additional sediment transport models being developed that would inform interim or long-term operations?
- Appendix C should include a written synthesis of the qualitative and quantitative metrics for sediment mobilization and transport, at a minimum comparing resulting values for the Preferred Alternative and Interim Operations to the No-Action Alternative. This synthesis should clarify how these analyses informed selection of a preferred alternative and elaborate on the potential expected impacts of different operations which are currently only presented in tables in this appendix.
- Dam modifications associated with deauthorization of hydropower and interim operations including deep drawdowns may affect mercury dynamics. The SEIS should include specific actions to assess the effects of operations and predict how they might be adaptively managed to reduce methylmercury production and bioaccumulation. Included strategies should align with the 2019 Willamette Mercury Water Quality Management Plan (WQMP) and should be implemented to meet assigned load allocations through control of existing sources of pollution or to offset predicted additional loading due to changes in operations and maintenance.

- Proposed changes to structures and operations in Alternative 6 and the interim operations should compare potential temperature impacts to the 2024 Willamette Subbasins Temperature Replacement Total Maximum Daily Load (TMDL) load allocations.
- Table 3-8 (Section 3.5.3.1) – Please describe what being within 2 degrees F of the temperature target is intended to represent. Is there a justification for this metric that could be described and/or cited?
- Table 3-9 (Section 3.5.3.1) – This section heading is "Summer Extremes", but Table 3-9 provides yearly output. The table would be more informative and interpretable if it only included the summer months, where the temperature could potentially be exceeded.

**Angling**

- Definitive statements regarding the effects of ODFW's kokanee releases into reservoirs are not warranted. Please change:
    - o "...in Detroit reservoir would mitigate..." to "may mitigate." (Section 7.2.2, pg. ES-10)
    - o "Releases of hatchery rainbow trout and kokanee would help maintain sport fishing opportunities..." to "Releases of hatchery rainbow trout and kokanee may help maintain sport fishing opportunities...". (Section 3.8.3.2, p. 132)
    - o "...in Detroit reservoir will mitigate..." to "might mitigate." (Section 3.8.4.1, p. 135)
    - o "Adverse effects...moderated....stocking of rainbow trout and kokanee...". Remove the word kokanee. We do not know whether stocking efforts will be successful or sustained. (Section 3.8.6, Table 3-24, p. 152. NAA column and Alternative 2A column)
    - o "Adverse effects...moderated....stocking of rainbow trout and kokanee...". Remove the word kokanee. We do not know whether stocking efforts will be successful or sustained. (Section 3.8.6, Table 3-24, p. 155. NAA column)
    - o "...in Detroit reservoir will mitigate..." to "might mitigate." (Section 3.11.4, p. 179)
    - o "Future stocking...in Detroit reservoir would mitigate..." to "may mitigate." (Section 3.14.4, p. 203 last sentence in last paragraph).
- Table 6-1 (Appendix E, Section 6.3.1, starting on p. E2-6-4) lacks the formatting of the original table cited in the HGMP which designates the waterbodies that do not include ESA-listed fish. Please update this table to clarify which waterbodies do not include ESA-listed fish.
- Appendix E, Section 6.3.2 Kokanee (starting on p. E2-6-6) should be updated to reflect that at least some kokanee that survived the Green Peter Reservoir deep drawdown returned as sockeye salmon in 2025. Following disease testing, ODFW transported some returning sockeye salmon above Green Peter Reservoir.
- Appendix E, p. E2-6-7. Kokanee are not present in Lookout Point Reservoir. Remove "Lookout Point Reservoir" from the last sentence of the second to last paragraph on this page.
- Chapter 3, p. 130 and Appendix E, Chapter 8 – consider updating to reflect recent Pacific lamprey releases above USACE WVS dams.

The success of the actions identified in both the Final EIS and this SEIS will depend on the appropriate research, monitoring, evaluation (RME) and resulting adaptive management of these actions to benefit multiple authorized purposes. We request a role in determining and prioritizing RME associated with the implementation of the EIS and SEIS, and input into decisions affecting adaptive management.

As cooperating agencies, we encourage USACE to coordinate with other state natural resource agencies, specifically, the Oregon Parks and Recreation Department, Oregon State Marine Board, and the Oregon Health Authority. These agencies manage state-owned facilities that may be impacted by operational changes at Detroit or may be aware of potential impacts to boating, recreation, and drinking water systems downstream.

Thank you again for the opportunity to comment. We look forward to working with USACE and other partners to finalize the supplemental EIS and implement the preferred alternative. If you have any questions, please feel free to contact our WATER Steering Team representatives.

Kind regards,

Doug Woodcock
Deputy Director
Water Resources Dept.

Jennifer Wigal
Water Quality Administrator
Dept. of Environmental Quality

Tom Stahl
Deputy Administrator for Inland Fish
Dept. of Fish and Wildlife

| | |
|---|---|
| From: | Alvin M. Klausen |
| To: | CENWP-PME-Williamette-Valley-System-EIS |
| Subject: | [Non-DoD Source] Public Comment from the Marion County Board of Commissioners on Detroit Dam Supplemental Environmental Impact Statement (SEIS) |
| Date: | Friday, December 19, 2025 2:51:53 PM |
| Attachments: | image001.png<br>Detroit SEIS USACE Public Comment - Marion County.pdf |

Good afternoon,

Please accept this letter of public comment from the Marion County Board of Commissioners regarding the Supplemental Environmental Impact Statement (SEIS) on the Army Corps of Engineers operational changes at the Detroit Dam in the Willamette Valley System.

Thank you for your time, consideration, and work on this issue.

**Alvin Klausen**
Government Relations
Marion County Board of Commissioners
Email: Aklausen@co.marion.or.us
Cell: 503-302-8440

**County Commissioners**
Danielle Bethell, Chair
Colm Willis
Kevin Cameron

**Chief Administrative Officer**
Jan Fritz

# MARION COUNTY BOARD OF COMMISSIONERS

December 16, 2025

U.S. Army Corps of Engineers, Portland District
Attn: Liz Oliver, Project Manager
Willamette Valley System Draft Supplemental EIS
333 SW 1st Avenue
Portland, OR 97204

**Re: Comments on the Willamette Valley System Operations and Maintenance – Draft Supplemental Environmental Impact Statement (SEIS)**

Dear Ms. Oliver:

The Marion County Board of Commissioners writes to provide comments on the Draft Supplemental Environmental Impact Statement (SEIS) addressing proposed changes to the operations of the Willamette Valley System, including Detroit Dam. Marion County encompasses downstream communities that rely heavily on the North and South Santiam Rivers for drinking water, economic vitality, recreation, and overall public health. As such, we have serious concerns regarding the Preferred Alternative as it relates to Detroit Reservoir operations.

**Downstream Drinking Water and Turbidity Concerns**

Foremost among our concerns is the risk of increased turbidity and sediment transport to downstream drinking water systems that rely on the Santiam River system as their primary source of potable water. Communities including Salem, Stayton, Turner, Jefferson, and multiple rural water districts collectively serve more than 200,000 Oregonians using water drawn directly from the Santiam Rivers. These systems are not designed to withstand prolonged or repeated high-sediment events without substantial cost, operational disruption, or risk to public health.

The SEIS characterizes anticipated turbidity impacts as "moderate," yet recent experience in the Willamette Basin calls that conclusion into question. The Green Peter and Foster Reservoir drawdown experiment, conducted for similar fish passage objectives, resulted in extreme turbidity levels downstream and tens of millions of dollars in documented damage to municipal drinking water infrastructure. Critically, the SEIS does not adequately incorporate this real-world data into its analysis, nor does it demonstrate how conditions at Detroit would materially differ in a way that meaningfully reduces risk.

Without clear, quantitative sediment modeling, turbidity projections, treatment-threshold analysis, and contingency planning, the SEIS does not provide sufficient assurance that downstream drinking water systems can operate reliably under the proposed drawdown regime. The Board is particularly concerned that proceeding without these analyses places local governments and ratepayers at risk of bearing the financial and public health consequences of a federal operational decision.

**Scientific Uncertainty and Effectiveness of the Proposed Action**

The Board is also concerned that the SEIS does not demonstrate, with site-specific scientific evidence, that the proposed deep drawdown at Detroit Dam will achieve its intended biological outcomes. While improving passage for ESA-listed salmonids is an important goal, the SEIS relies heavily on assumptions rather than empirical results. Notably, the Green Peter/Foster drawdown experiment has not yet demonstrated measurable improvements in salmon returns, and adult fish response will not be known for several years.

Given this uncertainty, it is premature to expand or replicate a drawdown strategy that has already produced severe and documented downstream impacts elsewhere in the basin. The SEIS does not answer the fundamental question facing affected communities: does this approach actually work, and does the anticipated benefits outweigh the demonstrated risks? Absent clear evidence of effectiveness, Marion County believes it is inappropriate to impose further risk on downstream water users and communities.

**Cumulative Impacts of Federal Actions**

Communities in the North Santiam Canyon and downstream Marion County have repeatedly absorbed the impacts of federal decisions related to land management, forest policy, dam operations, and emergency response. These cumulative impacts matter. Local governments and residents have consistently been asked to adapt to operational changes over which they have little control, while shouldering long-term economic and infrastructure consequences.

This proposed operational change must be evaluated within that broader context. The SEIS, as drafted, does not sufficiently account for the cumulative burden placed on these communities by successive federal actions, particularly when risks are localized while benefits remain uncertain or long-term.

**Ongoing Recovery from the 2020 Wildfires**

Finally, the Board emphasizes that communities in and around the Santiam Canyon are still actively recovering from the devastating 2020 Labor Day wildfires, which caused catastrophic loss of homes, businesses, infrastructure, and community stability in Detroit, Idanha, Gates, Lyons, and surrounding areas. Recovery has been slow and uneven, and recreation-based economic activity tied to Detroit Lake and the Santiam River system remains a critical pillar of that recovery. Actions that further disrupt reservoir levels, water quality, or recreation access risk undermining this fragile progress, yet the SEIS does not sufficiently analyze or acknowledge how the proposed drawdown could compound ongoing wildfire-related economic and social impacts.

**Marion County's Request**

The Marion County Board of Commissioners remains committed to protecting Oregon's natural resources and ensuring the long-term health and resilience of our environment. However, we cannot support proceeding with a deep drawdown at Detroit Dam without clearer scientific justification, comprehensive incorporation of lessons learned from the Green Peter/Foster experiment, and robust analysis of downstream drinking water risks and community impacts.

We respectfully request that the U.S. Army Corps of Engineers pause further implementation of this proposed operational change until:

- The results of prior drawdown experiments are fully evaluated and publicly documented;
- Site-specific sediment and turbidity modeling is completed for Detroit Reservoir;
- Downstream drinking water providers are fully engaged and protected; and
- The cumulative and post-wildfire impacts to Santiam Canyon communities are meaningfully addressed.

Marion County stands ready to work collaboratively with the Corps to identify solutions that balance fish recovery goals with public health, water reliability, and community resilience.

Thank you for your consideration of our comments.

Sincerely,

Danielle Bethell
Chair

Colm Willis
Commissioner

Kevin Cameron
Commissioner

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# DRAFT SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

NOVEMBER 2025

## TABLE OF CONTENTS

HOW TO USE THIS DOCUMENT ..... xiv

ABSTRACT ..... xv

ACRONYM AND ABBREVIATIONS ..... xvii

EXECUTIVE SUMMARY ..... ES-1

CHAPTER 1 - INTRODUCTION ..... 1

1.1 Background ..... 1
1.2 Chapter Terminology and Organization ..... 1
1.3 Regulatory Background ..... 1
 1.3.1 National Environmental Policy Act ..... 1
 1.3.2 Endangered Species Act ..... 1
 1.3.3 Willamette Valley System Endangered Species Act and National Environmental Policy History Since 2008 ..... 2
1.4 Geographic and Temporal Scopes ..... 2
 1.4.1 Geographic Scope ..... 2
1.5 Proposed Action ..... 2
1.6 National Environmental Policy Act Cooperating Agencies and Endangered Species Act Action Agencies ..... 2
1.7 U.S. Army Corps of Engineers-managed Dams, Reservoirs, and Bank Protection Structures in the Willamette River Basin ..... 3
 1.7.1 Dams and Reservoirs ..... 3
 1.7.2 Revetments and Other Structures for Bank Protection ..... 3
1.8 Non-U.S. Army Corps of Engineers-managed Dams in the Willamette River Basin ..... 3
1.9 U.S. Army Corps of Engineers Programs and Planning in the Willamette River Basin ..... 3
 1.9.1 Willamette River Basin Bank Protection Program ..... 3
 1.9.2 Willamette Hatchery Mitigation Program ..... 3
 1.9.3 Adult Fish Facilities ..... 3
 1.9.4 Research, Monitoring, and Evaluation ..... 3
 1.9.5 Forecast-informed Reservoir Operations ..... 3
1.10 Congressionally Authorized Purposes ..... 3
 1.10.1 Flood Risk Management ..... 3
 1.10.2 Hydropower ..... 4
 1.10.3 Fish and Wildlife ..... 4
 1.10.4 Recreation ..... 4
 1.10.5 Navigation ..... 4
 1.10.6 Irrigation ..... 4
 1.10.7 Municipal and Industrial Water Supply ..... 4
 1.10.8 Water Quality ..... 4

1.11 Willamette Valley System Operations and Annual Operational Planning ........................... 4
1.11.1 Reservoir Pools and Water Control ........................................................................ 4
1.11.2 Water Control Annual Planning ............................................................................. 4
1.11.3 Operation, Maintenance, Repair, Replacement, and Rehabilitation ....................... 9
1.11.4 Coordination of Willamette Valley System Operations with Other Agencies........... 9
1.12 Ongoing U.S. Army Corps of Engineers Planning and Environmental Reviews in the Willamette River Basin.................................................................................................... 9
1.12.1 Master Plans and Operational Management Plans................................................. 9
1.12.2 Interim Risk Reduction Measures............................................................................ 9
1.12.3 Court-ordered Injunction Measures........................................................................ 9
1.12.4 Willamette Valley System Vegetation Management Plans.................................... 10
1.12.5 Dexter Reservoir Shoreline Management ............................................................. 10
1.12.6 Long Tom River Ecosystem Restoration Project .................................................... 10
1.12.7 2022 Water Resource Development Act Report to Congress on Willamette Valley System Hydropower ............................................................................................... 10
1.12.8 2024 Water Resource Development Act Willamette Valley System Ceasing Hydropower Alternative ........................................................................................ 10

CHAPTER 2 - ALTERNATIVES ............................................................................................. 12
2.1 Introduction ................................................................................................................ 12
2.2 Chapter Terminology and Organization ...................................................................... 12
2.3 Proposed Action.......................................................................................................... 12
2.4 Purpose of and Need for the Proposed Action............................................................ 12
2.4.1 Summary of ESA Requirements Specific to the Need for the Proposed Action...... 13
2.5 Decision-making........................................................................................................... 13
2.6 Alternatives Development Overview............................................................................ 13
2.6.1 The Scoping Process................................................................................................ 13
2.7 Range of Reasonable Alternatives Development .......................................................... 14
2.8 Final Measures Developed for the Action Alternatives................................................. 15
2.8.1 Flow Measures......................................................................................................... 15
2.8.2 Water Quality Measures.......................................................................................... 16
2.8.3 Downstream Fish Passage Measures ...................................................................... 16
2.8.4 Upstream Fish Passage Measures ........................................................................... 16
2.8.5 Ceasing Federal Hydropower Operations Measures............................................... 16
2.8.6 Interim Operations ................................................................................................. 17
2.9 Alternatives Considered but Eliminated from Further Review ..................................... 20
2.10 Alternatives Considered in Detail and the Preferred Alternative ................................ 21
2.10.1 Adaptive Management Common to All Alternatives ............................................ 21
2.10.2 Existing Operations Common to All Alternatives .................................................. 21
2.10.3 No-action Alternative ............................................................................................ 21

2.10.4 Action Alternatives ........ 21

CHAPTER 3 - AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES ........ 30

3.1 Introduction ........ 30

3.1.1 Large Woody Debris ........ 30

3.2 Hydrologic Processes ........ 30

3.2.1 Affected Environment ........ 30

3.2.2 Environmental Consequences ........ 30

3.3 Section 3.3 ........ 75

3.4 Geology and Soils ........ 75

3.4.1 Introduction ........ 75

3.4.2 Affected Environment ........ 75

3.4.3 Environmental Consequences ........ 75

3.4.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 78

3.4.5 Climate Change under All Alternatives ........ 79

3.5 Water Quality ........ 79

3.5.1 Introduction ........ 79

3.5.2 Affected Environment ........ 79

3.5.3 Environmental Consequences ........ 79

3.5.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 89

3.5.5 Climate Change Effects ........ 96

3.5.6 Summary of Effects ........ 97

3.6 Vegetation ........ 107

3.6.1 Introduction ........ 107

3.6.2 Affected Environment ........ 107

3.6.3 Environmental Consequences ........ 107

3.6.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 112

3.6.5 Climate Change Effects under All Alternatives ........ 112

3.7 Wetlands ........ 113

3.7.1 Introduction ........ 113

3.7.2 Affected Environment ........ 113

3.7.3 Environmental Consequences ........ 113

3.7.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 117

3.7.5 Climate Change under All Alternatives ........ 117

3.8 Fish and Aquatic Habitat ........ 118

3.8.1 Introduction ........ 118

3.8.2 Affected Environment ........ 118

3.8.3 Environmental Consequences ........ 118

3.8.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 134

3.8.5 Climate Change Effects under All Alternatives ........ 137
3.8.6 Summary of Effects on Fish and Aquatic Habitat ........ 137
3.9 Wildlife and Habitat ........ 157
3.9.1 Introduction ........ 157
3.9.2 Affected Environment ........ 157
3.9.3 Environmental Consequences ........ 157
3.9.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 162
3.9.5 Climate Change Effects under All Alternatives ........ 162
3.10 Air Quality and Greenhouse Gas Emissions ........ 163
3.10.1 Introduction ........ 163
3.10.2 Affected Environment ........ 163
3.10.3 Environmental Consequences ........ 163
3.10.4 Alternatives Analyses ........ 167
3.10.5 Interim Operations ........ 169
3.11 Socioeconomics ........ 169
3.11.1 Introduction ........ 169
3.11.2 Affected Environment ........ 169
3.11.3 Environmental Consequences ........ 169
3.11.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 179
3.11.5 Climate Change under All Alternatives ........ 179
3.12 Power Generation and Transmission ........ 179
3.12.1 Introduction ........ 179
3.12.2 Affected Environment ........ 181
3.12.3 Environmental Consequences ........ 181
3.12.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 193
3.12.5 Climate Change under All Alternatives ........ 194
3.13 Water Supply ........ 194
3.13.1 Introduction ........ 194
3.13.2 Affected Environment ........ 194
3.13.3 Environmental Consequences ........ 194
3.13.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 198
3.13.5 Climate Change under All Alternatives ........ 199
3.14 Recreation Resources ........ 200
3.14.1 Introduction ........ 200
3.14.2 Affected Environment ........ 200
3.14.3 Environmental Consequences ........ 200
3.14.4 Interim Operations under All Action Alternatives Except Alternative 1 ........ 203
3.14.5 Climate Change Effects under All Alternatives ........ 204
3.15 Land Use ........ 204

3.16 Hazardous Materials ..... 204
3.17 Public Health and Safety—Harmful Algal Blooms ..... 204
3.18 Public Health and Safety—Hazardous, Toxic, and Radioactive Waste ..... 204
3.19 Public Health and Safety—Drinking Water ..... 204
3.19.1 Introduction ..... 204
3.19.2 Affected Environment ..... 204
3.19.3 Environmental Consequences ..... 205
3.19.4 Interim Operations under All Action Alternatives Except Alternative 1 ..... 209
3.19.5 Climate Change under All Alternatives ..... 212
3.20 Environmental Justice ..... 212
3.21 Cultural Resources ..... 213
3.21.1 Introduction ..... 213
3.21.2 Affected Environment ..... 213
3.21.3 Federal Laws and U.S. Army Corps of Engineers Regulations ..... 213
3.21.4 Environmental Consequences ..... 213
3.21.5 Effects to Downstream Cultural Resources under All Alternatives ..... 221
3.21.6 Interim Operations under All Action Alternatives Except Alternative 1 ..... 221
3.21.7 Climate Change under All Alternatives ..... 223
3.21.8 Mitigating Adverse Effects to Cultural Resources ..... 223
3.22 Visual Resources ..... 223
3.22.1 Introduction ..... 223
3.22.2 Affected Environment ..... 223
3.22.3 Assessing Visual Quality ..... 223
3.22.3 Visual Resource Inventory of Dams and Reservoirs ..... 223
3.22.4 Visual Quality of Dams and Reservoirs in the Analysis Area ..... 224
3.22.5 Environmental Consequences ..... 224
3.22.6 Interim Operations under all Alternatives Except Alternative 1 ..... 228
3.22.7 Climate Change under All Alternatives ..... 228
3.23 Noise ..... 229
3.24 Tribal Resources ..... 229
3.24.1 Introduction ..... 229
3.24.2 Affected Environment ..... 229
3.24.3 Environmental Consequences ..... 230
3.25 Summary of Direct and Indirect Environmental Consequences ..... 230
3.26 Unavoidable Adverse Effects ..... 230
3.27 Relationship between Short-term and Long-term Productivity ..... 230
3.28 Irreversible and Irretrievable Commitments of Resources ..... 231
3.29 Intentional Destructive Acts ..... 231

CHAPTER 4 - CUMULATIVE EFFECTS ........ 232

CHAPTER 5 - PREFERRED ALTERNATIVE ........ 233

5.1 Comparison of Alternatives ........ 233

5.1.1 Objective 1 - Allow greater flexibility in water management ........ 233

5.1.2 Objective 2 - Increase opportunities for the creation of nature-based structures 234

5.1.3 Objective 3 - Allow greater flexibility in hydropower production ........ 234

5.1.4 Objectives 4 through 6 - ESA-listed fish ........ 234

5.1.5 Objective 7 - Reduce spawning and rearing habitat competition caused by hatchery fish ........ 235

5.1.6 Cost Criteria and Metrics ........ 236

5.1.7 Economic Metrics for Effects to Recreation ........ 236

5.1.8 Summary of Alternatives Comparison ........ 237

5.1.9 Summary of Effects ........ 241

5.2 Preferred Alternative ........ 252

5.3 Implementation Plan Summary ........ 253

5.4 Adaptive Management Plan ........ 253

CHAPTER 6 - PUBLIC INVOLVEMENT ........ 254

6.1 Introduction ........ 254

6.1.1 Public Scoping Outreach ........ 254

6.1.2 Scoping Comments ........ 255

6.2 Key Issues and Resource Concerns ........ 256

6.2.1 Hydropower ........ 256

6.2.2 NEPA Process ........ 256

6.2.3 Environmental Impacts ........ 257

6.2.4 Deep Drawdown ........ 257

6.3 Interagency Coordination ........ 257

6.4 Tribal Consultation ........ 257

6.5 Draft EIS Public Outreach Summary ........ 257

CHAPTER 7 - RELATIONSHIP TO OTHER ENVIRONMENTAL PLANS, POLICIES, AND REGULATIONS ........ 258

CHAPTER 8 - GLOSSARY ........ 259

CHAPTER 9 - LIST OF PREPARERS ........ 260

CHAPTER 10 - REFERENCES ........ 263

CHAPTER 11 - ANALYSIS AREA SUBBASINS ........ 264

# How to Use This Document

The Supplemental EIS (SEIS) only includes new information related to the addition of an alternative that ceases Federal hydropower operations in the Willamette Valley System, and revisions to the Interim Operations including a late fall/early winter deep drawdown for fish passage at Detroit Dam and change to the minimum flow targets. Generally, the SEIS does not reproduce information from the Final EIS (FEIS) but incorporates information by reference as encouraged by NEPA and USACE policy and procedures. This results in a more concise document.

Some graphs and tables are reproduced to provide context. One example is the effects summary tables have been reproduced, retaining the effects of the seven alternatives presented in the FEIS, and then supplemented with new information.

Chapter and section numbers in the SEIS match the chapter and section numbers in the FEIS, which allows readers to quickly reference information from the FEIS and understand updates. Some sections have been descoped from the SEIS based on changes to laws, regulations, and recent executive orders; however, the SEIS retains those section number headings to mirror the FEIS. Tables and figures that are reproduced in the SEIS have different numbers than the FEIS, but include a footnote with the corresponding table in the FEIS. New tables created for the SEIS do not have a footnote, and they may repeat table numbers in the FEIS.

The Detroit Drawdown, as a part of the Interim Operations, has proven to be a primary interest of commenters during the scoping of this SEIS. The effects of the Detroit Drawdown are discussed throughout Chapter 3 but may be more efficiently accessed by searching the phrase “Detroit Drawdown”. Also, a brief summary of the effects of the drawdown is provided in section 7.2.2 of the Executive Summary.

The FEIS is available in the USACE Digital Library at:
https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/27619

# ABSTRACT

The U.S. Army Corps of Engineers (USACE), Portland District prepared this Draft Supplemental Environmental Impact Statement (DSEIS) to address the directive in the 2024 Water Resources Development Act (WRDA 24) to formally analyze an alternative that ceases Federal hydropower operations at USACE owned and operated Willamette Valley dams and reservoirs. This DSEIS supplements previous efforts, the Willamette Valley System (WVS) Draft and Final EIS (FEIS), to study how to continue to operate the WVS in a manner that complies specifically with the Endangered Species Act (ESA) as well as all other applicable legal requirements.

This SEIS complies with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321. Ten Cooperating Agencies and interested tribes provided information and review throughout the EIS process.

Public involvement during the scoping process informed the DSEIS. Public scoping began on May 16, 2025, with publication of a Notice of Intent in the Federal Register (90 FR 21015). The Public Comment Scoping Report is in Appendix P.

The Proposed Action is to continue operations and maintenance of the Willamette Valley System for specific, authorized purposes. Congress directed responsibility for operating each dam and reservoir individually and as part of a system to USACE in authorizing legislation. Consequently, the Proposed Action is to continue to operate this system to achieve the objectives set by Congress while meeting ESA requirements.

USACE operates a complex water management system in western Oregon's Willamette Valley by storing and releasing water from 13 reservoirs to balance needs and demands throughout the year. USACE coordinates the operations and maintenance of the 13 reservoirs and dams, which function together as the WVS. Water needs and demands are balanced among eight Congressional authorized uses: flood risk management, hydropower, fish and wildlife, recreation, navigation, irrigation, municipal and industrial water supply, and water quality. The system also must operate, follow, and comply with all applicable laws including the ESA, which it was found to be out of compliance.

This SEIS analyzes a new alternative that ceases Federal hydropower operations at the eight dams that produce Federal hydropower in the WVS. In the FEIS USACE analyzed the No-action Alternative and seven action alternatives. The seven action alternatives include various combinations of operational or structural measures to continue to improve conditions for ESA listed species including flow, water quality, and fish passage. The FEIS also included measures common to all action alternatives, including gravel augmentation and operation and maintenance of adult fish facilities among other measures. This SEIS only describes the new alternative in detail because it incorporates the other alternatives by reference.

This SEIS also analyses new operations required by the National Marine Fisheries Service's (NMFS) 2024 *Endangered Species Act Section 7(a)(2) Biological Opinion (Biological Opinion) and*

*Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Willamette Valley System*. This includes a new requirement for a deeper drawdown of Detroit Reservoir until a long-term fish passage solution is in place and continuation of NMFS's 2008 Biological Opinion flow requirements until a new flow management plan is developed. The operation is part of a suite of interim operations and its effects are often described in combination with the other operations. *If you are looking for information on the Detroit fall drawdown for fish passage it will be contained in the discussion of Interim Operations throughout Chapter 3.*

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# DRAFT SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

# EXECUTIVE SUMMARY



Painting by Lee Jensen, USACE Employee, 1991-2001 (USACE, Portland District Media Images).

## 1 - INTRODUCTION

The U.S. Army Corps of Engineers (USACE), Portland District prepared this Draft Supplemental Environmental Impact Statement (SEIS) in response to Section 1326 of the Water Resources Development Act of 2024 (WRDA 24). WRDA 24 states:

> The Secretary [of the Army] may not complete its review of, and consultation with other Federal agencies on, the operation and maintenance of the projects for flood control, navigation, and other purposes, Willamette River Basin, Oregon, authorized by section 4 of the Act of June 28, 1938 (chapter 795, 52 Stat. 1222; 62 Stat. 1178; 64 Stat. 177; 68 Stat. 1264; 74 Stat. 499; 100 Stat. 4144), until the Secretary prepares and formally analyzes an alternative that ceases hydropower operations at the projects, notwithstanding hydropower being an authorized purpose of such projects.

USACE published the Willamette Valley System Operations and Maintenance Final Environmental Impact Statement (FEIS) in April 2025. USACE signed a Record of Decision (ROD) on the interim operation and Foster Warm Water Supply Pipe in May 2025. This ROD allows USACE to comply with the National Environmental Policy Act (NEPA) requirements for Interim Operations while continuing to evaluate a new alternative addressed by this SEIS.

USACE is supplementing the FEIS to include a new alternative that ceases Federal hydropower operations at Willamette Valley System dams. Eight of the thirteen dams generate Federal hydropower. As described in WRDA 24, the new alternative only analyzes ending Federal operations to generate hydropower. The alternative maintains the remaining authorizations of flood control (flood risk management), fish and wildlife, recreation, navigation, irrigation, municipal and industrial water supply, and water quality.

The SEIS complies with the NEPA, 42 U.S.C. §§ 4321. The NEPA process for this EIS began in 2019, prior to Congress amending NEPA in 2023 under the Fiscal Responsibility Act, and revisions to the Council on Environmental Quality's (CEQ) 1978 implementing NEPA regulations. USACE complied with the previous statute in preparing this SEIS while also trying to carry out the provisions of the amendments as practical. CEQ rescinded all its implementing regulations on April 11, 2025. The Trump-Vance Administration rescinded several Executive Orders and related guidance regarding climate change and environmental justice analyses just prior to finalization of the FEIS. Consequently, references to the CEQ regulations and analyses of greenhouse gas emissions, social cost of carbon, and climate change were not removed from the FEIS to avoid delay in decision-making and the significant time and resources required for document revisions.

Ten Cooperating Agencies provided information and review throughout the SEIS process. Public involvement during the scoping process informed the development of the SEIS including the types of analyses to conduct and how to scope the additional alternative. Public scoping began on May 16, 2025, with publication of a Notice of Intent in the Federal Register (90 FR 21015). The Public Comment Scoping Report is in Appendix P.



Unknown Photo Credit (USACE Media Images Database)

McKenzie River.

## 2 - BACKGROUND

The United States Congress, through the Flood Control Act of 1938 and subsequent acts, authorized USACE to construct, operate, and maintain a system of dams, reservoirs and bank protection revetments primarily for flood control, now known as flood risk management, in the Willamette River Basin (Figure ES-1). USACE operates and maintains the Willamette Valley System (WVS) as a system of 13 dams and reservoirs and associated hatchery and fish collection facilities:

- Hills Creek, Lookout Point, Dexter, and Fall Creek dams and reservoirs in the Middle Fork Willamette River Subbasin
- Dorena and Cottage Grove dams and reservoirs in the Coast Fork Willamette River Subbasin
- Cougar and Blue River dams and reservoirs in the McKenzie River Subbasin
- Fern Ridge Dam and Reservoir in the Long Tom River Subbasin
- Green Peter and Foster Dams and Reservoirs in the South Santiam River Subbasin
- Detroit and Big Cliff dams and reservoirs on the North Santiam River

Congress authorized eight purposes for the WVS - flood risk management, hydropower, fish and wildlife, recreation, navigation, irrigation, municipal and industrial water supply, and water quality. To meet these purposes, the WVS stores and releases water from the 13 reservoirs to balance needs and demands for water resources. Congress authorized nine WVS dams for Federal hydropower: Hills Creek, Lookout Point, Dexter, Fall Creek, Cougar, Blue River, Detroit,

Big Cliff, Green Peter and Foster. Blue River Dam was authorized for hydropower, but USACE never installed power generators.

Congress delegated other Federal agencies responsibilities for the WVS, including the Bonneville Power Administration, which markets and transmits the electrical power generated by the eight Federal hydropower-producing dams, and the U.S. Bureau of Reclamation, which markets water for irrigation purposes to users within the Willamette River Basin.




**Figure ES-1. Willamette Valley System Dams, Reservoirs, Adult Fish Facilities, and Fish Hatcheries.**

**3 - PROPOSED ACTION**

The Proposed Action is to continue operations and maintenance of the Willamette Valley System (WVS) for specific, authorized purposes. Congress directed responsibility for operating each dam and reservoir individually and as part of a system to USACE in authorizing legislation. USACE would implement the Proposed Action over a 30-year timeframe.

**4 - PURPOSE AND NEED FOR THE PROPOSED ACTION**

The purpose and need for the continued operations and maintenance of the WVS is to operate the system in accordance with the eight Congressionally authorized purposes and in compliance with the ESA and all other applicable treaties, laws, and regulations (Chapter 1, Introduction, Section 1.10, Congressionally Authorized Purposes).

In the DEIS and FEIS, measures and alternatives were screened from further consideration if they did not meet the purpose and need statement. USACE interpreted the purpose and need statement very broadly when screening out measures or alternatives from further consideration. For example, the Cougar diversion tunnel operation only provides conservation storage and operates for hydropower purposes for a few days out the entire 84-year hydrological period of record analyzed. Because the measure did not eliminate these purposes entirely the Cougar diversion tunnel operation was retained for formal analysis, even though it is outside USACE's current authorities. This broad interpretation was the result of significant input from cooperators. Ultimately the screening process resulted in a reasonable range of seven different action alternatives composed of various measures.

As stated in Section 2.1, four months before publication of the FEIS and six years into the NEPA process, Congress passed a provision in WRDA 24 that required USACE to formally analyze an alternative that ceases hydropower operations at the WVS projects. WRDA 24 does not reference NEPA or proscribe that the alternative be formally analyzed in a NEPA document. However, USACE determined it had the discretion to supplement the FEIS to include the alternative required by WRDA 24. USACE decided that providing additional information for the public to comment on and context for the decision maker would be in furtherance of NEPA. However, USACE did not revise its purpose and need statement to include numerous other alternatives to keep the process efficient and timely, as emphasized in the Fiscal Responsibility Act (FRA) of 2023 (Pub. L. No. 118-5, 137 Stat. 10). Instead, it is relying on the clear directive in WRDA to analyze a single alternative that ceases hydropower operations at the WVS projects.

**5 - CONSTRAINTS**

USACE identified constraints on an alternative to ensure the actions properly considered the purpose and the need for the study and USACE responsibilities. For example, potential alternative measures were eliminated from consideration for the following:

- Flood Risk Management: Preliminary modeling results aided screening measures with potential adverse flood risk effects. Specifically, measures that would result in flood risk increases from current protection levels were eliminated as an alternative measure.
- Dam Safety: USACE performed a preliminary evaluation of measures for dam safety. Measures that would compromise dam safety and could not be mitigated were eliminated. USACE will evaluate components in a more detailed dam safety analysis during site-specific planning and design.

## 6 - OBJECTIVES

Objectives represent desired outcomes, as identified by the Federal agencies and scoping comments during the development of the FEIS. The SEIS retained the objectives. The seven primary objectives are:

1. Allow greater flexibility in water management (related to refill, drawdown timing, and other water management measures).
2. Increase opportunities for the creation of nature-based structures during maintenance of USACE-owned revetments (structures that help prevent bank erosion).
3. Allow greater flexibility in hydropower production.
4. Increase ESA-listed fish passage survival at WVS dams.
5. Improve water management during the conservation season to benefit anadromous ESA- listed fish and other authorized project purposes.
6. Reduce pollutant levels to restore impaired water quality associated with the WVS dams to benefit anadromous ESA-listed species.
7. Reduce spawning and rearing habitat competition caused by hatchery fish.

These objectives, along with the purpose and need, guided the development of a reasonable range of alternatives in the FEIS. As the SEIS is a supplement to the FEIS and retained the same purpose and need, the objectives are also carried forward in the analysis. However, as described above, Alternative 6 was developed in response to the requirements in WRDA 24 and is not aligned with the original purpose and need.

## 7 - MEASURES AND ALTERNATIVES

As part of the development of the FEIS, the USACE EIS team identified and compiled a list of operational and structural measures, or actions, that met at least one of the seven objectives for the Proposed Action. A measure is the action an agency would take to achieve a given objective. It describes either a physical (structural) change requiring construction or an operational change, usually in a precise location, that meets an objective, in whole or in part.

The team screened out potential measures based on criteria for meeting the purpose and need for the project, achieving stated objectives, and technical considerations. Using input from the public and cooperating agencies during scoping and professional judgement the team then created alternatives using combinations of the remaining measures around unifying themes or strategies. An alternative is a combination of one or more measures that, together, would address one or more of the objectives.

After multiple rounds of screening, the team compiled the measures that demonstrated the best outcomes for meeting project objectives into three hybrid alternatives (Alternatives 2A, 2B, and 5) that represents a fusion of four action alternatives (Alternatives 1, 3A, 3B, and 4). How each of the action alternatives meet the objectives is listed in Table ES-1.

**Table ES- 1. Project Alternative Strategies and Associated Objectives.**

| Alternative | Strategy | Objectives |
|---|---|---|
| No Action | Current O&M Practices | None |
| 1 | Improve Fish Passage Through Storage-Focused Measures: Increase the probability of refilling WVS reservoirs and supplemental water delivery for authorized purposes | 1, 2, 3, 4, 5, 6, 7 |
| 2A | Integrated Water Management Flexibility and ESA-Listed Fish Alternative | 1, 2, 4, 5, 6, 7 |
| 2B | Integrated Water Management Flexibility and ESA-Listed Fish Alternative | 2, 4, 5, 6, 7 |
| 3A & 3B | Operations Focused: Improve passage of ESA-listed fish through existing structures by modifying water control operations | 2, 4, 5, 6, 7 |
| 4 | Structures Focused: Improve passage of ESA-listed fish by constructing fish passage and temperature control structures | 1, 2, 3, 4, 5, 6, 7 |
| 5 | Refined Integrated Water Management Flexibility and ESA-Listed Fish Alternative - Preferred Alternative | 2, 4, 5, 6, 7 |
| 6 | Ceasing Federal Hydropower Operations | 2, 4, 5, 6, 7 |

### 7.1 Assessment and Comparison of Alternatives

For each resource topic, such as Water Quality, Fish and Wildlife, Cultural Resources, environmental effects are discussed in Chapter 3. The analysis of the resource effects in Chapter 3 is at a broad and macroscopic scale and scope given the regional nature of the study. USACE will conduct subsequent NEPA analyses of future site-specific actions. Additional information on how USACE intends to conduct subsequent site-specific NEPA analysis and environmental compliance is in Chapter 7 of the FEIS.

In the effects analysis, USACE compares the benefits, environmental consequences, and tradeoffs of each of the action alternatives against the No Action Alternative (NAA). USACE developed multiple criteria to evaluate how effectively each alternative met the objectives, while considering costs and environmental, economic, and social effects. USACE then performed a tradeoff analysis using these criteria to compare the alternatives. To develop criteria, USACE considered the benefits and environmental and social consequences as reflected in Chapters 3 and 4 and then assessed the tradeoffs presented under each alternative. Descriptions of the criteria, the procedure for comparing alternatives, and the results of that comparison to identify a preferred alternative are discussed in detail in Chapter 5 of the draft EIS and the draft SEIS. This information is solely to provide the public with USACE's current rational and may change before the final SEIS and subsequent ROD.

## 7.2 Alternative 6 and Interim Operations

USACE developed Alternative 6 to meet WRDA 24 requirements to include an alternative in the EIS that ceases Federal hydropower operations in the WVS. The specific language in WRDA 24 informed key portions of Alternative 6. For example, Congress directed the USACE to analyze ceasing hydropower operations at the projects, not reduce hydropower operations or remove the projects. The other features of Alternative 6 were developed like all the other alternatives in the FEIS, to meet the stated alternative strategies and associated objectives (Appendix A, Section 1.1.4 Development of Alternative 6).

Interim Operations are a suite of independent operations that would occur until the long-term solution for downstream fish passage and water temperature management at the respective location is in place and operational. Interim Operations in the SEIS are the same as the Interim Operations evaluated in the FEIS but now include a late fall/early winter deep drawdown for fish passage at Detroit Dam and replacement of the integrated temperature and flow management targets with the 2008 Biological Opinion minimum flow targets until a new flow management plan is developed in conjunction with the National Marine Fisheries Service (NMFS).

### 7.2.1 Effects of Alternative 6 – Ceasing Federal Hydropower Operations

The effects of Alternative 6 are discussed in detail in Chapter 3, but some of the more noteworthy effects are summarized here. In general, Alternative 6 is expected to have adverse effects on hydropower generation and increase construction costs. It would also remove the ability of the communities of Blue River and Oak Ridge to obtain power directly from the dam in emergency situations, which has historically been possible. Adverse effects to fish are reduced compared to the NAA primarily due to structural downstream passage improvements at Detroit, Foster and Lookout Point dams, and deep reservoir drawdowns to the diversion tunnel at Cougar Dam. At other dams adverse effects on fish passing downstream passage at dams are increased, along with impacts for fish below dams from high TDG, both due to modification of penstocks with removal of turbines and installation of cone valves or in-line orifices.

### 7.2.2 Effects of Detroit Drawdown

The effects of the Detroit Drawdown are a part of the Interim Operations and discussed in detail in Chapter 3, but some effects are summarized here. In general, the deep drawdown at Detroit Reservoir is expected to adversely affect water supply, water quality, drinking water (facility operation), and recreation. The effects of the drawdown on fish are mixed as described below.

Regarding water supply, the late fall/early winter drawdown could affect peak summer reservoir levels at Detroit Reservoir. In very dry winters, USACE may not be able to refill the reservoir to minimum conservation pool by February 1, which could result in a lower reservoir level than currently experienced in very dry years. Under current operations, naturally dry years affect how much water USACE is able to store while still meeting NMFS 2008 Biological Opinion downstream minimum flow targets. During dry years, USACE would coordinate with regional partners to minimize effects to downstream users reliant on the augmented streamflows.

For water quality and drinking water, the deeper drawdown of Detroit Reservoir would cause a moderate increase in sediment and turbidity levels downstream of Detroit Reservoir during the operation. This effect determination is based on knowledge of sediment and geologic characteristics of the basin, comparison to other drawdowns, and proposed approach to the drawdown operation. The deeper drawdown at Detroit Dam has not been conducted at the time of the SEIS development. USACE expects sediment to be mobilized by the drawdown action, resulting in increased turbidity downstream of Detroit and Big Cliff dams, but to a much lesser extent than experienced downstream during the recent deep drawdown of Green Peter Reservoir 2023 and 2024 because the drawdown of Detroit Reservoir will expose a significantly smaller area of sediment and retain a much larger residual pool relative to the Green Peter drawdown operation. Additionally, USACE is proposing to conduct the deep drawdown in a stepwise manner, reaching the target elevation over the course of several fall/winters, minimizing how much new sediment is mobilized and exposed each year. The larger residual pool is expected to act as a sediment sink more so than the Green Peter residual pool due to the differences in the type of clay in each sub-basin; though the fine clay material eroded from exposed sediment is likely to stay in suspension and pass downstream of Detroit dam.

Detroit Reservoir is one of the most popular reservoirs in the analysis area with high visitation numbers. A late fall/early winter deep drawdown of Detroit Reservoir would result in lower summer pool elevations, in dry years. Though it is difficult to determine if users would experience a meaningful increase because of the underlying issue is hydrologic conditions in dry years and USACE conducts in season adaptive management to limit these effects. Low summer pool elevations during dry years would result in boat ramp(s) being unusable. Mongold Boat Ramp, which is at the minimum conservation pool elevation, would be the only boat ramp available during extreme dry years, same as under current operations, but for a shorter duration. This would likely impact recreational opportunities for fishing and boating. These effects are not expected every year but may reoccur over the 30-year implementation timeframe.

Effects of Detroit Reservoir deep drawdowns on fish would vary by species, lifestage and their locations. The late fall/early winter deep reservoir drawdowns would benefit downstream fish passage for Chinook and steelhead salmon, by adding an option for greater survival of juvenile migrants through non-turbine routes when hydraulic conditions are safer (due to lower pool elevations) and allowing diverse migratory life history stages. Sport fishing in Detroit Reservoir would be adversely affected due to changes in the reservoir habitat conditions and food availability affecting fish growth and survival and increasing rates of entrainment for resident fish downstream of the dam (Appendix E, Chapter 6). Many entrained resident fish would be injured or not survive passage through the dam. For some species, significant reductions in abundance within Detroit Reservoir are possible. Ongoing future stocking of hatchery reared species (e.g. rainbow trout and kokanee) by ODFW in Detroit Reservoir would mitigate some of these effects.

### 7.3 Preferred Alternative

The FEIS identified Alternative 5 as the Preferred Alternative; and the DSEIS also identifies Alternative 5 as the Preferred Alternative. Identification of a preferred alternative does not prevent USACE from selecting a different alternative once the public has reviewed and commented on the SEIS. USACE developed Alternative 5 to (1) improve fish passage throughout the WVS, (2) to manage water quality downstream of WVS dams using a combination of modified operations and structural improvements, and (3) to balance water management flexibility to meet downstream water requirements for fish and wildlife.

Operations under Alternative 5 include implementing the NMFS 2024 Biological Opinion Reasonable and Prudent Alternatives, including Interim Operations for downstream fish passage and temperature management. The Interim Operations included in the FEIS now additionally include the drawdown of Detroit Reservoir in the late fall/early winter timeframe. As required by the NMFS 2024 Biological Opinion, USACE would implement the NMFS 2008 Biological Opinion minimum flow targets until USACE and NMFS develop a new flow management plan.

Under Alternative 5, USACE would construct fish passage structures at Detroit, Foster, and Lookout Point dams, and use operations to aid fish passage at Green Peter, Cougar and Fall Creek dams. Measures under Alternative 5 would also include:

- Construction of a selective withdrawal structure for temperature management at Detroit Dam.
- Operations to manage downstream temperatures at Green Peter Dam.
- Continue the fall drawdown to support fish passage at Fall Creek Reservoir.
- Operations of fish facilities and adult fish transport above the dams.
- Operations for environmental flows under the Sustainable Rivers Program.
- Gravel augmentation downstream of Cougar, Blue River, Foster, and Big Cliff dams.

- Nature-based approach to maintaining revetments.

## 8 - REGIONAL INPUT

USACE has the responsibility and legal authority for managing the WVS in coordination with tribal, Federal, and state partners, and for collaborating with these partners and other cooperating agencies under NEPA to develop this SEIS. When initiating and preparing the SEIS, USACE held three cooperating agency meetings and four public scoping meetings in May and June of 2025. A detailed description of the public involvement process is in Chapter 6 of the SEIS.

### 8.1 Cooperating Agencies

As the lead agency for this SEIS, USACE invited agencies with jurisdiction by law or special expertise relevant to the WVS and its O&M to be cooperating agencies. Agencies that accepted cooperating agency status are listed in Table ES-2, below, and are described briefly in Section 1.6 of the FEIS and in detail in Appendix L. These cooperating agencies contributed to the SEIS by providing information and input throughout the NEPA process.

**Table ES-2. Cooperating Agencies.**

| Agency |
| --- |
| **Tribal** |
| Confederated Tribes of Grand Ronde Community of Oregon |
| **Federal** |
| Bonneville Power Administration |
| U.S. Bureau of Reclamation |
| National Marine Fisheries Service |
| U.S. Fish and Wildlife Service |
| United States Environmental Protection Agency |
| **State of Oregon** |
| Oregon Department of Agriculture |
| Oregon Department of Environmental Quality |
| Oregon Department of Fish and Wildlife |
| Oregon Water Resources Department |

### 8.2 Public Scoping for SEIS

Two scoping meetings were held in person, the first in Detroit, Oregon and the second in Salem, Oregon. Two additional virtual meetings were held on Microsoft Teams. All meetings included a presentation. The virtual meeting presentations were followed by an open question and answer period. At the in-person meetings, an open house format followed the presentation to

encourage discussion and information sharing and to ensure the public had opportunities to speak with USACE representatives. An average of 20 people attended each scoping meeting.

USACE received 117 correspondence documents via email, mail, and comment brochures that were distributed and then collected at the meetings. Many of the correspondence documents contained multiple comments on different topics. A total of 246 comments were received from private citizens, non-governmental organizations, government agencies, and tribes (Table 6-1). The comments were then organized, analyzed, and categorized according to four topics as found in Table ES-3, below.

**Table ES-3. Public Scoping Comments Received by Topic.**

| Topic | # of Comments Received |
|---|---|
| Hydropower | 30 |
| Deep Drawdown | 133 |
| NEPA process | 65 |
| Environmental impacts | 18 |
| **Total** | **246** |

About half of the comments USACE received during scoping concerned the deep drawdown at Detroit Reservoir. Comments were used to inform the scope of analysis, alternatives development, and identification of potentially significant issues to be addressed in the Draft SEIS.

### 8.3 Key Issues and Resource Concerns

Several key issues were raised during scoping including, but not limited to, those listed in Table ES-4, below.

**Table ES-4. Summary of Key Concerns Identified During Public Scoping for the SEIS[1].**

| Issue Category | Summary of Concern |
|---|---|
| **Alternative/SEIS Development** | USACE should consider a dam-by-dam analysis of hydropower operations.<br>The scope of the alternative is too narrow.<br>Differing perspectives on how to balance all the authorized purposes and ESA requirements.<br>The SEIS should analyze impacts to water supply, sedimentation and turbidity. |
| **Hydropower Operations** | Support for continuing hydropower production, and support for ending hydropower production.<br>Questions about how ending hydropower operations would impact climate goals, cost for operation and maintenance of the dams.<br>Questions regarding what would happen to the reregulation dams with hydropower production. |
| **Deep drawdown at Detroit Reservoir** | Downstream water quality impacts to water supplies.<br>Recreational and economic impacts.<br>Impact to kokanee fishery. |

[1] Appendix P, Public Scoping Report.

## 9 – ISSUES TO BE RESOLVED

The SEIS analyzes the implementation of alternatives, comprised of structural modification to the dams and operation changes, across several environmental resources. The analysis discloses and documents the adverse and beneficial effects of these measures, including their effects on fish and aquatic habitat, which will inform USACE decisions on how to operate the WVS.

In total, USACE developed eight alternatives that incorporate a range of operational and structural measures to achieve the objectives, while maintaining authorized purposes. Seven alternatives were addressed in the Final EIS, and an additional alternative is here. WRDA 24 directed USACE to add an alternative that formally analyzes stopping hydropower operations at USACE dams, while maintaining all other authorized purposes. The SEIS addresses the need for a new alternative which ceases Federal hydropower operations while also analyzing revisions to the Interim Operations based on adaptive management.

The agency decision maker will use these analyses to select an alternative. This decision will balance operating and maintaining the WVS without jeopardizing the continued existence of listed species with anticipated effects to the human environment.

# Willamette Valley System Operations and Maintenance

# Draft Supplemental Environmental Impact Statement

# Chapter 1 through Chapter 11



Painting by Lee Jensen, USACE Employee, 1991-2001 (USACE Portland District Media Images).

# CHAPTER 1 - INTRODUCTION

On April 11, 2025, the U.S. Army Corps of Engineers (USACE), published the notice of availability for its final environmental impact statement (FEIS) for the Willamette Valley System (WVS) Operations and Maintenance. In Section 1326 of the Water Resources Development Act of 2024 (WRDA 24), Congress directed the Secretary of the Army to formally analyze an alternative that ceases Federal hydropower operations at the WVS before completing its overall review of the system. USACE determined the most appropriate way to address this directive is to supplement its analysis in the FEIS with a new alternative while also updating the proposed Interim Operations to reflect what has been learned during adaptive management as well as actions included in the 2024 National Marine Fisheries Service (NMFS) Biological Opinion but not previously analyzed. On May 15, 2025, USACE published a notice of intent to prepare this Supplemental Environmental Impact Statement (SEIS).

Specifically, USACE is supplementing the FEIS to include Alternative 6, which will analyze ceasing Federal hydropower operations at the WVS system projects. The supplement also includes revisions to the Interim Operations consisting of an interim late fall/early winter deep drawdown for fish passage at Detroit Dam and changes to minimum flow targets. This SEIS is a supplement to the FEIS; together, they comprise the full range of alternatives and their evaluations for the operation and maintenance of the WVS and should be read together. The SEIS incorporates much of the information in the FEIS by reference; therefore, the FEIS should be reviewed to facilitate a full understanding of the SEIS.

Most of this chapter is incorporated by reference. Some sections are updated with new information related to the addition of Alternative 6 and the Interim Operations. Some figures are reproduced for context.

## 1.1 Background

Incorporated by reference.

## 1.2 Chapter Terminology and Organization

Incorporated by reference.

## 1.3 Regulatory Background

Incorporated by reference.

### 1.3.1 National Environmental Policy Act

Incorporated by reference.

### 1.3.2 Endangered Species Act

Incorporated by reference.

### 1.3.3 Willamette Valley System Endangered Species Act and National Environmental Policy History Since 2008

This section has been incorporated by reference with the following addition:

In December 2024, the National Marine Fisheries Service published the *Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Continued Operation and Maintenance of the Willamette Valley System* (NMFS 2024b). NMFS determined the proposed action would jeopardize the continued existence of Upper Willamette River (UWR) Chinook salmon (Oncorhynchus tshawytscha) and UWR steelhead (O. mykiss) and would result in adverse modification of their designated critical habitat. The Biological Opinion identified a Reasonable and Prudent Alternative (RPA)—a suite of measures that, when implemented in conjunction with the proposed action, is expected to avoid jeopardizing the continued existence of all listed species and prevent adverse modification of designated critical habitat.

In April 2025, USACE completed a six-year study on the operations and maintenance of the WVS of dams and reservoirs and published the FEIS. The FEIS publicly discloses how USACE operations affect the environment, people, and ecosystems—and examines seven alternatives, or different ways USACE could adjust operations for the WVS.

In May 2025, USACE signed a Record of Decision (ROD) on the Interim Operations (minus the Detroit late fall/early winter drawdown) and Foster Warm Water Supply Pipe based on the analysis in the Final EIS. This ROD allows USACE to comply with the National Environmental Policy Act (NEPA) requirements for Interim Operations while continuing to evaluate a new alternative ceasing hydropower operations at the WVS and other changes to the Interim Operations based on adaptive management and the 2024 Biological Opinion.

## 1.4 Geographic and Temporal Scopes

### 1.4.1 Geographic Scope

Incorporated by reference.

## 1.5 Proposed Action

The Proposed Action is to continue operations and maintenance of the Willamette Valley System (WVS) for specific, authorized purposes. Congress directed responsibility for operating each dam and reservoir individually and as part of a system to USACE in authorizing legislation. USACE would implement the Proposed Action over a 30-year timeframe.

## 1.6 National Environmental Policy Act Cooperating Agencies and Endangered Species Act Action Agencies

Incorporated by reference.

# CHAPTER 2 - ALTERNATIVES

## 2.1 Introduction

Federal agencies must evaluate a reasonable range of feasible alternatives to their Proposed Actions (40 CFR 1502.14). Chapter 2 details the process USACE used to formulate the alternatives it considered but dismissed and those it formally analyzed. A key reason for supplementing the Final EIS was to include an additional Interim Operation at Detroit and to formally analyze ceasing hydropower operations at the WVS projects as required by WRDA 24.

Agencies are required to supplement an EIS when the agency makes a substantial change to the proposed action or there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis. An agency may also choose to supplement an EIS when it determines that the purposes of NEPA would be furthered by doing so (33 CFR 230.13(b) *citing* 40 CFR 1502.9). The criteria requiring supplementation have not been met.

In the WRDA 24, Congress directed USACE to "formally analyze an alternative that ceases hydropower operations at the projects" in the WVS. WRDA 24 did not specifically reference NEPA or proscribe that the alternative be analyzed in a NEPA document. However, USACE determined that supplementing its recent Final EIS for the Operation and Maintenance of the Willamette Valley System to include an alternative required by WRDA 24 would be in furtherance of NEPA while also meeting the requirements of WRDA 24. That analysis is contained in Alternative 6.

## 2.2 Chapter Terminology and Organization

Incorporated by reference.

## 2.3 Proposed Action

Incorporated by reference.

## 2.4 Purpose of and Need for the Proposed Action

The purpose and need for the continued operations and maintenance of the WVS is to operate the system in accordance with the eight Congressionally authorized purposes and in compliance with the ESA and all other applicable treaties, laws, and regulations (Chapter 1, Introduction, Section 1.10, Congressionally Authorized Purposes).

In the DEIS and FEIS, measures and alternatives were screened from further consideration if they did not meet the purpose and need statement. USACE interpreted the purpose and need statement very broadly when screening out measures or alternatives from further consideration. For example, the Cougar diversion tunnel operation only provides conservation storage and operates for hydropower purposes for a few days out the entire 84-year

hydrological period of record analyzed. Because the measure did not eliminate these purposes entirely the Cougar diversion tunnel operation was retained for formal analysis, even though it is outside USACE's current authorities. This broad interpretation was the result of significant input from cooperators. Ultimately the screening process resulted in a reasonable range of seven different action alternatives composed of various measures.

As stated in Section 2.1, four months before publication of the FEIS and six years into the NEPA process, Congress passed a provision in WRDA 24 that required USACE to formally analyze an alternative that ceases hydropower operations at the WVS projects. WRDA 24 does not reference NEPA or proscribe that the alternative be formally analyzed in a NEPA document. However, USACE determined it had the discretion to supplement the FEIS to include the alternative required by WRDA 24. USACE decided that providing additional information for the public to comment on and context for the decision maker would be in furtherance of NEPA. However, USACE did not revise its purpose and need statement to include numerous other alternatives to keep the process efficient and timely, as emphasized in the Fiscal Responsibility Act (FRA) of 2023 (Pub. L. No. 118-5, 137 Stat. 10). Instead, it is relying on the clear directive in WRDA to analyze a single alternative that ceases hydropower operations at the WVS projects.

#### 2.4.1 Summary of ESA Requirements Specific to the Need for the Proposed Action

Incorporated by reference.

### 2.5 Decision-making

Incorporated by reference.

### 2.6 Alternatives Development Overview

Before a lead agency can establish the range of alternatives analyzed in an EIS, it must engage in public scoping and develop an interdisciplinary analysis process (Appendix A, Alternatives Development).

#### 2.6.1 The Scoping Process

This section from the FEIS is incorporated by reference. Scoping for this SEIS began with publication in the Federal Register of the 2025 Notice of Intent to prepare a Supplemental EIS (FR Doc. 2025-08689), which invited participation in the NEPA process by the public and other Entities (Chapter 6, Public Involvement). Through the scoping process, USACE solicited input from stake holders, such as affected tribes, state and federal agencies and the public (including both private citizens and non-governmental organizations). USACE prepared a Scoping Report at the conclusion of the public scoping process that summarizes the process and comments received (see Appendix P, Public Scoping Report).

##### 2.6.1.1 Interdisciplinary Preparation and Cooperating Agency Involvement

Incorporated by reference.

## 2.7 Range of Reasonable Alternatives Development

This section has been updated from the FEIS to include the additional alternative development steps associated with meeting the requirements of WRDA 24. The remainder of this section is incorporated by reference.

The specific language in WRDA 24 was used to develop key portions of Alternative 6. For example, Congress directed the USACE to analyze *ceasing* hydropower *operations* at the projects, not the reduce hydropower operations or remove projects. The other features of Alternative 6 were developed like all the other alternatives in the FEIS, to meet the stated alternative strategies and associated objectives (Appendix A, Section 1.1.4 Development of Alternative 6). How each of the action alternatives meet the objectives is listed in Table 2-1. The USACE process for developing alternatives as described in the WVS FEIS is incorporated by reference.

**Table 2-1. Alternative Strategies and Associated Objectives[1].**

| Alternative | Strategy | Obj. 1 | Obj. 2 | Obj. 3 | Obj. 4 | Obj. 5 | Obj. 6 | Obj. 7 |
|---|---|---|---|---|---|---|---|---|
| No-action | Current operations and maintenance practices, as of April 2019. | – | – | – | – | – | – | – |
| 1 | Improve fish passage through storage-focused measures. Increase the probability of refilling WVS reservoirs and water delivery for authorized purposes. | X | X | X | X | X | X | X |
| 2A | Integrate water management flexibility with operations and structures for ESA-listed fish. | X | X | – | X | X | X | X |
| 2B & 5 | Integrate water management flexibility with operations and structures for ESA-listed fish. | – | X | – | X | X | X | X |
| 3A, 3B | Improve passage of ESA-listed fish through existing structures by modifying water control operations. | – | X | – | X | X | X | X |
| 4 | Improve passage of ESA-listed fish by constructing fish passage and temperature control structures. | X | X | X | X | X | X | X |
| 6 | Ceasing Federal hydropower operations | – | X | – | X | X | X | X |

Table 2.7-1 in the FEIS

[1] Objectives:

1. Allow greater flexibility in water management (related to refill, drawdown timing, and other water management measures) as compared to current operational requirements in water control diagrams and manuals. This objective supported development of measures that would meet authorized purposes and ESA obligations without current system management constraints.
2. Increase opportunities for the creation of nature-based structures during maintenance of USACE-managed revetments (structures that help prevent bank erosion) as compared to opportunities under current operations (Chapter 1, Introduction, Section 1.7.2, Revetments and Other Structures for Bank Protection). This objective supported development of a measure to manage revetments to provide engineering functions relevant to flood risk management while providing economic, environmental, or social benefits.

3. Allow greater flexibility in hydropower production as compared to current operational requirements in water control manuals. This objective supported development of measures that would provide opportunities in hydropower pool management to meet Congressionally authorized purposes and ESA obligations.
4. Increase anadromous ESA-listed fish passage survival at WVS dams as compared to conditions under current operations. This objective supported development of fish passage measures in compliance with ESA obligations.
5. Improve water management during the conservation season (related to refill, drawdown timing, and other water management measures), as compared to current operational requirements in water control diagrams and manuals, to benefit anadromous ESA-listed fish and other Congressionally authorized purposes.
6. Improve water quality associated with the WVS dams to benefit anadromous ESA-listed species.
7. Reduce spawning and rearing habitat competition caused by hatchery fish.

## 2.8 Final Measures Developed for the Action Alternatives

This section has been updated from the FEIS to include the additional measures needed to cease hydropower operations at the projects and changes to the Interim Operations, including modifications based on adaptive management of injunction operations, the deep late fall/early winter drawdown at Detroit minimum flow target requirements from the 2024 NMFS Biological Opinion, and large woody debris collection. The remainder of this section is incorporated by reference.

### 2.8.1 Flow Measures

Incorporated by reference.

#### 2.8.1.1 Integrated Temperature and Habitat Flow Regime (30a)

Incorporated by reference.

#### 2.8.1.2 Refined Integrated Temperature and Habitat Flow Regime (30b)

Incorporated by reference.

#### 2.8.1.3 Augment Instream Flows by Using the Power Pool (304)

Incorporated by reference.

#### 2.8.1.4 Augment Instream Flows by Using the Inactive Pool (718)

Incorporated by reference.

#### 2.8.1.5 Reduce Minimum Flows to Congressionally Authorized Minimum Flow Requirements (723)

Incorporated by reference.




**Figure 2-1. Hydropower Dam Outlet Configuration.**

Following turbine unit removal, the penstocks and penstock outlets would be reconfigured to allow continued use of the outlet for releasing flows. Turbines dissipate the energy of the water discharged downstream. Without them another method of energy dissipation is required to make the outlet safe to use. Without energy dissipation the flows released to the tailrace would be destructive, and the penstock and internal flow control features would experience damage from low pressures and cavitation. Cavitation is when tiny bubbles form because of a fast change in pressure. These bubbles can suddenly pop, which makes a strong force that damages metal and concrete. The method of outlet reconfiguration for energy dissipation would depend on the dam and whether there is a fish ladder downstream that needs the penstock outflow for attraction flow.

A major redesign of the integrated supervisory control and automation system would be necessary to sustain continuity of operations throughout the Willamette Valley, including but not limited to consolidation of control rooms.

Power required to operate each dam would be pulled from the grid and/or provided through emergency diesel generators. USACE would need to purchase a utility feeder, transformer, meter, and disconnect to sustain station service loads from a local utility and integrate them into the remaining 480V station service systems. Each dam requires a backup power source, such as a diesel generator. As the adult fish facilities at Dexter and Foster currently rely on power from the dam, these facilities would also need an alternative power source. Appendix A further describes the development of these measures and Alternative 6.

### 2.8.6 Interim Operations

Interim Operations are a suite of independent operations that would occur until the long-term solution for downstream fish passage and water temperature management at the respective location is in place and operational.

The Interim Operations (Table 2-2) described in the FEIS are incorporated by reference with the following changes as required by the 2024 Biological Opinion RPA:

- Addition of a late fall/early winter deep drawdown of Detroit reservoir to an elevation of 1395 feet for downstream fish passage. This operation would start on December 1 and end on December 31.
- Implementation of the 2024 WVS NMFS Biological Opinion RPAs for flow and water management, which include implementing the 2008 Biological Opinion flows until new flow management targets can be developed in coordination with NMFS and USFWS. New flow management targets will be tiered to this effort.

The Detroit drawdown operation was developed based on lessons learned from previous drawdowns at Green Peter and Lookout Point reservoirs, with a primary goal of minimizing water temperature impacts on aquatic life while improving volitional downstream fish passage. USACE would aim to initiate the drawdown closer to late November or early December, a period when the reservoir typically undergoes temperature destratification or at least cools at the surface. This timing reduces the potential for warm water releases in late fall/early winter and minimizes destratification effects on fish in the reservoir itself. The duration of the drawdown is set to last for two weeks based on passage studies at other reservoirs that have been drawn down. These studies suggest that fish are likely to migrate or "move out" of the reservoir during the drawdown process. Aligning the timing and duration of the drawdown with these findings, should facilitate fish passage while minimizing disruptions to the downstream river.

**Table 2-2. Interim Operations.**

| Description of Interim Operations by Dam Location | Duration of Operation | Priority Outlet | Target Elevation |
|---|---|---|---|
| **Detroit** | | | |
| Spring downstream fish passage and operational downstream temperature management | mid-March to Fall | Spillway/ Turbines/Regulating Outlets | N/A |
| Nighttime regulating outlet prioritization for improved downstream fish passage | Winter | Upper Regulating Outlets/ Lower Regulating Outlets | Less than 1,500 feet |
| Winter drawdown to 50 feet above the upper regulating outlets for improved downstream fish passage | Fall/Winter | Upper Regulating Outlets | 1,395 feet |
| **Big Cliff** | | | |
| Spread spill across spill bays to reduce downstream total dissolved gas (TDG) exceedances | Year-round | Spillway | Discharges greater than powerhouse capacity |

# CHAPTER 3 - AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

## 3.1 Introduction

Incorporated by reference.

Since the start of the SEIS there have been several key changes to federal law, regulations, and case law. On February 25, 2025, the Council on Environmental Quality (CEQ) published an Interim Final Rule removing CEQ's NEPA implementing regulations, effective April 11, 2025 (90 Fed. Reg. 10610). As a result, the FRA and USACE's implementing regulations at 33 C.F.R. §230 are applicable to this document but CEQ's previous regulations are not.

The decision maker will not consider areas analyzed that are no longer required to be considered by regulation or executive order in their decision. However, to keep the process efficient and timely, as emphasized in the FRA, some references to environmental justice, greenhouse gas, and climate change may appear in the draft SEIS. Social, economic, and community impacts will continue to be disclosed and considered, where appropriate, in accordance with USACE's NEPA regulations at 33 C.F.R. §230, which were applicable at the start of this SEIS but have been subsequently repealed.

### 3.1.1 Large Woody Debris

The FEIS did not include the collection and removal of large woody debris though it is an action USACE took prior to 2019. This measure would continue and is common to all alternatives. WVS dams block contributions of large wood from upstream. USACE would continue to collect large wood during annual maintenance operations that accumulates at WVS dams and make it available for habitat restoration projects. USACE would store material on USACE land for other appropriate entities to collect and use for habitat projects in the region. The effects of this measure would be minor and beneficial and are not discussed further in this SEIS. This analysis is commensurate with the minor beneficial impact of this action.

## 3.2 Hydrologic Processes

### 3.2.1 Affected Environment

Incorporated by reference.

### 3.2.2 Environmental Consequences

#### 3.2.2.1 Methodology

Incorporated by reference.

## 3.3 Section 3.3

This section was descoped from the FEIS.

## 3.4 Geology and Soils

### 3.4.1 Introduction

Incorporated by reference.

### 3.4.2 Affected Environment

Incorporated by reference.

### 3.4.3 Environmental Consequences

This section discusses the potential effects of Alternative 6 and the Interim Operations related to geology. The discussion includes the methodology used to assess effects, incorporated by reference, and a summary of the anticipated effects (Table 3-7).

Environmental Consequences from landslides are analyzed as impacts to slope stability. They are not analyzed as potential impacts to infrastructure or as impacts on other resources such as water quality from sediment movement. Information is not available to assess impacts from landslides on WVS infrastructure except for ongoing infrastructure repairs and maintenance related to ongoing slope instability. This is because slope failures are widely varied in location, size, and direction and site-specific information is not available for all slope conditions. Environmental consequences from the removal of geologic materials considers whether construction activities from measures would result in the removal of geologic materials.

Information on potential sediment movement is available in Appendix C, River Mechanics and Geomorphology Technical Information. Analyses of sediment movement as turbidity is in Section 3.5, Water Quality.

#### 3.4.3.1 Methodology

Incorporated by reference.

#### 3.4.5 Climate Change under All Alternatives

Incorporated by reference. This section was not updated to include Alternative 6. Prior to the release of this SEIS, Executive Order 14154 “Unleashing American Energy” was issued. Consistent with this Executive Order, a greenhouse gas analysis is not included here; however, this SEIS is consistent with the NEPA statute and existing agency regulations pertaining to air quality and emissions.

### 3.5 Water Quality

#### 3.5.1 Introduction

Incorporated by reference.

#### 3.5.2 Affected Environment

Incorporated by reference.

#### 3.5.3 Environmental Consequences

This section discusses the potential direct, indirect, and climate change effects of the alternatives on water quality in the analysis area (Section 3.5.2, Affected Environment). The discussion includes the methodology used to assess effects, an analysis of effects by alternative, and a summary of the anticipated effects.

##### 3.5.3.1 Methodology

Incorporated by reference. To support analysis of each subbasin in Section 3.5.3.2, the models and methodologies applied to specific parameters are detailed below.

**<u>Water Temperature Modeling</u>**

Incorporated by reference.

***Supplemental Environmental Impact Statement (SEIS)***

Modeled water temperatures below the dams were not simulated for Alternative 6 (Ceasing Federal Hydropower Operations) and Interim Operations. Instead, temperature summary values at each gage station are based on the outflow from the upstream dam, typically less than 3 miles upstream (Appendix D, Water Quality Analysis, Section 1.6.10, Supplemental EIS).

***Interim Operations***

Interim Operations are based on Interim Operations in the FEIS with updates to include deep winter drawdown at Detroit Dam and Reservoir and use of the 2008 Biological Opinion minimum flow targets basin wide. Summary tables of Interim Operations monthly mean water temperature and monthly mean difference between Interim Operations and the NAA for each

***Head-of-Reservoir Metric***

Incorporated by reference.

***Sediment Entrainment Metric***

Incorporated by reference.

***Mainstem Willamette River***

Incorporated by reference.

**Mercury Qualitative Methodology**

Incorporated by reference.

#### 3.5.3.2 Alternatives Analyses

Effects discussions for alternatives other than Alternative 6 and the Interim Operations are incorporated by reference.

**Alternative 6—Ceasing Federal Hydropower Operations**

***North Santiam River Subbasin***

*Water Temperature*

As under the NAA, operations under Alternative 6 would result in adverse effects to water quality from temperature conditions in the North Santiam River Subbasin during times of year when water temperature targets are not met. However, under Alternative 6, USACE would operate a selective withdrawal structure and floating screen structure at Detroit Dam resulting in beneficial effects to water quality from improved temperature conditions downstream of Detroit and Big Cliff dams and substantially fewer adverse effects than the NAA. Temperature targets would be met more often under Alternative 6 as compared to the NAA.

There may be differences in the number of days Alternative 6 would meet water temperature standards; however, this would not alter the overall adverse effect on water quality from temperature conditions in this subbasin (Table 1-3 and Table 1-4, Appendix D, Water Quality Analysis).

Under Alternative 6, as compared to the NAA:

- Modeled water temperatures below Detroit and Big Cliff dams would be within 2°F of the temperature target by 64 more days per year on average (Table 3-8).
- Exceedance of the 64.4°F temperature threshold would remain the same (Table 3-9).

### 3.5.4 Interim Operations under All Action Alternatives Except Alternative 1

The timing and duration of Interim Operations would vary by alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, 5, and 6. However, under Alternative 3A and Alternative 3B Interim Operations may not be implemented because long-term operational strategies are intended to be implemented immediately upon Record of Decision.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.6, Interim Operations). Interim Operations analyses did not include consideration of the impacts assessed under action Alternatives 2A, 2B, 3A, 3B, 4, 5, and 6 because Interim Operations would occur before, not in addition to, an action alternative.

Deep drawdowns, earlier drawdowns, and delayed refills for downstream fish passage would greatly increase erosion and bank instability, which would be a continuation of major, adverse effects to water quality.

#### 3.5.4.1 North Santiam River Subbasin

**Water Temperature**

Under Interim Operations, effects on water quality from temperature conditions in the North Santiam River Subbasin would continue to be adverse, similar to the NAA. Temperature targets under the Interim Operations differ from targets modeled for the NAA.

Under the Interim Operations as compared to the NAA:

- Modeled water temperatures would be within 2°F of targets below Detroit and Big Cliff dams by 20 fewer days per year on average and be below 64.4°F temperature threshold by 10 fewer days per year on average (Table 3-8 and Table 3-9).

Exceptions may occur at the local level and in the short term, depending on specific annual or seasonal climate conditions and specific dam operations, but overall, operations and maintenance under the Interim Operations would result in continuation of adverse effects on water quality from temperature conditions in the North Santiam River Subbasin even though the Interim Operations are expected to provide some benefit to water temperature conditions.

**Total Dissolved Gas**

The Interim Operations would substantially adversely affect water quality from TDG in the North Santiam River Subbasin as compared to the NAA. This is because there would be a combination of measures that would increase the spill frequency, and increase instances of TDG exceeding the 110 percent water quality standard as compared to the NAA.

Specifically, under the Interim Operations as compared to the NAA:

- TDG would exceed the water quality standard by 86 more days per year on average below Detroit Dam and by 72 more days per year on average below Big Cliff Dam (Table 3-10) (Appendix D, Water Quality Analysis, Section 2.2, Total Dissolved Gas Results and Effects Analysis).

Exceptions may occur at the local level and in the short term, depending on specific annual or seasonal climate conditions and specific dam operations, but overall, operations and maintenance under the Interim Operations would result in adverse effects on water quality from TDG in the North Santiam River Subbasin.

**Turbidity**

Under the Interim Operations, effects on water quality from turbidity would be moderately more adverse than those described under the NAA during the 30-year implementation timeframe. The Interim Operations would increase sediment and turbidity levels downstream of Detroit Reservoir because of the deeper drawdown increasing the potential for bank erosion and sloughing as compared to NAA operations.

While some fine-grained sediment that enters Big Cliff Reservoir from Detroit Reservoir may partially settle, most fine-grained sediment would pass through Big Cliff Reservoir and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns compared to NAA operations. While the incremental drawdown approach at Detroit Dam would span over three years and would dampen downstream elevated turbidity response from reservoir sediment erosion, some adverse effects would still exist due to deeper drawdown operations exposing bank shoreline.

As reservoir bed sediment is transported and re-deposited within the reservoir, turbidity levels due to deeper drawdowns are expected to continue to lessen in severity until they reach a new sediment equilibrium after years of the operation. Downstream turbidity effects will lessen over time becoming less adverse than the first few years of the deep drawdown.

**Harmful Algal Blooms and Mercury**

Under the Interim Operations, effects on water quality from harmful algal blooms, and mercury would have a slightly more adverse effect on the North Santiam River below Big Cliff Dam as compared to the NAA. This would be due to deeper drawdown operations exposing bank shoreline.

### 3.5.4.2 South Santiam River Subbasin

**Water Temperature**

Temperature targets under the Interim Operations differ from targets modeled for the NAA. However, effects on water quality from temperature conditions in the South Santiam River Subbasin would be adverse, similar to the NAA.

### 3.19.3 Environmental Consequences

This section discusses the potential effects of Alternative 6 and the Interim Operations to public health and safety risk from drinking water quality and water supply effects. The discussion includes the methodology used to assess effects, incorporated by reference, and a summary of the anticipated effects (Table 3-42).

#### 3.19.3.1 Methodology

Incorporated by reference.

#### 3.19.3.2 Alternatives Analyses

Effects discussions for alternatives other than Alternative 6 and the Interim Operations are in the FEIS and incorporated by reference.

**Construction and Routine and Non-routine Maintenance Activities under All Alternatives**

Incorporated by reference.

**Groundwater Supply for Drinking Water under All Alternatives**

There would not likely be any direct effect to groundwater supply or indirect effect to water supply users for drinking water in the analysis area from operations under any alternative, including Alternative 6, during the 30-year implementation timeframe. The rest of this section is incorporated by reference.

**Water Quality and Treatment Facility Operations under All Alternatives**

USACE operations and precipitation during drawdowns could cause an increase in the amounts of turbidity and harmful algal blooms discharged downstream. Drinking water facility operations could be adversely affected by the liberation of previously stored sediments caused by construction activities or by deep reservoir drawdowns over the 30-year implementation timeframe. These effects would be basin-wide. These conditions would result in indirect, adverse, temporary treatment costs of additional chemicals, testing, and facility maintenance as well as administrative costs and delays in drinking water supplied to affected communities (Section 3.11, Socioeconomics).

***Turbidity***

Sediment-related processes would occur in all subbasins under all alternatives, resulting in adverse water quality from turbidity. The degree of effect to water quality depends on a variety of factors, including but not limited to, geography, geology, wildfires, land use/cover, climate conditions, and seasonal reservoir operations.

The deep fall drawdown at Fall Creek Reservoir would continue resulting in temporary elevation of suspended sediment levels discharged from the dam (USGS 2023). Minor, short-term, adverse effects from temporary elevated turbidity would continue at this location over the 30-year implementation timeframe.

Turbidity would become more adverse under all action alternatives as compared to the NAA except for Alternative 1 and Alternative 4 (Section 3.5, Water Quality) due to operations exposing additional reservoir bed sediments resulting in erosion of the sediments. Increased adverse conditions would vary by alternative and location downstream of a dam. Adverse conditions would range from slightly more adverse than NAA operations as measured at the Salem gage under Alternative 2B, Alternative 5 (Preferred Alternative), and Alternative 6 to substantially more adverse below Hills Creek, Lookout Point and Dexter, Cougar, Foster, and

Detroit and Big Cliff dams under Alternative 3B. Except for during drawdown operations, the reservoirs would continue to provide benefits to drinking water facilities by trapping sediments during high flow events. Most of the facilities were built after the dams were constructed and their designs based on the existing conditions at the time of construction.

***Harmful Algal Blooms***

Incorporated by reference.

***Turbidity and Harmful Algal Bloom Effects to Drinking Water and Facility Operations***

Incorporated by reference.

**Water Availability in Dry Years under All Alternatives**

Incorporated by reference.

**Water Availability**

USACE operations could cause a change in the quantity of water available for downstream drinking water entities to withdraw within limits of their state issued water rights. These effects are described below for Alternative 6 and the Interim Operations; the other alternatives are in the FEIS and incorporated by reference.

***Alternative 6—Ceasing Federal Hydropower Operations***

*Stored Water*

Direct effects to stored water supply and indirect effects to drinking water users would be the same as described under Alternative 5, though there would be less stored water amounts under Alternative 6 than under Alternative 5. USACE is not able to store as much water in the spring while meeting the 2008 Biological Opinion minimum flow targets which are higher than the minimum flow targets in Alternative 5. (Section 3.13, Water Supply, Table 3-37).

*River Flow*

Direct effects to river flow on water supply and indirect effects to drinking water users under Alternative 6 would be the same as described for the NAA (Section 3.13, Water Supply, Table 3-37).

### 3.19.4 Interim Operations under All Action Alternatives Except Alternative 1

This section is incorporated by reference with the following additional information on the Detroit drawdown for fish passage:

The Interim Operations are a set of operations for downstream fish passage and temperature management that would be implemented until the long-term measure for fish passage or temperature management is being used. These operations would result in decreased system-wide stored water in the conservation pool.

The timing and duration of Interim Operations would vary by alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, 5, and 6. However, under Alternative 3A and Alternative 3B Interim Operations may not be fully implemented because long-term operational strategies for these alternatives are intended to be implemented immediately upon the Record of Decision.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.6, Interim Operations). Interim Operations analyses did not consider the impacts of Alternatives 2A, 2B, 3A, 3B, 4, 5, and 6 because Interim Operations will be implemented before, and not in addition to, an action alternative.

#### 3.19.4.1 Turbidity

Interim Operations would increase sediment and turbidity levels downstream of Lookout Point, Dexter, Green Peter, Foster, Detroit, and Big Cliff Reservoirs because of deeper drawdowns of the large reservoirs. Deep drawdowns increase the potential for bank erosion and sloughing as compared to NAA operations. While some fine-grained sediment that enters Dexter, Foster, and Big Cliff Reservoirs may partially settle, most fine-grained sediment would pass through these reservoirs and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns compared to NAA operations.

The deep drawdown operation at Lookout Point and Green Peter reservoirs in 2023 and 2024 was required by the injunction (Section 1.12.3). Bi-annual status reports finalized in February of 2024 and 2025 summarized effects to turbidity from the drawdowns. Turbidity downstream from Lookout Point Dam in 2024 was much less than in 2023. As noted in the USACE February 2025 Bi-Annual Status Report, while turbidity downstream of Green Peter Dam was less than during the 2023 operation, the elevated turbidity was still a concern for downstream drinking water facilities and the public downstream of Green Peter and Foster dams (USACE 2025).

The deeper drawdown at Detroit Dam has not started at the time of the SEIS development. USACE expects the drawdown to mobilize sediment, increasing turbidity downstream of Detroit and Big Cliff dams, but to a lesser extent than at Green Peter. The drawdown of Detroit reservoir will expose a significantly smaller area of sediment and retain a larger residual pool relative to the Green Peter drawdown operation (Figure 3-32), estimated to result in less turbidity in the North Santiam River. Additionally, USACE is proposing to draw down the reservoir in a stepwise manner, reaching the target elevation over the course of several fall/winters, minimizing how much new sediment is exposed each year. The larger residual pool is expected to act as a sediment sink more than the Green Peter residual pool, though the fine clay material eroded from exposed sediment is likely to stay in suspension and pass downstream of Detroit dam.




**Figure 3-32. Green Peter (bottom) and Detroit (top) exposed areas between the normal minimum conservation pool and the deep drawdown elevations.**

See Appendix C for full understanding of this figure.

Increased turbidity would result in adverse effects to drinking water facilities that use water from the North Santiam River below Detroit and Big Cliff reservoirs. Adverse effects could include increased maintenance of filters and increased staffing of the drinking water facility. A sediment transport modeling team will continue developing tools to inform adaptive management of future drawdown operations.

USACE would use the Deep Drawdown Emergency Response and Communications Plan for Detroit Reservoir deep drawdown operations to ensure strong communications with the State and cities of Salem, Stayton, and Gates's drinking water facilities during the drawdown of Detroit Reservoir to minimize impacts.

#### 3.19.4.2 Harmful Algal Blooms

Under Interim Operations, effects to water quality from harmful algal blooms would be moderately adverse compared to the slightly adverse conditions described under the NAA during the 30-year implementation timeframe. Interim Operations would increase sediment and nutrient loading into Detroit and Big Cliff reservoirs because the deeper drawdown of Detroit Reservoir would increase the potential for bank erosion and sloughing as compared to NAA operations.

The Detroit drawdown could result in moderate adverse effects to drinking water facilities that use water from the North Santiam River below Big Cliff reservoir.

#### 3.19.4.3 Stored Water

There would be a slight, beneficial, indirect effect to users under Interim Operations during most times of the year because the amount of water stored system wide would be slightly more than the amount needed to support minimum flow targets during the 30-year implementation timeframe with 80 percent likelihood (Section 3.13, Water Supply, Table 3-39). Stored water would be available to meet some municipal and industrial storage agreements and agricultural irrigation water service contracts under Interim Operations.

The drawdown operation at Detroit Dam would occur during the winter timeframe, allowing USACE to capture winter rains and refill the reservoir to minimum conservation pool by March 1 in most years. Same as under the NAA, during very dry years, there would likely not be enough water to refill the reservoir after winter flood risk management operations to meet consumptive demands from stored water, resulting in an adverse effect to users. In-season water management decisions could lessen the adverse effect, but there would likely still be an adverse effect.

#### 3.19.4.4 River Flow

Direct effects to river flow on water supply and indirect effects to drinking water users under the Interim Operations would be the same as described under the NAA (Section 3.13, Water Supply, Table 3-37).

### 3.19.5 Climate Change under All Alternatives

Incorporated by reference. This section was not updated to include Alternative 6. Prior to the release of this SEIS, Executive Order 14154 “Unleashing American Energy” was issued. Consistent with this Executive Order, a greenhouse gas analysis is not included here; however, this SEIS is consistent with the NEPA statute and existing agency regulations.

## 3.20 Environmental Justice

This section was descoped from the FEIS.

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## FINAL ENVIRONMENTAL IMPACT STATEMENT



APRIL 2025

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE FINAL ENVIRONMENTAL IMPACT STATEMENT

**Lead Agency**

U.S. Army Corps of Engineers
Portland, Oregon District

**Cooperating Agencies**

Bonneville Power Administration
Confederated Tribes of Grand Ronde Community of Oregon
Confederated Tribes of Siletz Indians
Confederated Tribes of the Warm Springs Reservation of Oregon
National Marine Fisheries Service
Oregon Department of Agriculture
Oregon Department of Environmental Quality
Oregon Department of Fish and Wildlife
Oregon Water Resources Department
U.S. Bureau of Reclamation
U.S. Environmental Protection Agency
U.S. Fish and Wildlife Service

**Proposed Action**

The Proposed Action is to continue operations and maintenance of the Willamette Valley System for specific, authorized purposes. Responsibility for operating each dam and reservoir and the overall system was directed to the U.S. Army Corps of Engineers by Congress in authorizing legislation. Consequently, the Proposed Action is to continue with this authorizing legislation.

**Affected Areas**

State: Oregon
Counties: Benton, Lane, Linn, and Marion Counties

**Contact for Further Information**

Liz Oliver, Project Manager
U.S. Army Corps of Engineers, Portland District
Block 300
333 SW 1st Avenue
Portland, OR 97204
Phone: 503-808-4712
Fax: 503-808-4882
Liz.Oliver@usace.army.mil

Cover Photograph: Cottage Grove Reservoir
Unknown Photo Credit (USACE Media Images Database)

## Federal Permits, Licenses, and Entitlements to be Obtained to Implement the Proposal

There are no permitting, licensing, or entitlement requirements related to the proposal under review. The proposal has been reviewed programmatically in this Environmental Impact Statement. Any permitting, licensing, or entitlement requirements will be identified in subsequent environmental reviews as applicable and as consistent with the National Environmental Policy Act and U.S. Army Corps of Engineers Procedures for Implementing the National Environmental Policy Act.



Unknown Photo Credit (USACE Media Images Database)

Fern Ridge Dam was the first of 13 dams to be built in the Willamette Valley System in 1941.

US Army Corps
of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## FINAL ENVIRONMENTAL IMPACT STATEMENT

## CHAPTER 1 INTRODUCTION

## TABLE OF CONTENTS

**CHAPTER 1 - INTRODUCTION ........ 1**
1.1 Background ........ 2
1.2 Chapter Terminology and Organization ........ 6
1.3 Regulatory Background ........ 8
1.3.1 National Environmental Policy Act ........ 8
1.3.1.1 Programmatic Reviews and Subsequent Tiering under the National Environmental Policy Act ........ 9
Programmatic Reviews ........ 9
Tiering from a Programmatic Review ........ 10
1.3.2 Endangered Species Act ........ 10
1.3.3 Willamette Valley System Endangered Species Act and National Environmental Policy History Since 2008 ........ 12
1.4 Geographic and Temporal Scopes ........ 13
1.4.1 Geographic Scope ........ 13
1.4.1.1 The Willamette River Basin ........ 14
1.4.2 Temporal Scope ........ 15
1.5 Proposed Action ........ 15
1.6 National Environmental Policy Act Cooperating Agencies and Endangered Species Act Action Agencies ........ 15
1.7 U.S. Army Corps of Engineers-managed Dams, Reservoirs, and Bank Protection Structures in the Willamette River Basin ........ 16
1.7.1 Dams and Reservoirs ........ 16
1.7.2 Revetments and Other Structures for Bank Protection ........ 17
1.7.2.1 Bank Protection Projects and Regulatory History ........ 17
1.8 Non-U.S. Army Corps of Engineers-managed Dams in the Willamette River Basin ........ 17
1.9 U.S. Army Corps of Engineers Programs and Planning in the Willamette River Basin ........ 18
1.9.1 Willamette River Basin Bank Protection Program ........ 18
1.9.2 Willamette Hatchery Mitigation Program ........ 18
1.9.3 Adult Fish Facilities ........ 23
1.9.4 Research, Monitoring, and Evaluation ........ 24
1.9.5 Forecast-informed Reservoir Operations ........ 25
1.10 Congressionally Authorized Purposes ........ 25
1.10.1 Flood Risk Management ........ 26
1.10.2 Hydropower ........ 27
1.10.3 Fish and Wildlife ........ 30
1.10.4 Recreation ........ 30
1.10.5 Navigation ........ 30
1.10.6 Irrigation ........ 31

1.10.7 Municipal and Industrial Water Supply ..... 31
1.10.8 Water Quality ..... 32
1.11 Willamette Valley System Operations and Annual Operational Planning ..... 32
1.11.1 Reservoir Pools and Water Control ..... 34
1.11.1.1 Water Control Diagrams ..... 36
1.11.1.2 Conservation Pool Allocation ..... 38
2019 Willamette Basin Review Biological Opinion Reasonable and Prudent Alternative ..... 39
1.11.2 Water Control Annual Planning ..... 41
1.11.2.1 Operational Considerations for Streamflow and Water Quality ..... 41
1.11.2.2 Operational Considerations for Hydropower ..... 42
1.11.2.3 Operational Considerations for Recreation ..... 42
1.11.2.4 Operational Considerations for Environmental Flows ..... 43
1.11.3 Operation, Maintenance, Repair, Replacement, and Rehabilitation ..... 44
1.11.3.1 Scheduled and Routine Maintenance ..... 44
1.11.3.2 Unscheduled and Non-routine Maintenance ..... 45
1.11.4 Coordination of Willamette Valley System Operations with Other Agencies ..... 45
1.12 Ongoing U.S. Army Corps of Engineers Planning and Environmental Reviews in the Willamette River Basin ..... 46
1.12.1 Master Plans and Operational Management Plans ..... 46
1.12.1.1 Master Plans ..... 46
1.12.1.2 Operational Management Plans ..... 47
1.12.2 Interim Risk Reduction Measures ..... 47
1.12.3 Court-ordered Injunction Measures ..... 48
1.12.4 Willamette Valley System Vegetation Management Plans ..... 49
1.12.5 Dexter Reservoir Shoreline Management ..... 50
1.12.6 Long Tom River Ecosystem Restoration Project ..... 50
1.12.7 2022 Water Resource Development Act Report to Congress on Willamette Valley System Hydropower ..... 51

**Summary of changes from the DEIS, continued:**

- **Information has been added regarding continued work with the WATER Forum in FEIS Section 1.11.1, Reservoir Pools and Water Control, Conservation Pool Allocation.**
- **Information on the description of flood pools, conservation pools, power pools, and dead pools has been revised for clarity in FEIS Section 1.11.1, Reservoir Pools and Water Control. New information on inactive pools has been provided.**
- **Additional information has been provided on the relationship between the 2019 Biological Opinion and conservation pool allocations in FEIS Section 1.11.1, Reservoir Pools and Water Control, Conservation Pool Allocation.**
- **Information has been added to clarify the relationship between master plans and the WVS EIS in FEIS Section 1.12.1, Master Plans and Operational Plans.**
- **Information on operational management plans and their relationship to master plans has been added to FEIS Section 1.12.1.2, Operational Management Plans.**
- **Updated information on the drop structure near Monroe, Oregon, has been provided in FEIS Section 1.12.6, Long Tom River Restoration Project.**
- **Information on the 2022 Water Resources Development Act Report to Congress on Willamette Valley System Hydropower has been added to Section 1.12.7.**

## 1.1 Background

The U.S. Army Corps of Engineers (USACE) Portland District operates and maintains the Willamette Valley System (WVS) to meet Congressionally authorized purposes. This National Environmental Policy Act (NEPA) Environmental Impact Statement (EIS) was prepared by USACE to analyze alternatives for the continued operation and maintenance of the system over a 30-year period while complying with Congressionally authorized purposes, the Endangered Species Act (ESA), and other applicable laws.

The WVS is located in the Willamette River Basin and comprises 13 multipurpose dams and reservoirs, hatcheries, adult fish facilities, and bank protections structures[1]. Variations in operations and maintenance are necessary because of unique component designs (dams, revetments, adult fish facilities, etc.) and their Congressionally authorized purposes (Figure 1.1-1 and Figure 1.1-2). These components also work together as a system to further meet the Congressionally authorized purposes for the WVS.

[1] While the term "project" is traditionally used to describe each dam and its related components, this term is not used in that context throughout the EIS. "Project" is used only in its traditional meaning as related to a "planned undertaking" (Webster Dictionary).




**Figure 1.1-1. USACE-managed Dams and Fish Facilities in the Willamette River Basin.**




**Figure 1.1-2. Willamette River Basin Bank Protection Projects.**

Note: Due to unknown locations of non-USACE-constructed revetments in the Willamette River Basin, the figure only depicts USACE-constructed revetments.

System-wide environmental effects of ongoing operations and maintenance activities were last analyzed in an EIS in 1980. Conditions in the Willamette River Basin have changed, and new information has become available since 1980 (e.g., continued population growth and associated development, operational modifications, structural improvements implemented for fish passage, and temperature control). Federal Biological Opinions have also been issued under the

ESA, seeking to lessen effects of WVS operations and maintenance on Federally listed threatened and endangered species.

This EIS is a programmatic-level review operations and maintenance of the WVS as a result of these changes. Additionally, the timeframe since an EIS was last prepared warranted an updated review. The programmatic approach provides an overview of effects on resources that could potentially be impacted by USACE actions. Additional NEPA analyses may be required for site-specific actions in the WVS and tiered from this EIS analysis as applicable (Section 1.3.1.1, Programmatic Reviews and Subsequent Tiering under the National Environmental Policy Act).

USACE constructed 13 dams and reservoirs between 1940 and 1969 through the passage of several flood control acts (Table 1.1-1). The various purposes of the WVS were authorized by Congress in the Flood Control Acts between 1938 and 1962, the Water Supply Act of 1958, and the Water Resources Development Act of 1986.

**THE DEIS HAS BEEN REVISED TO INCLUDE THE FOLLOWING TABLE IN THE FEIS**

**Table 1.1-1. Willamette Valley System Construction Dates and Authorizing Acts.**

| Dam | Subbasin | Construction Dates | Authorizing Flood Control Act |
|---|---|---|---|
| Fern Ridge | Long Tom River | 1940-1941 | Flood Control Act of 1938 |
| Cottage Grove | Coast Fork Willamette River | 1940-1942 | Flood Control Act of 1938 |
| Dorena | Coast Fork Willamette River | 1940-1949 | Flood Control Act of 1938 |
| Big Cliff | North Santiam River | 1949-1953 | Flood Control Act of 1948 |
| Detroit | North Santiam River | 1948-1953 | Flood Control Act of 1938 |
| Dexter | Middle Fork Willamette River | 1953-1954 | Flood Control Act of 1950 |
| Lookout Point | Middle Fork Willamette River | 1947-1955 | Flood Control Act of 1938 |
| Hills Creek | Middle Fork Willamette River | 1956-1962 | Flood Control Act of 1950 |
| Cougar | McKenzie River | 1956-1964 | Flood Control Act of 1950 |
| Fall Creek | Middle Fork Willamette River | 1961-1965 | Flood Control Act of 1950 |
| Green Peter | South Santiam River | 1963-1967 | Flood Control Act of 1950 |
| Foster | South Santiam River | 1964-1968 | Flood Control Act of 1950 |
| Blue River | McKenzie River | 1963-1969 | Flood Control Act of 1950 |

Congress designated the purpose for each dam and reservoir in these acts, which can include a combination of the following:

- flood control (i.e., flood risk management)
- hydropower
- fish and wildlife
- recreation
- navigation
- irrigation (i.e., agricultural irrigation)
- municipal and industrial water supply
- water quality

## 1.2 Chapter Terminology and Organization

**THE DEIS HAS BEEN MODIFIED TO REVISE THE FOLLOWING TABLES**

**Table 1.2-1. Summary of Chapter Terminology.**

| Term | Definition |
|---|---|
| Willamette Valley System (WVS) | The 13 USACE-managed dams, reservoirs, and bank protection structures in the analysis area. |
| Activities | Activities necessary to implement a measure, program, operations, or maintenance (e.g., construction of a selective withdrawal structure). |
| Measures | Proposed combination of activities that would be taken under an alternative to meet the purpose and need for the Proposed Action. Alternatives are formulated by suites of measures. |
| Analysis Area | The area defined as the Affected Environment for each resource in Chapter 3, Affected Environment and Environmental Consequences. Broadly, the analysis area is the Willamette River Basin. An analysis area may be narrower (e.g., subbasins) or broader (e.g., state- or region-wide) than the entire Basin depending on the resource analyzed. |

comprehensive research, monitoring, and evaluation program to obtain this needed information (NMFS 2008).

The program is managed with considerable coordination and input from the Willamette Action Team for Ecosystem Restoration (WATER) Forum established from the 2008 Biological Opinion to provide this input[12] (Section 1.11.1, Reservoir Pools and Water Control, Conservation Pool Allocations).

**THE DEIS HAS BEEN REVISED TO INCLUDE THE FOLLOWING INFORMATION IN THE FEIS**

### 1.9.5 Forecast-informed Reservoir Operations

Forecast-informed Reservoir Operations refers to a strategy that integrates additional release decision flexibility. This strategy is based on flood risk mitigation and is framed by use of enhanced observations and/or improved weather and streamflow forecasts.

Forecast-informed Reservoir Operations seek to improve outcomes in water supply, fish and wildlife, hydropower, and recreation authorized purposes without material increases in flood risk. To accomplish this goal, this strategy is designed as a partner- and stakeholder-informed viability study that identifies flood risk and benefits among several operational options (i.e., alternatives) for release decision-making.

The outcome of the Forecast-informed Reservoir Operations strategy development is a non-binding recommendation for updating the water control plan that USACE may elect to pursue in a formal request to Congress while ensuring NEPA and other regulatory requirements are met.

The USACE Directorate of Civil Works has committed to a multi-year viability study of Forecast-informed Reservoir Operations in the WVS.

**END NEW TEXT**

## 1.10 Congressionally Authorized Purposes

The WVS authorization history is described in Section 1.1, Background. The authorization purposes are detailed below.

Each of the 13 dams and reservoirs within the WVS are operated according to a Water Control Manual authorized by Engineering Regulation 1110-2-240. These manuals provide specific information to meet the Congressionally authorized purposes of flood risk management, generation of hydropower, fish and wildlife, recreation, navigation, irrigation, municipal and

[12] WATER, a collaborative advisory body made up of USACE, other Federal and state agencies with fisheries and water resource management responsibilities in the Willamette River Basin, and affected tribes, was established under the Services 2008 Biological Opinions to coordinate with USACE on operation of the WVS (NMFS 2008; USFWS 2008)

industrial water supply, and water quality. The manuals also detail operations, procedures, and rule curves[13] for each dam and reservoir.

Each manual includes a Drought Contingency Plan that addresses flow needs, drought management organizations, a drought assessment process, and a framework to carry out a drought response. The draft Master Water Control Manual for the Willamette Valley Project describes operations of the 13 dams and reservoirs as a system to meet the Congressionally authorized purposes of the WVS (USACE 2015a). The draft manual will be completed following a NEPA review tiered from this EIS (Section 1.3.1.1, Programmatic Reviews and Subsequent Tiering under the National Environmental Policy Act).

### 1.10.1 Flood Risk Management

Flood risk management is the primary authorized purpose of the WVS dams. The dams are operated as a system providing flood risk management on six major tributaries affecting approximately 27 percent of the watershed area upstream of Portland, Oregon. The 13 dams are operated as a system to prevent an estimated $1 billion in flood damages annually, based on the Annual Flood Damage Reduction numbers reported to Congress from 1994 to 2022, at 2022 price levels.

USACE coordinates with multiple partnering agencies to efficiently execute its flood risk management mission:

- National Oceanic and Atmospheric Administration's (NOAA's) Northwest River Forecast Center is responsible for flood forecasting and is co-located with the National Weather Service, which is responsible for both meteorological forecasting and the issuance of flood warnings. These two offices coordinate closely with USACE's Portland District for dissemination of river information and forecasts.
- The Natural Resources Conservation Service is responsible for obtaining hydrologic data. The Conservation Service Snow Survey monitors snow water content and cumulative precipitation at many stations in the Willamette River Basin. Both the Natural Resources Conservation Service and National Weather Service develop volume runoff forecasts in the spring of each year based on data provided by these field stations. These data are essential for planning for the best use of available water to meet the multiple purposes of the WVS.
- The U.S. Geological Survey (USGS) in Portland, Oregon, with field assistance from its Eugene, Oregon office, has the responsibility of collecting, calibrating, and publishing streamflow and water quality data in the Willamette River Basin.

[13] A rule curve is seasonal reservoir elevation target or restriction, represented graphically as curves, that guide reservoir operations.

### 1.10.2 Hydropower

Federal hydroelectric power facilities are installed at 8 of the 13 USACE dams in the Willamette River Basin (Figure 1.10-1). The volume of water flowing through a dam and the change in elevation, known as fall or head, from one point to another determines the amount of available energy in moving water. In general, the greater the water flow and the higher the head (fall), the more electricity a hydropower plant can produce.




**Figure 1.10-1. Locations, Dam Type, and Capacities of Hydropower Units in the Willamette Valley System.**

Hydropower plants are located at the base of dams. At a hydropower plant, water moving past a dam flows through a pipe, or penstock, and then pushes against and turns blades in a turbine to spin a generator to produce electricity (Figure 1.10-2 and Figure 1.10-3).




**Figure 1.10-2. General Dam Components (upper diagram) and Hydropower Dam Components (lower diagram).**



**Figure 1.10-3. Transmission Lines Extending from the Powerhouse at Detroit Dam.**

In the WVS, all water flow through dams is directed through the hydropower plants, or generating facilities, unless there are special circumstances that require use of another outlet. Special circumstances include operations for downstream fish passage, operational temperature control, turbine power outages, or outflow that exceeds turbine capacity.

Operation of the power transmission facilities at the dams is a highly coordinated effort between USACE and BPA. BPA is a non-profit, Federal power marketing administration located in the Pacific Northwest responsible for maintaining the safety and reliability of the transmission grid and for marketing electrical energy generated at the WVS dams and reservoirs (Appendix L, Cooperating Agencies).

There are two main types of Federal hydropower dams in the WVS: storage dams and reservoirs that receive unregulated inflow and re-regulation dams and reservoirs that receive and moderate dynamic flows from upstream dams—Foster Dam performs both storage and re-regulation functions. Power generation from storage dams and reservoirs is often based upon daily, weekly, and seasonal fluctuations in power demand (i.e., load); flows downstream are therefore subject to fluctuations that require re-regulation (Section 3.12, Power Generation and Transmission).

The re-regulation reservoirs are used to absorb the fluctuations in flows from upstream storage dams and reservoirs and to ensure downstream river flows are uniform for protection of aquatic habitat and human life and bank stability.

Lookout Point, Detroit, and Green Peter Dams are storage dams and reservoirs; their outflows are re-regulated by Dexter, Big Cliff, and Foster Dams, respectively, located downstream. Foster

Dam and Reservoir is also a storage facility because it receives unregulated inflow from the South Santiam River along with controlled flows from Green Peter Dam and Reservoir.

Hills Creek and Cougar Dams are storage dams and reservoirs without associated re-regulation dams located downstream but they do generate hydropower. Dorena Dam has a private hydropower facility regulated by FERC, and power generated is not part of the BPA system.

Hydropower operations are generally flexible and can allow electricity generation to vary with daily and seasonal demand. During the critical power production period from October through March, reservoirs at hydropower facilities have allocated storage space for power generation called the "power pool." This is water stored for when there are generally high demands for electricity.

### 1.10.3 Fish and Wildlife

The WVS is operated and maintained in a manner that supports fish and wildlife. Reservoirs and surrounding areas provide opportunities for sport fishing and wildlife hunting, improving habitat, and preserving wildlife. Under this purpose, USACE conducts projects to restore ecological function, promote species biodiversity, and monitor sensitive species. Additionally, USACE has modified operations to support habitat within the reservoirs and to augment stream flows downstream of dams during dry months.

### 1.10.4 Recreation

Recreation use and development is authorized at all the WVS dams and reservoirs. Recreational facilities managed by USACE (or other agencies or private organizations) are provided at all USACE dams and reservoirs and in the Willamette River below the dams. USACE cooperates with the USFS, Oregon State Parks, ODFW, and Linn and Lane Counties to build and manage a system of water-related recreation facilities.

Recreational demand in the Willamette River Basin places pressure on maintaining reservoirs at high levels for summer and early fall months. Many boat ramps and marinas become unusable when reservoir levels become abnormally low due to drought or other factors, which often occur during peak recreation season.

### 1.10.5 Navigation

Navigation was authorized at most of the dams and reservoirs in the WVS. HD531 recognized low channel depths due to increased withdrawal of streamflow as an impediment to navigation upstream of Willamette Falls. The navigation purpose is met by release of water for water quality and biological needs.

Storing excess spring runoff and releasing this stored water during the low-flow season would provide adequate channel depth from Corvallis, Oregon through the Willamette Falls. However, the upper river above Willamette Falls Locks is no longer utilized by commercial navigation. HD531 documents that flows released for navigation on the Mainstem Willamette River, with

flow targets at Albany and Salem, Oregon[14], would also reduce pollution concentrations in the river, providing for improved water quality and fish life.

### 1.10.6 Irrigation

Agriculture is an important part of the vitality and economy of Oregon.

There are 37,200 farms in Oregon, which generate $5.01 billion in agricultural products. Of these farms, 19,468 farms are in the Willamette River Basin, producing $2.3 billion in agricultural products. The total land area in farms in the Basin is 1.58 million acres, or approximately 17 percent of the land area of the Basin (ODA 2021a).

Oregon ranks first in the United States for producing several commodities, including hazelnuts, multiple varieties of grass seed, and Christmas trees (ODA 2025).

Agricultural irrigation diversions in the Willamette River Basin are not centralized. There are eight irrigation districts in the Basin; however, most irrigation needs are met via individual wells or diversions. In the Basin, there are more than 18,000 water rights permitted for irrigation uses, representing 65 percent of all authorized water rights.

There are presently no supplemental USACE releases intended specifically for irrigation use. Withdrawals associated with BOR's irrigation water service contracts are generally met within normal dam operations and releases (Section 1.11.1, Reservoir Pools and Water Control, Conservation Pool Allocation).

### 1.10.7 Municipal and Industrial Water Supply

Municipal and industrial water supply was an originally authorized purpose, as listed in authorizing HD531 (Appendix J, Water Supply Analysis). However, the need for municipal and industrial storage was found to be relatively low at the time the storage capacity of the reservoirs was planned. The Water Supply Act of 1958 (Public Law 85-500) added water supply as an authorized purpose at USACE dams and reservoirs.

The Willamette River and its tributaries are a major source of water for municipal and industrial needs; these systems rely on natural flow in the Willamette River Basin along with groundwater wells. However, population growth is leading to a demand for water that exceeds existing supplies for many systems throughout the Basin. This need was one of the factors that led to the Willamette Basin Review Feasibility Study along with strong support from the State of Oregon and municipal water providers (Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History Since 2008). The Feasibility Study resulted in the reallocation of 159,750 acre-feet from conservation storage used for all

---

[14] A flow target is the volume of water intended to be met at a given location. HD531 identifies Albany, Oregon, and Salem, Oregon, as locations where minimum flows are to be met.

authorized purposes to municipal and industrial water supply (Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History Since 2008).

To date, there are no signed agreements to use storage from any of the WVS reservoirs for municipal and industrial water supply, but there is considerable interest among water suppliers in the Willamette River Basin for such use (Section 1.11.1, Reservoir Pools and Water Control, Conservation Pool Allocation). As of 2023, USACE was processing a request from Eugene Water and Electric Board for 437 acre-feet of storage from the Dorena and Cottage Grove Reservoirs.

#### 1.10.8 Water Quality

HD531 authorizes the release of water for "stream purification" by diluting pollution levels. Congress anticipated that the water released for navigation purposes would increase discharges on the upper Willamette River threefold and approximately double present low-water discharges on the lower river (HD531), diluting pollution levels in the Willamette River.

In the 1996 Water Resources Development Act (Pub. L. No. 104-303) and 1999 Water Resources Development Act (Pub. L. No. 106-53), Congress authorized construction of a water temperature control tower at Cougar Dam. The control tower was implemented to manage water temperatures downstream of the dam for the benefit of spring Chinook salmon and native trout, including bull trout, which were listed as threatened under the ESA in 1999.

### 1.11 Willamette Valley System Operations and Annual Operational Planning

Operation of the WVS generally follows a seasonal cycle and is dynamically managed to meet several related, but sometimes conflicting, objectives. These objectives include:

- ✓ Providing adequate flood storage space for managing floods downstream.
- ✓ Providing sufficient water levels for water quality, recreation, and fish and wildlife.
- ✓ Providing adequate water releases for water quality and fish and wildlife.
- ✓ Providing adequate water supply for irrigation and municipal and industrial uses.
- ✓ Maximizing power generation within the requirements imposed by other objectives.

> **Seasonal Operational Cycles**
>
> The seasonal cycle that is generally followed includes the winter flood risk management season, spring conservation storing (refill) season, and summer and fall conservation use season.

The exact timeline of water control operations can shift depending on the dam, reservoir, and season (Table 1.11-1).

THE DEIS HAS BEEN MODIFIED TO REVISE THE FOLLOWING TABLE IN THE FEIS

**Table 1.11-1. Generic Reservoir Water Control Operations by Month.**

| Months | Operation | Description |
|---|---|---|
| November/ December – January | Winter Flood Risk Management Season | Reservoirs maintained near minimum flood/conservation pool elevations. During storm events, inflows are retained, and water is released downstream to minimize flooding effects. |
| February – May | Conservation Storing Season | Water is stored in the reservoir for later use for purposes such as minimum flows for fish, water supply, irrigation, recreation, and power production while still operating for its flood risk management purpose. Refill of the reservoirs according to the water control diagram during the conservation storing season is largely dependent on rain events and releases for ESA-listed-fish flow requirements, but maximum conservation pool is generally reached in May. |
| May – November | Conservation Release Season | Stored water is released for conservation benefits, such as minimum flows for fish, water supply, irrigation, recreation, and power production. |

Operating the WVS to meet multiple purposes is in part made possible by releasing water through outlets located at various depths in each dam. Surface water can be released over a spillway when there is sufficient stored water (Figure 1.11-1).




**Figure 1.11-1. Hydropower Dam Outlet Configuration.**

Spillways are structures that either form part of a dam or are found just beside it. Spillways are located high in the reservoir and allow for large volumes of water to be released. Many WVS dams have spillways with gates that allow operators to control flow over the spillway anytime the reservoir is high enough (i.e., spillgates). These outlets pass floodwater safely and in a controlled way, but also have been used for fish passage and downstream temperature management. However, these outlets are not available to release water once reservoir water elevations drop below the operational elevation of a spillway. Spillways that do not discharge immediately into the channel are only used for large flood control operations such as at Hills Creek, Fall Creek, Cougar, and Blue River Dams.

Water is also released through the regulating outlets located at a lower elevation than the spillways on the dam and deeper in the reservoir. These consist of pipes, box culverts, or tunnels with gates or valves to regulate the flow rate (Figure 1.11-1).

Hydropower dams have an additional outlet, the penstock, that directs water through the turbines to produce power[15]. Some dams have multiple penstocks.

The multiple outlets and USACE operational procedures allow some flexibility in WVS operations as USACE attempts to meet the diverse and changing needs of the region based on information that becomes available during an operating year. Many factors cause short-term operational adjustments. For example, periods of heavy rain can cause high flows in the winter, spring, and fall. In a dry year, minimum fish flows and other constraints dictate how much water USACE must discharge.

Actual operations occur as “real time,” that is, decisions must be made in a few minutes, days, or at most, a few weeks. Operators regulate the WVS to satisfy all the various purposes contained in the annual operating plan. In-stream conditions for fish, generator outages, the weather, and even the timing of recreational events can influence operational decisions. Periodic maintenance and inspection activities also affect reservoir levels and outlet priorities.

General procedures for reservoir elevation and water control, as well as the annual system operation processes and activities, are described below.

### 1.11.1 Reservoir Pools and Water Control

Reservoir water storage capacity can be conceptualized as pools making up an overall reservoir pool. Pools indicate designated purposes or management targets and occupy elevation bands that shift by season or specific operating conditions.

A typical WVS reservoir comprises flood, conservation, power (if a power-producing dam), inactive, and dead pools (located below any outlets, rendering water in this deep pool area inaccessible for release through the dam).

---

[15] Dams that produce hydropower in the WVS include Cougar, Hills Creek, Lookout Point, Dexter, Foster, Green Peter, Detroit, Big Cliff, and Dorena Dams.

**THE DEIS HAS BEEN MODIFIED TO REVISE THE FOLLOWING INFORMATION IN THE FEIS**

| | |
|---|---|
| Flood Pools | Flood pools contain space used during storm events to retain flood waters that reduce downstream risks. The flood pool is further designated by primary flood and secondary flood storage pools that pertain to different management conditions. Storage volumes are seasonal and defined by the rule curve (more in the winter, less in the summer). The summer flood storage pool is the space above the conservation pool up to the maximum allowable elevation of a reservoir. When this pool is filled, it is called "full pool." |
| Conservation Pools | Conservation pools contain the space allocated for conservation season Congressionally authorized purposes. The storage space is allocated between municipal and industrial water supply, agricultural irrigation, and fish and wildlife, but also supports water quality, recreation, and hydropower. The conservation pool overlaps some of the same elevation levels as the flood pool, but the conservation pool does not rise to the elevation of the overall reservoir maximum pool. Minimum flood pool and minimum conservation pool elevations are the same. |
| Power Pools | Power pools contain the space allocated for the generation of hydropower and lie below the conservation and flood pools and a distance above the penstock intake. All dams with hydropower facilities include storage space designated for power generation during the critical power period from October through March. This storage is relatively small and is between minimum conservation pool and minimum power pool elevations. The power pool is generally kept full to increase the hydraulic head, defined as the potential energy of water due to its height above the bottom of the dam, for hydropower generation. |
| Inactive/Dead Pools | The inactive pool is the lowest storage area in a reservoir and contains space designed to trap sediment. The inactive pool is below the normal operating minimum pool down to the lowest outlet. Similar to an inactive pool, a dead pool is the space also designed to trap sediment but is located below the lowest outlet. |

**END REVISED TEXT**

#### 1.11.1.1 Water Control Diagrams

To manage for the different purposes and seasonal needs, USACE utilizes water control diagrams (Figure 1.11-2). Individual water control diagrams depict allocated pools and elevations, also known as water-year-based rule curves[16], over the course of a year for each dam operation.

Water control diagrams are contained in the water control manuals for each individual dam and reservoir, along with detailed operations and procedures. The draft Master Water Control Manual integrates the operation of the individual dams and reservoirs to meet the system-wide goals of the WVS (Section 1.10, Congressionally Authorized Purposes).




Unknown Photo Credit (USACE Media Images Database)

Regulating Outlet and Channel at Cougar Dam.

[16] A rule curve is a seasonal reservoir elevation target or restriction, represented graphically as a curve, that guide reservoir operations.




**Figure 1.11-2. Typical Water Control Diagram for WVS Dams and Reservoirs.**

Departures from the rule curves (storage or elevation targets) during reservoir refill may be necessary due to the need for regulation of floods, excessive snowpack above the reservoirs, inadequate water supply, or critical power needs. Refill can be delayed when high runoff is expected, as this provides additional storage for flood damage reduction operations. Generally, each reservoir may be filled at a rate no faster than shown by the rule curve or as described in the water control manual unless the reservoir is being managed for downstream floods or there is an approved deviation.

When excess flood water stored above the rule curve is released, discharges are targeted to stay at or below downstream channel capacity. During dry conditions, the reservoir may be higher than the rule curve to reduce the risk of not filling the reservoir. Maintaining minimum in-stream flows downstream of a dam generally takes precedence when water supply is inadequate to maintain both minimum flows and the scheduled rate of filling, per the 2008 NMFS Biological Opinion (NMFS 2008) (Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History Since 2008).

#### 1.11.1.2 Conservation Pool Allocation

Under the 2008 RPA, USACE and BOR were directed to work toward protecting instream flows. A key step in complying with the RPA was completion of the Willamette Basin Review Feasibility Study (Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History Since 2008). In December 2020, Congress authorized a substantial reallocation of the conservation storage space in the WVS reservoirs for three purposes: fish and wildlife, municipal and industrial water supply, and agricultural irrigation (Table 1.11-2) (Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History Since 2008).

**Table 1.11-2. Authorized Use Allocation of Combined Conservation Storage.**

| Purpose | Acre-feet of Combined Storage Space |
|---|---|
| Fish and Wildlife | 1,102,600 |
| Agricultural Irrigation | 327,650 |
| Municipal and Industrial Water Supply | 159,750 |

Storage allocations were based on forecasted peak water demand in the year 2070, following the 50-year planning horizon of the Willamette Basin Review Feasibility Study. For the purposes of this EIS, the demand for municipal and industrial water supply and agricultural irrigation was calculated to the year 2050 to address the 30-year implementation timeframe of the alternatives in this EIS.

RPA Measure 2 in the 2019 NMFS Biological Opinion includes a limit on new municipal and industrial water supply agreements of 11,000 total acre-feet until certain conditions are met (NMFS 2008) (Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History Since 2008). It further restricts USACE from executing any

Per Engineering Regulation ER 1110-2-1156 (USACE Publications):

> USACE has specific public safety responsibility, when a project has known safety issues, to take appropriate interim risk reduction measures including reservoir releases. USACE statutory responsibilities require operation of dams in a manner that reduces the project's probabilities of failure when there are known issues with the integrity of the project.

These determinations resulted in development of Interim Risk Reduction Measures (IRRM) to address these risks temporarily until a permanent solution can be assessed and designed. IRRMs at these dams required a pool restriction on the maximum conservation pool elevation (i.e., the maximum elevation the associated reservoirs are allowed to reach each summer is lower than the authorized maximum identified in the water control manuals)—5 feet at Detroit and Lookout Point Dams and 10 feet at Hills Creek Dam. These temporary pool reductions will remain in place until the final studies are complete and issues resolved. However, by design, measures are temporary and may not be in place for the full 30-year implementation timeframe.

USACE, Portland District, is engaged in dam safety studies for all dams in the Willamette River Basin. IRRM Environmental Assessments have been completed for Detroit, Hills Creek, and Lookout Point Dams. Additional safety IRRMs may be recommended at other dams. All IRRMs would be assessed for environmental compliance prior to implementation and may be subject to NEPA review. Additionally, any long-term actions developed to replace the IRRMs would require environmental compliance and may be subject to NEPA compliance.

### 1.12.3 Court-ordered Injunction Measures

On September 1, 2021, the U.S. District Court for the District of Oregon issued an injunction in *NEDC v. USACE*[19]. The order requires USACE to implement interim actions intended to improve conditions for fish passage and water quality in the WVS to avoid irreparable harm to ESA-listed salmonids. These actions are to remain in effect until the completion of the reinitiated Section 7 ESA consultation with NMFS and USFWS.

The Court ordered operational changes and three structural modifications to existing dams and reservoirs (Table 1.12-1). The three structural modification actions have undergone, or are currently undergoing, separate site-specific NEPA processes by USACE to assess the direct, indirect, and cumulative impacts of their effects on the human environment.

The direct and indirect effects of these construction actions are being reviewed under separate NEPA compliance processes; therefore, they are not assessed in this EIS.

[19] *Northwest Environmental Defense Center, et al. v. United States Army Corps of Engineers, et al.*, No. 3:18-cv-00437-HZ (D. Or. September 1, 2021).

**Table 1.12-1. Court-ordered Structural Improvements and Modifications[20].**

| Dam | Description | Status |
|---|---|---|
| Dexter | Design and construct upgrades to the Dexter adult fish facility. | Construction was ongoing at the time the alternatives were analyzed. |
| Big Cliff | Determine whether operational measures alone are sufficient to maintain acceptable total dissolved gas levels below Big Cliff Dam and, if not, design and construct a structural solution for mitigating excess total dissolved gas levels during spill operations. | USACE determined that operational fixes are not sufficient and developed a schedule for design and construction of rock weirs to further reduce total dissolved gas. |
| Cougar | Determine whether structural improvements/modifications need to be made to regulating outlets to ensure safer fish passage and to reduce total dissolved gas levels and, if so determined, design and construct a structural solution. | The Court established an Expert Panel that recommended resurfacing of the regulating outlet chute, which was completed in 2023. |

### 1.12.4 Willamette Valley System Vegetation Management Plans

Vegetation management practices have been implemented at Fern Ridge Reservoir for several years. These practices include prescribed burning, mechanical and manual control, herbicide applications, and seed collection and plant propagation, which are intended to improve and maintain diverse native plant communities while preventing, eliminating, or reducing the presence or spread of invasive, noxious, and nuisance plants.

In 2023, USACE expanded vegetation management planning to encompass all 13 dams and reservoirs. A USACE Record of Environmental Consideration was signed on July 14, 2023 to implement the Vegetation Management Plan for USACE-managed lands in Lane, Linn, and Marion Counties, Oregon.

[20] Operational changes are not identified in the table because this section is focused on actions that are undergoing environmental reviews outside of, and in addition to, the WVS Operations and Maintenance EIS review.

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## FINAL ENVIRONMENTAL IMPACT STATEMENT

## CHAPTER 3 AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

## SECTION 3.5 WATER QUALITY

**TABLE OF CONTENTS**

3.5 Water Quality ..... 1
3.5.1 Introduction ..... 3
3.5.2 Affected Environment ..... 3
3.5.2.1 Water Quality Regulations ..... 3
Federal Clean Water Act and Oregon State Regulations ..... 3
Oregon State Harmful Algal Bloom Guidelines ..... 4
Oregon State Turbidity Regulations ..... 4
Oregon State Mercury Guidelines and Federal Regulations ..... 5
Endangered Species Act Biological Opinions ..... 5
3.5.2.2 Water Quality Parameter Overview and Subbasin Conditions ..... 13
Temperature ..... 13
Total Dissolved Gas ..... 53
Turbidity ..... 64
Harmful Algal Blooms or Cyanobacteria ..... 69
Mercury ..... 74
Sediment Quality ..... 76
3.5.3 Environmental Consequences ..... 81
3.5.3.1 Methodology ..... 81
Water Temperature Modeling ..... 82
Total Dissolved Gas Modeling ..... 85
Turbidity Qualitative Methodology ..... 87
Harmful Algal Blooms and Cyanobacteria Qualitative Methodology ..... 87
Mercury Qualitative Methodology ..... 88
3.5.3.2 Alternatives Analyses ..... 89
Construction and Routine and Non-routine Maintenance under All Action Alternatives ..... 89
No-action Alternative ..... 90
Alternative 1—Improve Fish Passage through Storage-focused Measures ..... 99
Alternative 2A—Integrated Water Management Flexibility and ESA-listed Fish Alternative ..... 107
Alternative 2B—Integrated Water Management Flexibility and ESA-listed Fish Alternative ..... 113
Alternative 3A—Improve Fish Passage through Operations-focused Measures ..... 120
Alternative 3B—Improve Fish Passage through Operations-focused Measures ..... 128
Alternative 4—Improve Fish Passage with Structures-based Approach ..... 138
Alternative 5—Preferred Alternative—Refined Integrated Water Management Flexibility and ESA-listed Fish Alternative ..... 144
3.5.4 Interim Operations under All Action Alternatives Except Alternative 1 ..... 150
3.5.4.1 North Santiam River Subbasin ..... 150
Water Temperature ..... 150
Total Dissolved Gas ..... 151
Turbidity, Harmful Algal Blooms, and Mercury ..... 151

3.5.4.2 South Santiam River Subbasin ........ 151
Water Temperature ........ 151
Total Dissolved Gas ........ 152
Turbidity, Harmful Algal Blooms, and Mercury ........ 152
3.5.4.3 McKenzie River Subbasin ........ 152
Water Temperature ........ 152
Total Dissolved Gas ........ 153
Turbidity, Harmful Algal Blooms, and Mercury ........ 153
3.5.4.4 Middle Fork Willamette River Subbasin ........ 154
Water Temperature ........ 154
Total Dissolved Gas ........ 154
Turbidity ........ 155
Harmful Algal Blooms ........ 155
Mercury ........ 155
3.5.4.5 Coast Fork Willamette River and Long Tom River Subbasins ........ 156
Water Temperature and Total Dissolved Gas ........ 156
Turbidity, Harmful Algal Blooms, and Mercury ........ 156
3.5.4.6 Mainstem Willamette River ........ 156
Water Temperature and Total Dissolved Gas ........ 156
Turbidity, Harmful Algal Blooms, and Mercury ........ 156
3.5.5 Climate Change ........ 157
3.5.5.1 No-action Alternative ........ 157
3.5.5.2 Alternative 1—Improve Fish Passage through Storage-focused Measures ........ 158
3.5.5.3 Alternative 2A—Integrated Water Management Flexibility and ESA-listed Fish Alternative ........ 158
3.5.5.4 Alternative 2B—Integrated Water Management Flexibility and ESA-listed Fish Alternative and Alternative 5—Preferred Alternative—Refined Integrated Water Management Flexibility and ESA-listed Fish Alternative ........ 158
3.5.5.5 Alternative 3A—Improve Fish Passage through Operations-focused Measures ........ 159
3.5.5.6 Alternative 3B—Improve Fish Passage through Operations-focused Measures ........ 159
3.5.5.7 Alternative 4—Improve Fish Passage with Structures-based Approach ........ 159
3.5.6 Summary of Effects ........ 160

### 3.5.1 Introduction

Operation of the Willamette Valley System (WVS) has direct effects on water quality in reservoirs and downstream of each dam. This section describes the relationship between the dams and water quality and analyzes potential effects to water quality under each alternative.

### 3.5.2 Affected Environment

The Affected Environment for water quality is described as existing conditions for water quality parameters, which include temperature, total dissolved gas (TDG), harmful algal blooms, turbidity, and mercury. Existing sediment quality conditions within the Willamette Valley System (WVS) is also a component of the Affected Environment, all of which are described by subbasin.

More information on existing conditions for water temperature and TDG are available than for turbidity, harmful algal blooms, and mercury. Consequently, the Affected Environment description below contains more detailed information for water temperature and TDG than for the other parameters where data are unavailable and parameter conditions are unknown. Regulations affecting water quality parameters are first outlined for context.

The analysis area for assessing water quality existing conditions and effects encompasses all reservoirs and Mainstem Willamette River associated with USACE-managed WVS dams in the Willamette River Basin to the Willamette Falls in Oregon City, Oregon.

Note that for improved readability, all figures and tables depicting existing conditions are placed at the end of a subsection or subbasin description.

#### 3.5.2.1 Water Quality Regulations

**Federal Clean Water Act and Oregon State Regulations**

The Clean Water Act Section 303(d) requires each state to prepare a list of impaired water bodies that do not meet state water quality standards. Under the State of Oregon Administrative Rules (OAR) 340-041, the Oregon Department of Environmental Quality (ODEQ) implements the Water Quality Standards and Total Maximum Daily Loads (TMDLs) for Oregon waters.

A TMDL is a load allocation of a pollutant implemented to reduce the pollutant impairment of a waterbody and to meet water quality standards. Water quality standards in the State of Oregon are listed for pH, bacteria, dissolved oxygen, temperature, TDG, total dissolved solids, turbidity, nuisance phytoplankton, and toxic substances.

> **What is Water Quality?**
>
> Water quality consists of chemical and physical properties that are an integral part in determining the health of a waterbody. Regulations and guidelines established to protect U.S. waters and species include the Federal Water Pollution Control Act (1948), which was amended and replaced by to the Clean Water Act (1972), as amended, and the Endangered Species Act (ESA) (1973).

In 1998, ODEQ added Willamette River Basin rivers and streams to the 303(d) list of impaired waters for exceeding standards for biological criteria, temperature, and bacteria. The 303(d) list included dissolved oxygen in 2012 and turbidity in 2018. ODEQ prepared an Integrated Report of impaired water bodies, including those downstream of USACE-managed WVS dams, by pollutant and initial year listed and assessed year (Table 3.5-1 located at the end of Section 3.5.2, Affected Environment, for readability) (ODEQ 2022).

ODEQ and EPA further addressed water quality impairments in the Willamette Basin in 2006 by finalizing the Willamette Basin TMDLs for temperature, mercury, and bacteria. In 2019, ODEQ issued the Final Revised Willamette Basin Mercury TMDL (ODEQ 2019a). These TMDLs highlight impaired rivers and streams of the Willamette River Basin and set guidelines designed to restore water quality by establishing limits on pollutants to meet water quality standards.

All Willamette River Basin subbasins and the Mainstem Willamette River have TMDL load allocations set by the state for mercury, and 9 of the 12 Subbasins have load allocations for temperature and bacteria. USACE-operated dams are in 6 of the 12 subbasins within the Willamette River Basin, and TMDL load allocations were set by the state for temperature of water released below these dams. At the time the alternatives were analyzed, there were no dissolved oxygen or turbidity TMDLs for the Willamette River Basin.

The Annual Willamette Basin Water Quality Reports, from 2009 to present, detail implemented water quality measures describing reservoir temperature targets, temperature TMDLs, TDG, and other water quality (USACE 2011b; USACE 2012b; USACE 2013e; USACE 2014c; USACE 2015m; USACE 2016d; USACE 2017f; USACE 2018c; USACE 2019e; USACE 2020d; USACE 2021f; USACE 2022f).

**Oregon State Harmful Algal Bloom Guidelines**

The Oregon Health Authority implements cyanobacteria toxin guidelines and threshold levels for recreation and drinking waters for the public (OHA 2019). Information provided by the Oregon Health Authority with current and archived algae bloom recreational advisories includes Willamette Valley reservoirs (OHA 2023). Oregon Health Authority is notified if levels are above the toxin threshold following USACE staff water sampling. The Oregon Health Authority then assesses the need for a public advisory for a particular water body.

**Oregon State Turbidity Regulations**

Turbidity regulations are defined by the State as no more than a 10 percent cumulative increase in natural stream turbidities. Increases are to be measured relative to a control point immediately upstream of the turbidity-causing activity (OAR 340-041-0036).

## Oregon State Mercury Guidelines and Federal Regulations

Federal and state agencies prepare mercury guidelines and advisories for human fish consumption limits (EPA and FDA 2022; OHA 2022b). As of February 4, 2021, the ODEQ and the U.S. Environmental Protection Agency (EPA) have issued a revised 2019 Willamette Basin Mercury TMDL; the previous TMDL was issued in 2006 (ODEQ 2019a; EPA 2011).

## Endangered Species Act Biological Opinions

In addition to Federal and state regulations and guidelines, the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (USFWS) issued their respective Willamette Project Biological Opinions in 2008 (NMFS 2008; USFWS 2008). The NMFS Biological Opinion identifies Reasonable and Prudent Alternatives that address multiple interim and long-term water quality improvement objectives and is referred to as the 2008 Biological Opinion in this water quality section.

**THE DEIS HAS BEEN MODIFIED TO REVISE THE FOLLOWING TABLE**

**THE DEIS HAS BEEN MODIFIED TO ADD OR REVISE THE FOLLOWING INFORMATION IN THE FEIS**

***Total Dissolved Gas Conditions in the Mainstem Willamette River***

TDG is not monitored on the Mainstem Willamette River. TDG gages are located downstream of WVS dams and reservoirs where there are known TDG issues.

**Turbidity**

Turbidity is a water quality parameter that can be qualitatively useful in understanding the clarity of water. Turbidity is defined as the visual property of water and implies a reduction or lack of clarity that results from the presence of suspended particles, such as inorganic particles (Wetzel 2001). Turbidity usually consists of inorganic particles and originates by soil erosion from the catchment basin and from re-suspension of bottom sediments (Nolen et al. 1985). When particles from the surrounding land are washed into the river it can make the water a murky brown color, indicating water turbidity has increased. Turbidity is caused by the presence of suspended and dissolved matter, such as clay, silt, finely divided organic matter, plankton and other microscopic organisms, organic acids, and dyes (Anderson 2004).

Turbidity is an indicator of ecosystem health because it indicates the amount of suspended material in the water column. High concentrations of particulate matter affect light penetration in water and ecological productivity, recreational values, and habitat quality, and cause reservoirs to fill in faster. Suspended sediment is known to cause detrimental changes in fish gill structure, and long-term turbidity exposure is detrimental to growth productivity (Cumming and Herbert 2016). Although immediate impacts to fish may occur, sediment transport downstream of dams as a result of deep drawdown operations could also provide habitat benefits for aquatic life over time (Section 3.8, Fish and Aquatic Habitat).

Turbidity measurements are influenced by factors beyond sediment in motion-sediment transport rates, and grain size distribution cannot be directly deduced from turbidity data alone. Suspended sediment sampling is required to quantify the mass (suspended sediment concentration) of mineral material in suspended transport. Suspended sediment sampling and laboratory work is also required to determine grain size distributions of sediment in transport.

While increased turbidity levels can exist during storm events, WVS reservoirs trap sediment from the upstream watershed and reduce turbidity downstream of the dams during high-flow events. However, increased turbidity levels can arise during dam maintenance operations. During storm events, bank erosion can increase sediment transport causing elevated turbidity.

Turbidity monitoring is conducted ad-hoc and as necessary to ensure sediment load is minimal. Turbidity monitoring was not conducted year-round by USACE when the alternatives were analyzed.

Turbidity conditions under operations until 2024 are described below.

### *Turbidity Conditions in the North Santiam River Subbasin*

USGS studied turbidity events that occurred in the North Santiam River due to high precipitation events from 1999 until 2004 (Sobieszcyk et al. 2007). Results concluded there is an increased likelihood of turbidity transportation by stormwater runoff due to the topography and sediment characteristics of the area.

A study conducted from 1998 to 2000 investigated turbidity-suspended sediment concentration relationships in three tributary inputs to the Detroit Reservoir in the North Santiam River Subbasin (Uhrich and Bragg 2003). Unregulated western Cascade Mountain tributaries are capable of yielding concentrations in excess of 100 milligrams per liter and turbidity in excess of 100 nephelometric turbidity units (NTUs). Reservoirs in the Willamette River Subbasin are substantial traps of sediment delivered from upstream tributaries, effectively reducing the amount of suspended and bed sediment delivered to downstream reaches.

A USGS study conducted from 2005 to 2008 indicated that two-thirds of sediment input into Detroit Reservoir originated from the upper North Santiam River Subbasin; two-thirds of sediment transported past Geren Island (located downstream of Detroit and Big Cliff Dams) originated from the Little North Santiam River Subbasin (Bragg and Uhrich 2010). Eighty percent of sediment transport occurred from November until January.

### *Turbidity Conditions in the South Santiam River Subbasin*

Green Peter Reservoir is not listed in the ODEQ 2022 Final Integrated CWA 303(d) database[9] for exceedances of the water quality criteria for turbidity. Although Foster Reservoir is listed on the ODEQ 2022 Final Integrated CWA 303(d) database and indicates exceedances of the water quality criteria for turbidity, data shows 45 days or less of high turbidity days per year.

USACE operations began to gradually draw down Green Peter Reservoir for the fall deep drawdown operation for improved volitional downstream passage in August 2023. The target elevation of 780 feet was reached on November 2, 2023. This was the first year since Green Peter Dam became operational (in 1967) that USACE had drawn down Green Peter Reservoir to this extent. In past years, USACE did not intentionally draw down Green Peter Reservoir below 887 feet because that is the minimum elevation necessary to generate power (i.e., the minimum power pool).

Green Peter Reservoir was held at elevation 780 feet (+/- 3 feet) until early December 2023 when the Willamette River Basin experienced multiple, large atmospheric river storms. During these events, inflows peaked to over 27,000 cfs upstream of Green Peter Reservoir. Consequently, USACE shifted operations by limiting outflows from Green Peter Reservoir and storing water in the reservoir to reduce downstream flooding at Waterloo and Jefferson, Oregon. In just a few days, the Green Peter Reservoir elevation rose over 100 feet. Stored

[9] ODEQ 303(d) Integrated Report Database (https://rstudioconnect.deq.state.or.us/2022_IR_Database/).

floodwater was evacuated at a maximum draft rate until the drawdown period ended on December 16, 2023; after which, Green Peter Reservoir was refilled to its minimum conservation elevation as inflows allowed.

The Green Peter drawdown led to increased turbidity in the Middle Fork Willamette and South Santiam Rivers. This was due to the upper reservoir shifting from lake to river conditions, cutting a new channel through the sediment that had accumulated in the bottom of the reservoir over decades.

Turbidity was monitored in real-time downstream of Green Peter and Foster Dams throughout the drawdown, and this monitoring continued throughout the remainder of 2023 and 2024. Based on initial, provisional information from USGS in early 2024, turbidity levels peaked to 1,380 formazin nephelometric units (FNU) directly downstream of Green Peter Dam when the reservoir was first drawn down in early November, followed by a second notable spike in turbidity in early December during a heavy rain event. Elevated levels of turbidity were measured downstream to Waterloo and observed even further downstream where the North and South Santiam Rivers converge and beyond.

Downstream communities reported that turbidity associated with the Green Peter Reservoir deep drawdown impacted drinking water facilities. The City of Sweet Home requested to alter operations because of turbidity to accommodate the limitations of its water treatment system (operating for extended hours and changing how water is treated). USACE engaged in multiple meetings with the Cities of Sweet Home and Lebanon and attended a public meeting to discuss the drawdown, share data collected to-date, and listened to citizen concerns.

Turbidity levels indicate that sediment from the drawdown at Green Peter Dam is being transported below Foster Dam to the confluence of the South and North Santiam Rivers. As of 2024, it is uncertain if this sediment is impacting Chinook salmon eggs in gravels (i.e., redds) below Foster Dam. Impacts from elevated turbidity on downstream spawning beds was monitored during the drawdown of Cougar Reservoir when the water temperature control tower was completed in 2005 (Anderson 2007). NTU levels as high as 1,420 were reported below Cougar Dam, briefly, then averaged below 100 NTUs. Monitoring demonstrated minor impacts on Chinook salmon redds located downstream of Cougar Dam.

***Turbidity Conditions in the McKenzie River Subbasin***

USACE conducted a Water Quality study in 1996 at Cougar Reservoir, Blue River Reservoir, and in the McKenzie River from April through September. This study was in response to a proposed selective withdrawal structure (Hains 1997). The study collected in-situ field parameters and water samples for chemical analyses (chlorophyll, dissolved organic carbon, turbidity, alkalinity). The study observed that surface waters were less turbid throughout the season, and turbidity was maintained at bottom water depths in both reservoirs.

At Blue River Reservoir, outflows released turbid bottom water, which then decreased in-reservoir bottom turbidity. At Cougar Reservoir, turbid waters were located at bottom water

(Ambers and Hygelund 2001). Signs are posted by the Oregon Health Authority at the reservoir boat ramps to educate the public of fish consumption guidelines.

***Background Mercury Conditions at Willamette Valley System Reservoirs***

The EPA, CDM Smith, and USGS conducted mercury sampling in Hills Creek, Lookout Point, Dexter, Fall Creek, Fern Ridge, Foster, and Detroit Reservoirs as part of the ongoing Superfund cleanup of the Cottage Grove area. The sampling was conducted during 2023 to define background mercury conditions compared to Cottage Grove Reservoir (Eagles-Smith et al. 2022). All water samples collected at these reservoirs were below the total mercury freshwater aquatic life chronic criteria of 0.012 ug/L (12 ng/L) for wildlife exposure (Silvertooth 2024) (Appendix D, Water Quality Analysis, Chapter 4, Other In-Reservoir Water Quality Background Information).

**Sediment Quality**

***Overview***

Sediment is defined as mineral and/or organic material that is eroded, transported, and deposited by wind, water, and/or glacial erosion. Sediment can be composed of clay, silt, sand, gravel, and large-sized rocks as well as organic matter derived from plants, animals, fungi, etc.

When wetted, sediment composed of fine-grained mineral particles (silts and clays) and organic matter are capable of adsorbing ions (i.e., bind/hold). They are also able to adsorb contaminants. Manmade contaminants such as pesticides and polychlorinated biphenyls (PCBs) and naturally occurring contaminants (generated from the erosion of volcanic rocks) are hydrophobic (“water-fearing”) and are adsorbed and sequestered in the sediment rather than readily dissolving in water. As such, contaminants sequestered in the sediment do not typically impact the water quality in the overlying water column unless they occur at very high concentrations.

Once adsorbed, contaminants can persist in the sediment for years, long after they are no longer detectable in water. Although many of these manmade chemicals were banned decades ago, they are still found in lakebed and streambed sediment, sometimes at concentrations high enough to be a risk to aquatic organisms.

In the Northwest region, the Sediment Evaluation Framework for the Pacific Northwest is used to evaluate sediment quality in the states of Oregon, Washington, and Idaho (NWRSET 2018). This guidance was developed for use in these three states by Federal agencies[17], the state water quality agencies, and the Washington Department of Natural Resources.

[17] USACE, Northwestern Division; Environmental Protection Agency, Region 10; National Marine Fisheries Service; U.S. Fish and Wildlife Service; Oregon Department of Environmental Quality; Washington Department of Ecology; Idaho Department of Environmental Quality.

Per the Evaluation Framework, the area of interest (i.e., dam and reservoir area or dredge area) is identified and sediment sampling objectives are defined. Sediment samples are collected from the area of interest and sent to laboratories for analysis. Up to nearly 60 contaminants are analyzed. The bulk sediment concentrations are measured and compared to freshwater thresholds (“screening levels”) that are protective of benthic and epibenthic fauna.

The sediment chemical screening levels presented in the Evaluation Framework are primarily used to evaluate Federal and non-Federal navigational dredging projects. However, guidance thresholds may also be used to assess the quality of sediments stored behind reservoirs or connected to dam operations where sediments may be excavated and discharged into wetlands or waterways.

A synoptic study of bottom sediments of the Willamette River was conducted by USGS in 1973 to analyze trace metal concentrations (Rickert et al. 1977b). A map included in the study identified historical mines for copper, gold, silver, lead, and zinc near the Coast Fork Willamette River; Middle Fork Willamette River; and the McKenzie, South Santiam, and North Santiam River Subbasins. Two mercury mine sites were also identified, one near the Coast Fork Willamette River above Cottage Grove Reservoir and one mercury mine site from the Oak Grove Fork of the Clackamas River.

Sediment samples were collected on the Mainstem Willamette River and analyzed for trace metals such as zinc, lead, copper, chromium, mercury, and cadmium to assess inputs from natural versus pollution sources. The study concluded that accumulated metal concentrations in the Willamette River did not pose an immediate ecological threat.

A 1992 until 1994 study was then conducted, which included water and sediment sampling in the Willamette River at approximately 50 sites (Harrison et al. 1995). The report contains trace-element, organic compounds (such as pesticides, volatile and semi-volatile organic, and dioxin and furan compounds), and nutrient concentration data from the water column, suspended sediment, and bed sediment samples on the Willamette River.

**END NEW OR REVISED TEXT**

### *Sediment Quality in the Willamette Valley System*

USACE has conducted sediment sampling in 11 of the 13 WVS reservoirs. Blue River and Hills Creek Reservoirs have not been sampled because of resource constraints; no future sampling is anticipated. Sampling occurred between 2002 and 2021 and was analyzed to determine the presence or absence of sediment-borne contaminants (Table 3.5-9).

Sediments in the 11 reservoirs were analyzed for grain-size distribution, total organic carbon content, heavy metals, and organochlorine pesticides. The metals analysis was performed because of the volcanic nature of the soils contributing sediment to the reservoirs and the occurrence of mines above some of the reservoirs.

Analyses for other contaminant groups are typically performed if contaminant chemicals might be present in sediment due to a nearby source (semi-volatile organic compounds including polynuclear aromatic hydrocarbons, phthalates, phenols, and miscellaneous extractable compounds; polychlorinated biphenyls).

Differences exist between the Sediment Evaluation Framework (Table 3.5-9) and the ODEQ 303d Rationale (Table 3.5-1). These differences may be due to the updated TMDL, sampling locations, and screening limits.

The EPA began sediment sample collection in 2021 from Cottage Grove Reservoir relating to the Black Butte Mine clean up. Sampling is ongoing and 2021 results are pending (CDM Smith 2022) (Section 3.5.2.2, Water Quality Parameters and Subbasin Conditions, Mercury Conditions in the Coast Fork Willamette River and Long Tom River Subbasins).

***Pesticide Contaminants in Sediment***

Pesticide analyses are performed where there is a history of aerial application to control invasive plant species. To date, none of the in-water sediment samples collected have shown contaminant concentrations above the regional Evaluation Framework freshwater screening levels. Pesticides were detected in forested soils adjacent to Cougar Reservoir during the 2002 sediment sampling event; however, pesticides were not detected above the regional sediment quality guidelines in reservoir sediments.

### 3.5.3 Environmental Consequences

This section discusses the potential direct, indirect, and climate change effects of the alternatives on water quality in the analysis area (Section 3.5.2, Affected Environment). The discussion includes the methodology used to assess effects, an analysis of effects by alternative, and a summary of the anticipated effects.

#### 3.5.3.1 Methodology

**THE DEIS HAS BEEN MODIFIED TO REVISE THE FOLLOWING INFORMATION IN THE FEIS**

The degree of impact on water quality parameters described in Section 3.5.2, Affected Environment, are assessed qualitatively and discussed descriptively (e.g., slight, moderate[18], substantial). Specified criteria to describe the degree of effect are not provided because criteria based on collected data would be speculative (e.g., defining minor or major effects descriptions that correlate to a specific parameter condition), and data are not available for all parameters or dams. Further, water quality conditions would remain adverse with varying degrees of adversity or improvement depending on the alternative. Therefore, descriptions of these effects are more informative and accurate than attempting to assign specific criteria to adverse or beneficial effects.

All effects on water quality parameters from dam operations are considered direct effects unless otherwise indicated.

Water temperature and TDG parameters were modeled and described below with additional detail in Appendix D, Water Quality Analysis, Chapters 1 and 2. Turbidity, harmful algal blooms (also known as cyanobacteria), and mercury parameters were qualitatively analyzed under each alternative, incorporating information from Appendix C, River Mechanics and Geomorphology Technical Information; Appendix B, Hydrological Processes, Section 3.2; and the climate change appendices, Appendix F1, Qualitative Assessment of Climate Change Impacts, and Appendix F2, Supplemental Climate Change Information.

The analysis methodology applied to each parameter is first described below. The environmental consequences of water quality parameters were compared between the No-action Alternative (NAA) and the action alternatives following the methodology information.

Hatcheries in the analysis area are funded by USACE and managed by ODFW. While hatcheries can result in effects on localized and downstream water quality near the hatcheries, none of

[18] “Negligible” is defined in its common use as “too slight or small in amount to be of importance” (Cambridge Dictionary). “Minor” is defined as comparatively unimportant (Merriam-Webster Dictionary). “Slight” is defined in its common use as “small of its kind, or in amount” (Merriam-Webster Dictionary). “Moderate” is defined in its common use as “average in amount, intensity, quality, or degree” (Oxford Languages). “Substantial is defined in its common use as “considerable in quantity, great [in amount]” (Merriam-Webster Dictionary).

the alternatives would alter management affecting water quality at hatcheries as compared to the NAA.

## Water Temperature Modeling

Water temperature modeling criteria under the NAA differs from water temperature modeling criteria under the action alternatives. Specifically, the Resource Agency temperature targets were applied to the NAA, while modified temperature targets were applied to the action alternatives. The CE-QUAL-W2 model was applied to simulate water temperatures resulting from the various measures within each alternative. The CE-QUAL-W2 model optimizes water releases from various outlets to meet the designated temperature targets (Appendix D, Water Quality Analysis, Section 1.6, Supporting Data For Water Quality Effects Analysis).

Water temperature was not simulated at Blue River, Fall Creek, Dorena, Cottage Grove, or Fern Ridge Reservoirs. CE-QUAL-W2[19] models do not exist for Blue River or Fern Ridge Reservoirs. At Dorena and Cottage Grove Reservoirs, there would be only a slight difference in operation among the action alternatives as compared to the NAA. At Fall Creek Reservoir, CE-QUAL-W2 modeling was not determined a high priority effort to assess effects under the action alternatives because operations are typically motivated by flood risk management and downstream fish passage with limited ability to affect downstream temperature with current outlet configurations.

Each modeled year represented a different climatological condition: wet year (2011), dry year (2015), and average year (2016). CE-QUAL-W2 reservoir water temperature model output was analyzed for each of the 3 years in each reservoir and immediately downstream (Appendix D, Water Quality Analysis, Section 1.2.2, Model Configuration). Inflow[20], inflow water temperature, air temperature, barometric pressure, wind speed, wind direction, and gate-specific outflow data were used as inputs for each simulation.

To assess effects under the NAA and each action alternative, the hourly water temperature below each dam was used in a calculation of the 7-day Average of the Daily Max (7dADM) water temperature (Appendix D, Water Quality Analysis, Section 1.6, Supporting Data For Water Quality Effects Analysis). The 7dADM water temperature was then compared to the temperature targets at each location to describe the degree of effect on water quality from temperature. The 7dADM of a stream is utilized for life stages of fish species, for example UWR spring Chinook salmon, UWR steelhead, and bull trout, in determining temperature thresholds (OAR 340-041-0028 (4)) (Section 3.5.2.2, Water Quality Parameter Overview and Subbasin Conditions, Temperature).

---

[19] CE-QUAL-W2 is a two-dimensional (longitudinal/vertical) hydrodynamic reservoir and river model (Wells 2019).

[20] Reservoir Inflows: most runoff to a reservoir is via river tributaries (high stream orders); penetration into stratified strata complex (over-, inter-, and underflows); often flow is directed along old riverbed valleys (Wetzel 2001).

Willamette Valley under any alternative (Appendix D, Water Quality Analysis, Chapter 2, Total Dissolved Gas).

The TDG analysis for Interim Operations was qualitatively assessed for the FEIS analyses. Results from the model and methodology for the DEIS analyses were considered in development of expected Interim Operations conditions over the 30-year implementation timeframe (Appendix D, Water Quality Analysis, Chapter 2, Total Dissolved Gas, Section 2.2, Total Dissolved Gas Results and Effects Analysis).

**Turbidity Qualitative Methodology**

The turbidity analyses are qualitative and based on field data collected during deep drawdown operations and fine-grained sediment information provided in Appendix C, River Mechanics and Geomorphology Technical Information, Chapter 2, Alternative Comparison Summaries.

For this qualitative analysis, it was assumed that sediment supply from rivers upstream of WVS dams, or tributaries to the WVS-impacted reaches that are not downstream of a WVS reservoir, would be the same under any action alternative as under the NAA (Section 3.5.2.2, Water Quality Parameter Overview and Subbasin Conditions, Turbidity, Sediment Quality).

**Harmful Algal Blooms and Cyanobacteria Qualitative Methodology**

The harmful algal bloom analyses are qualitative and based on harmful algal bloom occurrence from monthly synoptic surveys and reservoir analyses (Appendix D, Water Quality Analysis, Chapter 4, Other In-Reservoir Water Quality Background Information, Section 4.3) (Appendix C, River Mechanics and Geomorphology Technical Information, Chapter 2, Alternative Comparison Summaries, Head-of-Reservoir, Sediment Re-entrainment). The analyses also incorporate information from Appendix F1, Qualitative Assessment of Climate Change Impacts, and Appendix F2, Supplemental Climate Change Information.

Metrics were utilized to describe potential availability of nutrients and algae blooms associated with sediment under any alternative. Metrics include sediment movement into the reservoir (head-of-reservoir) and sediment that could pass through a storage reservoir (reservoir-supplied sediment) (Appendix C, River Mechanics and Geomorphology Technical Information, Chapter 2, Alternative Comparison Summaries, Head-of-Reservoir, Sediment Re-entrainment).

***Head-of-Reservoir Metric***

The transition from riverine to reservoir conditions can shift upstream and downstream considerable distances at dams that have large amounts of storage volume and operate over a wide range of elevations throughout the year. The head-of-reservoir sediment mobilization metric indicates the potential for changes in sediment scour and deposition patterns in the most upstream portion of storage reservoirs as they may impact nutrient availability within sediments for algae.

### *Sediment Entrainment Metric*

The sediment re-entrainment metric estimates the potential for changes for reservoir supplied sediment under each alternative as compared to the NAA in the amount of sediment that can deposit within or pass through the storage reservoirs. Wind-wave erosion on stored fines and rarely exposed banks are also drivers for changes in sediment supply internal to the reservoir.

### *Mainstem Willamette River*

The Mainstem Willamette River was not analyzed for harmful algal bloom effects under any alternative because the metrics used to describe the potential increase of algal blooms are for storage-based dams (i.e., reservoir storage); the Mainstem Willamette River is not a reservoir and does not store water (Section 3.5.2.2, Water Quality Parameter Overview and Subbasin Conditions, Harmful Algal Blooms).

## Mercury Qualitative Methodology

The mercury analyses are qualitative and based on reservoir analyses provided in Appendix C, River Mechanics and Geomorphology Technical Information, Chapter 2, Alternative Comparison Summaries, Reservoir-supplied Sediment. The analyses also incorporate information from Appendix F1, Qualitative Assessment of Climate Change Impacts, and Appendix F2, Supplemental Climate Change Information.

The reservoir-supplied sediment metric is included in the run-of-river and free-flowing reach metric for sediment supply. This metric is used to describe the potential effect or increases in sediment supply internal to the reservoir from bed sediments passing downstream through a dam.

It is acknowledged that anoxic conditions[21] are also a factor in the methylation of mercury due to the role of sulfate-reducing bacteria and nutrient loading (Chen et al. 1997; Dent et al. 2014). Currently, USACE does not have the capability to simulate dissolved oxygen in the available models; however, dissolved oxygen is typically above 50 percent at most reservoirs throughout the summer, except for Fern Ridge, Fall Creek, Dorena, and Cottage Grove Reservoirs where periods of low dissolved oxygen can exist for some periods (typically late summer) (Appendix D, Water Quality Analysis, Chapter 4, Other In-Reservoir Water Quality Background Information). Qualitative mercury methylation impacts are best estimates based on current understanding of dissolved oxygen, mercury data, methylation data, and methylation potential at each reservoir at the time the alternatives were analyzed.

**END REVISED TEXT**

[21] Anoxia is a condition of no, or at times very little, dissolved oxygen in marine or freshwater systems (Diaz 2016).

### 3.5.4 Interim Operations under All Action Alternatives Except Alternative 1

The timing and duration of Interim Operations would vary depending on a given alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, and 5. However, Interim Operations under Alternative 3A and Alternative 3B may not be fully implemented or required because long-term operational strategies for these alternatives are intended to be implemented immediately upon Record of Decision finalization.

Interim Operations are not an alternative (Chapter 2, Alternative, Section 2.8.5, Interim Operations). Interim Operations analyses did not include consideration of the impacts assessed under action Alternatives 2A, 2B, 3A, 3B, 4, and 5 because Interim Operations would be implemented in succession with, and not in addition to, action alternative implementation.

Revisions to modeled Interim Operations from DEIS alternatives analyses to FEIS alternatives analyses did not warrant revisions to water temperature or TDG modeling due to the resulting minor changes to operations. These changes were limited to extreme dry years and are explained further in Appendix D. Therefore, the DEIS analyses were not revised in the FEIS because the expected differences did not warrant analysis modifications.

Operations that focus on deep drawdowns, earlier drawdown, and delayed refills for downstream fish passage would greatly increase erosion and bank stability, which would be a continuation of major, adverse effects to water quality.

#### 3.5.4.1 North Santiam River Subbasin

**Water Temperature**

An overall continued adverse effect to water quality would occur with implementation of the Interim Operations in the North Santiam River Subbasin. However, there would be a slight improvement to water temperature as compared to the NAA. Temperature targets under the Interim Operations differ from targets modeled for the NAA.

Specifically, under the Interim Operations as compared to the NAA:

- Modeled water temperatures would be within 2°F of targets more often as compared to the NAA below Detroit and Big Cliff Dams by 16 days per year on average (Table 3.5-10 and Table 3.5-11) (Appendix D, Water Quality Analysis, Section 1.6, Supporting Data for Water Quality Effects Analysis).
- Exceedance of the 64.4°F temperature threshold would remain the same as under the NAA.

Exceptions may occur at the local level and in the short term, depending on specific annual or seasonal climate conditions and specific dam operations, but overall, operations and maintenance under the Interim Operations would result in continuation of adverse effects on

water quality from temperature conditions in the North Santiam River Subbasin even though the Interim Operations are expected to provide some benefit to water temperature conditions.

**Total Dissolved Gas**

Under the Interim Operations, there would be a substantial adverse effect to water quality from TDG as compared to the NAA in the North Santiam River Subbasin. This is because there would be a combination of measures implemented that would increase the spill frequency, increasing TDG exceedance of the water quality standard as compared to the NAA.

Specifically, under the Interim Operations as compared to the NAA:

- There would be an increase in TDG exceedance of the water quality standard below Detroit Dam by 161 days per year on average and below Big Cliff Dam by 147 days per year on average as compared to the NAA (Table 3.5-12) (Appendix D, Water Quality Analysis, Section 2.2, Total Dissolved Gas Results and Effects Analysis).

Exceptions may occur at the local level and in the short term, depending on specific annual or seasonal climate conditions and specific dam operations, but overall, operations and maintenance under the Interim Operations would result in adverse effects on water quality from TDG in the North Santiam River Subbasin.

**Turbidity, Harmful Algal Blooms, and Mercury**

Under the Interim Operations, effects on water quality in the North Santiam River Subbasin from turbidity, harmful algal blooms, and mercury would be the same as those described under Alternative 1.

### 3.5.4.2 South Santiam River Subbasin

**Water Temperature**

Temperature targets under the Interim Operations differ from targets modeled for the NAA. However, effects on water quality from temperature conditions in the South Santiam River Subbasin would be adverse, similar to the NAA.

Specifically, under the Interim Operations as compared to the NAA:

- Modeled water temperatures below Foster Dam would be within 2°F of the water temperature target less often as compared to the NAA by 31 days per year on average; however, temperatures would remain below the 64.4°F temperature threshold by 15 days per year on average more often than under the NAA.

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

## FINAL ENVIRONMENTAL IMPACT STATEMENT

## CHAPTER 3 AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

## SECTION 3.19 PUBLIC HEALTH AND SAFETY—DRINKING WATER

**TABLE OF CONTENTS**

3.19 Public Health and Safety—Drinking Water ... 1
3.19.1 Introduction ... 2
3.19.2 Affected Environment ... 4
3.19.2.1 Drinking Water Contaminants and Treatment ... 5
Harmful Algal Blooms ... 5
Turbidity ... 6
3.19.2.2 Drinking Water Regulatory Background ... 6
Federal Regulations ... 6
Oregon State Regulations ... 7
3.19.2.3 Groundwater and Surface Water Regulatory Background ... 8
3.19.3 Environmental Consequences ... 10
3.19.3.1 Methodology ... 10
3.19.3.2 Alternatives Analyses ... 13
Construction and Routine and Non-routine Maintenance Activities under All Alternatives ... 13
Groundwater Supply for Drinking Water under All Alternatives ... 13
Water Quality and Treatment Facility Operations under All Alternatives ... 14
Water Availability in Dry Years under All Alternatives ... 15
No-action Alternative ... 15
Alternative 1—Improve Fish Passage through Storage-focused Measures ... 16
Alternative 2A—Integrated Water Management Flexibility and ESA-listed Fish Alternative ... 16
Alternative 2B—Integrated Water Management Flexibility and ESA-listed Fish Alternative ... 17
Alternative 3A—Improve Fish Passage through Operations-focused Measures ... 18
Alternative 3B—Improve Fish Passage through Operations-focused Measures ... 18
Alternative 4—Improve Fish Passage with Structures-based Approach 19
Alternative 5—Preferred Alternative—Refined Integrated Water Management Flexibility and ESA-listed Fish Alternative ... 19
3.19.4 Interim Operations under All Action Alternatives Except Alternative 1 ... 20
3.19.4.1 Turbidity ... 20
3.19.4.2 Harmful Algal Blooms ... 21
3.19.4.3 Stored Water ... 21
3.19.4.4 River Flow ... 21

**Summary of changes from the DEIS, continued:**

- **Methodology has been revised in FEIS Section 3.19.3.1 to further explain the qualitative analysis approach. Information on potential effects from construction and routine and non-routine maintenance and effects on groundwater wells has been added. DEIS Table 3.19-4, Effects Criteria, has been deleted because the criteria were based on a quantitative analysis inconsistent with the FEIS qualitative analysis approach.**
- **DEIS Table 3.19-4, Summary of Effects to Public Health and Safety, has been revised to summarize qualitative analyses (FEIS Table 3.19-2).**
- **The alternatives analyses have been modified to provide additional rationale for effects conclusions (FEIS Section 3.19.3.2, Alternatives Analyses). For example, water supply from reservoir storage and river flow have been clarified. Hatchery effects have been deleted because hatchery effluent and released water is treated and does not impact drinking water under any alternative. Degrees of direct effect have been re-focused from effects on reservoir refill to effects on water supply.**
- **Analyses of construction, routine and non-routine maintenance, groundwater supply, water quality, and effects on treatment facility operations have been added to FEIS Section 3.19.3.2, Alternatives Analyses.**
- **Information on water availability for drinking water use in dry years has been provided in FEIS Section 3.19.3.2, Alternatives Analyses.**
- **The effects analyses from Near-term Operation Measures have been revised in FEIS Section 3.19.4. The term “Near-term Operations” has been changed to “Interim Operations” throughout the EIS.**
- **The climate change analysis has been revised to reflect anticipated water quality and water supply effects in FEIS Section 3.19.5, Climate Change under All Alternatives.**

### 3.19.1 Introduction

THE DEIS HAS BEEN MODIFIED TO INCLUDE THE FOLLOWING INFORMATION IN THE FEIS

Public health and safety can be at risk from adverse effects to consumer drinking water. Consumer drinking water and public water systems in the analysis area are regulated by Federal and Oregon State laws. The Willamette Valley System (WVS) is not a public water system under Federal or state regulations.

USACE operations store and release water in the WVS for multiple Congressionally authorized purposes, including municipal and industrial water supply and water quality (Chapter 1,

Introduction, Section 1.10, Congressionally Authorized Purposes). The Willamette River and its tributaries, along with groundwater, are the major sources of water for municipal and industrial needs in the analysis area. Currently, USACE operates releases and subsequent downstream flows in the analysis area under the 2008 National Marine Fisheries Service (NMFS) Biological Opinion (NMFS 2008) (Chapter 1, Introduction, Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History since 2008).

At the time the alternatives were analyzed, population growth created a demand for water that would exceed existing supplies for many municipal and industrial systems throughout the Willamette River Basin in the near future. This need was one of the factors that led to the Willamette Basin Review Feasibility Study (USACE 2019a) (Chapter 1, Introduction, Section 1.3.3, Willamette Valley System Endangered Species Act and National Environmental Policy Act History since 2008), which resulted in a total of 159,750 acre-feet of conservation storage reallocated to the purpose of municipal and industrial water supply.

Demands for water stored in the WVS to supply municipal and industrial water are spread across all subbasins (USACE 2019a). However, the greatest demand is on the Mainstem Willamette River (Section 3.13, Water Supply, Table 3.13-3).

While operations of the WVS store water for municipal and industrial uses, USACE is not authorized to provide drinking water for consumer use. Similarly, while water quality is an authorized purpose, USACE is not responsible for the quality of water that is then used for drinking water. Drinking water quality is the responsibility of municipalities that own and operate public water systems.

At the time the alternatives were analyzed, the injunction deep drawdown operations at Green Peter Dam mobilized large amounts of sediment at Green Peter dam. The drawdown was halted over concerns by communities in Linn County, Oregon that the sediment would overwhelm the surrounding cities' drinking water systems (USACE 2024b).

This section provides an overview of drinking water use, supply sources, public water systems, contaminants, and regulations applicable to water used from WVS operations as drinking water. This section combines analysis information from the water quality and water supply sections as they pertain to drinking water.

Detailed descriptions of existing water quality conditions below WVS reservoirs and effects under each alternative are provided in Section 3.5, Water Quality. Information on municipal and industrial water supply and users within the analysis area, including water rights, storage agreements, and water service contracts, are provided in Section 3.13, Water Supply.

**END NEW TEXT**

### 3.19.2 Affected Environment

The drinking water analysis area is defined broadly as the geographic boundaries of the Willamette River Basin, which encompasses groundwater and surface water sources that communities rely on for public drinking water (Table 3.19-1). At the time the alternatives were analyzed, a greater population was supplied drinking water from Mainstem Willamette River surface water upstream (south) of Salem, Oregon (118,975 population supplied) than below (north of) Salem (45,800 population supplied) (OHA 2024b).

Most of the Portland metropolitan area, which is north of Salem, is served by drinking water sourced from the Bull Run River (outside of the analysis area) and not from the Mainstem Willamette River (OHA 2024c). As population increases throughout the Willamette River Basin, municipal and industrial needs will increase, putting pressure on existing water supplies.

**Table 3.19-1. Public Water Systems in the Willamette River Basin and Water Source.**

| Subbasin | Source Water Bodies[1] | Public Water System |
|---|---|---|
| **North Santiam River** | Detroit Reservoir, North Santiam River | City of Detroit, City of Gates, Lyons-Mehama Water District, Salem Public Works (City of Salem), City of Albany, City of Jefferson, Stayton Water Supply |
| **South Santiam River** | South Santiam River | City of Sweet Home, City of Lebanon |
| **McKenzie River** | Blue River, McKenzie River | Springfield Utility Board, Eugene Water and Electric Board, Rainbow Water District |
| **Middle Fork Willamette River** | Dexter Reservoir, Middle Fork Willamette River | Springfield Utility Board, City of Lowell |
| **Coast Fork Willamette River** | Coast Fork Willamette River, Row River | City of Creswell, City of Cottage Grove |
| **Long Tom River** | Long Tom River | City of Monroe |
| **Long Tom River** | Groundwater wells | City of Elmira, City of Veneta<br>City of Veneta also supplements drinking water purchased from the Eugene Water and Electric Board (the Board sources surface water from the McKenzie River) |
| **Mainstem Willamette River** | Mainstem Willamette River | City of Corvallis, City of Wilsonville, City of Sherwood, Village of Adair, Willamette Water Supply System Commission (under construction) |

Source: OHA 2025a, OHA 2024b

[1] The majority of municipal water in the analysis area is withdrawn downstream of the WVS reservoirs.

The Willamette Water Supply System Commission (WWSS Commission) is an Oregon intergovernmental organization formed by Tualatin Valley Water District (TVWD), the City of Hillsboro, and the City of Beaverton. The WWSS Commission was formed to build the Willamette Water Supply System (WWSS) in response to planned growth in their service areas. The WWSS also provides additional water supply to Washington County in the Portland metropolitan area (WWSSC 2024). When completed, the pipeline and water treatment facility, sourced from the lower Mainstem Willamette River, will serve approximately 380,243 additional people. Once online, the highest level of Willamette River water sourced for drinking water would convert from upstream to downstream of Salem (OHA 2024b).

#### 3.19.2.1 Drinking Water Contaminants and Treatment

Contamination of drinking water sources can be caused by animal waste, improper disposal of chemicals, naturally occurring substances within a watershed, and pesticide use. In the Willamette Valley, approximately 33 percent of rural water wells contained at least one pesticide from historical uses (ODEQ 2017). For example, USACE commonly uses pesticides such as triclopyrcholine and glyphosate for routine maintenance (Section 3.16, Hazardous Materials).

Water can dissolve substances from human activities or animals as it runs over land or percolates through the ground and then enters drinking water sources. Contaminants that can be found in drinking water include microbial contaminants such as viruses and bacteria, inorganic contaminants such as salts and metals, pesticides and herbicides, other chemicals, and radioactive contaminants that may be naturally occurring (City of Sweet Home Public Works 2021).

The proper treatment, disinfection, and distribution of clean drinking water is vital to the prevention of public health risks in the analysis area. Water sourced from downstream of the WVS reservoirs is treated by a combination of filtration, aeration, and disinfection at a public water treatment facility before it is distributed.

**Harmful Algal Blooms**

Some algal blooms are harmful if people or pets come in contact with polluted water or consume tainted fish or shellfish (EPA 2022d) (Section 3.5.1.2, Water Quality Parameters and Subbasin Conditions, Harmful Algal Blooms).

In addition to direct harm to people and pets, harmful algal blooms can cause challenges to the delivery of safe drinking water. Potential negative impacts to drinking water utility systems include unpleasant taste and odor; interference with water treatment plant operations such as floc formation, filtration, and chlorination; increased levels of disinfection by-product precursors; and if not addressed, pass-through of cyanotoxins into finished drinking water (EPA 2024b). Finished water is water that has been treated and is ready to be delivered to customers (EPA 2012).

**Turbidity**

Turbidity is the cloudiness of water due to suspended particles (Section 3.5, Water Quality, Section 3.5.1.2, Water Quality Parameters and Subbasin Conditions, Turbidity). Materials that cause water to be turbid include clay, silt, very tiny inorganic and organic matter, algae, dissolved colored organic compounds, and plankton and other microscopic organisms (USGS 2018). Higher turbidity levels are often associated with higher levels of disease-causing microorganisms such as viruses, parasites, and some bacteria (EPA 2022a).

High turbidity events can occur due to very heavy rainfall or rapid snowmelt causing rapid runoff in the watershed. Deep reservoir drawdowns can liberate previously stable sediments and contribute to elevated levels of turbidity downstream of the reservoir. Increased levels of turbidity can cause water treatment facility operations to be impacted, leading to the potential for disruption in drinking water service.

Additional pretreatment may be necessary to reduce turbidity. Municipal water quality monitoring allows the water treatment facility to receive advanced notice if pretreatment processes are necessary or if the facility must prepare to close.

### 3.19.2.2 Drinking Water Regulatory Background

Federal and Oregon State drinking water regulations protect drinking water sources, including lakes, rivers, streams, springs, and groundwater wells and regulate the operation and maintenance of drinking water treatment facilities in Oregon. USACE operations are not subject to Federal or state drinking water regulations.

**Federal Regulations**

***Safe Drinking Water Act***

The Federal Safe Drinking Water Act was passed in 1974 to protect public health by regulating the national drinking water supply. The Safe Drinking Water Act authorizes the U.S. Environmental Protection Agency (EPA) to set standards for drinking water. Drinking water sources covered under the act include groundwater and surface waters such as rivers, lakes, streams, reservoirs, springs, ponds, and wells.

The act originally focused on treatment as the means of providing safe drinking water at the tap. However, the 1996 amendments expanded the existing law by adding protections at drinking water sources, providing for operator training, providing funding for water system projects, and recognizing public information as important components of safe drinking water (EPA 2004).

***Environmental Protection Agency Standards***

The EPA drinking water standards regulate over 90 contaminants in community and non-community water systems as defined under the National Primary Drinking Water Regulations

(40 CFR 141). These standards are grouped in two categories: the National Primary Drinking Water Regulations (or primary standards) and the National Secondary Drinking Water Regulations (or secondary standards). Primary drinking water standards are legally enforceable. Primary standards set mandatory water quality standards or "maximum contaminant levels" to protect the public against drinking water contaminants. Secondary standards are non-enforceable and provide guidelines for aesthetic considerations such as taste, color, and odor (EPA 2021h).

**Oregon State Regulations**

**THE DEIS HAS BEEN REVISED TO INCLUDE THE FOLLOWING INFORMATION IN THE FEIS**

The Oregon Drinking Water Quality Act enacted in 1981 ensures safe drinking water, provides a regulatory program for drinking water, and provides a means to improving inadequate drinking water systems (OHA No Date-c). USACE operations are not subject to Oregon State drinking water regulations, which "apply to all public water systems providing piped water for human consumption…" (ORS 333-061-0010(1)).

**END NEW TEXT**

The Oregon Health Authority regulates drinking water under Oregon State law and the Federal Safe Drinking Water Act and works with Oregon Department of Environmental Quality (ODEQ) on drinking water source protection to prevent public health risks. The ODEQ works to protect drinking sources by implementing the Clean Water Act, identifying the source waters in watersheds and aquifers for surface water and groundwater for public water supply systems, and developing water assessments and guides for community public water systems (ODEQ 2021e).

If drinking water is found to be contaminated, a water advisory is issued by public water system officials (CDC 2020). The Oregon Health Authority Drinking Water Advisories website posts current drinking water advisories in Oregon. It includes information such as the source of water (surface water or groundwater), the reason for the advisory (e.g., nitrate, *E. coli*, arsenic), and the towns or communities affected (OHA No Date-d).

**THE DEIS HAS BEEN REVISED TO INCLUDE THE FOLLOWING INFORMATION IN THE FEIS**

ODEQ added Willamette River Basin rivers and streams to the Clean Water Act Section 303(d) list of impaired waters in 1998 for exceeding standards for biological criteria, temperature, and bacteria. ODEQ has also prepared an Integrated Report of impaired water bodies, including those downstream of USACE-managed WVS dams. Section 3.5, Water Quality, Section 3.5.1.1, Water Quality Regulations, Table 3.5-1, provides details on impaired water bodies downstream of the Willamette Valley System dams, including identification of harmful algal blooms and turbidity (current as of 2022).

The Oregon Health Authority also implements cyanobacteria toxin guidelines and threshold levels for recreation and drinking waters for the public (OHA 2020). Information provided by the Oregon Health Authority with current and archived algae bloom recreational advisories includes Willamette Valley reservoirs (OHA 2020). Oregon Health Authority is notified if levels are above the toxin threshold following USACE staff water sampling. The Oregon Health Authority then assesses the need for a public advisory for a particular water body.

Since 2005, Oregon Health Authority has posted advisories based on sample results that exceed the cyanotoxin threshold levels in Oregon waters for drinking water (Section 3.5, Water Quality, Section 3.5.1.2, Water Quality Parameters and Subbasin Conditions, Harmful Algal Blooms, Table 3.5-8). Harmful algal bloom advisories have been issued at USACE-managed reservoirs (Section 3.5, Water Quality, Section 3.5.2.1, Water Quality Parameters and Subbasin Conditions, Harmful Algal Blooms, Figure 3.19-57).

The harmful algal bloom criteria have evolved from 2005 to present (Section 3.5, Water Quality, Section 3.5.2.1, Water Quality Parameters and Subbasin Conditions, Harmful Algal Blooms, Figure 3.5-58). Currently, if microcystin exceeds 8 µg/L (*Microcystis* sp.), the Health Authority will post an advisory for the water body. Advisories are posted on the Oregon Heath Authority Cyanobacteria (Harmful Algae) Blooms public website. Advisories are updated as further water testing is conducted until the toxin levels are reduced below the Health Authority toxin threshold (OHA 2022a).

Additionally, USACE has placed informational signage near boat ramp areas at USACE facilities to bring awareness to the public regarding harmful algal blooms. USACE also reviews Landsat satellite imagery of reservoirs for potential algae bloom activity, which is publicly provided on the USACE Water Management Water Quality Reports website (USACE 2022e).

**END NEW TEXT**

### 3.19.2.3 Groundwater and Surface Water Regulatory Background

Groundwater is a critical source of drinking water in Oregon. Approximately 35 percent of people rely solely on groundwater for drinking water, 10 percent rely on surface water, and 55 percent rely on a combination of both (OHA 2018). EPA has issued Surface Water Treatment Rules and a Ground Water Rule for public drinking water systems. USACE operations are not subject to this rule because the WVS is not operated as a public water system under its Congressionally authorized purposes.

Groundwater wells can be contaminated by surface pollutants such as microbial contamination, fertilizers and pesticides, and arsenic[1].

ODEQ is designated as the lead agency for implementation of the Wellhead Protection Program. The program was implemented to “protect wellhead areas within their jurisdiction

[1] The Oregon Health Authority does not maintain a list of public water systems in Oregon that are exposed to groundwater contamination from active chemical cleanup sites.

### 3.19.3 Environmental Consequences

**THE DEIS HAS BEEN MODIFIED TO INCLUDE OR TO REVISE THE FOLLOWING INFORMATION**

This section discusses the potential direct, indirect, and climate change effects of the alternatives related to public health and safety risk from drinking water quality and water supply effects. The discussion includes the methodology used to assess effects and a summary of the anticipated effects. The supporting water supply analysis is provided in Section 3.13, Water Supply and in Appendix J, Water Supply Analysis. Although USACE is not responsible for drinking water supply or treatment, effects to drinking water from WVS operations would be the result of:

- Direct effects to water supply necessary for drinking water use. Adverse or beneficial effects on drinking water could occur from operational effects to available water. If water is not available to supply drinking water needs under an alternative, then a direct adverse effect would occur to the health and safety of analysis area communities. If water availability improves relative to the No-action Alternative (NAA), then a public health and safety benefit would be realized.

- Indirect effects to drinking water quality could occur if water quality is adverse below a dam, affecting a drinking water source under any alternative. Subsequent direct effects on drinking water quality would be the result of post-treatment conditions and not the result of WVS operations.

#### 3.19.3.1 Methodology

The expected effects from water quality and water supply under each alternative is integral to the assessment of drinking water conditions in the analysis area. Consequently, information from these analyses is synthesized into the drinking water analyses (Section 3.5, Water Quality; Section 3.13, Water Supply).

The degree of impact to drinking water parameters described in Section 3.19.2.1, Drinking Water Contaminants and Treatments, are assessed qualitatively and discussed descriptively (e.g., slight[2], substantial). Quantitative criteria to describe the degree of effect are not applicable for this analysis because the WVS is not operated as a drinking water supply. Therefore, there are no quantitative data under each alternative to assess drinking water impacts from water quality or water supply effects; descriptions of these effects are more informative and accurate than attempting to assign defined degree criteria to adverse or beneficial effects.

---

[2] "Slight" is defined in its common use as "small of its kind, or in amount" (Merriam Webster Dictionary). "Moderate" is defined in its common use as "average in amount, intensity, quality, or degree" (Oxford Languages). "Substantial is defined in its common use as "considerable in quantity, great [in amount]" (Merriam Webster Dictionary).

Direct effects to water supply are described qualitatively by stored water and river flow water supply. Subsequent indirect effects to drinking water users are related to these sources of water supply.

Construction and routine and non-routine maintenance effects are also addressed qualitatively because site-specific NEPA analyses would be needed to assess actual effects that would occur during the 30-year implementation timeframe. Construction would not occur under the NAA.

Routine and non-routine maintenance would continue under all alternatives basin wide; however, it is unknown where activities associated with maintenance would occur, the extent of these activities, or the seasonality of these activities. (Chapter 1, Introduction, Section 1.11.3, Operation, Maintenance, Repair, Replacement, and Rehabilitation).

The summary of potential effects to public health and safety from effects to drinking water are provided in Table 3.19-2.

**Water Quality and Treatment Facility Operations under All Alternatives**

Drinking water quality could be adversely affected by the liberation of previously stored sediments caused by construction activities or by deep reservoir drawdowns over the 30-year implementation timeframe. These effects would be basin-wide. Both USACE operations could cause an increase in the amounts of turbidity and harmful algal blooms discharged downstream into drinking water sources. These conditions would result in indirect, adverse, temporary treatment costs of additional chemicals, testing, and facility maintenance as well as administrative costs and delays in drinking water supplied to affected communities (Section 3.11, Socioeconomics).

***Turbidity***

Sediment-related processes would occur in all subbasins under all alternatives, resulting in adverse water quality from turbidity. The degree of effect to water quality depends on geography, climate conditions, and seasonal reservoir operations affecting turbid water conditions in the analysis area. However, continued benefits in water quality from turbidity would occur because WVS reservoirs can trap sediment from the upstream watershed during high-flow events (Section 3.5, Water Quality, Section 3.5.2.2, Alternatives Analyses, No-action Alternative, Turbidity).

Under the NAA, there would be a deep fall drawdown at Fall Creek Reservoir resulting in temporary elevation of suspended sediment levels discharged from the dam (USGS 2023). Minor, short-term, adverse effects from temporary elevated turbidity may occur under the NAA at this location over the 30-year implementation timeframe.

Turbidity would become more adverse under all action alternatives as compared to the NAA with the exception of Alternative 1 and Alternative 4 (Section 3.5, Water Quality, Figures 3.5-59 through 3.5-63). Increased adverse conditions would vary depending on alternative and location downstream of a given dam. Adverse conditions would range from slightly more adverse than under NAA operations as measured at the Salem gage under Alternative 2B and Alternative 5 (Preferred Alternative) to substantially more adverse below Hills Creek, Dexter, Cougar, Foster, and Big Cliff Dams under Alternative 3B.

***Harmful Algal Blooms***

Under the NAA, operations at dams with deep outlets would continue to avoid releasing surface water that may contain cyanotoxins when conditions allow, having a beneficial effect on downstream water quality. However, due to the potential for harmful algal blooms to occur at some reservoirs in some years and under various conditions, a slight adverse effect from harmful algal blooms is expected under the NAA over the 30-year implementation timeframe (Section 3.5, Water Quality, Section 3.5.2.2, Alternatives Analyses, No-action Alternative, Harmful Algal Blooms).

***River Flow***

Direct effects to river flow on water supply and indirect effects to drinking water users under Alternative 5 would be the same as described under the NAA (Section 3.13, Water Supply, Table 3.13-20).

### 3.19.4 Interim Operations under All Action Alternatives Except Alternative 1

The Interim Operations are a set of operations for downstream fish passage and temperature management that would be implemented until the long-term measure for fish passage or temperature management is being used. These operations would result in decreased system-wide stored water in the conservation pool.

The timing and duration of Interim Operations would vary depending on a given alternative. Interim Operations could extend to nearly the 30-year implementation timeframe under Alternatives 2A, 2B, 4, and 5. However, Interim Operations under Alternative 3A and Alternative 3B may not be fully implemented or required because long-term operational strategies for these alternatives are intended to be implemented immediately upon Record of Decision finalization.

Interim Operations are not an alternative (Chapter 2, Alternatives, Section 2.8.5, Interim Operations). Interim Operations analyses did not include consideration of the impacts assessed under Alternatives 2A, 2B, 3A, 3B, 4, and 5 because Interim Operations will be implemented in succession with, and not in addition to, action alternative implementation.

#### 3.19.4.1 Turbidity

Under Interim Operations, effects to water quality from turbidity would be the same as those described under the direct and indirect effects throughout the analysis area. However, effects in the Middle Fork Willamette River Subbasin and the South Santiam River Subbasin would be substantially more adverse than those described under the NAA during the 30-year implementation timeframe.

Interim Operations would cause an increase in sediment and turbidity levels downstream of Lookout Point, Dexter, Green Peter, and Foster Reservoirs because of deeper drawdowns. Deep drawdowns increase the potential for bank erosion and sloughing as compared to NAA operations. While some fine-grained sediment that enters Dexter Reservoir from Lookout Point Reservoir may partially settle, most fine-grained sediment would pass through Dexter Reservoir and be transported downstream, likely resulting in increased turbidity downstream during deeper drawdowns compared to NAA operations.

Substantial, adverse effects to water quality would result in similar effects on drinking water users to the extent that supply is sourced below Lookout Point and Green Peter Reservoirs.

US Army Corps of Engineers®
Portland District

# WILLAMETTE VALLEY SYSTEM OPERATIONS AND MAINTENANCE

# DRAFT PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT

November 30, 2022

# DRAFT PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT FOR WILLAMETTE VALLEY SYSTEM O&M

## November 30, 2022

### Lead Agency

U.S. Army Corps of Engineers
Portland, Oregon District

### Cooperating Agencies

Confederated Tribes of Grand Ronde Community of Oregon
Confederated Tribes of Warm Springs
Confederated Tribes of Siletz Indians
National Marine Fisheries Service and U.S. Fish and Wildlife Service
U.S. Bureau of Reclamation
Bonneville Power Administration
United States Environmental Protection Agency
Oregon Department of Agriculture
Oregon Department of Environmental Quality
Oregon Department of Fish and Wildlife
Oregon Water Resources Department

### Proposed Action

The Proposed Action is continued operation and maintenance of the Willamette Valley System in compliance with the ESA and all other applicable laws and regulations. The Preferred Alternative is Alternative 5.

### Affected Areas

State: Oregon
Counties: Benton, Lane, Linn, Marion Counties

### Contact for Further Information:

Nicklas Knudson, Project Manager
U.S. Army Corps of Engineers, Portland District
Block 300
333 SW 1st Avenue
Portland, OR 97204
Phone: 503-808-4739
Fax: 503-808-4882
Nicklas.B.Knudson@usace.army.mil

**Public Comment Deadline:** January 19, 2023



**Figure ES-11. Rearing ponds at Marion Forks Fish Hatchery in the North Santiam Sub-basin**

## 2 INTRODUCTION

USACE has developed this Draft Programmatic Environmental Impact Statement (PEIS) for the continued O&M of the WVS, in accordance with the National Environmental Policy Act (NEPA). USACE prepared this PEIS in response to the need to review and update operations and maintenance of the 13 multipurpose projects (dams and reservoirs) and numerous revetments along the Willamette River and tributaries, in accordance with authorized project purposes, while still meeting obligations under the ESA to avoid jeopardizing the continued existence of ESA-listed species. The locations of these projects are shown in **Figure ES-12**.

To meet the many purposes of the WVS, USACE manages a complex operation that includes storing and releasing water from the 13 WVS reservoirs to balance various needs and demands throughout the year such as flood control, fish migration and habitat, hydropower power peaking, recreation, irrigation, water quality, and water supply. Intermittently, an action taken to meet one need makes it more challenging to meet one or more other needs. For example, in the fall, operators begin drafting WVS reservoirs (lowering water levels) to provide for flood risk management during the high-precipitation winter months. However, come early spring, there must be enough water available to help propel juvenile salmon (smolts) in their journey downstream toward the Pacific Ocean.

In addition, other federal agencies use the WVS include the Bonneville Power Administration (BPA), which is authorized to market and transmit the electrical power generated by the eight hydropower plants in the WVS, and the Bureau of Reclamation (BOR), which conducts water marketing to water users within the WRB. As a result, because all WVS purposes and users are important, actions that affect those purposes and users must be carefully planned, coordinated, and implemented.

As part of the WVS PEIS, USACE analyzed the environmental, economic, and social impacts of the no-action and seven action alternatives, reviewing new scientific and technical information, where applicable.

This Executive Summary provides an overview of the draft PEIS, which is a much larger document that contains highly detailed information, technical analyses, and results. The Executive Summary also furnishes an overview of the major environmental effects of the Preferred Alternative, but it is not intended to substitute for the more comprehensive draft WVS PEIS document. The draft WVS PEIS provides a detailed description of the environmental effects of not only the Preferred Alternative, but also the No Action Alternative and the other six action alternatives. Table ES-1 below identifies the major topics and chapters of the Draft PEIS. Where possible, the executive summary points to the Draft PEIS chapter and section at which the reader can find further details on a given topic.

**Table ES-1 Chapters of the draft WVS PEIS with summary of content**

| Chapter Number | Chapter Title | Chapter Content |
|---|---|---|
| **1** | Introduction | Provides background information on the NEPA, ESA, and WVS |
| **2** | Alternatives | Provides an overview of the alternatives' development process. Describes the suites of measures that comprise 7 action alternatives that meet the purpose and need of the PEIS. Describes the No Action Alternative and the 7 Action Alternatives. |
| **3** | Affected Environment and Environmental Consequences | Analyzes the direct and indirect effects of the 8 alternatives across 24 resource topic areas. |
| **4** | Cumulative Effects | Analyzes the effects of the 8 alternatives in conjunction with the trends of past, present, and reasonably foreseeable actions and their effects on each of the 24 resource topic areas. |
| **5** | Preferred Alternative | Discusses the evaluation and comparison of the 8 alternatives and the selection of the preferred alternative as well as provides an overview of the preferred alternative and the implementation and adaptive management plans. |

| Chapter Number | Chapter Title | Chapter Content |
|---|---|---|
| **6** | Public Involvement | Describes the public involvement process for the WVS PEIS. |
| **7** | Compliance with Environmental Laws, Regulations, and Executive Orders | Provides the status of environmental and cultural resources compliance and explains the plan to update compliance. |
| **8** | Glossary | Provides definitions for terms used throughout the WVS PEIS |
| **9** | List of Preparers | Lists the authors, editors, and reviewers of the WVS by discipline and chapter |
| **10** | References Cited | Lists the references cited throughout the WVS PEIS. |
| **11** | Index | Indexed Terms |
| **12** | List of Appendices | Lists the documents prepared to inform and support the WVS PEIS. |

The geographic scope of the Draft PEIS encompasses the 13 USACE projects (dam and reservoirs) on the Willamette River and the sub-basins of the following tributaries: the North Santiam, South Santiam, McKenzie, Middle Fork Willamette, Coast Fork Willamette, and Long Tom. Also included in the geographic scope are revetments along the banks of the mainstem Willamette and its tributaries, fish hatcheries, and adult fish collection facilities. The temporal scope of this analysis is assumed to be 30 years from the signing of the Record of Decision (ROD), except for the socioeconomic-related resource analysis. A 30-year horizon for the EIS was determined appropriate due to the dynamic nature of the system and the current and future needs of the communities that rely on the system.

# 3 REGIONAL INPUT

USACE carries the responsibility and legal authority for managing the WVS in coordination with its tribal, federal, and state partners, and for collaborating with these partners and other cooperating agencies under NEPA to develop this draft PEIS. When initiating and preparing the draft PEIS, USACE understood the importance of seeking broad input from a diverse array of stakeholders in the region. USACE gathered input through public and agency scoping, cooperating agencies, and tribal consultation.

## 3.1 Public Scoping

Scoping for the PEIS formally began on April 1, 2019, with the publication of a Notice of Intent (NOI) in the *Federal Register* (Vol. 84, No. 62, pp. 12,237 – 12,238). Comments were accepted until June 28, 2019. The NOI also notified the public of the scoping meetings held at various locations within the Willamette Valley from June 4 to 13, 2019. Meeting participants included private citizens, utility boards/councils; watershed councils; farm associations; non-

| Tribe or Tribal Entity |
|---|
| Nez Perce Tribe |
| Confederated Tribes of the Umatilla Indian Reservation |
| Yakama Nation of Indians |

## 3.4 Key Issues and Resource Concerns

The NEPA public scoping process for the WVS PEIS resulted in the identification of issues important to stakeholders. The list below summarizes several of the key issues and resource concerns associated with the proposed alternatives.

- ESA comments conveyed concerns on ESA-listed species (particularly to UWR Chinook salmon, UWR steelhead, and bull trout), and effects of dams to anadromous fish migration patterns, water conditions affecting fish passage and fish populations, and general ecosystem effects
- Flood Risk Management comments conveyed concerns on the WVS flood risk, preserving human and economic resources, and balancing needs for flood risk management and fish and wildlife values
- NEPA Process comments conveyed concerns on how the PEIS may affect other ongoing USACE NEPA analyses within the WVS, cumulative effects to natural resources and ecosystems within the WVS, inclusion of information in the PEIS to inform analysis on fish habitats, water allocation and storage, and streamflow.
- Water Storage and Allocation comments conveyed concerns on water storage capacity and allocation, effects on irrigation and municipal water users, and effects from changing water storage on fish and habitat.
- Water Quality comments received conveyed concerns on water contaminants, water temperature, total dissolved gas, and drinking water safety
- Recreation comments conveyed concerns on recreational opportunities, effects to recreation of algal blooms and reservoir levels, recreation employment, recreation opportunities, and recreational effects to ESA-listed species

# 4 DEVELOPMENT AND COMPARISON OF ALTERNATIVES

After scoping and consideration of public input, an interdisciplinary team of USACE experts participated in alternatives development using information and feedback from multiple federal, tribal, and state stakeholders. The team used an iterative process to identify, screen, evaluate, compare, and refine alternatives. The alternatives development process utilized the purpose and need and well as UACE identified constraints and objectives for the Proposed Action as the basis of each alternative and associated suite of measures.

This meaningful engagement with federal, tribal, and state cooperators and the public through scoping has greatly enhanced the development of alternatives and the analysis in the PEIS. Sections 2.1 and 2.2 in the PEIS describe the alternatives development process in detail. **Figure ES-17** is a diagram depicting the iterative and sequential approach used by USACE in formulating alternatives, including a Preferred Alternative.

## 4.1 Purpose and Need

The purpose and need for the proposed action are the continued O&M of the WVS in accordance with authorized project purposes, while meeting ESA obligations to avoid jeopardizing the continued existence of ESA-listed species.

The proposed action is continued operation and maintenance of the WVS for specific, authorized purposes and in compliance with the ESA and all other applicable treaties, laws, and regulations. The last PEIS that evaluated WVS systems and operations was completed in 1980. Over the ensuing four decades following completion of the 1980 PEIS (1980 – 2022), operations have been modified and structural measures for fish passage and temperature control have been implemented to improve conditions for ESA-listed fish species. New information relevant to the environmental effects of operating the WVS has also been acquired, including information related to ESA-listed fish species.

More specifically, the aim of the proposed action and alternatives is to improve salmonid passage over dams and through reservoirs to increase their survival though cost-effective means while still meeting the Congressionally authorized project purposes of the WVS. Fish passage is a limiting factor affecting the prospects of recovery for ESA-listed and other native migratory fish. Improvements to salmonid passage includes both the passage of adults migrating upstream to spawn, and juveniles (smolts) migrating downstream toward the ocean.

## 4.2 Constraints

Constraints based on the purpose of and need for the proposed action and life safety were identified. Potential alternative measures were eliminated from consideration for the following reasons:

- Flood Risk Management: Results of the preliminary modeling were used to screen any measures with potential adverse flood risk effects. Specifically, measures that would result in flood risk management changes from current protection levels were eliminated as an alternative measure.
- Dam Safety: USACE performed a preliminary evaluation of measures for dam safety considerations. Measures that would compromise dam safety and that could not be mitigated were eliminated as an alternative measure. A more detailed dam safety evaluation of components will be conducted during site-specific planning and design.

## 4.3 Objectives

Objectives for the Proposed Action are statements of the desired outcome of the PEIS, as identified by the federal agencies and scoping comments. The resulting seven primary objectives include:

1. Allow greater flexibility in water management (related to refill, drawdown timing, and other water management measures).
2. Increase opportunities for the creation of nature-based structures during maintenance of USACE-owned revetments (structures that help prevent bank erosion).
3. Allow greater flexibility in hydropower production.
4. Increase ESA-listed fish passage survival at WVS dams.
5. Improve water management during the conservation season to benefit anadromous ESA-listed fish and other authorized project purposes.
6. Reduce pollutant levels to restore impaired water quality associated with the WVS dams to benefit anadromous ESA-listed species.
7. Reduce spawning and rearing habitat competition caused by hatchery fish.

The identification of these objectives, along with the PEIS purpose and need, guided the development of a reasonable range of alternatives.




**Figure ES- 13. Diagram of Planning Process Leading to Selection of a Preferred Alternative**

## 4.4 Measures and Alternatives

Using public comments, internal cross-disciplinary working groups, and input from cooperating agencies, the USACE PEIS team identified and compiled a list of operational and structural measures, or actions, that meet seven objectives USACE developed for the Proposed Action. A measure is the action an agency would take to achieve a given objective. It describes either a physical (structural) change requiring construction or an operational change, usually in a precise location, that meets an objective, in whole or in part.

The team screened out potential measures based on criteria for meeting purpose and need for the project, achieving stated objectives, and technical considerations. The team then fashioned alternatives using combinations of the remaining measures around unifying themes or strategies. An alternative is a combination of one or more measures that, together, would address one or more of the objectives.

Building alternatives was an iterative process that increased the level of detail at each step to inform decisions concerning which alternatives to carry forward for analysis and consideration. Following initial modeling and evaluation of preliminary alternatives, new refined alternatives were developed to assess modified combinations of measures, and to distinguish the tradeoffs associated with key measures. Each alternative has an overall strategy that places emphasizes project objectives differently. **Table ES-4** summarizes the alternative strategies and associated project objectives.

After multiple rounds of screening, the measures that demonstrated the best outcomes for meeting project objectives were then compiled and bundled into a hybrid alternative (Alternative 5) that represents a fusion of the other four action alternatives.

**Table ES- 5. Project Alternative Strategies and Associated Objectives**

| Alternative | Strategy | Objectives[1] |
|---|---|---|
| No Action | Current O&M Practices | 1, 5 |
| 1 | Improve Fish Passage Through Storage-Focused Measures: Increase the probability of refilling WVS reservoirs and supplemental water delivery for authorized purposes | 1, 5 |
| 2A & 2B | Integrated Water Management Flexibility and ESA-Listed Fish Alternative | 1, 4, 6 |
| 3A & 3B | Operations Focused: Improve passage of ESA-listed fish through existing structures by modifying water control operations | 1, 4, 5, 6 |
| 4 | Structures Focused: Improve passage of ESA-listed fish by constructing fish passage and temperature control structures | 2, 4, 5, 6, 7 |
| 5 | Refined Integrated Water Management Flexibility and ESA-Listed Fish Alternative - Preferred Alternative | 1, 4, 6 |

[1]Proposed Action Objectives

1. Allow greater flexibility in water management (related to refill, drawdown timing, and other water management measures).
2. Increase opportunities for the creation of nature-based structures during maintenance of USACE-owned revetments (structures that help prevent bank erosion).
3. Allow greater flexibility in hydropower production.
4. Increase anadromous ESA-listed fish passage survival at WVS dams.
5. Improve water management during the conservation season to benefit anadromous ESA-listed fish and other authorized project purposes.
6. Reduce pollutant levels to restore impaired water quality associated with the WVS dams to benefit anadromous ESA-listed species.
7. Reduce spawning and rearing habitat competition caused by hatchery fish.

## 4.5 Assessment and Comparison of alternatives

The potential effects associated with each of the alternatives are analyzed under the following resource topics in Chapter 3 and 4 of the PEIS:

- Hydrologic Processes and River Infrastructure
- River Mechanics and Geomorphology
- Geology and Soils
- Water Quality
- Vegetation
- Wetlands
- Fish and Aquatic Habitat (including ESA-listed species and critical habitat)
- Wildlife, Birds, and Terrestrial Habitat (including ESA/sensitive species and critical habitat)
- Air Quality
- Socioeconomics
- Power and Transmission
- Water Supply (Irrigation, Municipal, and Industrial)
- Recreation
- Land Use
- Hazardous Materials
- Public Health and Safety – Hazardous Algal Blooms
- Public Health and Safety – Hazardous, Toxic, and Radioactive Waste
- Public Health and Safety – Drinking Water
- Environmental Justice
- Cultural Resources
- Visual Resources
- Noise
- Tribal Resources

For each of these resource topics and for each alternative, direct and indirect impacts or effects (environmental consequences) in Chapter 3. Direct effects are those caused by an action and occur at the same time and place. Indirect effects are those which occur later in time and/or are further removed in space (physical distance), but which are still reasonably foreseeable; indirect effects also include “induced changes” in the natural and human environments. Cumulative effects on all resources are addressed in Chapter 4. Cumulative effects are the interactive and additive effects on each of the resource topics from each alternative when combined with relevant past, present, and reasonably foreseeable future actions. All effects were assessed according to their magnitude, duration, and/or geographic extent. Effects could be considered either beneficial, adverse, both, or neither.

Programmatic analysis of the resource topics in Chapter 3 is at a broad and macroscopic scale and scope. This analysis of the resource topics focuses on the effects that are relevant at the broad scale and would factor into the decision to select the suite of measures to include in the Preferred Alternative. USACE will conduct subsequent NEPA analyses of future site-specific actions. Additional information on how USACE intends to conduct subsequent site-specific NEPA analysis and environmental compliance is in Chapter 7.

Upon completion of the effects analysis, USACE compared the benefits, environmental consequences, and tradeoffs of each of the alternatives (i.e., no-action and action alternatives). USACE developed multiple criteria to evaluate how effectively each alternative met the PEIS objectives, while considering costs and environmental, economic, and social effects. USACE then performed a tradeoff analysis using these criteria to compare the alternatives. To develop criteria, USACE considered the benefits and environmental and social consequences as reflected in Chapters 3 and 4 of the PEIS and then assessed the tradeoffs presented under each alternative within and outside of current authorities. Descriptions of the criteria, the procedure for comparing PEIS alternatives, and the results of that comparison are discussed in detail in Chapter 5 of the PEIS.

# 5 ALTERNATIVES AND COMPARISON OF EFFECTS

The sections below describe in sequence, the measures common to all alternatives, near term operational measures, and the alternatives and their effects.

## 5.1 Measures common to all Alternatives

Measures common to all action alternatives are those that would be implemented regardless of the action alternative selected because the effects would be consistent across the alternatives and do not provide a basis for differentiating between alternatives or selecting a preferred alternative. Measures common to all action alternatives include both operational measures and structural measures in multiple locations throughout the WVS. They also include new measures, existing operations, and O&M activities that would be carried forward.

As described in Section 2.4.2 of the PEIS, new measures common to all action alternatives include:

# Willamette Basin
# Bi-Annual Status Report
# August 2024

US Army Corps
of Engineers®
Portland District

# Table of Contents

List of Figures .......... **Error! Bookmark not defined.**

List of Tables .......... 4

Introduction .......... 6

Purpose .......... 7

Reinitiated ESA Consultation Process .......... 7

Establishment of the Expert Panel .......... 7

Research, Monitoring, and Evaluation .......... 12

Operational Measures .......... 18

North Santiam River Injunction Measures .......... 19

South Santiam River Injunction Measures .......... 30

McKenzie River Injunction Measures .......... 52

Middle Fork Willamette River Injunction Measures .......... 60

Willamette Fish Operations Plan Deviations (unit outages, ramp rates, minimum flows) .......... 84

Structural Measures .......... 85

Dexter Adult Fish Facility Upgrades (IM 18) .......... 85

Big Cliff TDG Abatement Structural Improvement (IM 10b) .......... 86

Cougar Regulating Outlet Modifications (IM 15b) .......... 86

Lebanon Dam PIT Tag Detection Arrays (Antennas) (IM 13a) .......... 87

References .......... 88

Figure 1. Detroit Dam Operations, January 01 - June 30, 2024 .......... 20
Figure 2. Detroit Dam Operations and Water Temperatures Measured at the USGS Niagara Gage, January 01 - June 30, 2024 .......... 21
Figure 3. Inflows into Detroit Reservoir in 2024 as Compared to Conditions from 2010-2024 .......... 22
Figure 4. Detroit and Big Cliff Project Operations and Downstream Total Dissolved Gas, January 01 - June 30, 2024 .......... 23
Figure 5. Total Dissolved Gas Monitoring Locations Upstream and Downstream of Detroit Dam in 2024 (Google Earth) .......... 24
Figure 6. Total Dissolved Gas Monitoring Locations below Big Cliff Dam in 2024 (Google Earth) .......... 24
Figure 7. Detroit Dam Operations and Total Dissolved Gas Data Measured Downstream of Detroit and Big Cliff Dams .......... 25
Figure 8. Green Peter Dam Operations, January 01 - June 30, 2024 .......... 31
Figure 9. Green Peter and Foster Dam Operations and Downstream Total Dissolved Gas below Green Peter and Foster Dams, January 01 - June 30, 2024 .......... 32
Figure 10. Green Peter Dam Operations and Downstream Water Temperature, January 01 - June 30, 2024 .......... 33

# Introduction

On September 1, 2021, the U.S. District Court for the District of Oregon issued an interim injunction order that directs the U.S. Army Corps of Engineers (Corps) to implement specified actions intended to improve conditions for fish passage and water quality in the Willamette Valley System (WVS) to avoid irreparable harm to Endangered Species Act (ESA) -listed salmonids during the interim period until the completion of the reinitiated ESA consultation on the operation and maintenance of the WVS. These actions include operational measures; structural improvements; outplanting of adult Chinook salmon above Green Peter Dam; research, monitoring, and evaluation (RM&E); and compliance with maintenance outage schedules and emergency protocols. The injunction also directs the Corps and National Marine Fisheries Service (NMFS) to post the results of all RM&E on a publicly available website and to complete the reinitiated ESA consultation on the WVS and issue a new Biological Opinion (BiOp) by December 31, 2024. The injunction will remain in effect until issuance of a new BiOp. *See* ECF 212 at 31 (¶ 3).

The injunction requires the Corps and NMFS to provide status reports every six months, detailing their progress and compliance with the injunction requirements. This is the sixth Biannual Status Report that has been submitted. This report sets forth the operations that have been conducted and data that has been collected from January 1, 2024 through June 30, 2024.

Additionally, this report provides an overview of the results of RM&E activities during the same January 1, 2024 to June 30, 2024 period.. The Corps and its research contractors prepare separate technical RM&E reports, which provide more detailed results of the RM&E studies. The RM&E reports are available at the Corps injunction website[1]: https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/. The detailed results of those studies are not repeated in this report.

The intent of the technical RM&E reports from research contractors is to provide meaningful results of RM&E actions as soon as feasible following data collection and analysis. Some RM&E activities can be reported on quickly (i.e., within the same biannual report for the reporting period in which the data was collected), while results from other RM&E actions take longer to collect (e.g., the 1-2 year outmigration period for each juvenile Chinook salmon brood year), process, analyze, and formulate meaningful results. The Corps is working with the University of British Columbia (UBC) to provide a report analyzing available RST data pre- and post-injunction with an anticipated first draft in September 2024 and subsequent refinements as data is further analyzed and additional data is collected. When completed, the UBC report will be made available on the following website: https://pweb.crohms.org/tmt/documents/FPOM/2010/Willamette_Coordination/Willamette%20RME/InjunctionRME.html. Additionally, the Corps continues to undertake considerable efforts to compile and manage data from RST and telemetry studies to allow that data to be added to the comparative analysis of pre- and post-injunction operation effects on downstream passage of juvenile Chinook and steelhead. As additional RST data is obtained, it will be curated and combined with existing datasets to support analyses of the injunction operations and those occurring in the

[1] The Corps injunction website (https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/) provides a link to the website where RM&E reports are posted (https://pweb.crohms.org/tmt/documents/FPOM/2010/Willamette_Coordination/Willamette%20RME/InjunctionRME.html ); this biannual report provides links to the Corps injunction website and RM&E website interchangeably.

future. Similar to RST datasets, available telemetry datasets from studies completed pre- and post-injunction at WVS dams are also being compiled and curated for analysis. UBC will be applying these data in the second phase of their assessment of the effects of the injunction operations. The completion of the second phase of their report is anticipated in fall 2024, and will also be posted on the pweb.crohms.org website noted above.

## Purpose

The purpose of this report is to provide a status update to the Court that details the Corps' and NMFS's progress and compliance with the injunction-related actions, including the following information:

1. The injunction measures that have occurred at each dam;
2. Any deviation from outage schedules, emergency protocols, and water quality standards due to injunction operations;
3. All RM&E that was conducted during the reporting period and any available results of that research;
4. All RM&E planned for the next six months; and
5. Any proposed changes to the injunction measures based on changed circumstances or the results of RM&E.

## Reinitiated ESA Consultation Process

In its Interim Injunction Order, the Court ordered the Corps and NMFS to complete reinitiated ESA-consultation and NMFS to issue a new biological opinion by December 31, 2024. ECF No. 212, Interim Injunction at 1. The agencies continue to work diligently on the reinitiated consultation in an effort to meet that deadline. However, given the complexities and challenges involved and staffing limitations with NMFS, it is possible that Federal Defendants may need to request more time to complete the consultation and issue the biological opinion. As of the date of this filing, NMFS is working to meet its statutory and regulatory obligations that apply when issuing a biological opinion and to complete the biological opinion by the court-ordered deadline. NMFS currently believes it may be able to timely satisfy its obligations. If that changes, Federal Defendants will confer with Plaintiffs and seek appropriate relief from the Court.

## Establishment of the Expert Panel

In the injunction, the Court ordered the establishment of an Expert Panel, comprised of two of Plaintiffs' experts, two NMFS biologists, two Corps employees, and two "ad hoc" Federal experts. This panel was charged with jointly developing specific parameters of certain interim measures ordered in the injunction, which were detailed in Implementation Plans or Recommendations submitted to the Court. In June 2023, the Expert Panel finalized the last of the implementation plans and recommendations. The implementation status of the measures recommended by the Expert Panel and adopted by the Court is presented in Table 1 below.

***Table 1. Status of Injunction Measures (DSFP – Downstream Fish Passage, DSTM – Downstream Temperature Management)***

| Injunction Measure | Injunction No. | Date Submitted to the Court | Status | Description |
|---|---|---|---|---|
| Foster Fall Downstream Fish Passage | 13a | August 20, 2021 | Implemented in fall 2023; reported on in previous status report. | Utilize the spillway for improved DSFP in the fall from 01 Oct – 15 Dec. |
| Cougar Fall Drawdown for Downstream Fish Passage | 14 | August 20, 2021 | Implemented in fall 2023; reported on in previous status report. | Reservoir drawdown to El. ~1505 ft. 15 Nov – 15 Dec + RO prioritization when <El. 1571 ft. |
| Detroit Lower Regulating Outlet (LROs) Operation for Downstream Water Temperature Management | 10a[2] | September 8, 2021 | Implemented in fall/winter 2023; reported on in previous status report. | Water temperature management through strategic use of spillway, turbines and upper/lower ROs. |
| Foster Spring Downstream Fish Passage | 13b | October 15, 2021 | DSFP implemented in 2024 with spillway and fish weir operations implemented through July 2024. | Delay refill + utilize spillway in the spring for improved DSFP 01 Feb – 15 June + summer fish weir operation for improved DSTM and upstream fish migration. |
| Cougar Spring Downstream Fish Passage (Delayed Refill) | 15a | October 15, 2021 | Implemented in 2023/2024. | Delayed reservoir refill and RO prioritization for improved DSFP Feb – May/June. |
| **Injunction Measure** | **Injunction No.** | **Date Submitted to the Court** | **Status** | **Description** |
| Fall Creek Winter/Spring Downstream Fish Passage | 20 | October 15, 2021 | Implemented in 2023/2024. | Delayed reservoir refill to El. 700 ft. + RO prioritization for improved DSFP, 16 Jan – 15 Mar. |
| Green Peter Outplanting Plan | 11 | November 5, 2021 | Green Peter outplanting continues. | Spring Chinook salmon outplanting above Green Peter Dam. |

[2] The implementation strategy for IM10a was refined in 2022 based on the negative outcome (i.e., poor water temperatures) observed during the 2021 operation. Instead of drawing Detroit Reservoir down to El. 1465 ft. by 15-October, the drawdown will be delayed until early November. This will allow for the extended evacuation of warm surface water from Detroit Reservoir while also allowing time for surface waters to cool due to atmospheric cooling (i.e., cooler air temperatures).

| | | | | |
|---|---|---|---|---|
| Green Peter Spring Downstream Fish Passage | 12a | November 5, 2021 | Implemented in 2024. | Utilize spillway for improved DSFP in the spring; perform spill operation until 01 May or for 30 days, whichever is longer. |
| Lookout Point/Dexter Spring Downstream Fish Passage and Regulating Outlet Use for Downstream Water Temperature Management | 17 | December 8, 2021 | DSFP operation implemented in spring 2024; RO operations will be utilized for downstream temperature management later this summer (of 2024). | Utilize spillway for improved DSFP in the spring and RO use in the summer/fall for DSTM. |
| Lookout Point Deep Drawdown Landslide Risk Assessment and Recommendation | 16 | January 31, 2022 | Completed. | The Corps completed a landslide risk assessment that concludes that risk of landslides is low, but potential consequences are high. The Corps recommended that the deep drawdown of Lookout Point Reservoir for improved downstream fish passage not occur without landslide monitoring in place, along with continued coordination with Union Pacific and Oregon Dept. of Transportation, whose assets could be affected by a slide. Monitoring equipment installed. |
| **Injunction Measure** | **Injunction No.** | **Date Submitted to the Court** | **Status** | **Description** |
| Lookout Point Fall Downstream Fish Passage Operation | 16 | June 30, 2023 | Drawdown implemented in the fall of 2023. Will be implemented again in 2024. | Deep drawdown and RO prioritization for improved DSFP 15 Nov – 15 Dec. |

| | | | | |
|---|---|---|---|---|
| Research, Monitoring, and Evaluation Plan | 4 | February 18, 2022 | Implementation is ongoing. | Expert Panel proposed its plan for the RM&E to accompany the injunction measures for the remainder of the injunction. |
| Green Peter Fall Downstream Fish Passage Operation | 12b | April 28, 2022 | Drawdown implemented in the fall of 2023. Will be implemented again in 2024. Revisions to operational plan and coordination with Plaintiffs, Cities and State of Oregon is ongoing. | Deep drawdown and RO prioritization for improved DSFP. |
| Cougar RO Modification (Recommendation) | 15b | April 28, 2022 | The RO chute resurfacing has been completed. The Cougar RO Mods EDR is complete, and DDR is now underway; see details in report below. | The Expert Panel made two recommendations: resurfacing of the RO chute by 30 Sept. 2023 and an alternatives study complete by 30 June 2023. |
| Big Cliff Structural TDG Abatement (Recommendation) | 10b | February 10, 2022 (Expert Panel's recommendation); August 5, 2022 (Corps' schedule submitted) | Work is on track; see details in report below. | The Corps is currently working on the design phase of this project. |

**Operations Planned for July – December 2024**

The Corps has coordinated with the State of Oregon, Plaintiffs, and the cities of Sweet Home and Albany to develop proposed revised operations for the 2024 fall deep drawdown of Green Peter Reservoir. The goal of the Corps' proposed revisions is to minimize water temperature impacts in the South Santiam River and improve communications with downstream communities so that they are not caught off guard by elevated turbidity conditions. On August 20, the Corps filed a motion asking the Court to enter its proposed revised implementation plan for Green Peter drawdown operations. If the motion is granted, the 2024 Green Peter deep drawdown operations will incorporate revisions based on lessons learned from the 2023 operation.

**RM&E**

*Green Peter Spring Spill Operation: Downstream Passage and Survival Study*

Spillway operations were initiated at Green Peter Dam on March 13, 2024 as a non-turbine route for downstream juvenile fish passage. The spring spill operation was evaluated for juvenile Chinook salmon passage and survival rates with active-tagged (radio telemetry) surrogate yearling Chinook salmon. The study fish were also PIT tagged. Although the study fish were PIT tagged, PIT tag data is not provided in this report due to limitations in downstream PIT detection sites (Lebanon Dam and Willamette Falls). The PIT antennas previously installed in the Lebanon Dam spillway have been damaged by high flows and debris,[7] and data from the Willamette Falls PIT detection system is not available. The objective of the study is to collect information of reservoir entry timing and downstream passage of juvenile Chinook salmon during the following two spill treatments, during which time the turbines were not operated:

1) Nighttime only spill during March13-April 11
2) 24-hour spill during April 11-May 13

The objectives of the study were to describe the following:

1) Seasonal and diel distribution, behavior, and movements for juvenile fish into and within the forebay of the dam. Document and quantify different behaviors (i.e., milling, traversing, direct downstream passage).
2) Seasonal and diel downstream passage, including reservoir survival, forebay residency time, route distribution, dam passage efficiency, route specific survival, and reach survival. a. Reach survival will be measured from the time of Green Peter passage to the confluence of the Santiam River with the mainstem Willamette River.

This study provides information on downstream passage and dam passage survival and reach survival estimates of the tagged fish to the confluence of the South Santiam River with the mainstem Willamette River. This Green Peter study was conducted concurrent with the Foster Dam spring spill study during 2024 by the Pacific Northwest National Laboratory (PNNL).

---

[7] While the north and south fish ladder and juvenile bypass antennas are operational, the data collected from these antennas is marginal and incomplete without spillway data to supplement. Additional groups of juvenile Chinook salmon have been PIT-tagged and released by Cramer Fish Sciences ('bulk release groups'), which is reported separately from this active-tag study (Cramer in-prep).

# Willamette Basin
# Bi-Annual Status Report
# February 28, 2025

# FINAL

US Army Corps
of Engineers®
Portland District

# Table of Contents

List of Figures .... 4
List of Tables .... 5
Introduction .... 7
Purpose .... 8
Establishment of the Expert Panel .... 8
Research, Monitoring, and Evaluation (RM&E) Summary .... 13
Fiscal Year (FY) 2024 & 2025 - Funded RM&E Activities .... 13
RM&E Activities .... 14
Operational Measures .... 18
North Santiam River Injunction Measures .... 18
Detroit and Big Cliff Dams .... 19
Operational Details .... 19
Water Temperature .... 20
Total Dissolved Gas .... 21
Research, Monitoring and Evaluation (RM&E) .... 23
Lessons Learned .... 25
South Santiam River Injunction Measures .... 26
Green Peter Dam .... 26
Operational Details .... 26
Water Temperature .... 28
Total Dissolved Gas .... 32
Sediment Quality Sampling .... 35
Turbidity .... 37
Research, Monitoring and Evaluation (RM&E) .... 40
Lessons Learned .... 45
Green Peter Outplanting .... 46
Foster Dam .... 46
Operational Details .... 46
Water Temperature .... 47
Total Dissolved Gas .... 49
Research, Monitoring and Evaluation (RM&E) .... 49
Lessons Learned .... 54

McKenzie River Injunction Measures....55
Cougar Dam....55
Operational Details .... 55
Water Temperature .... 56
Total Dissolved Gas .... 59
Research, Monitoring and Evaluation (RM&E) .... 60
Lessons Learned .... 62
Middle Fork Willamette River Injunction Measures....62
Hills Creek Dam ....62
Operational Details .... 62
Total Dissolved Gas .... 63
Research, Monitoring and Evaluation (RM&E) .... 64
Lessons Learned .... 69
Lookout Point/Dexter Dams ....69
Operational Details .... 69
Water Temperature .... 70
Total Dissolved Gas .... 76
Turbidity .... 77
Research, Monitoring and Evaluation (RM&E) .... 78
Lessons Learned .... 81
Fall Creek Dam ....81
Operational Details .... 81
Water Temperature .... 82
Total Dissolved Gas .... 85
Turbidity .... 85
Research, Monitoring and Evaluation (RM&E) .... 87
Lessons Learned .... 88
Deviations from Outage Schedules and Flow Criteria .... 88
Structural Measures.... 89
Dexter Adult Fish Facility Upgrades (IM 18) ....89
Big Cliff TDG Abatement Structural Improvement (IM 10b)....90
Cougar Regulating Outlet Modifications (IM 15b)....91
Lebanon Dam PIT Tag Detection Arrays (Antennas) (IM 13a) ....91

References ........................................................................................................................ 94

## List of Figures

Figure 1. Detroit and Big Cliff Dam Operations, July 01 - December 31, 2024 .................................. 19
Figure 2. Detroit Dam Operations and Reservoir Elevations, July 01 - December 31, 2024................ 20
Figure 3. Detroit Operations and In-Reservoir and Downstream Water Temperatures, January – December 2024 ........................................................................................................ 21
Figure 4. Detroit and Big Cliff Project Operations and Downstream Total Dissolved Gas, July 01 – December 31, 2024. ........................................................................................................ 22
Figure 5. Green Peter Dam Operations and Reservoir Elevations, July 01 - December 31, 2024 ....... 28
Figure 6. Green Peter Dam Operations and Reservoir Elevations, 2023 and 2024 Comparison......... 28
Figure 7. Green Peter Operations, In-Reservoir and Downstream Water Temperatures, January – December 2024 ........................................................................................................ 30
Figure 8. Water Temperatures Measured Downstream of Green Peter and Foster Dams, as Compared to Water Temperature Targets, July – December 2024................................................... 31
Figure 9. Water Temperatures Measured Downstream of Foster Dam, 2023 and 2024 Comparison 32
Figure 10. Green Peter Dam Operations and Downstream Total Dissolved Gas, July - December 2024 ........................................................................................................ 33
Figure 11. Total Dissolved Gas Measured Downstream of Green Peter Dam, 2023 and 2024 Comparison ........................................................................................................ 34
Figure 12. Foster Dam Operations and Downstream Total Dissolved Gas, July - December 2024 ..... 35
Figure 13. Sediment sampling locations, Green Peter Reservoir, 2024............................................. 36
Figure 14. Sediment sampling locations, Foster Reservoir, 2024 ....................................................... 36
Figure 15. Provisional Turbidity Data Measured at the USGS GagesGages #14186200, Middle Santiam River below Green Peter Dam near Foster, Oregon, #14187200, South Santiam River near Foster, OR, and #14187500, South Santiam River at Waterloo, OR, 2024 ....................................... 38
Figure 16. Turbidity Measured Downstream of Green Peter Dam, 2023 and 2024 Comparison ....... 39
Figure 17. Foster Dam Operations and Reservoir Elevations, July - December 2024......................... 47
Figure 18. Water Temperatures Measures downstream of Foster Dam, July - December 2024........ 48
Figure 19. Foster Reservoir Temperatures, January – December 2024.............................................. 48
Figure 20. Foster Dam Operations and Downstream Total Dissolved Gas, July 01 - December 31, 2024 ........................................................................................................ 49
Figure 21. Cougar Dam Operations, July 01 – December 31, 2024 .................................................... 56
Figure 22. Cougar Dam Operations, In-Reservoir and Downstream Water Temperatures, January - December 2024 ........................................................................................................ 57
Figure 23. Cougar Dam Operations and Downstream Water Temperature, July 01 - December 31, 2024 ........................................................................................................ 58
Figure 24. Cougar Dam Operations and Downstream Water Temperature, July 01 - December 31, 2022 ........................................................................................................ 59
Figure 25. Cougar Dam Operations and Downstream Total Dissolved Gas, July 01 - December 31, 2024 ........................................................................................................ 60

# Introduction

On September 1, 2021, the U.S. District Court for the District of Oregon issued an interim injunction order that directs the U.S. Army Corps of Engineers (“Corps”) to implement specified actions intended to improve conditions for fish passage and water quality in the Willamette Valley System (WVS) to avoid irreparable harm to Endangered Species Act (ESA) - listed salmonids during the interim period until NMFS the National Marine Fisheries Service (NMFS) issues a new Biological Opinion (BiOp).) These actions include operational measures; structural improvements; outplanting of adult Chinook salmon above Green Peter Dam; research, monitoring, and evaluation (RM&E); and compliance with maintenance outage schedules and emergency protocols. The injunction also directs the Corps and NMFS to post the results of all RM&E on a publicly available website. The Corps must implement interim injunction measures until NMFS issues a new BiOp by December 31, 2024.

The injunction requires the Corps and NMFS to provide status reports every six months, beginning February 28, 2022, detailing their progress and compliance with the injunction actions. This is the seventh and final Bi-Annual Status Report to be submitted and includes accomplishments and RM&E data collected from July 1, 2024 through December 31, 2024.

On December 30, 2024, the Corps received the NMFS BiOp for the continued operation and maintenance (O&M) of the WVS. The Corps is evaluating the 2024 BiOp while it works to complete the ongoing review for the WVS O&M under the National Environmental Policy Act (NEPA). While these reviews are ongoing, the Corps will continue RM&E efforts for the actions planned for 2025.

The Corps and its research contractors prepare separate technical RM&E reports, which provide more detailed results of the RM&E studies. These RM&E reports are available at the Corps injunction website[1]: https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/. The detailed results of those studies are not repeated in this report. The intent of the technical RM&E reports from research contractors is to provide meaningful results of RM&E actions as soon as feasible following data collection and analysis. Some RM&E activities can be reported on quickly (i.e., within the same biannual report for the reporting period in which the data was collected), while results from other RM&E actions take longer to collect (e.g., the 1-2 year outmigration period for each juvenile Chinook salmon brood year), process, analyze, and formulate meaningful results.

The Corps is working with the University of British Columbia (UBC) to provide further analysis of available RST data prior to and during the injunction with the first phase of reporting having been completed in Fall 2024 (UBC 2024) and available on the Corps’ website. Subsequent refinements and additions to this effort by UBC will be conducted as data is further analyzed and additional data is collected. Additionally, the Corps continues to undertake efforts to compile and manage data from RST and telemetry studies to allow that data to be added to the comparative analysis of operation effects on downstream passage of juvenile Chinook and steelhead prior to and during the injunction. As additional RST data is obtained, it will be curated and combined with existing datasets

[1] The Corps injunction website (https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/) provides a link to the website where RM&E reports are posted (https://pweb.crohms.org/tmt/documents/FPOM/2010/Willamette_Coordination/Willamette%20RME/InjunctionRME.html ); this biannual report provides links to the Corps injunction website and RM&E website interchangeably.

to support analyses of the injunction operations and those occurring in the future. Similar to RST datasets, available telemetry datasets from studies completed prior to and during the injunction at WVS dams are also being compiled and curated for analysis. UBC will be applying these data in subsequent phases of their assessment on the effects of the injunction operations.

## Purpose

The purpose of this report is to provide a status update to the Court that details the Corps' and NMFS's progress and compliance with the injunction-related actions, including the following information:

1. The injunction measures that have occurred at each dam;
2. Any deviation from outage schedules, emergency protocols, and water quality standards;
3. All RM&E that was conducted during the reporting period and any available results of that research;
4. All RM&E that has been funded for the next six months as of December 2024; and
5. Any proposed changes to the injunction measures based on changed circumstances or the results of RM&E.

Results of RM&E activities are reported in this biannual report where information is available for publication. The intent is to provide meaningful results of RM&E actions as soon as feasible following data collection and analysis. Some RM&E activities can be reported on quickly (i.e., within the same biannual report as the data was collected), while results from other RM&E actions may take longer to process and formulate meaningful results.

## Establishment of the Expert Panel

In the injunction, the Court ordered the establishment of an Expert Panel, comprised of two of Plaintiffs' experts, two NMFS biologists, two Corps employees, and two "ad hoc" Federal experts. This panel was charged with jointly developing specific parameters of certain interim measures ordered in the injunction, which were detailed in Implementation Plans or Recommendations submitted to the Court. In April 2022, the Expert Panel finalized the last of the implementation plans and recommendations. The implementation status of the measures recommended by the Expert Panel and adopted by the Court is presented in Table 1.

***Table 1. Status of Injunction Measures, July 01 – December 31, 2024 (DSFP – Downstream Fish Passage, DSTM – Downstream Temperature Management)***

| Injunction Measure | Injunction No. | Date Submitted to the Court | Status | Description |
|---|---|---|---|---|
| Foster Fall Downstream Fish Passage | 13a | August 20, 2021 | Implemented in fall 2024; see details in report below. | Utilize the spillway for improved DSFP in the fall from 01 Oct – 15 Dec. |
| Cougar Fall Drawdown for Downstream Fish Passage | 14 | August 20, 2021 | Implemented in fall 2024; see details in report below. | Reservoir drawdown to El. ~1505 ft. 15 Nov – 15 Dec + RO prioritization when <El. 1571 ft. |
| Detroit Lower Regulating Outlet (LROs) Operation for Downstream Water Temperature Management | 10a[2] | September 8, 2021 | Implemented in 2024; CE-QUAL W2 models used to inform operations as described in report below. | Water temperature management through strategic use of spillway, turbines and upper/lower ROs. |
| Foster Spring Downstream Fish Passage + Water Temperature Management | 13b | October 15, 2021 | DSFP will be implemented in spring of 2025 with fish weir operation implemented throughout summer of 2025 for water temperature improvement. | Delay refill + utilize spillway in the spring for improved DSFP 01 Feb – 15 June + summer fish weir operation for improved DSTM and upstream fish migration. |
| Cougar Spring Downstream Fish Passage (Delayed Refill) | 15a | October 15, 2021 | Will be implemented in spring of 2025. | Delayed reservoir refill and RO prioritization for improved DSFP Feb – May/June. |
| Fall Creek Winter/Spring Downstream Fish Passage | 20 | October 15, 2021 | Currently being implemented. | Delayed reservoir refill to El. 700 ft. + RO prioritization for improved DSFP, 16 Jan – 15 Mar. |

[2] The implementation strategy for IM10a was refined in 2022 based on the negative outcome (i.e., poor water temperatures) observed during the 2021 operation. Instead of drawing Detroit Reservoir down to El. 1465 ft. by 15-October, the drawdown will be delayed until early November. This will allow for the extended evacuation of warm surface water from Detroit Reservoir while also allowing time for surface waters to cool due to atmospheric cooling (i.e., cooler air temperatures).

| Injunction Measure | Injunction No. | Date Submitted to the Court | Status | Description |
|---|---|---|---|---|
| Green Peter Outplanting Plan | 11 | November 5, 2021 | Green Peter outplanting sites established; first outplanting started in July 2022 in Mid Santiam; both Mid Santiam and Quartzville outplanting to continue under BiOp. | Spring Chinook salmon outplanting above Green Peter Dam. |
| Green Peter Spring Downstream Fish Passage | 12a | November 5, 2021 | Will be implemented in spring of 2025. | Utilize spillway for improved DSFP in the spring; perform spill operation until 01 May or for 30 days, whichever is longer. |
| Lookout Point/Dexter Spring Downstream Fish Passage and Regulating Outlet Use for Downstream Water Temperature Management | 17 | December 8, 2021 | DSFP operation will be implemented in spring of 2025; RO operations for downstream temperature will be implemented in the summer/fall of 2025. | Utilize spillway for improved DSFP in the spring and RO use in the summer/fall for DSTM. |
| Lookout Point Deep Drawdown Landslide Risk Assessment and Recommendation | 16 | January 31, 2022 | Landslide risk assessment completed; implementation of mitigation plan is on-going. Monitoring equipment has been installed and monitoring activities are ongoing. | The Corps completed a landslide risk assessment that concludes that risk of landslides is low, but potential consequences are high. The Corps recommended that the deep drawdown of Lookout Point Reservoir for improved downstream fish passage not occur without landslide monitoring in place, along with continued coordination with Union Pacific and |

| Injunction Measure | Injunction No. | Date Submitted to the Court | Status | Description |
|---|---|---|---|---|
| | | | | Oregon Dept. of Transportation, whose assets could be affected by a slide. Monitoring Equipment was in the of fall 2023. |
| Lookout Point Fall Downstream Fish Passage Operation | 16 | June 30, 2023 | Drawdown implemented in the fall of 2024; see report below. | Deep drawdown and RO prioritization for improved DSFP 15 Nov – 15 Dec. |
| Research, Monitoring, and Evaluation Plan | 4 | February 18, 2022 | Implementation is ongoing. | Expert Panel proposed its plan for the RM&E to accompany the injunction measures for the remainder of the injunction. |
| Green Peter Fall Downstream Fish Passage Operation | 12b | April 28, 2022 | Drawdown implemented in the fall of 2024; see report below. | Deep drawdown and RO prioritization for improved DSFP for 30 days after reaching target elevation sometime between 15 Nov and 1 Dec. |
| Cougar RO Modification (Recommendation) | 15b | April 28, 2022 | The RO chute resurfacing has been completed. The Cougar RO Mods EDR is complete and DDR is now underway; see details in report below. | The Expert Panel made two recommendations: resurfacing of the RO chute by 30 Sept. 2023 and an alternatives study complete by 30 June 2023. |
| Big Cliff Structural TDG Abatement (Recommendation) | 10b | February 10, 2022 (Expert Panel's recommendation); August 5, 2022 (Corps' schedule submitted) | Work is on track; see details in report below. | The Corps is currently working on the design phase of this project. |

In addition to the injunction measures listed above, four interim measures, developed prior to issuance of the injunction, were carried forward into the injunction Table 2. While these measures did not require Expert Panel development of an Implementation Plan, the Court did order the Corps continue with the operations, with one refinement to the annual Fall Creek Reservoir deep drawdown operation.  This included implementation to the drawdown similar to prior years but with extended dates from December 1 through January 15.  The list of interim measures include:

take more time to collect, process and interpret. Additionally, making interpretations that would justify a change of operations should be based on several years' worth of information, not just one or two seasons.

### *South Santiam River Injunction Measures*

From July 01 - December 31, 2024, two injunction measures were implemented at Green Peter Dam and two at Foster Dam. These included:

- Green Peter Fall Downstream Fish Passage Operation (IM 12b)
- Green Peter Outplanting (IM 11)
- Foster Fish Weir Operation for Summer Downstream Temperature Management (IM 13a)
- Foster Nighttime Spill Operation for Fall Downstream Fish Passage (IM 13b)

The general operational plan for each of these measures can be found in Table 1 and Table 2 above, while more specific details can be found in respective Implementation Plans found on the Corps' website https://www.nwp.usace.army.mil/Locations/Willamette-Valley/Injunction/. Information regarding actual implementation during the July – December 2024 season is described below.

### *Green Peter Dam*

#### Operational Details

In 2023, a deep reservoir drawdown was implemented at Green Peter Reservoir as part of the Court's Interim Injunction for improved volitional downstream passage. This operation resulted in elevated turbidity and water temperatures, which likely created stressful conditions ESA-listed salmonids and resident fish species. Additionally, downstream communities reported impacts to their drinking water facilities. For those reasons, Federal Defendants modified the Green Peter Dam Fall Downstream Fish Passage Implementation Plan for 2024 to reduce impacts observed the previous year while still providing improved volitional downstream fish passage conditions for ESA-listed fish. Revisions included:

1. Holding Green Peter Reservoir higher, later into the fall season.
    a. *Hold reservoir at minimum conservation pool elevation (El. 922 feet) until depth average thermocline water temperatures (surface water temperatures) have cooled to <18°C; this typically occurs in mid-October. After this point, begin the active drawdown towards El. 780 feet. This results in a later, but faster drawdown (draft rate).*
2. Draft the reservoir faster, providing a more flexible window in which the targeted deep drawdown elevation is reached.
    a. *Reach the deep drawdown target elevation (El. 780 feet) between 15-November and 01-December.*
3. *Hold the reservoir at the targeted deep drawdown elevation (El. 780 feet) for 30 days, or as long as possible.*
4. Refrain from impacted flood risk reduction operations.
    a. *The Corps' flood control mission is prioritized over all other actions and at no time will human health or safety be jeopardized during the implementation of this measure. The injunction operation may be paused or terminated if flood risk management operations are necessary.*
5. Limit impacts to downstream drinking water facilities.

a. *The injunction operation may be paused or terminated if downstream drinking water facilities are unable to meet water supply demands or if a public health emergency is declared (e.g., city issues boil water notifications, do not use declaration or water restrictions).*

In addition to the revised Green Peter Dam Fall Downstream Fish Passage Implementation Plan, an Emergency Response and Communications Plan was developed that identified criteria for implementing notification and response procedures that cities, the State of Oregon, and the Corps would follow to track and minimize adverse impacts to municipal drinking water facilities located downstream of Green Peter or Lookout Point Reservoirs. This plan was often referred to during weekly meetings that the Corps held with affected cities and the State of Oregon and was ultimately used in the decision the halt to the 2024 Green Peter deep drawdown operation early, an outcome discussed in further detail below.

In 2024, Green Peter Reservoir was drafted below minimum conservation pool elevation (El. 887.5 feet) on October 18, 2024. While surface water temperatures were still warm and additional delays in drawdown timing would have been ideal, the start of drawdown was necessary to meet the court-mandated deep drawdown timeline and support dive work for installation of hydrophones in the forebay of Green Peter Dam for RM&E purposes. Dive work was completed on October 30, 2024 followed by the draft to the targeted elevation of El. 780 ft. (+/- 3 ft.) on November 8, 2024 (
Figure 5 and
Figure 5).

Green Peter Reservoir was held at El. 780 ft. (+/- 3 ft.) until November 22, 2024, a total of approximately 13 days rather than the planned 30 days. The early halt to the deep drawdown operation was decided after the cities of Lebanon, Sweet Home and Albany sent letters November 20, 21 and 22, respectively, to the Corps and the Oregon Health Authority (OHA), which administers and enforces drinking water quality standards for public water systems. The cities requested that the Corps halt drawdown operations at Green Peter Dam due to risks posed to their water treatment facilities. The Corps worked closely with the state of Oregon in determining that the conditions in the Deep Drawdown Emergency Response Communications Plan had been reached, and the drawdown operations were immediately halted.

When the decision was made to halt the drawdown, Green Peter dam outflows were reduced to the minimum permissible rate of 50 cubic feet per second. The reservoir refilled gradually at first, but quickly rose in mid-December when a series of rain events hit the region. By 31 December, Green Peter Reservoir was well above minimum conservation pool elevation and storing water to limit downstream flooding (
Figure 5).

APPEAL,CONSOLIDATED,LEAD

# U.S. District Court
# District of Oregon (Eugene (6))
# CIVIL DOCKET FOR CASE #: 6:26−cv−00956−MTK

Marion County v. U.S. Army Corps Of Engineers et al
Assigned to: Judge Mustafa T. Kasubhai
Case in other court: 9th Circuit, 26−07451
Cause: 05:702 Administrative Procedure Act

Date Filed: 05/13/2026
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2026 | 104 | **ORDER** signed on 11/18/2026 by Judge Mustafa T. Kasubhai: Plaintiffs' Emergency Motion for an Injunction Pending Appeal (ECF No. 89 ) is DENIED because of a failure of proof. Plaintiffs fail to make a clear showing that irreparable harm is likely to occur in the absence of relief. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) *(Deposited in outgoing mail to pro se party on 11/18/2026.)* (bd) (Entered: 11/18/2026) |
| 11/17/2026 | 103 | Notice *Regarding Planned Drawdown* Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 11/17/2026) |
| 11/16/2026 | 105 | Application for CM/ECF Registration as a Self−Represented Party. Prior e−Filer Case Number 3:25−cv−00501−AB. Filed by David White. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (le) (Entered: 11/18/2026) |
| 11/12/2026 | 102 | Response *and Joinder In City of Salem and Marion County's Responses* to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK). Filed by City of Stayton. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 11/12/2026) |
| 11/12/2026 | 101 | Response to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK). Filed by Santiam Water Control District. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 11/12/2026) |
| 11/12/2026 | 100 | Response to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK) Oral Argument requested. Filed by Marion County. (Attachments: # 1 Attachment Declaration of Garrett Olson, # 2 Attachment Declaration of Brian Nicholas, # 3 Attachment Declaration of Scott Amerman, # 4 Attachment Declaration of Tamra Goettsch, # 5 Attachment Declaration of Jacob Ramsey, # 6 Attachment Declaration of Jeff Leclaire) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 11/12/2026) |
| 11/12/2026 | 99 | Response to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK). Filed by City of Salem.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) (Entered: 11/12/2026) |
| 11/12/2026 | 98 | Notice of Joinder in Reply to Motion, ( 95 in 6:26−cv−00956−MTK, 79 in 6:26−cv−01381−MTK) Filed by City of Stayton. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 11/12/2026) |
| 11/12/2026 | 97 | Notice of Joinder in Reply to Motion, ( 79 in 6:26−cv−01381−MTK, 95 in 6:26−cv−00956−MTK) Filed by Santiam Water Control District. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 11/12/2026) |
| 11/12/2026 | 96 | Reply *in Support* to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 89 in 6:26−cv−00956−MTK, 73 in 6:26−cv−01381−MTK). Filed by Marion County. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 11/13/2026 to correct |

| | | |
|---|---|---|
| | | document links and remove duplicate docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/12/2026) |
| 11/12/2026 | 95 | Reply to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 73 in 6:26−cv−01381−MTK, 89 in 6:26−cv−00956−MTK). Filed by City of Salem. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) Modified on 11/13/2026 to fix document links and remove duplicate docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/12/2026) |
| 11/10/2026 | 94 | Response to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 89 in 66:26−cv−00956−MTK, 73 in 6:26−cv−01381−MTK). Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) Modified on 11/13/2026 to add document link to lead case and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/10/2026) |
| 11/10/2026 | 93 | Response in Opposition to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 89 in 6:26−cv−00956−MTK, 73 in 6:26−cv−01381−MTK). Filed by Native Fish Society, Northwest Environmental Defense Center. (Attachments: # 1 Exhibit 17, # 2 Exhibit 18, # 3 Exhibit 19) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Rule, Lauren) Modified on 11/13/2026 to fix document links and remove duplicate docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/10/2026) |
| 11/09/2026 | 92 | Application for Leave to Proceed IFP filed by David White.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (jk) (Entered: 11/10/2026) |
| 11/09/2026 | 91 | Amicus Curiae Brief by FRCP 29 filed by David White. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (jk) (Entered: 11/10/2026) |
| 11/06/2026 | 90 | **ORDER** by Judge Mustafa T. Kasubhai: Plaintiffs filed an Emergency Motion for an Injunction Pending Appeal (ECF No. 89 ). The motion is 20 pages in length, includes a declaration and exhibit, and makes several substantive arguments including citations to what Plaintiffs purport are instructive cases supporting the granting of this motion. Then, Plaintiffs ask this Court to summarily deny the motion without awaiting Defendants' response if this Court finds the motion lacks merit. This Court operates on the presumption that represented parties would file such motions only in good faith and because there is a meritorious claim, and not merely because they are seeking some performative rubber stamp so they might proceed with an appeal. If that were the case, then they should say so. Because the motion presents substantive arguments, Defendants are entitled to respond. Their response is due 11/10/2026. Any reply will be due on 11/16/2026. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) (Entered: 11/06/2026) |
| 11/06/2026 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal − Preliminary Injunction (88 in 6:26−cv−00956−MTK, 72 in 6:26−cv−01381−MTK). **Case Appealed to 9th Circuit. Case Number 26−7451** assigned. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (le) Modified on 11/9/2026 to correct USCA Case Number. NEF Regenerated. (le) (Entered: 11/06/2026) |
| 11/05/2026 | 89 | Motion for Preliminary Injunction *Pending Appeal*, Motion to Expedite or Accelerate . Filed by City of Salem, City of Stayton, Santiam Water Control District, Marion County. (Attachments: # 1 Attachment Declaration of Stephen Elzinga in Support of Plaintiffs' Emergency Motion for an Injunction Pending Appeal)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 11/05/2026) |
| 11/05/2026 | 88 | Notice of Appeal to the 9th Circuit Filing fee $605 collected; Agency Tracking ID: ORDC−10478111. Filed by City of Salem. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) (Entered: 11/05/2026) |
| 11/05/2026 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal − Preliminary Injunction(71 in 6:26−cv−01381−MTK). **Case Appealed to Ninth Circuit of Appeals Case Number 26−7415** assigned. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (hm) (Entered: 11/05/2026) |

| | | |
|---|---|---|
| 11/05/2026 | 87 | Notice of Appeal to the 9th Circuit Filing fee $605 collected; Agency Tracking ID: ORDC−10477236. Filed by Marion County. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 11/05/2026) |
| 11/04/2026 | 86 | **OPINION AND ORDER** signed on 11/4/2026 by Judge Mustafa T. Kasubhai: The parties' Motions for Preliminary Injunction (ECF Nos. 18 , 51 , 55 , 58 ) are DENIED without prejudice to renewed motions for injunctive relief as explained in this Opinion and Order. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) (Entered: 11/04/2026) |
| 10/27/2026 | 85 | Notice of Joinder in Response( 84 in 6:26−cv−00956−MTK, 68 in 6:26−cv−01381−MTK), Response, ( 83 in 6:26−cv−00956−MTK, 67 in 6:26−cv−01381−MTK) *Notice of Joinder in Plaintiffs' Responses to Defendants' Notice Re Section 1205(b) of WRDA 2024* Filed by Santiam Water Control District.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 10/27/2026) |
| 10/27/2026 | 84 | Response *to Defendants' Notice Regarding Section 1205(b) of WRDA 2024*.(Related document(s): Notice, ( 79 in 6:26−cv−00956−MTK, 63 in 6:26−cv−01381−MTK).) Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 10/28/2026 to update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 10/27/2026) |
| 10/27/2026 | 83 | Response *to Defendant's Notice re Section 1205(b) of WRDA 2024*.(Related document(s): Notice, ( 79 in 6:26−cv−00956−MTK, 63 in 6:26−cv−01381−MTK).) Filed by City of Salem.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) (Entered: 10/27/2026) |
| 10/22/2026 | 82 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Oral Argument held on October 6, 2026, before Judge Mustafa T. Kasubhai, Court Reporter Shellene L. Iverson, telephone number 541−431−4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at shellene_iverson@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 10/29/2026. Redaction Request due 11/12/2026. Redacted Transcript Deadline set for 11/23/2026. Release of Transcript Restriction set for 1/20/2027. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Iverson, Shellene) (Entered: 10/22/2026) |
| 10/22/2026 | 81 | Notice *of Related Cases*. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 10/22/2026) |
| 10/15/2026 | 80 | Motion to Dismiss for Failure to State a Claim . Oral Argument requested. Filed by United States Army Corps of Engineers.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 10/15/2026) |
| 10/13/2026 | 79 | Notice *Regarding Section 1205(b) of WRDA 2024* Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States of America. (Attachments: # 1 Exhibit A)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 10/13/2026) |
| 10/06/2026 | 78 | **MINUTES of Proceedings:** Motion Hearing Held before Judge Mustafa T. Kasubhai regarding Motion for Preliminary Injunction ( 18 in 6:26−cv−00956−MTK), Motion for Preliminary Injunction ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK), Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK), Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK). The Court takes the motions under advisement. By October 13, 2026, Defendants shall file a notice to the Court identifying where in the record the Corps addressed each specific item that was required under the WRDA to be included in the report to Congress. The notice shall also contain the date the Corps expects to file its report to Congress or a sufficient explanation why such a date cannot be provided. In the event Defendants decide to begin the drawdown prior to November 15, 2026, they are ordered to file a notice at least 48 hours before beginning the drawdown. By October 27, 2026, Plaintiffs shall file a response to the notice providing their positions on the sufficiency of the identified portions of the record under the WRDA. Defendants shall produce the draft administrative record to all parties by |

| | | |
|---|---|---|
| | | January 29, 2027. The parties shall confer regarding the completeness of the draft administrative record and the need for any extrinsic discovery by April 23, 2027. In the event the parties are unable to resolve any disputes, they are directed to first e−mail a brief summary of the dispute to the Courtroom Deputy at kasubhai_crd@ord.uscourts.gov. If the dispute cannot be resolved by e−mail correspondence, a telephonic hearing to discuss the matter will be scheduled on an expedited timeline. Any emails to the Court raising administrative record or discovery disputes must be received by May 14, 2027. The final administrative record shall be filed by June 30, 2027. Stephen Elzinga, Kevin Kono, Michelle Teed, Veronica Muriel Carrioni, Daniel Quinley present as counsel for plaintiffs. Samantha K. Sondag present as counsel for intervenor plaintiff Santiam Water Control District. Jennifer Gates present as counsel for intervenor plaintiff City of Stayton. Ashley M. Cerritos and Shawn Martin present as counsel for defendants. Lauren Rule and Amanda Lyon present as counsel for intervenor defendants. (Court Reporter: Shellene Iverson.) (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) Modified on 10/7/2026 to update the docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 10/07/2026) |
| 10/05/2026 | 77 | Notice *of Administrative Action* Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America. (Attachments: # 1 Emergency Response Communication Plan)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Philpott, Romney) (Entered: 10/05/2026) |
| 10/05/2026 | 76 | Notice of Appearance. Filed by Daniel P. Driscoll, William H. Graham, Jr, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Philpott, Romney) (Entered: 10/05/2026) |
| 10/02/2026 | 75 | Reply *and Joinder in Plaintiffs' Replies In Support* to Motion for Preliminary Injunction(51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK). Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 10/02/2026) |
| 10/02/2026 | 74 | Reply to Motion for Preliminary Injunction(51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK), Motion for Preliminary Injunction *to Protect Detroit Lake*(18 in 6:26−cv−00956−MTK). Filed by Santiam Water Control District.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 10/02/2026) |
| 10/02/2026 | 73 | Reply *in Support* to Motion for Preliminary Injunction *to Protect Detroit Lake*(18 in 6:26−cv−00956−MTK) Oral Argument requested. Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 10/02/2026) |
| 10/02/2026 | 72 | Reply to Motion for Preliminary Injunction(51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK). Filed by City of Salem.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Kono, Kevin) (Entered: 10/02/2026) |
| 09/24/2026 | 71 | **ORDER** by Judge Mustafa T. Kasubhai: Pursuant to its informal discovery process, the Court is in receipt of emails dated 9/21/2026 and 9/22/2026 from Plaintiff Marion County and Federal Defendants regarding a discovery dispute. The Court stays any discovery until at least the time of oral argument on 10/6/2026. At that hearing, in addition to hearing argument on the Motions for Preliminary Injunction, the Court will take up argument on whether production of the administrative record is warranted in advance of Defendants' anticipated motion to dismiss, and whether and when any additional discovery is appropriate beyond the administrative record. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK. (bd) (Entered: 09/24/2026) |
| 09/18/2026 | 70 | Declaration of Greg Taylor *in Support of Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction*. Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States of America. (Related document(s): Response in Opposition to Motion,,, ( 68 in 6:26−cv−00956−MTK, 50 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 09/18/2026) |

| | | |
|---|---|---|
| 09/18/2026 | 69 | Declaration of Kathryn Tackley *in Support of Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction*. Filed by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. (Related document(s): Response in Opposition to Motion,,, ( 50 in 6:26−cv−01381−MTK, 68 in 6:26−cv−00956−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 09/18/2026) |
| 09/18/2026 | 68 | Response in Opposition to Motion for Joinder *in Marion County's and City of Salem's Motions for Preliminary Injunction* ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK), Motion for Preliminary Injunction *to Protect Detroit Lake* ( 18 in 6:26−cv−00956−MTK), Motion for Joinder *in Plaintiffs' Motions for Preliminary Injunction* ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK), Motion for Preliminary Injunction ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK). Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) Modified on 9/21/2026 to fix document links and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 09/18/2026) |
| 09/18/2026 | 67 | Declaration of Kirk Schroeder . Filed by Native Fish Society, Northwest Environmental Defense Center. (Related document(s): Response in Opposition to Motion,,, ( 48 in 6:26−cv−01381−MTK, 66 in 6:26−cv−00956−MTK).) (Attachments: # 1 Exhibit)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Rule, Lauren) (Entered: 09/18/2026) |
| 09/18/2026 | 66 | Response in Opposition to Motion for Preliminary Injunction *to Protect Detroit Lake*( 18 in 6:26−cv−00956−MTK), Motion for Preliminary Injunction ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK) oral argument requested. Filed by Native Fish Society, Northwest Environmental Defense Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Rule, Lauren) Modified on 9/21/2026 to fix document links and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 09/18/2026) |
| 09/18/2026 | 65 | **ORDER** by Judge Mustafa T. Kasubhai GRANTING Unopposed Motion to File Excess Pages *For Response to Plaintiffs' Motions For Preliminary Injunction* ( 64 in case 6:26−cv−00956−MTK; 46 in case 6:26−cv−01381−MTK). Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK. (bd) (Entered: 09/18/2026) |
| 09/17/2026 | 64 | Unopposed Motion to File Excess Pages *For Response to Plaintiffs' Motions For Preliminary Injunction*. Filed by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 09/17/2026) |
| 08/27/2026 | 63 | Amended Declaration of Brent Stevenson. Filed by Santiam Water Control District. (Related document(s): Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/27/2026) |
| 08/26/2026 | 62 | Declaration of Lee Loving *In Support of Intervenor−Plaintiff City of Stayton's Joinder in Motions for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 61 | Declaration of Michael Taylor *On Behalf of the City of Sublimity In Support of Intervenor−Plaintiff City of Stayton's Motion for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |

| | | |
|---|---|---|
| 08/26/2026 | 60 | Declaration of Julia Hajduk *In Support of Intervenor−Plaintiff City of Stayton's Motion for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit A) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 59 | Declaration of Barry Buchanan *In Support of Plaintiff−Intervenor City of Stayton's Joinder in Motions for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 40 in 6:26−cv−01381−MTK, 58 in 6:26−cv−00956−MTK).) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 58 | Motion for Joinder *in Marion County's and City of Salem's Motions for Preliminary Injunction*. Oral Argument requested. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 57 | Declaration of Greg Addington. Filed by Santiam Water Control District. (Related document(s): Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/26/2026) |
| 08/26/2026 | 56 | Declaration of Brent Stevenson. Filed by Santiam Water Control District. (Related document(s): Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/26/2026) |
| 08/26/2026 | 55 | Motion for Joinder *in Plaintiffs' Motions for Preliminary Injunction*. Filed by Santiam Water Control District.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/26/2026) |
| 08/26/2026 | 54 | Notice of Joinder in Motion for Preliminary Injunction, ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK) *Partial Joinder* Filed by Marion County. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/26/2026) |
| 08/26/2026 | 53 | Notice of Appearance*by Mario Alfonso Luna*. Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Luna, Mario) (Entered: 08/26/2026) |
| 08/21/2026 | 52 | Declaration of Jason Pulley . Filed by City of Salem. (Related document(s): Motion for Permanent Injunction, ( 52 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Kono, Kevin) Modified on 9/14/2026 to add document link. (bd) (Entered: 08/21/2026) |
| 08/21/2026 | 51 | Motion for Preliminary Injunction . Oral Argument requested.Expedited Hearing requested. Filed by City of Salem. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Kono, Kevin) Modified on 8/21/2026 to correct event and docket text to match caption. NEF regenerated. (jw) (Entered: 08/21/2026) |
| 08/21/2026 | 50 | Corporate Disclosure Statement . Filed by Native Fish Society, Northwest Environmental Defense Center. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Potter, Elizabeth) (Entered: 08/21/2026) |
| 08/21/2026 | 49 | Answer to Complaint Filer is subject to the requirements of Fed. R. Civ. P. 7.1 *of City of Salem, ECF 1, 6:26−cv−01381−MTK*. Filed by Native Fish Society, Northwest Environmental Defense Center.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Potter, Elizabeth) (Entered: 08/21/2026) |

| | | |
|---|---|---|
| 08/21/2026 | 48 | Answer to (9 in 6:26−cv−00956−MTK) Amended Complaint . Filed by Native Fish Society, Northwest Environmental Defense Center.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Potter, Elizabeth) (Entered: 08/21/2026) |
| 08/20/2026 | 47 | A duplicate payment in the amount of $405.00 was submitted by City of Stayton in the above−referenced case. For information on refund procedures, visit Requesting a Refund of Electronically Paid Fees on the Court's website. Refund Request is Due 8/31/2026. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (lp) (Entered: 08/20/2026) |
| 08/19/2026 | 46 | Intervenor Complaint . Filed by Santiam Water Control District against All Defendants. (Sondag, Samantha) (Entered: 08/19/2026) |
| 08/19/2026 | 45 | Intervenor Complaint. Filing fee in the amount of $405 collected. Agency Tracking ID: AORDC−10381341 Jury Trial Requested: No. Filed by City of Stayton against U.S. Army Corps Of Engineers. (Gates, Jennifer) Modified on 8/20/2026 to update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/19/2026) |
| 08/18/2026 | 44 | Notice of Appearance *for Heather C. Doherty*. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/18/2026) |
| 08/18/2026 | 43 | Notice of Appearance *for Jennifer L. Gates*. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/18/2026) |
| 08/18/2026 | 42 | **MINUTES of Proceedings:** Telephonic Status Conference held before Judge Mustafa T. Kasubhai. Environmental Defense Center and Native Fish Society's Motion to Intervene (ECF No. 13 in 6:26−cv−00956−MTK), Santiam Water Control District's Motion to Intervene (ECF No. 38 in 6:26−cv−00956−MTK; ECF No. 22 in 6:26−cv−01381−MTK), and City of Stayton's Motion to Intervene (ECF No. 41 in 6:26−cv−00956−MTK; ECF No. 25 in 6:26−cv−01381−MTK) are GRANTED pursuant to Rule 24(a)(2), as the Court finds that the motions are timely, that each of the proposed Intervenors have significant protectable interests in this action, that the interests may be impaired by the litigation, and that the existing parties do not adequately represent their interests. Plaintiff City of Salem's Motion for Preliminary Injunction is due 8/21/2026. Plaintiff−Intervenors' Motions to Join Plaintiffs' Motions for Preliminary Injunction (and any supplemental declarations in support) are due 8/26/2026. Defendants' and Defendant−Intervenors' Responses to the Motions for Preliminary Injunction are due 9/18/2026. Plaintiffs' Replies in Support of the Motions for Preliminary Injunction are due 10/2/2026. **Oral Argument on the Motions for Preliminary Injunction will take place 10/6/2026 at 9:00AM in Eugene, Oregon Courtroom 1 before Judge Mustafa T. Kasubhai.** Defendants' Motion to Dismiss is due 10/15/2026. Plaintiffs' and Plaintiff−Intervenors' Responses to the Motion to Dismiss are due 11/12/2026. Defendants' Reply in Support of their Motion to Dismiss is due 12/3/2026. In response to questions regarding how to appropriately file documents in these consolidated cases, the Court directs the parties to review Local Rule 42−4(b). Stephen Elzinga present as counsel for plaintiff Marion County; Kevin H. Kono and Veronica Muriel Carrioni present as counsel for plaintiff City of Salem; Jennifer Gates present as counsel for intervenor plaintiff City of Stayton; Samantha Sondag present as counsel for intervenor plaintiff Santiam Water Control District; Ashley Cerritos and Mario Alfonso Luna present as counsel for defendant U.S. Army Corps Of Engineers, Daniel P. Driscoll, William H. Graham, Jr. and United States of America; Lauren Rule present as counsel for intervenor defendants Northwest Environmental Defense Center and Native Fish Society. (Court Reporter: Lindsey Weresch.) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK. (bd) (Entered: 08/18/2026) |
| 08/14/2026 | 41 | Motion to Intervene . Jennifer L. Gates for City of Stayton,Heather Doherty,Jennifer L. Gates. Filed by City of Stayton. (Attachments: # 1 Proposed Document Proposed Complaint − 6:26−cv−00956, # 2 Proposed Document Proposed Complaint − 6:26−cv−01381, # 3 Attachment Declaration)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Doherty, Heather) (Entered: 08/14/2026) |

| | | |
|---|---|---|
| 08/14/2026 | 40 | Corrected Exhibits re Motion to Intervene (22 in 6:26−cv−01381−MTK). Filed by Santiam Water Control District. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/14/2026) |
| 08/14/2026 | 39 | Declaration of Brent Stevenson . Filed by Santiam Water Control District. (Related document(s): Motion to intervene(22 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/14/2026) |
| 08/14/2026 | 38 | Motion to Intervene . Oral Argument requested. Filed by Santiam Water Control District. (Attachments: # 1 Exhibit A, # 2 Exhibit B)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/14/2026) |
| 08/14/2026 | 37 | Joint Status Report by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. Filed by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 08/14/2026) |
| 08/13/2026 | 36 | Declaration of Stephen Elzinga *in Support of Plaintiff Marion County's Opposition to Northwest Environmental and Native Fish Society's Motion to Intervene as Defendant−Intervenors*. Filed by Marion County. (Related document(s): Memorandum in Opposition( 35 in 6:26−cv−00956−MTK, 19 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 8/14/2026 to fix document link. (bd) (Entered: 08/13/2026) |
| 08/13/2026 | 35 | Memorandum in Opposition to Motion to Intervene ( 13 in 6:26−cv−00956−MTK). Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 8/14/2026 to fix document link. (bd) (Entered: 08/13/2026) |
| 08/13/2026 | 34 | **Case Management Order** signed on 08/13/2026 by Judge Mustafa T. Kasubhai. (bd) (Entered: 08/13/2026) |
| 08/11/2026 | 33 | **SCHEDULING ORDER** by Judge Mustafa T. Kasubhai: The **Status Conference set for 8/14/2026 is RESET for 8/18/2026 at 09:30AM in Eugene by telephone before Judge Mustafa T. Kasubhai.** The conference call information remains as previously provided. The joint status report is now due by August 14, 2026, at 5:00PM. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK) (bd) (Entered: 08/11/2026) |
| 08/11/2026 | 32 | **ORDER** by Judge Mustafa T. Kasubhai: The Joint Motion for Status Conference (ECF No. 17 in 6:26−cv−00956−MTK) is GRANTED. These matters are set for a telephonic status conference on August 14, 2026, at 10:00 AM to address next steps following consolidation, including briefing deadlines and hearing scheduling for pending and anticipated motions. The parties are ordered to confer and submit a joint status report providing the parties' proposed briefing and hearing schedule (if agreed) or schedules (if conflicting) by August 13, 2026, at 5:00 PM. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) (Entered: 08/11/2026) |
| 08/11/2026 | 31 | **ORDER** by Judge Mustafa T. Kasubhai: Case number 6:26−cv−00956−MTK is deemed the lead case and is consolidated with trailing case number 6:26−cv−01381−MTK. Counsel shall adhere to Local Rule 42−4 "Document Caption Requirements After Consolidation" when submitting future pleadings in this matter. (bd) (Entered: 08/11/2026) |
| 08/11/2026 | 30 | Notice of Correction by Clerk regarding (26 in 6:26−cv−00956−MTK) Exhibits. A Clerical error has been discovered in the case record: The filing was missing a case caption cover page. The following corrections were made to the record: A corrected PDF has been uploaded to replace the incorrect one. The Notice of Electronic Filing (NEF) will be regenerated to all parties.. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (cw) (Entered: 08/11/2026) |

| | | |
|---|---|---|
| 08/11/2026 | 29 | Notice of Case Reassignment: This case has been reassigned from Judge Michael J. McShane to Judge Mustafa T. Kasubhai. Associated Cases: 6:26−cv−00956−MC, 6:26−cv−01381−MTK (cw) (Entered: 08/11/2026) |
| 08/11/2026 | 28 | **ORDER:** Granting Unopposed Motion to Consolidate, ECF No. 16 . Because City of Salem v. United States (26−cv−1381−MTK) and Marion County v. U.S. Army Corps of Engineers (26−cv−00956−MC) share common questions of law and fact, consolidation is appropriate. Fed. R. Civ. Pro. 42(a). Consolidation will save time and effort, thus diminishing "inconvenience, delay, or expense[.]" See *Huene v. United States*<, 743 F.2d 703, 704 (9th Cir. 1984), on reh'g, 753 F.2d 1081 (9th Cir. 1984). Both cases are consolidated under Judge Mustafa T. Kasubhai. Ordered by Judge Michael J. McShane. (cp) (Entered: 08/11/2026) |
| 08/10/2026 | 27 | Declaration of Stephen Elzinga *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3 − Part 1 of 12, # 4 Exhibit Exhibit 3 − Part 2 of 12, # 5 Exhibit Exhibit 3 − Part 3 of 12, # 6 Exhibit Exhibit 3 − Part 4 of 12, # 7 Exhibit Exhibit 3 − Part 5 of 12, # 8 Exhibit Exhibit 3 − Part 6 of 12, # 9 Exhibit Exhibit 3 − Part 7 of 12, # 10 Exhibit Exhibit 3 − Part 8 of 12, # 11 Exhibit Exhibit 3 − Part 9 of 12, # 12 Exhibit Exhibit 3 − Part 10 of 12, # 13 Exhibit Exhibit 3 − Part 11 of 12, # 14 Exhibit Exhibit 3 − Part 12 of 12) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 26 | Exhibits *4 to Declaration of Stephen Elzinga* re Motion for Preliminary Injunction *to Protect Detroit Lake* 18 . Filed by Marion County. (Attachments: # 1 Exhibit Exhibit 5 − Part 1 of 9, # 2 Exhibit Exhibit 5 − Part 2 of 9, # 3 Exhibit Exhibit 5 − Part 3 of 9, # 4 Exhibit Exhibit 5 − Part 4 of 9, # 5 Exhibit Exhibit 5 − Part 5 of 9, # 6 Exhibit Exhibit 5 − Part 6 of 9, # 7 Exhibit Exhibit 5 − Part 7 of 9, # 8 Exhibit Exhibit 5 − Part 8 of 9, # 9 Exhibit Exhibit 5 − Part 9 of 9, # 10 Exhibit Exhibit 6) (Elzinga, Stephen) (Main Document 26 replaced on 8/11/2026) (cw). (Entered: 08/10/2026) |
| 08/10/2026 | 25 | Declaration of Michelle Teed . Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 24 | Declaration of Brian Nicholas *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 23 | Declaration of Scott Lunski *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 22 | Declaration of Dean O'Donnell *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 21 | Declaration of Eric Page *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 20 | Declaration of Scott Amerman *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 19 | Declaration of Thomas Rumreich *in Support of Marion County's Motion for Preliminary Injunction*. Filed by Marion County. (Related document(s): Motion for Preliminary Injunction 18 .) (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/10/2026 | 18 | Motion for Preliminary Injunction *to Protect Detroit Lake*. Oral Argument requested.Expedited Hearing requested. Filed by Marion County. (Elzinga, Stephen) (Entered: 08/10/2026) |
| 08/07/2026 | 17 | Joint Motion for Hearing *Motion for Status Conference*. Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. (Cerritos, Ashley) (Entered: 08/07/2026) |

| | | |
|---|---|---|
| 07/31/2026 | 16 | Unopposed Motion to Consolidate . Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. (Cerritos, Ashley) (Entered: 07/31/2026) |
| 07/30/2026 | 15 | Declaration of Karl Anuta . Filed by Native Fish Society, Northwest Environmental Defense Center. (Related document(s): Motion to intervene, 13 .) (Rule, Lauren) (Entered: 07/30/2026) |
| 07/30/2026 | 14 | Declaration of Jennifer Fairbrother . Lauren Rule,Elizabeth Hunter Potter for Native Fish Society,Lauren Rule. Filed by Northwest Environmental Defense Center, Native Fish Society. (Related document(s): Motion to intervene, 13 .) (Rule, Lauren) (Entered: 07/30/2026) |
| 07/30/2026 | 13 | Motion to Intervene . Lauren Rule,Lauren Rule,Elizabeth Hunter Potter for Northwest Environmental Defense Center,Lauren Rule,Elizabeth Hunter Potter for Native Fish Society. Filed by Northwest Environmental Defense Center, Native Fish Society. (Attachments: # 1 Proposed Document Answer) (Rule, Lauren) (Entered: 07/30/2026) |
| 07/30/2026 | 12 | **ORDER:** Granting Unopposed Motion for Extension of Time to Answer 10 . Answer is due by 9/8/2026. Ordered by Judge Michael J. McShane. (cp) (Entered: 07/30/2026) |
| 07/29/2026 | 11 | Response to Unopposed Motion for Extension of Time to Answer Amended Complaint 9 10 . Filed by Marion County. (Elzinga, Stephen) (Entered: 07/29/2026) |
| 07/29/2026 | 10 | Unopposed Motion for Extension of Time to Answer Amended Complaint 9 . Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. (Cerritos, Ashley) (Entered: 07/29/2026) |
| 07/17/2026 | 9 | First Amended Complaint . Filed by Marion County against All Defendants. (Elzinga, Stephen) Modified on 7/17/2026 to change docket text to reflect caption title. NEF regenerated. (jw) (Entered: 07/17/2026) |
| 06/25/2026 | 8 | Notice of Appearance. Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. (Carter, Ashley) (Entered: 06/25/2026) |
| 06/09/2026 | 7 | Certificate of Service by Marion County *Upon the United States Government* Filed by Marion County. (Teed, Michelle) (Entered: 06/09/2026) |
| 06/04/2026 | 6 | Return of Service Executed as to Daniel P. Driscoll served on 5/29/2026, answer due on 6/22/2026. (Elzinga, Stephen) (Entered: 06/04/2026) |
| 06/04/2026 | 5 | Return of Service Executed as to William H. Graham, Jr served on 5/29/2026, answer due on 6/22/2026. (Elzinga, Stephen) (Entered: 06/04/2026) |
| 06/04/2026 | 4 | Return of Service Executed as to U.S. Army Corps Of Engineers served on 5/29/2026, answer due on 7/28/2026. Service specifically made upon Local U.S. Attorney. (Elzinga, Stephen) (Entered: 06/04/2026) |
| 05/13/2026 | 3 | Summons Issued Electronically as to All Defendants. **NOTICE: The filing party shall print and serve the summonses and all other documents issued by the Clerk at the time of case initiation upon all named parties in accordance with Local Rule 3−5(c).** (Attachments: # 1 Summons US Army Corps of Engineers, # 2 Summons William H. Graham) (jw) (Entered: 05/13/2026) |
| 05/13/2026 | 2 | Notice of Case Assignment to Judge Michael J. McShane and Discovery and Pretrial Scheduling Order. **NOTICE: The filing party shall print and serve this Order, the summonses, and all other documents issued by the Clerk at case initiation upon all named parties in accordance with Local Rule 3−5(c)**. Discovery is to be completed by 9/10/2026. Joint Alternate Dispute Resolution Report is due by 10/13/2026. Pretrial Order is due by 10/13/2026. Ordered by Judge Michael J. McShane. (jw) (Entered: 05/13/2026) |
| 05/13/2026 | 1 | Complaint. Filing fee in the amount of $405 collected. Agency Tracking ID: AORDC−10265402 Jury Trial Requested: Yes. Filed by Marion County against All Defendants (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons). (Elzinga, Stephen) (Entered: 05/13/2026) |

CONSOLIDATED

# U.S. District Court
# District of Oregon (Eugene (6))
# CIVIL DOCKET FOR CASE #: 6:26−cv−01381−MTK

City of Salem v. United States of America et al
Assigned to: Judge Mustafa T. Kasubhai
Lead case: 6:26−cv−00956−MTK
Member case: (View Member Case)
Case in other court: Ninth Circuit of Appeals, 26−07415
9th Circuit, 26−07415
Cause: 5:706 Administrative Procedures Act(Judicial Review)

Date Filed: 07/08/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2026 | 88 | **ORDER** signed on 11/18/2026 by Judge Mustafa T. Kasubhai: Plaintiffs' Emergency Motion for an Injunction Pending Appeal (ECF No. 89 ) is DENIED because of a failure of proof. Plaintiffs fail to make a clear showing that irreparable harm is likely to occur in the absence of relief. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) *(Deposited in outgoing mail to pro se party on 11/18/2026.)* (bd) (Entered: 11/18/2026) |
| 11/17/2026 | 87 | Notice *Regarding Planned Drawdown* Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 11/17/2026) |
| 11/16/2026 | 89 | Application for CM/ECF Registration as a Self−Represented Party. Prior e−Filer Case Number 3:25−cv−00501−AB. Filed by David White. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (le) (Entered: 11/18/2026) |
| 11/12/2026 | 86 | Response *and Joinder In City of Salem and Marion County's Responses* to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK). Filed by City of Stayton. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 11/12/2026) |
| 11/12/2026 | 85 | Response to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK). Filed by Santiam Water Control District. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 11/12/2026) |
| 11/12/2026 | 84 | Response to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK) Oral Argument requested. Filed by Marion County. (Attachments: # 1 Attachment Declaration of Garrett Olson, # 2 Attachment Declaration of Brian Nicholas, # 3 Attachment Declaration of Scott Amerman, # 4 Attachment Declaration of Tamra Goettsch, # 5 Attachment Declaration of Jacob Ramsey, # 6 Attachment Declaration of Jeff Leclaire) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 11/12/2026) |
| 11/12/2026 | 83 | Response to Motion to Dismiss for Failure to State a Claim ( 80 in 6:26−cv−00956−MTK, 64 in 6:26−cv−01381−MTK). Filed by City of Salem.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) (Entered: 11/12/2026) |
| 11/12/2026 | 82 | Notice of Joinder in Reply to Motion, ( 95 in 6:26−cv−00956−MTK, 79 in 6:26−cv−01381−MTK) Filed by City of Stayton. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 11/12/2026) |
| 11/12/2026 | 81 | Notice of Joinder in Reply to Motion, ( 79 in 6:26−cv−01381−MTK, 95 in 6:26−cv−00956−MTK) Filed by Santiam Water Control District. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 11/12/2026) |

| | | |
|---|---|---|
| 11/12/2026 | 80 | Reply *in Support* to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 89 in 6:26−cv−00956−MTK, 73 in 6:26−cv−01381−MTK). Filed by Marion County. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 11/13/2026 to correct document links and remove duplicate docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/12/2026) |
| 11/12/2026 | 79 | Reply to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 73 in 6:26−cv−01381−MTK, 89 in 6:26−cv−00956−MTK). Filed by City of Salem. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) Modified on 11/13/2026 to fix document links and remove duplicate docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/12/2026) |
| 11/10/2026 | 78 | Response to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate (73 in 6:26−cv−01381−MTK). Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 11/10/2026) |
| 11/10/2026 | 77 | Response in Opposition to Motion for Preliminary Injunction *Pending Appeal* Motion to Expedite or Accelerate ( 89 in 6:26−cv−00956−MTK, 73 in 6:26−cv−01381−MTK). Filed by Native Fish Society, Northwest Environmental Defense Center. (Attachments: # 1 Exhibit 17, # 2 Exhibit 18, # 3 Exhibit 19) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Rule, Lauren) Modified on 11/13/2026 to fix document links and remove duplicate docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 11/10/2026) |
| 11/09/2026 | 76 | Application for Leave to Proceed IFP filed by David White.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (jk) (Entered: 11/10/2026) |
| 11/09/2026 | 75 | Amicus Curiae Brief by FRCP 29 filed by David White. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (jk) (Entered: 11/10/2026) |
| 11/06/2026 | 74 | **ORDER** by Judge Mustafa T. Kasubhai: Plaintiffs filed an Emergency Motion for an Injunction Pending Appeal (ECF No. 89 ). The motion is 20 pages in length, includes a declaration and exhibit, and makes several substantive arguments including citations to what Plaintiffs purport are instructive cases supporting the granting of this motion. Then, Plaintiffs ask this Court to summarily deny the motion without awaiting Defendants' response if this Court finds the motion lacks merit. This Court operates on the presumption that represented parties would file such motions only in good faith and because there is a meritorious claim, and not merely because they are seeking some performative rubber stamp so they might proceed with an appeal. If that were the case, then they should say so. Because the motion presents substantive arguments, Defendants are entitled to respond. Their response is due 11/10/2026. Any reply will be due on 11/16/2026. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) (Entered: 11/06/2026) |
| 11/06/2026 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal − Preliminary Injunction (88 in 6:26−cv−00956−MTK, 72 in 6:26−cv−01381−MTK). **Case Appealed to 9th Circuit. Case Number 26−7451** assigned. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (le) Modified on 11/9/2026 to correct USCA Case Number. NEF Regenerated. (le) (Entered: 11/06/2026) |
| 11/05/2026 | 73 | Motion for Preliminary Injunction *Pending Appeal*, Motion to Expedite or Accelerate . Filed by City of Salem, City of Stayton, Santiam Water Control District, Marion County. (Attachments: # 1 Attachment Declaration of Stephen Elzinga in Support of Plaintiffs' Emergency Motion for an Injunction Pending Appeal)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 11/05/2026) |
| 11/05/2026 | 72 | Notice of Appeal to the 9th Circuit Filing fee $605 collected; Agency Tracking ID: ORDC−10478111. Filed by City of Salem. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) (Entered: 11/05/2026) |
| 11/05/2026 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal − Preliminary Injunction(71 in 6:26−cv−01381−MTK). **Case Appealed to Ninth Circuit of Appeals Case Number 26−7415** assigned. Associated Cases: |

| | | |
|---|---|---|
| | | 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (hm) (Entered: 11/05/2026) |
| 11/05/2026 | 71 | Notice of Appeal to the 9th Circuit Filing fee $605 collected; Agency Tracking ID: ORDC−10477236. Filed by Marion County. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 11/05/2026) |
| 11/04/2026 | 70 | **OPINION AND ORDER** signed on 11/4/2026 by Judge Mustafa T. Kasubhai: The parties' Motions for Preliminary Injunction (ECF Nos. 18 , 51 , 55 , 58 ) are DENIED without prejudice to renewed motions for injunctive relief as explained in this Opinion and Order. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) (Entered: 11/04/2026) |
| 10/27/2026 | 69 | Notice of Joinder in Response( 84 in 6:26−cv−00956−MTK, 68 in 6:26−cv−01381−MTK), Response, ( 83 in 6:26−cv−00956−MTK, 67 in 6:26−cv−01381−MTK) *Notice of Joinder in Plaintiffs' Responses to Defendants' Notice Re Section 1205(b) of WRDA 2024* Filed by Santiam Water Control District.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 10/27/2026) |
| 10/27/2026 | 68 | Response *to Defendants' Notice Regarding Section 1205(b) of WRDA 2024*.(Related document(s): Notice, ( 79 in 6:26−cv−00956−MTK, 63 in 6:26−cv−01381−MTK).) Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 10/28/2026 to update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 10/27/2026) |
| 10/27/2026 | 67 | Response *to Defendant's Notice re Section 1205(b) of WRDA 2024*.(Related document(s): Notice, ( 79 in 6:26−cv−00956−MTK, 63 in 6:26−cv−01381−MTK).) Filed by City of Salem.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Jamin, Olivier) (Entered: 10/27/2026) |
| 10/22/2026 | 66 | OFFICIAL COURT TRANSCRIPT OF PROCEEDINGS FILED Oral Argument held on October 6, 2026, before Judge Mustafa T. Kasubhai, Court Reporter Shellene L. Iverson, telephone number 541−431−4112. Transcript may be viewed at Court's public terminal or purchased from the Court Reporter before the deadline for Release of Transcript Restriction. Afterwards it may be obtained through the Court Reporter at shellene_iverson@ord.uscourts.gov or PACER. See Policy at ord.uscourts.gov. Notice of Intent to Redact Transcript is due by 10/29/2026. Redaction Request due 11/12/2026. Redacted Transcript Deadline set for 11/23/2026. Release of Transcript Restriction set for 1/20/2027. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Iverson, Shellene) (Entered: 10/22/2026) |
| 10/22/2026 | 65 | Notice *of Related Cases*. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 10/22/2026) |
| 10/15/2026 | 64 | Motion to Dismiss for Failure to State a Claim . Oral Argument requested. Filed by United States Army Corps of Engineers.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 10/15/2026) |
| 10/13/2026 | 63 | Notice *Regarding Section 1205(b) of WRDA 2024* Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States of America. (Attachments: # 1 Exhibit A)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 10/13/2026) |
| 10/06/2026 | 62 | **MINUTES of Proceedings:** Motion Hearing Held before Judge Mustafa T. Kasubhai regarding Motion for Preliminary Injunction ( 18 in 6:26−cv−00956−MTK), Motion for Preliminary Injunction ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK), Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK), Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK). The Court takes the motions under advisement. By October 13, 2026, Defendants shall file a notice to the Court identifying where in the record the Corps addressed each specific item that was required under the WRDA to be included in the report to Congress. The notice shall also contain the date the Corps expects to file its report to Congress or a sufficient explanation why such a date cannot be provided. In the event Defendants decide to begin the drawdown prior to November 15, 2026, they are ordered to file a notice at least 48 hours before beginning the drawdown. By October 27, 2026, Plaintiffs shall file a response to the notice providing |

| | | |
|---|---|---|
| | | their positions on the sufficiency of the identified portions of the record under the WRDA. Defendants shall produce the draft administrative record to all parties by January 29, 2027. The parties shall confer regarding the completeness of the draft administrative record and the need for any extrinsic discovery by April 23, 2027. In the event the parties are unable to resolve any disputes, they are directed to first e−mail a brief summary of the dispute to the Courtroom Deputy at kasubhai_crd@ord.uscourts.gov. If the dispute cannot be resolved by e−mail correspondence, a telephonic hearing to discuss the matter will be scheduled on an expedited timeline. Any emails to the Court raising administrative record or discovery disputes must be received by May 14, 2027. The final administrative record shall be filed by June 30, 2027. Stephen Elzinga, Kevin Kono, Michelle Teed, Veronica Muriel Carrioni, Daniel Quinley present as counsel for plaintiffs. Samantha K. Sondag present as counsel for intervenor plaintiff Santiam Water Control District. Jennifer Gates present as counsel for intervenor plaintiff City of Stayton. Ashley M. Cerritos and Shawn Martin present as counsel for defendants. Lauren Rule and Amanda Lyon present as counsel for intervenor defendants. (Court Reporter: Shellene Iverson.) (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) Modified on 10/7/2026 to update the docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 10/07/2026) |
| 10/05/2026 | 61 | Notice *of Administrative Action* Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America. (Attachments: # 1 Emergency Response Communication Plan)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Philpott, Romney) (Entered: 10/05/2026) |
| 10/05/2026 | 60 | Notice of Appearance. Filed by Daniel P. Driscoll, William H. Graham, Jr, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Philpott, Romney) (Entered: 10/05/2026) |
| 10/02/2026 | 59 | Reply *and Joinder in Plaintiffs' Replies In Support* to Motion for Preliminary Injunction(51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK). Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 10/02/2026) |
| 10/02/2026 | 58 | Reply to Motion for Preliminary Injunction(51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK), Motion for Preliminary Injunction *to Protect Detroit Lake*(18 in 6:26−cv−00956−MTK). Filed by Santiam Water Control District.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 10/02/2026) |
| 10/02/2026 | 57 | Reply *in Support* to Motion for Preliminary Injunction *to Protect Detroit Lake*(18 in 6:26−cv−00956−MTK) Oral Argument requested. Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) (Entered: 10/02/2026) |
| 10/02/2026 | 56 | Reply to Motion for Preliminary Injunction(51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK). Filed by City of Salem.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Kono, Kevin) (Entered: 10/02/2026) |
| 09/24/2026 | 55 | **ORDER** by Judge Mustafa T. Kasubhai: Pursuant to its informal discovery process, the Court is in receipt of emails dated 9/21/2026 and 9/22/2026 from Plaintiff Marion County and Federal Defendants regarding a discovery dispute. The Court stays any discovery until at least the time of oral argument on 10/6/2026. At that hearing, in addition to hearing argument on the Motions for Preliminary Injunction, the Court will take up argument on whether production of the administrative record is warranted in advance of Defendants' anticipated motion to dismiss, and whether and when any additional discovery is appropriate beyond the administrative record. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK. (bd) (Entered: 09/24/2026) |
| 09/23/2026 | 54 | **ORDER** by Judge Mustafa T. Kasubhai GRANTING Motion for Leave to Appear *Pro Hac Vice* 53 requested by attorney Daniel Lewis−Foote Quinley. (bd) (Entered: 09/23/2026) |
| 09/21/2026 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Daniel Lewis−Foote Quinley. Filing fee in the amount of $300 |

| | | |
|---|---|---|
| | | collected; Agency Tracking ID: AORDC−10419574 53 : **Reviewed and Ready for Ruling. (le) (Entered: 09/21/2026)** |
| 09/21/2026 | 53 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Daniel Lewis−Foote Quinley. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC−10419574. Filed by City of Salem. (Quinley, Daniel) (Entered: 09/21/2026) |
| 09/18/2026 | 52 | Declaration of Greg Taylor *in Support of Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction*. Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States of America. (Related document(s): Response in Opposition to Motion,,, ( 68 in 6:26−cv−00956−MTK, 50 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 09/18/2026) |
| 09/18/2026 | 51 | Declaration of Kathryn Tackley *in Support of Defendants' Opposition to Plaintiffs' Motions for Preliminary Injunction*. Filed by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. (Related document(s): Response in Opposition to Motion,,, ( 50 in 6:26−cv−01381−MTK, 68 in 6:26−cv−00956−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 09/18/2026) |
| 09/18/2026 | 50 | Response in Opposition to Motion for Joinder *in Marion County's and City of Salem's Motions for Preliminary Injunction* ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK), Motion for Preliminary Injunction *to Protect Detroit Lake* ( 18 in 6:26−cv−00956−MTK), Motion for Joinder *in Plaintiffs' Motions for Preliminary Injunction* ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK), Motion for Preliminary Injunction ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK). Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) Modified on 9/21/2026 to fix document links and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 09/18/2026) |
| 09/18/2026 | 49 | Declaration of Kirk Schroeder . Filed by Native Fish Society, Northwest Environmental Defense Center. (Related document(s): Response in Opposition to Motion,,, ( 48 in 6:26−cv−01381−MTK, 66 in 6:26−cv−00956−MTK).) (Attachments: # 1 Exhibit)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Rule, Lauren) (Entered: 09/18/2026) |
| 09/18/2026 | 48 | Response in Opposition to Motion for Preliminary Injunction *to Protect Detroit Lake*( 18 in 6:26−cv−00956−MTK), Motion for Preliminary Injunction ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK) oral argument requested. Filed by Native Fish Society, Northwest Environmental Defense Center. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Rule, Lauren) Modified on 9/21/2026 to fix document links and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 09/18/2026) |
| 09/18/2026 | 47 | **ORDER** by Judge Mustafa T. Kasubhai GRANTING Unopposed Motion to File Excess Pages *For Response to Plaintiffs' Motions For Preliminary Injunction* ( 64 in case 6:26−cv−00956−MTK; 46 in case 6:26−cv−01381−MTK). Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK. (bd) (Entered: 09/18/2026) |
| 09/17/2026 | 46 | Unopposed Motion to File Excess Pages *For Response to Plaintiffs' Motions For Preliminary Injunction*. Filed by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 09/17/2026) |
| 08/27/2026 | 45 | Amended Declaration of Brent Stevenson. Filed by Santiam Water Control District. (Related document(s): Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) Modified on 9/14/2026 to correct |

| | | |
|---|---|---|
| | | document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/27/2026) |
| 08/26/2026 | 44 | Declaration of Lee Loving *In Support of Intervenor−Plaintiff City of Stayton's Joinder in Motions for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 43 | Declaration of Michael Taylor *On Behalf of the City of Sublimity In Support of Intervenor−Plaintiff City of Stayton's Motion for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 42 | Declaration of Julia Hajduk *In Support of Intervenor−Plaintiff City of Stayton's Motion for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 58 in 6:26−cv−00956−MTK, 40 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit A) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 41 | Declaration of Barry Buchanan *In Support of Plaintiff−Intervenor City of Stayton's Joinder in Motions for Preliminary Injunction*. Filed by City of Stayton. (Related document(s): Motion for Joinder ( 40 in 6:26−cv−01381−MTK, 58 in 6:26−cv−00956−MTK).) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 40 | Motion for Joinder *in Marion County's and City of Salem's Motions for Preliminary Injunction*. Oral Argument requested. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/26/2026) |
| 08/26/2026 | 39 | Declaration of Greg Addington. Filed by Santiam Water Control District. (Related document(s): Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/26/2026) |
| 08/26/2026 | 38 | Declaration of Brent Stevenson. Filed by Santiam Water Control District. (Related document(s): Motion for Joinder ( 55 in 6:26−cv−00956−MTK, 37 in 6:26−cv−01381−MTK).) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/26/2026) |
| 08/26/2026 | 37 | Motion for Joinder *in Plaintiffs' Motions for Preliminary Injunction*. Filed by Santiam Water Control District.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/26/2026) |
| 08/26/2026 | 36 | Notice of Joinder in Motion for Preliminary Injunction, ( 51 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK) *Partial Joinder* Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 9/14/2026 to correct document link and update docket text. Notice of Electronic Filing regenerated to the parties. (bd) (Entered: 08/26/2026) |
| 08/26/2026 | 35 | Notice of Appearance*by Mario Alfonso Luna*. Filed by Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers, United States Army Corps of Engineers, United States of America.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Luna, Mario) (Entered: 08/26/2026) |
| 08/21/2026 | 34 | Declaration of Jason Pulley . Filed by City of Salem. (Related document(s): Motion for Permanent Injunction, ( 52 in 6:26−cv−00956−MTK, 33 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Kono, Kevin) Modified on 9/14/2026 to add document link. (bd) (Entered: 08/21/2026) |

| | | |
|---|---|---|
| 08/21/2026 | 33 | Motion for Preliminary Injunction . Oral Argument requested.Expedited Hearing requested. Filed by City of Salem. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Kono, Kevin) Modified on 8/21/2026 to correct event and docket text to match caption. NEF regenerated. (jw) (Entered: 08/21/2026) |
| 08/21/2026 | 32 | Corporate Disclosure Statement . Filed by Native Fish Society, Northwest Environmental Defense Center. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Potter, Elizabeth) (Entered: 08/21/2026) |
| 08/20/2026 | 31 | Intervenor Complaint . Filed by Santiam Water Control District against All Defendants. (Sondag, Samantha) (Entered: 08/20/2026) |
| 08/20/2026 | 30 | Intervenor Complaint . Filed by City of Stayton against United States Army Corps of Engineers. (Gates, Jennifer) (Entered: 08/20/2026) |
| 08/20/2026 | 29 | A duplicate payment in the amount of $405.00 was submitted by City of Stayton in the above−referenced case. For information on refund procedures, visit Requesting a Refund of Electronically Paid Fees on the Court's website. Refund Request is Due 8/31/2026. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (lp) (Entered: 08/20/2026) |
| 08/18/2026 | 28 | Notice of Appearance *for Heather C. Doherty*. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/18/2026) |
| 08/18/2026 | 27 | Notice of Appearance *for Jennifer L. Gates*. Filed by City of Stayton.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Gates, Jennifer) (Entered: 08/18/2026) |
| 08/18/2026 | 26 | **MINUTES of Proceedings:** Telephonic Status Conference held before Judge Mustafa T. Kasubhai. Environmental Defense Center and Native Fish Society's Motion to Intervene (ECF No. 13 in 6:26−cv−00956−MTK), Santiam Water Control District's Motion to Intervene (ECF No. 38 in 6:26−cv−00956−MTK; ECF No. 22 in 6:26−cv−01381−MTK), and City of Stayton's Motion to Intervene (ECF No. 41 in 6:26−cv−00956−MTK; ECF No. 25 in 6:26−cv−01381−MTK) are GRANTED pursuant to Rule 24(a)(2), as the Court finds that the motions are timely, that each of the proposed Intervenors have significant protectable interests in this action, that the interests may be impaired by the litigation, and that the existing parties do not adequately represent their interests. Plaintiff City of Salem's Motion for Preliminary Injunction is due 8/21/2026. Plaintiff−Intervenors' Motions to Join Plaintiffs' Motions for Preliminary Injunction (and any supplemental declarations in support) are due 8/26/2026. Defendants' and Defendant−Intervenors' Responses to the Motions for Preliminary Injunction are due 9/18/2026. Plaintiffs' Replies in Support of the Motions for Preliminary Injunction are due 10/2/2026. **Oral Argument on the Motions for Preliminary Injunction will take place 10/6/2026 at 9:00AM in Eugene, Oregon Courtroom 1 before Judge Mustafa T. Kasubhai.** Defendants' Motion to Dismiss is due 10/15/2026. Plaintiffs' and Plaintiff−Intervenors' Responses to the Motion to Dismiss are due 11/12/2026. Defendants' Reply in Support of their Motion to Dismiss is due 12/3/2026. In response to questions regarding how to appropriately file documents in these consolidated cases, the Court directs the parties to review Local Rule 42−4(b). Stephen Elzinga present as counsel for plaintiff Marion County; Kevin H. Kono and Veronica Muriel Carrioni present as counsel for plaintiff City of Salem; Jennifer Gates present as counsel for intervenor plaintiff City of Stayton; Samantha Sondag present as counsel for intervenor plaintiff Santiam Water Control District; Ashley Cerritos and Mario Alfonso Luna present as counsel for defendant U.S. Army Corps Of Engineers, Daniel P. Driscoll, William H. Graham, Jr. and United States of America; Lauren Rule present as counsel for intervenor defendants Northwest Environmental Defense Center and Native Fish Society. (Court Reporter: Lindsey Weresch.) Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK. (bd) (Entered: 08/18/2026) |
| 08/14/2026 | 25 | Motion to Intervene . Jennifer L. Gates for City of Stayton,Heather Doherty,Jennifer L. Gates. Filed by City of Stayton. (Attachments: # 1 Proposed Document Proposed Complaint − 6:26−cv−00956, # 2 Proposed Document Proposed Complaint − 6:26−cv−01381, # 3 Attachment Declaration)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Doherty, Heather) (Entered: 08/14/2026) |

| | | |
|---|---|---|
| 08/14/2026 | 24 | Corrected Exhibits re Motion to Intervene (22 in 6:26−cv−01381−MTK). Filed by Santiam Water Control District. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/14/2026) |
| 08/14/2026 | 23 | Declaration of Brent Stevenson . Filed by Santiam Water Control District. (Related document(s): Motion to intervene(22 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/14/2026) |
| 08/14/2026 | 22 | Motion to Intervene . Oral Argument requested. Filed by Santiam Water Control District. (Attachments: # 1 Exhibit A, # 2 Exhibit B)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Sondag, Samantha) (Entered: 08/14/2026) |
| 08/14/2026 | 21 | Joint Status Report by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. Filed by United States Army Corps of Engineers, United States of America, Daniel P. Driscoll, William H. Graham, Jr, U.S. Army Corps Of Engineers. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Cerritos, Ashley) (Entered: 08/14/2026) |
| 08/13/2026 | 20 | Declaration of Stephen Elzinga *in Support of Plaintiff Marion County's Opposition to Northwest Environmental and Native Fish Society's Motion to Intervene as Defendant−Intervenors*. Filed by Marion County. (Related document(s): Memorandum in Opposition( 35 in 6:26−cv−00956−MTK, 19 in 6:26−cv−01381−MTK).) (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5)Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 8/14/2026 to fix document link. (bd) (Entered: 08/13/2026) |
| 08/13/2026 | 19 | Memorandum in Opposition to Motion to Intervene ( 13 in 6:26−cv−00956−MTK). Filed by Marion County.Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (Elzinga, Stephen) Modified on 8/14/2026 to fix document link. (bd) (Entered: 08/13/2026) |
| 08/11/2026 | 18 | **SCHEDULING ORDER** by Judge Mustafa T. Kasubhai: The **Status Conference set for 8/14/2026 is RESET for 8/18/2026 at 09:30AM in Eugene by telephone before Judge Mustafa T. Kasubhai.** The conference call information remains as previously provided. The joint status report is now due by August 14, 2026, at 5:00PM. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK) (bd) (Entered: 08/11/2026) |
| 08/11/2026 | 17 | **ORDER** by Judge Mustafa T. Kasubhai: The Joint Motion for Status Conference (ECF No. 17 in 6:26−cv−00956−MTK) is GRANTED. These matters are set for a telephonic status conference on August 14, 2026, at 10:00 AM to address next steps following consolidation, including briefing deadlines and hearing scheduling for pending and anticipated motions. The parties are ordered to confer and submit a joint status report providing the parties' proposed briefing and hearing schedule (if agreed) or schedules (if conflicting) by August 13, 2026, at 5:00 PM. (Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK.) (bd) (Entered: 08/11/2026) |
| 08/11/2026 | 16 | **ORDER** by Judge Mustafa T. Kasubhai: Defendants' Unopposed Motion to Consolidate (ECF No. 12 ) is GRANTED pursuant to Rule 42(a). Case number 6:26−cv−00956−MTK is deemed the lead case and is consolidated with trailing case number 6:26−cv−01381−MTK. Counsel shall adhere to Local Rule 42−4 "Document Caption Requirements After Consolidation" when submitting future pleadings in this matter. (bd) (Entered: 08/11/2026) |
| 08/11/2026 | 15 | **ORDER** by Judge Mustafa T. Kasubhai: Northwest Environmental Defense Center and Native Fish Society's Unopposed Motion to Intervene (ECF No. 9 ) is GRANTED pursuant to Rule 24(a)(2), as the Court finds that the motion is timely, that the proposed Defendant−Intervenors have a significant protectable interest in this action, that the interest may be impaired by the litigation, and that the existing parties do not adequately represent their interests. (bd) (Entered: 08/11/2026) |

| | | |
|---|---|---|
| 08/11/2026 | 14 | Notice of Correction by Clerk regarding (26 in 6:26−cv−00956−MTK) Exhibits. A Clerical error has been discovered in the case record: The filing was missing a case caption cover page. The following corrections were made to the record: A corrected PDF has been uploaded to replace the incorrect one. The Notice of Electronic Filing (NEF) will be regenerated to all parties.. Associated Cases: 6:26−cv−00956−MTK, 6:26−cv−01381−MTK (cw) (Entered: 08/11/2026) |
| 08/11/2026 | 13 | Notice of Case Reassignment: This case has been reassigned from Judge Michael J. McShane to Judge Mustafa T. Kasubhai. Associated Cases: 6:26−cv−00956−MC, 6:26−cv−01381−MTK (cw) (Entered: 08/11/2026) |
| 07/31/2026 | 12 | Unopposed Motion to Consolidate . Filed by United States Army Corps of Engineers, United States of America. (Cerritos, Ashley) (Entered: 07/31/2026) |
| 07/30/2026 | 11 | Declaration of Karl Anuta . Filed by Native Fish Society, Northwest Environmental Defense Center. (Related document(s): Motion to intervene, 9 .) (Rule, Lauren) (Entered: 07/30/2026) |
| 07/30/2026 | 10 | Declaration of Jennifer Fairbrother . Filed by Native Fish Society, Northwest Environmental Defense Center. (Related document(s): Motion to intervene, 9 .) (Rule, Lauren) (Entered: 07/30/2026) |
| 07/30/2026 | 9 | Unopposed Motion to Intervene . Lauren Rule,Lauren Rule,Elizabeth Hunter Potter for Northwest Environmental Defense Center,Lauren Rule,Elizabeth Hunter Potter for Native Fish Society. Filed by Northwest Environmental Defense Center, Native Fish Society. (Attachments: # 1 Proposed Document Proposed Answer) (Rule, Lauren) (Entered: 07/30/2026) |
| 07/16/2026 | 8 | Notice of Appearance *of Ashley M. Cerritos*. Filed by United States Army Corps of Engineers, United States of America. (Cerritos, Ashley) (Entered: 07/16/2026) |
| 07/10/2026 | 7 | Affidavit of Service upon United States Army Corps of Engineers served on 7/10/2026, answer due on 7/31/2026 Filed by City of Salem. (Jamin, Olivier) (Entered: 07/10/2026) |
| 07/10/2026 | 6 | Affidavit of Service upon United States of America served on 7/10/2026, answer due on 7/31/2026 Filed by City of Salem. (Jamin, Olivier) (Entered: 07/10/2026) |
| 07/09/2026 | 3 | **Case Management Order** signed on 07/09/2026 by Judge Mustafa T. Kasubhai. (bd) (Entered: 07/09/2026) |
| 07/08/2026 | 5 | Summons Issued Electronically as to United States Army Corps of Engineers. **NOTICE: The filing party shall print and serve the summonses and all other documents issued by the Clerk at the time of case initiation upon all named parties in accordance with Local Rule 3−5(c).** (le) Modified on 7/17/2026 to correct filing date. NEF Regenerated. (le) (Entered: 07/09/2026) |
| 07/08/2026 | 4 | Summons Issued Electronically as to United States of America. **NOTICE: The filing party shall print and serve the summonses and all other documents issued by the Clerk at the time of case initiation upon all named parties in accordance with Local Rule 3−5(c).** (le) Modified on 7/17/2026 to correct filing date. (le) NEF Regenerated. (le) (Entered: 07/09/2026) |
| 07/08/2026 | 2 | Notice of Case Assignment to Judge Mustafa T. Kasubhai and Discovery and Pretrial Scheduling Order. **NOTICE: The filing party shall print and serve this Order, the summonses, and all other documents issued by the Clerk at case initiation upon all named parties in accordance with Local Rule 3−5(c)**. Discovery is to be completed by 11/5/2026. Joint Alternate Dispute Resolution Report is due by 12/7/2026. Pretrial Order is due by 12/7/2026. Ordered by Judge Mustafa T. Kasubhai. (le) (Entered: 07/08/2026) |
| 07/08/2026 | 1 | Complaint. Filing fee in the amount of $405 collected. Agency Tracking ID: AORDC−10328928 Jury Trial Requested: No. Filed by City of Salem against All Defendants (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons, # 3 Proposed Summons). (Jamin, Olivier) (Entered: 07/08/2026) |